UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
MONIQUE SYKES, REA VEERABADREN,
KELVIN PEREZ, and CLIFTON ARMOOGAM,
individually and on behalf of all other similarly
situated,

                        Plaintiffs,

                                        ECF Case No.
            -against-                   Civ. 8486(DC)

MEL S. HARRIS AND ASSOCIATES LLC;
MEL S. HARRIS; MICHAEL YOUNG; DAVID
WALDMAN, KERRY LUTZ; TODD FABACHER;
MEL HARRIS JOHN/JANE DOES 1-20;
LEUCADIA NATIONAL CORPORATION;
L-CREDIT, LLC; LR CREDIT, LLC; LR CREDIT
10, LLC; LR CREDIT 14, LLC; LR CREDIT 18,
LLC; LR CREDIT 21, LLC; JOSEPH A. ORLANDO;
PHILIP M. CANNELLA; LR CREDIT JOHN/JANE
DOES 1-20; SAMSERV, INC.; WILLIAM MLOTOK'
BENJAMIN LAMB; MICHAEL MOSQUERA; JOHN
ANDINO; and SAMSERV JOHN/JANE DOES 1-20
                        Defendants.
-----------------------------------x

                        November 17, 2011
                        10:34 a.m.


     Deposition of BENJAMIN LAMB, taken by
Plaintiffs, pursuant to Notice, at the offices of
Emery Celli Brinckerhoff & Abady LLP, 75 Rockefeller
Plaza, New York, New York, before William Visconti, a
Shorthand Reporter and Notary Public within and for
the State of New York.

A P P E A R A N C E S:

EMERY CELLI BRINCKERHOFF & ABADY LLP
Attorneys for Plaintiff
75 Rockefeller Plaza
New York, New York 10019

BY: EISHJA JAIN, ESQ.
ejain@ecbalaw.com

NEIGHBORHOOD ECONOMIC DEVELOPMENT ADVOCACY PROJECT
Attorneys for Plaintiffs
175 Grand Street
New York, New York 10013

BY: CLAUDIA WILNER, ESQ.
JOSH ZINNES, ESQ.

MFY LEGAL SERVICES INCORPORATED
Attorneys for Plaintiffs
299 Broadway
New York, New York 10007
BY: CAROLYN E. COFFEY, ESQ.
ANAMARIA SEQURA, ES.

KAUFMAN DOLOWICH VOLUCK & GONZO LLP
Attorneys for Mel Harris Defendants
135 Crossways Park Drive, Suite 201
Woodbury, New York 11797

BY: BRETT A. SCHER, ESQ.

MC ELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
Attorneys for the Leucadia Defendants
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075

BY: ASHLEY ROSE VALLILLO, ESQ.

A P P E A R A N C E S (Continued)

BABCHICK & YOUNG LLP
Attorneys for Samserv Defendants
200 East Post Road
White Plains, New York 10601

BY: JORDAN SKLAR, ESQ.

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

BENJAMIN LAMB

B E N J A M I N L A M B, having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION CONDUCTED BY MS. COFFEY:

**Q. Mr. Lamb, my name is Carolyn Coffey and we are one of the attorneys along with co-counsel representing Plaintiffs in this case. You understand that you're a Defendant in this case?**

A. Yes, I do.

**Q. Have you ever been deposed before?**

A. No, I haven't.

**Q. Do you understand that you're here to give testimony under oath?**

A. Yes, I do.

**Q. I'm going to ask you questions and you will answer the questions and the court reporter here will write down everything that we say. It is important that only one of us talk at one time. So do your best to try to let me finish a question before you answer. It is also very important that everything that we say today is done out loud and so, you want to be careful not to nod your head or shake your head or do any**

**gestures that can't be recorded by the court reporter?**

A. Okay.

**Q. If you don't understand a question, I'm happy to clarify it or rephrase it so you understand it. If you answer a question, I'm going to assume that you did understand the question?**

A. Okay.

**Q. If you want a break at any time this morning or today, let me, I do ask that you finish answering a question before we take a break?**

A. Okay.

**Q. Are you taking any medication today?**

A. No, I'm not.

**Q. Are you represented by counsel today?**

A. Yes, I am.

**Q. Who is that?**

A. Mr. George Sklar.

**Q. Other than any conversations that you had with Mr. Sklar, did you discuss this**

**deposition with anyone?**

A. No.

**Q. Have you reviewed any documents before today's deposition regarding this lawsuit?**

A. Only the things with Mr. Sklar.

**Q. Can you tell me what documents you reviewed?**

A. We talked -- reviewed --

MR. SKLAR: Don't say what we talked about. If you remember specific documents.

A. That is what I'm trying to do. Some of the things that were given to me by Samserv, the company that I work for and went over a logbook and my entries. That was pretty much it. The affidavits that he showed me.

**Q. Mr. Lamb, what is your educational background?**

A. As far as?

**Q. Did you complete high school for example?**

A. Yes.

**Q. Did you attend any school after?**

A. I went to college for a little while.

**Q. Did you get a degree?**

A. No, I didn't finish college.

**Q. How long did you attend college?**

A. Maybe one year.

**Q. Where was that?**

A. BMCC.

**Q. Do you have any kind of a degree?**

A. No, I don't.

**Q. Are you currently employed?**

A. Yes, I am.

**Q. What is your position?**

A. I'm a process server.

**Q. Where are you a process server?**

A. For Samserv.

**Q. Are you an employee of Samserv?**

A. No, I'm not.

MR. SKLAR: Objection to form. He answered.

**Q. So you're not an employee, what would you characterize yourself?**

A. I'm an independent contractor.

**Q. How long have you worked as an independent contractor for Samserv?**

A. Since 1999.

**Q. Do you only work as an independent contractor for Samserv?**

A. I only work for Samserv now. I have worked for others in the past.

**Q. So, what other process serving companies have you worked for in the past?**

A. I worked for Nationwide.

**Q. And when was that?**

A. Maybe 2000, and I can't tell you when it ended. It didn't last long. I know I started with Samserv. I don't remember how long after.

**Q. Do you think it was a matter of months or matter of years?**

A. Maybe one or two years, something like that. No more than that.

**Q. From 2000 until maybe 2001 or 2002 were you performing service for both Samserv and Nationwide?**

A. Yes, but Nationwide their workload wasn't as heavy.

**Q. Have you ever worked for any other process serving company?**

A. I did some outside independent

BENJAMIN LAMB

things but nothing -- there was nothing major, a couple of jobs here, a couple jobs there.

**Q. Do you remember the names of the process serving company?**

A. It wasn't a company. It was an individual job. If you asked me to do something for you I would do it. That type of thing.

**Q. Where did you work before 1999?**

A. I was a barber.

**Q. How long have you been a barber?**

A. I have been a barber since I was 13.

**Q. So what year would that have been?**

A. Right now -- I'm not good with numbers. Right now, I can't tell you what year, maybe '97, '86. Something like that.

**Q. Have you had any other jobs?**

A. I was a manager for a little while.

**Q. Manager with?**

A. It was independent. I didn't work for a company. I did it on my own.

**Q. What kind work were you doing?**

A. I managed comedians and I managed musicians.

BENJAMIN LAMB

**Q. Where was that?**

A. I did it on my own. It wasn't with a company.

**Q. Was this in New York?**

A. Yes, it was in New York.

**Q. Do you remember what years that was?**

A. My early 20s, I can't tell you.

**Q. Have you ever received any formal training to be a process server?**

A. No.

**Q. So you never attended a training or class about process serving?**

A. No.

**Q. Do you currently hold any licenses?**

A. Yes, I do.

**Q. What licenses would those be?**

A. Process server license and my driver's license.

**Q. Have you previously held any other licenses?**

A. Security.

**Q. When did you have a security license?**

**BENJAMIN LAMB**

A. In 1995.

**Q. Did you do any security work?**

A. Briefly. Bouncing, things like that, that's all.

**Q. Did you ever renew your security license?**

A. No, I didn't.

**Q. Was that in New York?**

A. Yes, it was.

**Q. Who issued that license?**

A. The state.

**Q. Who issued your process serving license?**

A. The state.

**Q. Do you know what agency?**

A. Department Of Consumer Affairs.

**Q. Do you know what your process serving license number is?**

A. 1071492.

**Q. Do you know when your current process serving license expires?**

A. February of next year.

**Q. When did you last renew your process serving license?**

**BENJAMIN LAMB**

A. Next year will be two years ago.

**Q. When did you first obtain a process serving license?**

A. 1999.

**Q. 1999?**

A. Yes. I'm sorry, it may have been -- yes, around 1999. It should have been 1999. Somewhere in the last part of the year, the start of the year, something like that. I'm not really sure which time it was.

**Q. Just to clarify, the last part of --**

A. The last part of 1999 or the beginning of '99. Somewhere in that range.

**Q. Have you ever let your process serving license lapse?**

A. No.

**Q. Are you a member of any professional process serving association?**

A. No.

**Q. Are you a member of any process serving trade group?**

A. No.

**Q. Anything like that?**

A. No.

BENJAMIN LAMB

**Q. What does it mean to you to be a licensed process server?**

MR. SKLAR: Objection to form. I mean as a legal matter? As an emotional matter? What do you mean.

**Q. I mean what does it mean to be licensed? What are the requirements of being a licensed process server?**

MR. SKLAR: Okay.

A. At the time there were no requirements, all you had to do is fill out an application and apply for it.

**Q. At what time?**

A. When I first applied for my license.

**Q. Were there any requirements to keep your license?**

A. No.

**Q. Is it your understanding that the requirements for obtaining a license have changed?**

A. The only thing that I know that changed now the fact that we just took this test and that's all.

**Q. So from 1999 to the present the**

**BENJAMIN LAMB**

**requirements of maintaining a process serving license have changed because now you have to take a test?**

A. Yes.

**Q. Do you know if anyone has filed a complaint against you with the Department Of Consumer Affairs?**

A. No, I'm not aware.

**Q. Has the Department Of Consumer Affairs ever subpoenaed you?**

A. No.

**Q. Has the Department Of Consumer Affairs ever disciplined you in any way?**

A. No.

**Q. Have you ever had your process serving license suspended?**

A. No.

**Q. Was your license renewal application ever denied?**

A. No.

**Q. Can you tell me what it means to serve process?**

MR. SKLAR: Objection to form. Again, I mean he is a fact witness.

BENJAMIN LAMB

MS. JAIN: If your objection is to form that's fine. It is her deposition.

MR. SKLAR: He is not here as a 30(b)(6) witness or expert. He is here as a fact witness so these questions are just your personal understanding not an interpretation of the law.

MS. JAIN: You're speaking -- -

MR. SKLAR: I won't interrupt you, don't interrupt me. Remember for everyone's knowledge and just to set the ground rules as a fact witness answer truthfully, but don't try to think what the law is. What you know, that's it.

**Q. Mr. Lamb, you're a licensed process server, you have been a licensed process server since 1999, that is your profession and I'm asking what it means to be a process server, what does it mean to serve process?**

A. Again, I mean, you're asking me for what it meant for something else before too, and what you asking me now I still don't understand it. If you asking what do I do, that is different. I don't really understand what you're

BENJAMIN LAMB

asking me. I really don't, maybe you can rephrase it. I don't know what you really asking. I don't know how to answer that.

**Q. We will get to, in a little while, what it is that you do on a daily basis. I would like to understand what your understand of the definition of serving process. What is it that you do every day?**

A. What you just asked me, I serve process, I serve papers.

**Q. What kind of papers?**

A. All the kinds paper.

**Q. Are you talking about court papers?**

A. Yes.

**Q. What kind of court papers?**

A. Summons, subpoenas, orders to show cause.

**Q. When you serve those kinds of papers that you just mentioned, subpoenas, summons, orders to show cause, what is the purpose of serving those papers?**

MR. SKLAR: Objection to form.

**Q. You can still answer the question, if you can.**

Page 18

BENJAMIN LAMB

A. What is the purpose of serving them?

**Q. Yes.**

A. I would, if I understand you correctly, I would guess the purpose is to have the matter be brought before the court. Right?

**Q. That is a fair understanding, sure. Would you agree that serving process provides the people that you are serving the process with notice about court cases?**

MR. SKLAR: Objection to form. You can answer.

A. If I understand you correctly I would say it does, definitely.

**Q. Did you have a process serving license when you first starting working at Samserv?**

A. Yes, I did.

**Q. How did you first start working at Samserv?**

A. I don't understand what you mean.

**Q. Did you answer an ad in the newspaper?**

A. Yes.

Page 19

BENJAMIN LAMB

**Q. What did the ad say?**

A. I don't remember.

**Q. Did you have an interview at Samserv?**

A. Yes.

**Q. Who interviewed you?**

A. The process server, I guess the process server supervisor was her title at the time.

**Q. Do you remember the person's name?**

A. Miss Lewis, I don't recall the first name right now.

**Q. Do you remember if you gave her a resume?**

A. No, I don't remember that.

**Q. You don't remember?**

A. I don't remember if I gave a resume, no.

**Q. Do you remember if you provided her with references?**

A. I don't remember the interview being that way, no.

**Q. Did you meet with anyone else before you were hired by Samserv?**

Page 20

BENJAMIN LAMB

A. No.

**Q. Was anyone else present at the interview with Miss Lewis?**

A. I don't remember.

**Q. Had you started doing any process serving before that interview?**

A. No.

**Q. So you had the license, but you hadn't done any serving yet?**

A. Right.

**Q. Do you remember telling Miss Lewis that you had never done any process serving before in the interview?**

A. Yes.

**Q. Do you remember what kinds of questions she asked you in the interview?**

A. No.

**Q. Do you remember how long the interview lasted?**

A. Not offhand, no.

**Q. Do you remember when the interview was in 1999?**

A. No.

**Q. Did you sign any sort of contract**

Page 21

BENJAMIN LAMB

**when you started working at Samserv?**

A. No.

**Q. Since then have you signed any contract working at Samserv?**

A. No.

**Q. Do you remember your first day at Samserv?**

A. No.

**Q. What kind of training did you receive when you started working at Samserv about processing?**

A. I went out with one of their process servers.

**Q. What do you mean by that?**

A. He took me out and show me what it is he does and how to do it. It was like a hands-on type of situation.

**Q. Do you remember that process server's name?**

A. Mosquera.

**Q. Do you know how long he had been working for Samserv at the time?**

A. No, I don't.

**Q. Do you know how long he had been a**

**BENJAMIN LAMB**

**process server at the time?**

A. No, I don't.

**Q. Did you get the sense that he was an experienced process server when you went out with him that day?**

A. Yes.

**Q. Can you describe that day?**

A. I don't remember it other than just taking me with him on different locations and serving papers. It wasn't, I mean there is nothing really I could tell you spectacular, he showed me what to do.

**Q. Did he talk to you about what to do?**

A. We talked here and there. It wasn't anything in-depth. He showed me more than telling me. He went and served and showed me how he goes about it.

**Q. Did you take notes that day?**

A. No, I didn't take notes. Mental.

**Q. Do you remember how many places you went to serve process that day?**

A. No.

**Q. Do you remember how long the day**

**BENJAMIN LAMB**

**was?**

A. Almost the whole day.

**Q. What is a whole day, in your opinion?**

A. I would say from 9 to 5. Maybe up until -- maybe 10 to 2, something like that.

**Q. How many times did you go out with Mr. Mosquera?**

A. I think I went out with him twice.

**Q. Did you go out with any other process servers?**

A. No.

**Q. Did he show you his logbook that day?**

A. No.

**Q. Or those days?**

A. No.

**Q. Did anyone from Samserv give you any guidance about how to serve process?**

A. Mike Mosquera.

**Q. Was Mike Mosquera an employee of Samserv?**

A. Not that I know of.

**Q. Do you think he was an independent**

**BENJAMIN LAMB**

**contractor?**

A. I would assume, I don't know. I didn't ask him his business.

**Q. When you went out with him on those two days and you said he showed you what he did, can you be a little more specific?**

A. I thought I was. I told you he showed me -- he went and served the papers and showed me how this is, how you do it talk to the people and the dialogue somewhat when it comes to trying to serve the papers.

**Q. What kind of dialogue is that?**

A. It depend on what the paper is or who you're talking about or things of that nature.

**Q. Do you remember what kind of papers he served that day?**

A. I don't remember what he served that day.

**Q. Do you remember any of the specific people that he served?**

A. No.

**Q. Do you remember any of the conversations that he had with those people?**

A. Not at this time, no.

BENJAMIN LAMB

**Q. Do you remember what kind of service he affected?**

A. No. Service as far as what?

**Q. There is different kinds of service, correct?**

A. Yes.

**Q. There is personal service, for example?**

A. That is what I want to be clear that is what you're asking. I don't remember if it was personal or whatever at this point, no.

**Q. Did he have a logbook with him that day?**

A. I don't remember.

**Q. Did anyone from Samserv give you a manual with process serving?**

A. No.

**Q. Did anyone give you any rules or regulations about process serving?**

A. No.

**Q. Are you familiar with New York Civil Practice Laws And Rules, CPLR?**

A. No.

**Q. You were never given a copy of the**

**New York Civil Practice Laws and Rules?**

MR. SKLAR: At any time or in the initial day or two?

**Q. I'm talking about at any time.**

A. I was given something at some point.

**Q. When you say something, what is that?**

A. Is it the CPLR?

**Q. Yes.**

A. Yes. I don't remember what it was offhand right now.

**Q. Do you remember when that was?**

A. No.

**Q. Did anyone from Samserv ever tell you about any procedures or policies for serving process?**

A. Are you asking about their own personal procedures and process, what are you asking?

**Q. Yes, Samserv's own procedures and policies for serving process, did anyone from Samserv ever --**

A. No, they didn't have any particular

procedure. All they ask that it be done correctly.

**Q. Can you repeat that?**

A. All they asked was that it be done correctly.

**Q. All they asked was that it be done correctly?**

A. Yes.

**Q. How would you know what was correct?**

A. From what I learned from being out with Mr. Mosquera and teaching me, this is how you serve. To know that it was either done like you said either personal or otherwise, I know it was done right.

**Q. Did Mr. Mosquera tell you any of the rules or regulations that are required for serving process in New York City?**

A. No.

**Q. Did anyone from Samserv ever tell you about any rules or regulations regarding serving process in New York City?**

A. The only thing that I remember discussed at some points were certain times. All

of those things were like the times and the ages, it is just things like that. But that is like common knowledge that you wouldn't -- certain times you're not going to go places.

**Q. Could you be a little more clearer when you say certain times?**

A. Like after a certain hour I'm not going to go knock on somebody's door and expect to serve a paper.

**Q. Did Samserv tell you a specific hour that you shouldn't knock on a person's door?**

A. No, they didn't tell me. I took it into consideration myself. This is too late to be doing that.

**Q. You also mention there are certain kinds of people?**

A. No, I didn't. I said ages.

**Q. What do you mean by ages?**

A. I mean I'm not going to serve anybody that is too young to receive the paper.

**Q. You're basing that on your own common sense, not anything from Samserv actually told you?**

A. Right.

**Q. Are you aware that there are certain rules and regulations for serving process in New York City?**

A. Yes.

**Q. Do you know what those rules and regulations are?**

MR. SKLAR: Objection to form.

A. If you ask me if I'm familiar with them all, no, I'm not.

**Q. Are you aware that the Department Of Consumer Affairs which issues you your process serving license has specific rules about serving process in New York City?**

A. Yes.

**Q. Can you describe any of those rules?**

A. No, not right now.

**Q. Can you just give me your best understanding of the rules?**

MR. SKLAR: Objection to form.

A. As I said to you before, like you wrote it down, that it was my personal understanding that I wouldn't do -- wouldn't serve certain people that were under age and things like

that. And I do understand that I have to go and physically talk to someone if I'm going to serve them. In an apartment I have to talk to someone in the household. Business I have to talk to somebody who is capable of receiving the service. Those are the things that I do understand as far as process serving. So I do know I have to do that. In order to effectuate service properly.

**Q. When you say effectuate service properly, what does that mean to you?**

A. What I just said to you.

**Q. So you said previously that beside taking a test to receive a license from the Department Of Consumer Affairs, there are no requirements for being licensed by the Department Of Consumer Affairs; is that right?**

A. Right.

**Q. Would you agree that following the rules that are set out by the Department Of Consumer Affairs is a requirement of keeping a process serving license?**

MR. SKLAR: Objection to form.

A. Are you asking me if I actually follow what they say in order to maintain my

license?

**Q. Yes.**

A. I believe so. They issued me the license, so definitely.

**Q. You would agree with that?**

A. Yes.

**Q. What would happen if you didn't follow the Department Of Consumer Affairs rules?**

MR. SKLAR: Objection. What are you asking him? There this a legal conclusion that you're asking him to draw.

MS. COFFEY: Are you objecting to form?

MR. SKLAR: This question makes no sense, so I'm objecting.

**Q. You have a license to serve process, right?**

A. Yes.

**Q. What is your understanding of how that license can be revoked or suspended?**

A. My understanding is if I don't do what I'm supposed to do properly, that that is reason to cause to take it from me.

**Q. When you say if you don't don**

**things properly, what do you mean?**

A. What I had explained to you previously about serving papers properly and effectuating service properly.

**Q. Forgive me, I don't remember exactly what you said. Can you tell me again what it means to serve papers properly?**

A. What I was saying to you before, what I explained to you before, like going to an apartment, making sure that I talk to someone inside the household, things of that nature. That is what I'm talking about.

**Q. Beside the rules promulgated by the Department Of Consumer Affairs, are you aware that there are also state laws regarding process serving?**

A. Yes.

**Q. Can you describe what those laws are?**

A. No, not offhand.

**Q. Just to the best of your ability.**

A. I don't want to misquote, no, I can't.

**Q. Try to let me finish the question**

**before you answer. It is hard for the court reporter to write everything down.**

**Do you understand that as part of the requirements for having a license, a process serving license, there are record-keeping requirements?**

A. Yes.

**Q. Can you describe your understanding of what those requirements are?**

A. I have to keep a logbook of the entries.

**Q. What are those entries?**

A. Basically the entries are the paper that I served, the time that I served it, the date that I served it, the type of paper it was, the court it came from, the information who I spoke to.

**Q. You mentioned to effectuate proper service you had to find someone who lived in the apartment, is that what you said?**

A. Someone from inside the household.

**Q. What happens if no one is home?**

A. I would come back.

**Q. So you would come back if you could**

**find no one from the household home?**

A. Right.

(Lamb Exhibit 1 for identification, Document previously marked Lewis 2.)

**Q. Mr. Lamb, I show you what is marked has Lamb Exhibit 1 which is also just for the record Lewis 2. It's a one-page document. Do you recognize this document?**

A. Yes.

**Q. Can you describe what it is?**

A. This was a letter given to me by Samserv about consumer debt.

**Q. Do you remember receiving this document?**

A. Yes, I remember receiving it a long time ago.

**Q. Do you remember when?**

A. No.

**Q. When you say a long time ago?**

A. Years ago.

**Q. Years, like five years?**

A. Around that, yes.

**Q. Do you remember seeing any other similar documents from Samserv with instructions**

**about how to serve properly?**

A. I received other documents from them, yes, about different things, different service.

**Q. Do you remember what any of those documents said?**

A. No.

**Q. Do you remember how many times you received them?**

A. No.

**Q. Did you keep them?**

A. Yes, I kept them.

**Q. Do you still have them?**

A. Where they are now, no, I don't know.

**Q. Do you want to take a minute to try to remember where any of the other documents are that you received from Samserv?**

A. At this point in time I couldn't tell you where a lot of things are. There have been a lot of things that transpired with me in the last year. I can't tell you where they are.

**Q. Can you tell me what they are?**

A. No.

**Q. After you serve people with court papers, you sign an affidavit describing how you served those people; is that correct?**

A. After I serve them I submit the information, the affidavit is given to me that I sign.

**Q. There may be a few steps in between, but at some point you sign an affidavit attesting to how you did service in a particular case, right?**

A. If by that you're asking me does the paperwork state the information that I gave them, is that what you're saying?

**Q. I'm asking if you sign affidavits that describe the service that you affected?**

A. That is what I'm saying is that what you're asking it shows what I submitted. Because if it is what I submitted yes, I sign that.

**Q. We will talk about what you submitted. I assume what you mean what you submit to Samserv?**

A. No, I'm assuming you mean what I submitted.

**Q. Can we agree that you do service, you serve a subpoena or an order to show cause or summons and complaint on someone and then you sign an affidavit that describes how you served that piece of court paper?**

A. That is what I'm saying, I'm still stuck on what you're asking me. What I sign doesn't necessary say this is how I served it. What you sign shows the people that I -- the person that I served, the paper that was and so on. I mean it is not so much how I served it.

I don't understand. Maybe I can be misunderstanding you, but I don't get it. I don't get what you're asking me.

**Q. What happens when you serve someone? Maybe we should clarify.**

A. What do you mean what happens when I serve someone? After I serve a paper I submit the information.

**Q. So what information are you talking about?**

A. The information that is in my logbook is the same that is on the worksheet that is provided for me for the service or I fill out a

Page 38

BENJAMIN LAMB

worksheet based on what is written in my logbook.

**Q. So the information on the worksheet and the information in the logbook reflect service that you did?**

A. Right.

**Q. And then that information appears on an affidavit?**

A. Yes.

**Q. And you sign the affidavit?**

A. Right.

**Q. So I think we agree that an affidavit contains information about the service that you did in a particular case?**

A. Right.

**Q. I want to clarify that we agree on that. Do you know what happened to that affidavit? Do you know that the affidavit is filed in court?**

A. I believe it is filed in court. I really don't know what happens after I submit the information. After I sign it. I don't know what is done with anything. I'm really not sure.

**Q. Would you be surprised that affidavits of service are filed with the court, in**

Page 39

**BENJAMIN LAMB**

**the court?**

A. Would I be surprised, no.

**Q. Do you understand that affidavits are used by the court, they are reviewed by the court?**

A. Yes, I understand that.

**Q. Would you agree that the information that is in an affidavit is supposed to be accurate?**

A. Yes.

**Q. Would you agree that it is important that the information is accurate so that the court can rely on the affidavit?**

A. Yes.

**Q. Do you understand when I say the court is relying on the affidavit, that I mean the court is relying on the affidavit to recognize that someone was served with court papers?**

MR. SKLAR: Objection to form.

**Q. You can answer the question, if you understand it.**

A. Can you say it again?

**Q. Do you understand that the court's rely on those affidavits to show that someone was**

Page 40

**BENJAMIN LAMB**

**actually served with the court papers?**

A. Okay, yes.

**Q. Do you agree with that?**

A. I can agree with that.

**Q. So you understand that it is important for those affidavits to be accurate; correct?**

A. Yes.

**Q. Why is it important for the affidavits to be correct?**

A. You just said it.

**Q. What did I say?**

A. So the courts can rely on the fact that to know that someone was served.

**Q. Who is currently your supervisor at Samserv?**

A. I don't have one.

**Q. Who do you interact with at Samserv?**

A. I interact with the whole office.

**Q. By the whole office, who exactly do you mean? Do you know their names?**

A. Mr. Mlotok, Miss Hoisen.

MR. SKLAR: Do you how to spell her

Page 41

BENJAMIN LAMB

name.

THE WITNESS: H O I S E N.

A. I can't think of her name right now, I talk to her, but I don't talk to her. Melissa. I don't know her last name.

**Q. Is there anyone else?**

A. No.

**Q. Do you know Miss Hoisen's first name?**

A. Seleshia.

**Q. How do those people from Samserv communicate with you?**

A. I go to the office or they call me.

**Q. They call you on your phone?**

A. Yes.

**Q. Do they ever e-mail you?**

A. No.

**Q. What do they call you about?**

A. They want to know about service or if there is something that I have to get, things like that.

**Q. They would tell you if there is work for you to be done?**

A. Right.

Page 42

BENJAMIN LAMB

**Q. What kind of cases do you serve for Samserv?**

A. Summons, subpoenas, orders to show cause, consumer debt.

**Q. Do you serve cases that are not consumer debt? For example, do you know if you serve personal injury cases?**

A. No.

**Q. No, you don't or you don't know?**

A. I don't know if it is personal injury or not, no, I don't know. I really don't read the paperwork. I just serve it.

**Q. Do you know if there are different requirements for consumer debt cases?**

MR. SKLAR: In terms of service?

**Q. At Samserv, are there different requirements?**

A. You mean personally?

MR. SKLAR: Objection to form. Different requirements?

**Q. Okay. Did you understand the question?**

A. No, I don't.

**Q. Does Samserv have different**

Page 43

BENJAMIN LAMB

**requirements for serving consumer debt cases?**

A. No. I mean if there is anything in particular then I will be let known of it. You will be let known of it before you do it.

**Q. Do you know when you're serving consumer debt cases?**

A. Usually consumer debt -- we know what consumer debt clients he has, I know that much of it, yes.

**Q. So you know -- you look at the caption, for example, and you could tell when it's a consumer debt case?**

A. No, consumer debt, he has -- how you code different -- no code it, but I don't know it is the consumer debt papers, usually they come with a worksheet and the worksheet is different for consumer debt than others.

**Q. There are different procedures?**

A. It is not necessarily procedure, it was a worksheet involved and we fill out things on the worksheet. When we submit it we submit the worksheet.

**Q. You mentioned Samserv's consumer debt clients, do you know who they are off the top**

Page 44

BENJAMIN LAMB

**of your head?**

A. The only person that I could think of now is a company called Choi.

**Q. Can you think of any other consumer debt?**

A. Not offhand.

**Q. Can you walk me through how you will actually receive assignments at Samserv?**

A. I go into the office and we have little boxes with our names on it and work is usually in the box waiting for you.

**Q. Do all the process servers have boxes with their names on them?**

A. As far as I know.

**Q. Where are those boxes located?**

A. In the room.

**Q. In what room?**

A. In the room in the office.

**Q. Do you know who else is in that room?**

A. Nobody is in that room.

**Q. Nobody is in that room?**

A. No.

**Q. Does anyone besides process servers**

Page 45

BENJAMIN LAMB

**have their names on the boxes in that room?**

A. No.

**Q. Is that room called something?**

A. No.

**Q. It is not called the process server room?**

A. No, it is called the office.

**Q. What is in that office?**

A. A lot of office things, desks, chairs.

**Q. Are there any computers?**

A. No.

**Q. Is there a table?**

A. Yes.

**Q. Do you use that office as an office for yourself?**

A. Yes.

**Q. So when you walk into this office and you go to your box with your name on it, if there is something in the box that means there is work for you to be done?**

A. Sometimes work and sometimes just affidavits to be signed.

**Q. So when there is work for you to be**

**BENJAMIN LAMB**

**done, what would be in your mail box -- am I correct in calling it a mailbox?**

A. No.

**Q. When you say box, what do you mean?**

A. It is just like a cubby. It's a box, my things are put in there.

**Q. How big is it?**

A. I don't know. It is not that big. I don't know the exact measurements.

**Q. If there is work for you to be done, what is in your box?**

A. The work.

**Q. Can you be a little more detailed?**

A. The type of work, I don't know that until I look at what it is. Is that what you're asking me?

**Q. Is there a summons and complaint?**

A. The type of work, I don't know until I look at it. I can't tell you. I'm not aware ahead of time that it is a summons and complaint, you have order to show cause.

**Q. A that is my question, what is in there?**

A. Whatever they have for me is in

BENJAMIN LAMB

there.

**Q. The actual documents that you're supposed to serve?**

A. That's.

**Q. Are there any instructions?**

A. Yes.

**Q. Just a stack of documents to serve?**

A. Yes.

**Q. You mention worksheets before, are there also worksheets in there?**

A. The worksheets are attached to the documents.

**Q. So that is what I'm trying to ask, I'm trying to have you paint a picture for me. There is a stack of work to be done for each assignment, can we call them assignments?**

A. Yes.

**Q. For each assignment there is a worksheet attached to the assignment?**

A. Yes.

**Q. What does the worksheet say?**

A. The worksheet has the company name, the, I'm not going to say a caption, it has the Defendant's name and address and it has different

BENJAMIN LAMB

fields to be filled out. Like gender, height, weight, age, that type of thing.

**Q. When you say the company name, what company?**

A. Samserv.

**Q. So Samserv's name is on every worksheet?**

A. Right.

**Q. And then different fields that you mentioned, those are blank?**

A. Yes.

**Q. Is there anything else on the worksheets?**

A. Just the, like I said, the information from the paper, like the court, the index number, things like that. That's all.

**Q. Is it one page?**

A. Just one sheet.

**Q. One sheet per assignment?**

A. Yes.

**Q. You mentioned before that the worksheets are different for consumer debt cases, how are they different?**

A. The only real difference is that

BENJAMIN LAMB

the design of it. That's all. That is all that I could tell you is the difference.

**Q. Do they say consumer debt cases --**

A. No, they don't. The actual paper will tell you that it's a consumer debt paper, but the worksheet doesn't tell you that.

**Q. When you say actual paper you mean document to be served?**

A. The documents to be served.

**Q. The information that you're supposed to fill out is the same for every worksheet regardless whether it is a consumer debt case or not?**

A. Yes.

**Q. Do you have any idea why consumer debt cases would be -- worksheets for consumer debt would be formatted differently?**

A. It is not really formatted differently. I just told you it is design. It may be a bold line around it, because maybe that is the way he wanted the paper to look, I don't know.

**Q. By he who are you referring to?**

A. Mr. Mlotok.

BENJAMIN LAMB

**Q. Do you know who puts those assignments in your box?**

A. No.

**Q. But it could be any three of the people that you mentioned before who call you to tell you that there is work available?**

A. I'm sure it could.

**Q. On average how many assignments are you given at one time?**

A. There is no average, because it varies so much. Sometimes it could be one paper, sometimes it could be three papers, sometimes it could be 10, I don't know. It all depends on what comes in.

**Q. What is the most number that you ever got?**

A. I can't tell offhand, I don't remember.

**Q. Can you give me an estimate? Do you have hundred assignments in are box?**

A. At one time, no.

**Q. Do you ever have 50?**

A. At one time, I don't recall that, no. At one time, no, I don't recall that.

BENJAMIN LAMB

**Q. But you had as few as one?**

A. Definitely.

**Q. How often do you go to Samserv's office?**

A. Now, maybe once or twice a week.

**Q. When you started in 1999 how often did you go in?**

A. Maybe four times a week.

**Q. When did you start going in only one or two times a week?**

A. When they moved.

**Q. When did they move?**

A. I don't know how long ago.

**Q. Why do you go in fewer times now?**

A. One, they are all the way in Long Island and two, the workload is not as heavy.

**Q. So, because they moved to Long Island it is farther for you to get to, is that what you mean by the fact that they are in Long Island?**

A. Yes. They moved to Long Island, it's a little farther out now, but the workload is not as heavy.

**Q. When you're given these**

**BENJAMIN LAMB**

**assignments, are you given a deadline to complete them?**

A. Sometimes.

**Q. Is that deadline, would that deadline appear on the worksheet?**

A. Yes.

**Q. How long do you have when there is a deadline? How long is the deadline usually?**

A. I don't know. It depends. It depends on when I get it for when they need it served by, so, I don't know.

**Q. So would they say on the worksheet that this has to be served by a certain date?**

A. Yes.

**Q. What is the shortest time that you recall ever receiving a deadline?**

A. The same day.

**Q. How often does that happen?**

A. I don't recall.

**Q. Well, even now you go in once or twice a week, does it happen once a week?**

A. Now, no. It doesn't happen now at all.

**Q. Do you remember the last time that**

**BENJAMIN LAMB**

**you got a deadline to do --**

A. No.

MR. SKLAR: Let her finish.

**Q. -- to do service in one day?**

A. No, I don't remember the last time that I had to do one.

**Q. When there is no deadline, how do you know when to finish an assignment?**

A. When there is no deadline I just, I assume they want it done as soon as possible but I'm not going to sit there and hold on to the paper for weeks.

**Q. What percentage of the cases -- of the assignments that you received have deadlines on the worksheets?**

A. There is not even a percentage, because like I said, it is not always like that. There has been a few times here and there throughout. It is not like at least twice a week I get deadline papers. It is not like that.

**Q. Do you have any idea how many assignments you receive now per week?**

A. Like I said, once again it varies.

**Q. Can you give me a range?**

Page 54

BENJAMIN LAMB

A. 0 to 10.

**Q. How about five years ago, do you remember how many assignments you received per week?**

A. No.

**Q. Did it used to be more assignments, did you use to receive more assignments?**

A. Five years ago, definitely.

**Q. When you started in 1999 do you remember how many assignments you received per week?**

A. It was a lot better in 1999 too. No, I don't remember how many it was a week.

**Q. Can you try to give me an estimate?**

A. Too hard to remember.

**Q. Now, you receive between 0 and 10 assignments a week. Back then did you receive a hundred?**

A. Not a week, no.

**Q. Fewer?**

A. Definitely.

**Q. 50?**

A. When are you talking about five years ago or 1999?

Page 55

BENJAMIN LAMB

**Q. How about 1999?**

A. Not even 50. It was fewer than that.

**Q. Do you remember since 1999 any period of time that was more busy than others?**

A. Yes, five years ago. For five years ago it was much more busy than any other time.

**Q. How many assignments did you receive back then?**

A. Again you're asking me questions that I don't know. It was a different number, it is up and down all the time. It always has been that way.

**Q. Can you just give me a ballpark estimate for say one month?**

A. No, I can't. It is up and down.

**Q. Can you give me a range, is it up and down?**

A. It is always up and down. Like I said, maybe 50.

**Q. Maybe 50 in a month?**

A. No. Maybe 50 in a week and a half or so. Something like that, maybe. Maybe a

Page 56

BENJAMIN LAMB

little more, maybe a little less, it all depended.

**Q. When you were receiving more assignments when you were busy, do you remember if those were consumer debt transaction cases?**

A. It was everything.

**Q. What do you mean by everything?**

A. Same stuff that I told you before. Subpoena, summons, orders to show cause, at one point I was doing landlord/tenant. It was everything. It was never just one particular thing.

**Q. After you received your stack of assignments, do you talk to anyone at Samserv?**

A. No.

**Q. Do you need to take a break?**

A. Not right this minute. I will deal with that later.

**Q. So what happens after you take the assignments out of your box, can you be more precise?**

A. I separate it and I look.

**Q. What do you mean by separate it?**

A. Usually we get two copies, one for service and one for mailing.

Page 57

BENJAMIN LAMB

**Q. And you leave the one for mailing at Samserv office?**

A. Yes.

**Q. Where do you leave it?**

A. In my box.

**Q. You leave it in your own box?**

A. Yes.

**Q. Then what do you do?**

A. What do you mean?

**Q. You're walking me through --**

A. I leave.

**Q. How long are you generally at Samserv's office when you go?**

A. It depends on what I have to turn in. It varies. If I have to discuss anything with Mr. Mlotok or anything, it all depends. Sometimes I'm just sitting there talking, shooting the breeze.

**Q. Who do you shoot the breeze with?**

A. The same people in the office that I mentioned?

**Q. So what other activities do you do when you're at the office?**

A. I do my work at the office. I mean --

Page 58

BENJAMIN LAMB

as far as what, I'm sorry?

**Q. We talked about how you would go there to pick up your assignments.**

A. Right.

**Q. What else do you do when you're at Samserv's office?**

A. If I'm at Samserv I'm turning in the worksheet from the work that I have done already.

**Q. Who did you turn those into?**

A. I put them in a box. They have a bin that they have in there set up for that.

**Q. In the same room that you talked about?**

A. No, not in the room that I'm in. In the main part of the office where Seleshia and Melissa sit in.

**Q. What do you put in the bin?**

A. The worksheet.

**Q. What else did you do when you're in the office?**

A. I get my affidavits that have been put in the box for me.

**Q. Where are the affidavits?**

Page 59

BENJAMIN LAMB

A. In the box, I said sometimes there is work and sometimes there is affidavits in the box.

**Q. In your box with your name?**

A. Yes.

**Q. Can you describe what the affidavits are?**

A. Same stuff that we discussed. The work that I did, I turned in from the worksheet or now that everything is done through the computerized system, the electronic system, it is already in their system and they can pull it out before I get there and they have it ready for me so I don't have to go back and get it.

**Q. When you say they have it ready for you, you mean the actual affidavits?**

A. The actual affidavit.

**Q. Do those affidavits have your name on them?**

A. Yes.

**Q. And your license number?**

A. Yes, they do.

**Q. The only thing that you have to fill out is your signature?**

Page 60

BENJAMIN LAMB

A. Yes, I do.

**Q. Where do you sign those affidavits?**

A. The right-hand corner.

**Q. Sorry, that was unclear. Which room do you sign the affidavits in?**

A. I take them in the room with Mr. Mlotok.

**Q. What room is Mr. Mlotok in?**

A. In his office.

**Q. You take the affidavits into Mr. Mlotok's office?**

A. Yes.

**Q. Then what happens?**

A. I sign them.

**Q. Who else is there when you sign them?**

A. Usually just Mr. Mlotok.

**Q. Do you sit at a table in his office?**

A. I sit in a chair and use the corner end of his desk.

**Q. What kind of review do you make of the affidavits?**

A. I try to look over as many of them --

Page 61

BENJAMIN LAMB

I try to look over them as well as I can, sometimes I don't look at them all properly as I should.

**Q. When you look over them, what are you looking for?**

A. I'm just reading it to make sure that the information is on it that I submitted.

**Q. Do you ever see any inaccuracies?**

A. I have a couple times.

**Q. What would happen when you noticed there are inaccuracies in the affidavit?**

A. I asked him to change it.

**Q. Who would you ask?**

A. Whoever could change it at the time. It may not be the person that actually typed it out or pulled it out for me. I ask whoever is available.

**Q. What kind of inaccuracies were they, do you remember?**

A. No. I don't remember what they are.

**Q. Can you try to remember?**

A. It is too hard.

**Q. Do you think they were misspellings**

**or problems with --**

A. As far as misspelling, I can't say misspelling. I'm not sure that I spell everything right when I write it in, so I don't know. Maybe times with information as far as the physical description of the person, the date or the time, things like that.

**Q. How do you know they were inaccurate -- how do you know they were inaccurate?**

A. It is not too long in between when I'm serving and receiving affidavits to sign that I could remember pretty much what was going on at the time. If it has been a while, that will be a different case.

THE WITNESS: Before you ask your next question, can I return some calls?

MS. COFFEY: Sure, we could take a break.

(Recess taken.)

BY MS. COFFEY:

**Q. Mr. Lamb, I want to clarify a couple of questions that I asked you about before. The layout of the office that you described**

**before, is that the Long Island location of Samserv that you were describing?**

A. Yes.

**Q. When you go out to Samserv's office, how do you get there?**

A. I drive.

**Q. How long does it take you to get there?**

A. 30 minutes, 40 minutes.

**Q. Samserv was previously located in Brooklyn, right?**

A. Yes.

**Q. How would you get to the office location in Brooklyn?**

A. I would drive or take the train.

**Q. How long would that take you?**

A. About the same amount of time, depending.

**Q. So, could you clarify why it is more difficult to go to the Long Island office?**

A. I didn't say it was difficult, I said they are in Long Island and their workload is less and that is why I don't go as much.

**Q. I think when we took the break we**

**were talking about your signing the affidavits of service?**

A. We had finished that.

**Q. I have a couple of more follow up questions about that. When you received the stacks of affidavits, how many do you receive at one time?**

A. It depends on what was readily available. Sometimes they print them up and other times they don't.

**Q. How many times would you say?**

A. I don't know, depends on what work was done.

**Q. Could you give me a range?**

A. No, I can't. It depends on what work was done.

**Q. Have the number of affidavits that you signed at one time changed over the years?**

A. Of course. It is always changing, depending on what work was done.

**Q. Right now, when go out to Samserv's office what is a range of affidavits, a stack of affidavits that you signed?**

A. It depends on what work that was

done.

**Q. Can you explain whether it is fewer than ten?**

A. It depends on what work was done.

**Q. Is it as many as 50?**

A. I haven't told you that I had that much work. So it couldn't be as many as 50.

**Q. It could be as few as one?**

A. Yes.

**Q. When your signing the affidavits of service in Mr. Mlotok's office, do you ever compare the affidavits with your logbook?**

A. No.

**Q. Why not?**

A. Because I don't -- I told you that I sit there and read it because it is never that far that I can't remember offhand. Like I also said, sometimes I don't always go through them the way that I should. So if something slips through I don't know until later on.

**Q. Are you aware that if information in an affidavit is wrong and someone actually isn't served, that means they don't go to court and default judgment can be entered against them?**

BENJAMIN LAMB

MR. SKLAR: Objection to form an objection to the premise.

**Q. Did you understand the question?**

A. No, can you say it again?

**Q. Are you aware that if information in an affidavit of service is wrong, and someone actually was not served with process, do you understand that a default judgment can be entered against them in court?**

A. But if somebody -- how could the information is wrong and somebody not be served if somebody is served, then they are served.

**Q. Do you understand if someone does not show up in court a default judgment can be entered against them?**

MR. SKLAR: Objection to form. He is not an attorney, but your understanding.

A. I mean, I don't know, I haven't been in that situation. I don't know what happens with it.

**Q. Do you know what a default judgment is?**

A. No, can you explain?

**Q. I will be happy to explain it?**

BENJAMIN LAMB

A. Thank you.

**Q. When someone is sued in a court case, if they don't respond to the court case, they don't respond to let's say a summons and complaint, then the Plaintiff is able to obtain a judgment against that Defendant?**

A. Okay.

**Q. If they don't show up they win that judgement by default?**

A. Okay.

**Q. Have you ever heard of a judgement before?**

A. A judgment, yes.

**Q. Are you aware when someone has a judgment against someone they could use that to garnish their wages, freeze their bank account, put a lien on their home?**

MR. SKLAR: Objection to the form.

A. Actually, I didn't know that.

**Q. You didn't know that, okay. But we did agree before that an affidavit of service reflects service that was performed on an individual?**

A. Yes.

BENJAMIN LAMB

**Q. We agreed that serving process is providing someone with notice about court papers, right?**

A. The notice is the court papers, right? I'm trying to understand where you're going. I thought that was the -- the purpose of the papers was -- that was the notice, no?

**Q. Right. I think we agree on that.**

A. Okay, sure.

**Q. When you sign an affidavit, it has to be notarized; is that right?**

A. Yes.

**Q. Do you know who notarizes the affidavits that you sign for Samserv?**

A. Yes, Mr. Mlotok.

**Q. Does anyone else notarize them?**

A. No.

**Q. Have you ever seen Mr. Mlotok notarize your --**

A. Yes.

**Q. Let me finish the question. Have you ever seen Mr. Mlotok notarize your affidavits?**

A. Yes.

**Q. Does he do that right after you**

BENJAMIN LAMB

**sign it in their office?**

A. Yes, sometimes he does it when I'm handing it to him and sometimes he does it right after I give it to him.

**Q. You mentioned before that you got two copies of the court papers, one for service and one for mailing; is that right?**

A. Yes.

**Q. So, can you describe to me the process of mailing the court papers?**

A. After I serve the process and I come back in the office with the worksheet, I pull all the information back out of my box and then I take the paper and I go to the envelopes and I get some envelopes and I sit there and physically handwrite the Defendant's name, address and so on on the envelope, I fold the paper myself and put it in, seal it, either write or stamp personal confidential on the bottom, and put the address back on the top and I take it to the mail machine, stamp it and physically walk it to the mailbox.

**Q. Where is the mailbox?**

A. The mailbox in Brooklyn was on the corner across the street from the office. It was

Page 70

BENJAMIN LAMB

the big blue mailbox.

**Q. How about in Long Island?**

A. In Long Island they have a mailbox there, they come and get the mail and you take it and put it in the box and they pick it up.

**Q. You put it in a box in Samserv's office?**

A. Right.

**Q. How do you stamp the envelope?**

A. There is a mail machine. A machine with a stamp.

**Q. You use the mail machine?**

A. Yes, yes, right.

**Q. Do you mail a copy of the court papers in every case?**

A. Only a suitable age serve.

**Q. How do you know that an individual assignment was a suitable age serve?**

A. If I served it, I would know.

**Q. How do you check? You said you leave a second copy of the summons and complaint or the court papers in your box?**

A. Right.

**Q. And then when you go to mail them**

Page 71

**BENJAMIN LAMB**

**you do the things that you just described. How do you know which ones to mail?**

MR. SKLAR: Objection to form.

A. I don't know which ones to mail. I served it so I know who I served. I also explained that it is not that long in between that I take stuff back into the office and I have my worksheet with me so I know what I'm returning and what I'm mailing.

**Q. Do you compare your worksheets to the copies of the summonses and complaints that are left in your box?**

A. Compare how?

**Q. I'm just trying to figure out -- let's back up a moment.**

**When would you not mail a summons and complaint?**

A. If it was served on a business or served personally.

**Q. But you said that every single case you get a second copy from Samserv just in case you have to mail it?**

A. No, sometimes that is what it is. Sometimes you have more than one copy. I know for

Page 72

BENJAMIN LAMB

certain business or a certain person I don't have to do mailing.

**Q. I want to clarify how you know which case you served a business or served personally or served by suitable age and discretion?**

A. Can you say it again? Say it again, sorry.

**Q. You testified just now that you only -- that you don't have to mail the second copy for a personal service and business service?**

A. Right.

**Q. I'm trying to figure out how you know which assignments to mail and which not to mail? How do you know which cases were suitable age and discretion and which were not?**

A. Because I served it. That is what I'm saying.

**Q. You look through a stack of summons and complaints and remember how you served each one?**

A. Again, yes, I mean it is not that long before I go back in the office and also I have the copies of the worksheet with me.

Page 73

BENJAMIN LAMB

**Q. So you can look at the worksheet and that will remind you how you did service and you will know whether to follow up with a mailing?**

A. Okay, yes.

**Q. I'm asking you.**

A. That is what I'm telling you, yes.

**Q. What do you do with the second copy in instances where you did personal service?**

A. I reattach it to the worksheet and turn it in.

**Q. Do you ever file affidavits of service with the court?**

A. No.

**Q. Do you know what happens to the affidavits of service that you sign after you sign them at Samserv?**

A. No.

**Q. Had you ever heard of Mel S. Harris & Associates?**

A. Yes.

**Q. Do you know what they are?**

A. One of the consumer debt clients that he had.

**Q. When you say client, are all of the**

**BENJAMIN LAMB**

**Samserv's clients law firms?**

A. No, I don't know that.

**Q. Do you know if Mel Harris is a law firm?**

A. I assume he was.

**Q. Are all the procedures and practices that you just described the same for cases involving Mel Harris as a client?**

A. As far as what?

**Q. You described going into the office and receiving assignments in your box, filling out worksheets, submitting the worksheets, signing affidavits?**

A. Wait a minute. I don't fill out worksheets in the office. I didn't tell you that.

**Q. You do fill out worksheets?**

A. I do that during the course of my serving.

**Q. All of those steps that you take from receiving an assignment and signing an affidavit of service, are all of those steps the same for cases involving Mel Harris?**

A. The statement thing.

**Q. Would you agree signing the**

**BENJAMIN LAMB**

**affidavit of service is the last step that you take in completing an assignment?**

MR. SKLAR: Objection to form.

A. No, not always, if you're asking is that the last thing that I do when I'm done, no, not necessarily, because I may not do that last I'm in. I may do that when I walk in. If I understand you correctly, if you ask me that is what I do when I go on my daily routine and do I do that last and leave, no.

**Q. I'm sorry if the question is confusing. When you receive an assignment to seven process, the first step is that you receive the assignment in your box?**

A. Yes.

**Q. What would you describe as the last step?**

MR. SKLAR: Not what you have done a particular day, just in terms of assignment.

**Q. Per assignment.**

A. When I'm done with the assignment after I signed the affidavit and I done the mailing, I'm done. I don't have anything to do with it after that.

BENJAMIN LAMB

**Q. Do you ever sign affidavits before doing the mailing?**

A. Sometimes I do, and sometimes I don't. I didn't understand what you are saying. That is what I asked you.

**Q. Either signing the affidavit or doing the mailing is the last step in completing an assignment?**

A. Yes.

**Q. So, let me just clarify. Wouldn't some of the affidavits, wouldn't the affidavits where you did substitute service actually say that you already did the mailing?**

A. No. Because what would happen it would -- the affidavits that I'm signing are affidavits from stuff that I already did. If I'm doing mailing, that is stuff that I'm turning in. It is not the same.

**Q. So, you would always from one particular assignment, you would always do the mailing before signing the affidavit?**

A. Okay, let me make sure that I understand you clearly. What it sounds like you're trying to say is, they put in the mailing

BENJAMIN LAMB

before I actually did it, and that is not the case. That is what you're trying to say, right?

**Q. I think that is what you said.**

A. No, that is what you're trying to say. I didn't say that.

MR. SKLAR: She is just trying to understand the process.

**Q. I'm not accusing you of anything.**

A. I'm not saying that you're accusing me of anything. That is what it sounded like you were saying. Just because I went in and did the mailings doesn't mean that the affidavits that I signed were from that mailing.

**Q. Let me go back to my question. What is the last step that you would take in any individual assignment?**

A. That is what I'm saying again. I guess, all right, for that matter I would guess that the last step I would -- see again, no, I can't say because as I'm thinking about it and talking to you, I can't say. If I serve a paper today and I go in there later on today and they give me the affidavit, I'm doing the mailing that day. So if they give me the affidavit after the

BENJAMIN LAMB

fact, then we understand it is going to say that I did the mailing today, I came in to do everything today. So they are aware of that. Now if I did it today and I don't go in for a couple of days, it is not going to have the indication until after I go in there. They are going to ask me when I'm doing everything and they are going to put it on there. So I don't know.

Like I said, again, I could do a service a day and then go in and do the mailing and everything when I go in after that and/or however it may be. I'm done when I either do the mailing or the affidavit is signed on it, so I don't know what will be.

**Q. Do you fill out on your worksheet when you do a mailing?**

A. We used to do that on the worksheets now we don't. If there is any questions it is things done right then and there. One of the young girls will ask me and they will put it in as they do, so everything is done correctly when the mailing is done or what is going on. Because they know I am in there doing the mailing, if that stuff they are getting ready

BENJAMIN LAMB

to give me, that is how it would be.

**Q. As an example you might be preparing an affidavit and they would just ask are you mailing this particular -- in this case are you mailing the summons and complaint today and you would say yes?**

A. Yes.

**Q. And they would include that in the affidavit?**

A. Yes.

**Q. And print it out for you to sign?**

A. Yes.

**Q. Possibly that same day?**

A. Yes, that same day, yes.

**Q. But it is possible that you didn't walk out to the mailbox and actually mail those documents until after you signed the affidavit?**

MR. SKLAR: Objection to form.

A. I don't understand what you're -- it sounds like you're mixing up what I'm saying. I don't understand what you're saying.

**Q. I want to understand what you're saying. I'm frying to get the procedure. I understand that Melissa and Seleshia prepare**

**BENJAMIN LAMB**

**affidavits and print them out for you, and you sign them and your job is done?**

A. Right.

**Q. And I guess we are just miscommunicating somehow about the steps involving mailing. So on any one particular case do you ever mail the documents after you sign affidavits saying that you mailed them?**

A. Are you asking me if everything has already been put in place and everything is on the affidavit and I turned around afterward and mail it?

**Q. Yes.**

A. No.

**Q. You mail it first?**

A. Yes.

**Q. The last step that you take in one particular assignment is signing the affidavit of service?**

A. Signing affidavit of service, yes, now I understand, yes.

**Q. How much are you paid, Mr. Lamb?**

A. It all depends on the paper.

**Q. Are you paid per paper?**

**BENJAMIN LAMB**

A. Yes, paid per paper.

**Q. You just said it varies per paper; is that right?**

A. Yes.

**Q. So, can you tell me what you're paid per paper?**

MR. SKLAR: Current rates?

**Q. Currently.**

A. What I'm paid currently per paper?

**Q. Yes.**

A. If it is regular, it was a regular summons and not a rush or anything like that then usually 8.50.

**Q. When you say regular summons?**

A. Like there is no rush or anything, there is not a rush or anything like that.

**Q. How much are you paid if there is rush?**

A. Usually double.

**Q. What does rush mean?**

A. Like what you asked about having it be done in a certain amount of time.

**Q. Is there a window of time that is considered a rush?**

Page 82

**BENJAMIN LAMB**

A. It could be that day, three days.

**Q. Are there any other rates of pay, either 8.50 or $17?**

A. If I have to do a service by appointment it is usually a little more money.

**Q. What is service by appointment?**

A. Where you have to schedule a time to be served.

**Q. Do you know how much you're paid for those?**

A. I think it is like $20.

**Q. Are there any other rates ever pay?**

A. Not that I know of, not unless it was maybe it was a special rate worked out, maybe the price would vary but other than that, no.

**Q. When a specific rate might be worked out, would that be with one particular client?**

A. I mean that would have nothing to do with me. That would be between the client and Mr. Mlotok.

**Q. Would that be just one paper?**

A. That would be the service that is in question, yes.

Page 83

BENJAMIN LAMB

**Q. Just one --**

A. Just that one time.

**Q. One job?**

A. Yes, that one time.

**Q. Have you always been paid these rates?**

A. No.

**Q. The entire time that you worked at Samserv, are you always paid per paper?**

A. The whole time.

**Q. In 1999 do you remember how much you were paid per paper?**

A. I think it was like maybe $6, 6.50, something like that.

**Q. When did it go up?**

A. I don't remember when.

**Q. Did it go up gradually?**

A. More like a few years in between.

**Q. Do you remember when you started receiving 8.50 per paper?**

A. Quite a few years ago.

**Q. Like five years ago?**

A. Maybe a little more than that.

**Q. Seven years?**

Page 84

**BENJAMIN LAMB**

A. Maybe six, seven years.

**Q. Are you paid the same amount regardless whether you're serving consumer debt cases or not?**

A. Yes.

**Q. It is always 8. 50?**

A. Yes.

**Q. Do you ever receive any bonus?**

A. No.

**Q. Are you paid in cases where you can't affect service?**

A. Sometimes on a regular papers I may get paid for an attempt of service, but that would vary. It depends on if I had to turn it back in or if I had to go back on it or whatever, then he may pay for the attempt, he may not, it depends.

**Q. And he you mean Mr. Mlotok?**

A. Yes, Mr. Mlotok.

**Q. Can you explain that to me again. If you try to serve papers, you made an attempt to serve papers and you were unsuccessful, Mr. Mlotok may pay you or may not?**

A. What happens is, if I go to serve the paper and I'm not successful in serving it, I

Page 85

BENJAMIN LAMB

either have to return it to him and maybe they check and get a new address or maybe the person doesn't live there anymore or whatever may be, or I have to go back out on it. So it depends on that if they pay for the attempt. If they have a new address I get paid for the attempt because I had to go out there and they don't live there.

**Q. If someone wasn't home?**

A. I would have to go back and I had to do some diligence on it and find out the person, maybe they just wasn't home.

**Q. If you had to go back three times would you get paid for each attempt?**

A. No, I get paid for the one time that I served. Sorry, hold on. If I had to go back three times because I turned it in and they it gave to me three times and I had to go back, yes, I would get paid for each time.

**Q. What would determine if you had to give back the papers?**

A. Like I said, the person is not there and maybe the client that the paper came from they would have -- they want the paper returned if it is not able to be served and they

BENJAMIN LAMB

decide what they want to do after that. For those reasons.

**Q. But if that happened you won't actually go back and try again?**

A. If they gave it back to me, yes, I would.

**Q. If Mr. Mlotok told you to go back a second time or a third time, and you were still unsuccessful on the third time, what would happen, would you get paid?**

A. No, return it -- I mean after the third time in between they would probably ask me to do more things maybe check with some neighbors or talk to a super or something like that to find out. If I have to go back three times you have no information to go on other than somebody being home.

**Q. Would you get paid for those attempts?**

A. After the third time of doing that I would get paid for it. I did the diligence work on it, so, yes.

**Q. Are the rules for whether you're paid, do they depend on whether it is a consumer**

**BENJAMIN LAMB**

**debt case or not?**

A. I don't understand.

**Q. When you're serving consumer credit cases and you're unsuccessful in finding someone at home, are you paid for those attempts?**

A. No, I just said that to you.

**Q. Everything that you said is the same for any kinds of case?**

A. It doesn't matter what kind of case.

**Q. It doesn't matter whether it is consumer credit?**

A. Right.

**Q. If it turned out that the address was correct and you tried to serve it and you bring it back and you said somebody at Samserv would check, if it turns out the address is correct and you went back out, would you be paid for each attempt, for both attempts or just once?**

A. If they found out -- no, the first one I would get paid for going the first time -- all right. First I don't know who would check to find out if the address is correct. You said Samserv, I never told you that. I don't know who

BENJAMIN LAMB

does it.

The second thing is if I went out the first time on it and there somebody was just not home, there is not a guarantee, yes, I get paid for it until they check it and figure out what is going on and work out whether I get paid for that, paid for that attempt or if it has to go somewhere else. Usually I would get paid for the attempt if we found out for some reason maybe it wasn't just that the person wasn't home, they no longer lived there or something to that effect. Then I would definitely get paid for that. There is no second attempt on the same address if I don't have to go back.

If I have to go back there, then of course I have to the diligence on it and go back for that reason. It is not about getting paid for the first time or second time, it is not like that. I would go back and if I could serve the second time then I get paid for the service.

**Q. You only get paid 8.50 for both attempts?**

A. I get paid 8.50 for the service.

**Q. If you have to go back a second or**

**BENJAMIN LAMB**

**third time even though you now made two for three visits, you still only get paid for one time?**

A. Yes.

**Q. Can you clarify for me if there is any circumstances when you're not paid for a service?**

MR. SKLAR: Service or attempted service?

**Q. Attempted service or service.**

A. I just explained that to you. I mean if I'm going back -- if the address was checked and given back to me, if the address is checked and given back to me and they found the person does live there, I would get paid for -- that is the only time that I would get paid for that first attempt on it. And then I get paid for the service. Other than if it was, I was told to go back because we haven't found out anything just they weren't home, I'm not getting paid for it until the service. Or I come back with information that allows me not to go back again.

**Q. Are you ever not paid at all?**

A. No, I'm never not paid at all. If I did due diligence on it, I'm entitled to

BENJAMIN LAMB

something for going to do the service.

**Q. When you have to make more than one attempt, are you ever paid more than 8.50?**

A. I'm only paid, again, if the lawyer or whoever actually sends me back out because whatever information, then I would get the 8.50 again, other than that, no.

**Q. Do you know how much other process servers at Samserv are paid?**

A. No, I don't.

**Q. Do you have any idea if they are paid differently than you?**

A. No, I don't.

**Q. Are you friends with any of the other process servers?**

A. We are associates.

**Q. Do you know if Mr. Mosquera is still a server for Samserv?**

A. No, I don't know.

**Q. So, can you walk me through what happens when you receive an assignment, how you go about completing service for those assignments?**

A. I don't understand what you mean.

**Q. When you receive assignments from**

BENJAMIN LAMB

**Samserv, you go to Samserv's office as you testified and you get the assignments that are in your cubby hole, do you go out that same day and start serving those papers?**

A. Sometimes.

**Q. So you might leave Samserv's office and directly start going and serving?**

A. Sometimes.

**Q. How many days a week do you generally serve process?**

A. Every day except Sunday if I have them.

**Q. How many hours a day do you work?**

A. It varies depending on what I feel like, depends on what I have to do or depends if I have anything to do.

**Q. Can you give me a range?**

A. I can't, it varies.

**Q. One day you might work an hour?**

A. Maybe an hour, maybe not even, maybe a few minutes just to serve a paper.

**Q. What is a long day for you? What would be the most number of hours that you work in a day?**

**BENJAMIN LAMB**

A. I worked for more than 12 hours with a couple of breaks in between. I worked for more than 12 hours.

**Q. That is not common?**

A. Not at all.

**Q. Would you say you worked a normal 7 or 8-hour day?**

A. Sometimes more than that.

**Q. Do you currently have any other job besides serving process for Samserv?**

A. No, I don't.

**Q. When you are serving process, do you drive everywhere?**

A. Sometimes.

**Q. When you say sometimes what other means do you use?**

A. Public transportation.

**Q. Are there any costs incurred when you drive?**

A. Yes, gas.

**Q. Does Samserv reimburse you for your gas?**

A. No.

**Q. Do you ever have to pay any tolls**

**BENJAMIN LAMB**

**or anything like that?**

A. No.

**Q. Do you work alone?**

A. Yes.

**Q. Do you ever serve with anybody else?**

A. I have.

**Q. Can you describe that?**

A. Somebody will drive for me sometimes.

**Q. You have someone drive for you, would they be in your car?**

A. Yes.

**Q. Do you pay this person?**

A. No.

**Q. They were just helping you out?**

A. Yes.

**Q. Doing you a favor?**

A. Yes.

**Q. How often does that happen?**

A. Not often.

**Q. Mean once a week or --**

A. Not even.

**Q. Once a month?**

**BENJAMIN LAMB**

A. Maybe twice a month. Maybe, depends on the workload. If I need that kind of assistance.

**Q. What would make you decide if you need assistance?**

A. Workload. The workload.

**Q. Is there a magic number where you think you need some help today?**

A. No. It all depends on what I'm looking at and the time of the day, try to get some of the stuff knocked out so they could drive and I could run in and out and do what I have to do.

**Q. How does that help you -- how does having someone drive help you do your job?**

A. It cuts the time.

**Q. How so?**

A. Because I don't have to look for a parking spot, I don't have to take chances with my car like I do most of the time and leaving it on fire hydrants or double parking where I could catch tickets.

**Q. Do you often get tickets?**

A. I try not to.

BENJAMIN LAMB

**Q. When you get a ticket, does Samserv reimburse you for those tickets?**

A. Not at all.

**Q. How do you decide your route for the day? How do you decide the order that you're going to go in to try to serve process?**

A. When I look at my papers and set them up I know what I'm going to do for the day.

**Q. How do you decide that?**

A. Whatever I feel like doing for the day I set it up.

**Q. When you say set it up, what do you mean?**

A. I set them in order so I can go to from place to place.

**Q. What do you mean by set them in order?**

A. Set them in order based on the street address.

**Q. Do you do that on your own or do you use, for example, Google Maps or something like that?**

A. I do it on my own. If I get thrown off sometimes I may go to Google Maps, sure.

BENJAMIN LAMB

**Q. You could take a look addresses that are on a summons and just figure out the order that you want to serve them in?**

A. Yes.

**Q. So you must know New York City pretty well?**

A. I don't all of New York City, I just do Manhattan and the Bronx.

**Q. You must know the addresses in Manhattan and the Bronx?**

A. I know the numbers pretty well, yes.

**Q. When would you use Google Maps?**

A. If sometimes I don't recognize a certain street address, I may look and try to find the cross-streets and bring it back.

**Q. Would you say that Google Maps is pretty accurate**

MR. SKLAR: Objection to form.

A. Actually, I don't particularly like Google Maps. I may try to find a cross-street an and pick it up from there. I don't use navigation and things of that nature. I don't particular care for them.

BENJAMIN LAMB

**Q. Why not?**

A. I don't care for it, because Google Maps they give you -- Map Quest, things of that nature, they give you way too many in between things because it too straightforward. When you know an area the way that I know areas, you don't have to go through all of that. It takes time going through all of that. It is not necessary.

**Q. Are you talking about directions?**

A. Yes.

**Q. I don't understand, you say there is too many things?**

A. They give you too many extra steps in between that is not necessary.

**Q. You feel like you know how to drive somewhere -- you know how to drive from point A to point B in a simpler fashion than what Google Maps or Map Quest tells you to do?**

A. Sometimes, yes.

**Q. And you said you serve Manhattan and the Bronx, do you generally choose to do one borough in one day?**

A. It all depends. Because of what I have, if I could maneuver into both, I will, if I

Page 98

BENJAMIN LAMB

don't, I won't. If I feel like doing that much work, I will. If I don't, I won't.

**Q. It is possible that you would serve in Manhattan and the Bronx in the same day?**

A. Yes.

**Q. Why do you only do Manhattan and the Bronx?**

A. Those are the areas that I chose.

**Q. Did you tell someone at Samserv that those were the only boroughs that you would --**

A. When I started at Samserv, I only did Manhattan.

**Q. Sorry?**

A. When I started at Samserv I only worked at Manhattan.

**Q. That was your request?**

A. That was my request.

**Q. What made you branch out to the Bronx?**

A. They needed help in the Bronx, so I learned the Bronx so could help out.

**Q. Have you ever thought about branching out to any other boroughs?**

A. No.

Page 99

BENJAMIN LAMB

**Q. Why not?**

A. I don't want to.

**Q. Why not?**

A. I'm sufficient where I am.

**Q. When you decide what service attempts you're going to make in a day, do you try to choose an efficient route?**

A. Definitely.

**Q. Do you look for ways to do things efficiently and in the least amount of time as possible?**

A. As far as what?

**Q. As far as completing your service for the day?**

A. Do I try to find a way to get that, maximize my time to do that?

**Q. Yes, a better way to say it.**

A. Yes, I do.

**Q. Thank you. Do you have normal work hours? Do you start at a certain time during the day and end at a certain time?**

A. No.

**Q. What determines when you start process serving in a day?**

Page 100

**BENJAMIN LAMB**

A. Me.

**Q. Just what you feel like?**

A. Exactly.

**Q. So, you mentioned earlier that you often times have trouble finding a parking spot so you double park or park in fire hydrants.**

MR. SKLAR: Objection to form.

A. I have.

**Q. Can you just walk me through what happens when you try and serve someone? You drive to their address, you try to find a parking slot, and then what happens?**

A. If I can't find one then I take chances with my car and I leave it where it is so I can serve the paper.

**Q. What is the next step? You leave your car and what is the next step?**

A. I serve the paper.

**Q. Can you tell me a little more detail? Do you ring the bell?**

A. Yes, I ring the bell and knock on the door and whatever is necessary to get into the building or apartment or whatever and I do what I have to do. When I'm done I try to come back

Page 101

BENJAMIN LAMB

down, I try to rush back down after I'm done and pray that I don't have a ticket on my car.

**Q. If someone doesn't buzz you in, do you try other way to get into a building? I'm talking about an apartment building not a --**

A. Definitely.

**Q. -- not an individual house?**

A. Definitely.

**Q. What methods do you have to get into a building?**

A. Ring other bells, sometimes people walk in and out depending on where I am, the building may have high activity, I get in some kind of way.

**Q. Your goal is to get in to go to the actual apartment?**

A. Definitely.

**Q. And then does it ever happen that you can't get into the building?**

A. Not really, no. I mean usually, like I said, sometimes most buildings have high traffic, so it is not hard. Sometimes you can ring another bell and sometimes they just buzz you right in and they don't ask you who it is or

BENJAMIN LAMB

anything.

**Q. If someone does ask you who are you, do you tell them the truth?**

A. No.

MR. SKLAR: Objection to form.

**Q. What did you say?**

A. I try to get into the building, sometimes I'm the super, cable, FedEx.

**Q. So then you get into the building however you get in there and you get to the person's apartment and then what happened?**

A. I knock on the door or ring the bell.

**Q. And if someone asks -- if someone is home and asks you who is at the door?**

A. I tell him them who I'm looking for.

**Q. And if they won't open the door, do you have any tactics?**

A. I usually don't have that type of problem.

**Q. People open the door for you?**

A. Yes.

**Q. What do you say?**

**BENJAMIN LAMB**

A. I tell them who I'm looking for and they tell me they are not here, I explain what I have, usually we go through some type of dialogue depending on what happens, if they tell me they are not there or they don't live there, or whatever

**Q. Tell me what the dialogue is. Let's say the person, the person that you're speaking to says this person is not here.**

A. I explain that I have some important document for them and I ask them could I leave it with them.

**Q. You use this term important documents?**

A. Yes.

**Q. What do you do then?**

A. Then I usually leave it with them, they look at it and take the papers and I ask them for the name, their name, I need to verify who I'm leaving it with. I ask them by any chance is this person in the military or whatever, and they like, no. And I get a physical description and I leave.

**Q. Do you write down that physical description and the person's name while you're**

**BENJAMIN LAMB**

**standing there?**

A. No, sometimes I do it when -- after I walk away from them.

**Q. When you go back out into your car?**

A. No, I walk away from them.

**Q. So you're still in the building?**

A. I'm still in the building.

**Q. What are you writing it down into? What are you writing it on?**

A. The work sheet that was attached to the work.

**Q. You bring the worksheet and the court papers with you when you enter into a building?**

A. Yes.

**Q. And then you record the information on the worksheet?**

A. Yes.

**Q. What do you do with the worksheet?**

A. I take it back to the car and usually put it in my book.

**Q. Your logbook?**

A. Yes.

**Q. You physically stick the worksheet**

**BENJAMIN LAMB**

**in the logbook?**

A. I physically write the information off the worksheet into the logbook.

**Q. You do that while you're in your car?**

A. Yes.

**Q. And then do you go on to the next place to serve process?**

A. Yes.

**Q. On average how long does that process take from the moment you get out of the car to the moment that you get back in your car?**

A. I don't know. It all depends, if I have to try to get into the building that is going to take a little longer, if I could get right in sometimes it as 1, 2, 3, things, I can't tell you.

**Q. Can you give me a range?**

A. No, I can't, because it varies.

**Q. What is shortest time?**

A. I served a paper in less than a minute and get back, so.

**Q. How long would you wait around to try to get into a building before you gave up?**

A. I mean, I'm there, I'm not just

BENJAMIN LAMB

going to give up and leave and act like -- that doesn't help me.

**Q. So you pretty much stay until you could get in?**

A. Yes.

MR. SKLAR: Objection to form.

**Q. Today currently, how many service attempts do you make in an average day?**

A. Currently, no, I mean I never know how many I make in an average day. I never know that. I set up my work and do I what I do. If I don't finish, I don't finish it. I don't look back at it until later on and sometimes I don't look at it at all.

**Q. If you don't finish do you try the next day do finish it?**

A. The next day.

**Q. So you don't keep track necessarily as you go through each day how many service attempts you're making, but you do record how many service attempts you're making?**

A. I do.

**Q. You have never looked at the worksheets or looked at your logbooks to see how**

**BENJAMIN LAMB**

**many you serve in a day?**

A. I don't. That is not really a concern that I did this many a day or I didn't do that many a day. The objective is for me to get my work done. I don't look back and say, wow, I did this today. I don't do that.

**Q. You're served per paper, right, won't that translate to how much you made day?**

MR. SKLAR: He is paid per paper.

**Q. Aren't you interested in knowing how much money you made that day?**

A. Not necessarily, not all the time. I'm actually paid when I submit a bill for it. So if I -- I don't want to look at a day and I only did a couple of papers that day and I look at a sad day. I'm more earned concerned that whatever I put in for I'm paid for that, not so much what I made each day.

**Q. When you plan your day, what is the highest, largest number of service attempts that you plan to make in a day? You may not finish, I understand, what is your goal?**

MR. SKLAR: Objection to form.

A. If I understand you correctly, if I

BENJAMIN LAMB

could tell you that, then I could tell you what my attempts are for the day. I don't know. I set it up and whatever falls in place with what I'm setting is already set up. If I get it done, I get it done. If I don't, I don't.

**Q. Do you have any idea what the most number is that you have done?**

A. Again, I set it up, if I get it done, I get it done and if I don't, I don't.

**Q. You mentioned that you submit bills to Samserv; is that right?**

A. Yes.

**Q. How often do you submit bills to Samserv?**

A. It depends on what -- it depends on a couple things. It depends if I need money right then and there or if I could wait a little longer I will stretch it.

**Q. What do the bills reflect?**

A. The work that I done.

**Q. Do you indicate the number of process servings that you have done?**

A. No, I show a list what I have done.

**Q. A list of what you have done?**

**BENJAMIN LAMB**

A. A list is basically you could say in other words an itemization of what I done. I do it off of my logbook.

**Q. What does the list say it?**

A. It shows the service.

**Q. Is it the name of the case?**

A. It is everything. It is off of my logbook.

**Q. So everything that is in your logbook is on your bill?**

A. That is what is in the bill, yes.

**Q. How do you create the bills?**

A. That is what is on the bill, the actual page logbook is the bill.

**Q. Do you photocopy the logbook?**

A. I copy the logbook and submit that as the bill.

**Q. You photocopy your logbook and is there -- do you fill out something that goes on top?**

A. No.

**Q. Do you total anything?**

A. No. I mean if I total, it is a personal total, so I can make sure that I keep up

BENJAMIN LAMB

with whatever he is paying me for.

**Q. When you total, it would be the total number of services?**

A. Right.

**Q. Because you know you would be paid a set rate per service?**

A. Right.

**Q. What about for rush jobs, how do you characterize -- how do you insure that you're paid for rush jobs?**

A. When I hand in -- on the end of the line when I finish serving I put the information in and it says rush or whatever time of place, a summons or order to show cause or whatever the case may be, it says rush and I know that rush that I was supposed to get paid for.

**Q. How often are you paid by Samserv?**

A. Whenever I submit a bill.

**Q. How soon after?**

A. What do you mean how soon after?

**Q. You would go into Samserv and hand the bill in personally?**

A. Yes.

**Q. And when do you get the check?**

**BENJAMIN LAMB**

A. Usually on a Friday.

**Q. So you get paid usually the first Friday after you submit a bill?**

A. Any given Friday. He pays on a Friday. If I go in and submit a bill Wednesday, Thursday, or whatever, then I should have a check Friday.

**Q. How do you confirm that the bill -- that the check that you received is accurate?**

A. Because, like I said, if it looks funny then I go back and I check my work. I don't always check it to see what is going on. If it looks like it is not right, maybe something is off, I check it and if I have a discrepancy I talk to them about it.

**Q. Who do you talk to?**

A. Mr. Mlotok.

**Q. When there has been a problem in the past, what has been the problem?**

A. I don't understand that.

**Q. You just say you checked the bill, you checked the check and if there is discrepancy you talk to Mr. Mlotok. So what kind of discrepancy or problems?**

**BENJAMIN LAMB**

A. In payment.

**Q. In payment?**

A. In payment.

**Q. Yes.**

A. That discrepancy.

**Q. He paid you less than you were supposed to be paid?**

A. Yes.

**Q. And when you talked to Mr. Mlotok about that, what happened?**

A. We -- do we sit down and go over the bill and discuss what was going on, if he owes me, if he owes me he pays me, if he shows me where I wasn't getting paid for that for whatever reason, I understand.

**Q. Why wouldn't you get paid for something?**

A. It depends whatever it may have been, maybe there was an attempt that I made on, or something that I wrote down at the last point that I didn't get paid for, it depends.

**Q. Have you ever had an experience where you absolutely couldn't serve someone?**

A. Yes.

BENJAMIN LAMB

**Q. And what is your procedure for telling Samserv that? Would you call them from the field, for example, or would you just wait until you come back to the office?**

MR. SKLAR: Objection to form. You mean getting into a building and getting to a person?

**Q. Any time that you're not able to serve someone what is the procedure?**

A. Yes, I do call to let them know. Sometimes it depends on what is going on if it is really late I write the information down and let them know the next morning. If I can't serve the person, I will let them know and put it in writing and let them though.

MR. SKLAR: Off the record.

(Discussion off the record.)

(Lunch recess taken at 1:05 p.m.)

BENJAMIN LAMB

A F T E R N O O N S E S S I O N

1:05 p.m.

B E N J A M I N L A M B,

resumed, having been previously duly sworn, was examined and testified further as follows:

BY MS. COFFEY:

**Q. Mr. Lamb, in your opinion is there a good time of the day to find someone at home, a better time than other times during the day to find someone home?**

MR. SKLAR: Objection to form. You can answer.

A. Not really. I mean you take chances any time finding somebody home.

**Q. How about days of the week, is there a greater chance of finding someone home on a certain day of the week?**

A. About the same thing as any time during the day.

**Q. We talked briefly about Samserv doesn't reimburse you for your gas or your tickets when you get them, does Samserv reimburse you for any other costs?**

**BENJAMIN LAMB**

A. No.

**Q. Can you give me an estimate of how much you make a year?**

A. No. As I told you, it varies everything is up and down. I really don't know.

**Q. Can you tell me how much money you made last year?**

MR. SKLAR: Objection. You can answer.

A. I think it was maybe 16,000, something like that.

**Q. Since 1999 were there ever any years where you made more than 16,000?**

A. I just remember last year, because I don't even remember that correctly and the honest part I had the paper in my hand yesterday, and there have been years where I made more money than that, yes.

**Q. Do you ever ask for more work in order to make more money?**

A. Sure, who wouldn't.

**Q. Do you actually ask?**

A. Yes, I do.

**Q. You call Samserv and ask do you**

**BENJAMIN LAMB**

**have more work for me?**

A. Yes, I do.

**Q. You don't wait for them to call you?**

A. No.

**Q. Do they say yes sometimes?**

A. Sometimes.

**Q. And other times?**

A. No.

**Q. Has anyone you ever served disputed your service?**

MR. SKLAR: Objection to form.

A. Anyone as in who? I don't understand.

**Q. You serve Defendants with court papers?**

A. Yes.

**Q. Has any Defendants ever disputed your service upon them?**

A. Are you asking me that have I ever had anybody bring me to Traverse/.

**Q. As that was my next question, but yes.**

A. Yes.

BENJAMIN LAMB

**Q. Do you know how many Traverse Hearings you attended since 1999?**

A. Four.

**Q. Were there other Traverse Hearings that were scheduled that you didn't have to appear at?**

A. Yes.

**Q. Do you know how many in total?**

A. Eight or nine.

**Q. Do you recall if any of those hearings involved Mel Harris cases?**

A. No. There was none -- was there any from Mel Harris. I think there may have been one.

**Q. Does Samserv notify you when someone disputes service?**

MR. SKLAR: Objection to form.

A. Notify me how? What do you mean do they --

**Q. How do you find out about a Traverse Hearing?**

A. Through Samserv.

**Q. They call you and tell you?**

A. Yes.

**Q. Do they call and tell you what the date of the Traverse Hearing is?**

A. They call me and tell me that and they will give me paperwork to let me know when the date is.

**Q. What do you mean by paperwork?**

A. They may write a note to let me know.

**Q. Do you ever talk to the attorney for the Plaintiff in the case before the Traverse Hearing?**

A. Yes, I talk to them if I have to go before -- if they are going forward with it, we will set up a meeting.

**Q. Do you remember setting up a meeting with Mel Harris?**

A. No.

**Q. What were the outcomes of the Traverse Hearings that you attended?**

A. I think I won two and lost two, I think. Won three and lost one, something like that.

**Q. Just to clarify, those four hearings you actually testified during the**

**hearing?**

A. To be honest, I recall testifying at maybe two right now.

**Q. So you recall testifying in two hearings but you said ---**

MR. SKLAR: I think he is thinking.

A. Yes, I recall it was either two for three, I'm not sure actually having to testify.

**Q. You said that you were notified of eight or nine Traverse Hearings?**

A. Yes, around that, maybe eight or nine.

**Q. Do you know what happened in the hearings -- in the cases that you did not testify in?**

A. I really don't recall, but I think it was they settled it some kind of way, so that is why it never went on.

**Q. Do you recall if any of those cases you came to court but didn't testify?**

A. One.

**Q. Do you remember what happened there?**

A. I think on that particular one --

I'm sorry, there were three cases, I testified -- there were four cases, I testified in three and one, the people that were -- we were going -- were going to testify on, the other people, the other side, they looked over and saw me and all of a sudden and came back and said they remembered getting the papers from me and decided they didn't want to go forward.

**Q. So that was one hearing you attended but did not testify at?**

A. Right.

**Q. And there were three that you testified at?**

A. Right.

**Q. And were there any instances where you came to court and were there any other instance where you came to court and did not testify?**

A. No.

**Q. Do you remember any cases where you testified, how you prepared for those hearings?**

A. Other than going -- looking back for my logbook for how far back it was, and maybe if I had to talk to the attorney for the

Plaintiff, that's about it.

**Q. Do you remember what you talked about --**

A. No, I don't.

**Q. -- with the Plaintiff's attorney?**

A. No, I don't.

**Q. And did you have logbooks at all of those hearings?**

A. Yes.

**Q. Do you get paid for appearing at Traverse Hearings?**

A. Yes.

**Q. Do you remember how much?**

A. Usually 150.

**Q. $150?**

A. Yes.

**Q. Did you get paid the one time where you didn't testify?**

A. Yes.

**Q. What was the outcome of the three hearings that you testified at, do you remember?**

A. I think one I lost and the other two I won. You're talking about testifying, the other two I won.

Page 122

BENJAMIN LAMB

**Q. Do you remember the names of those cases?**

A. No.

**Q. After the Traverse Hearings were scheduled, did anyone from Samserv ask you about them?**

A. Say that again, after they were what?

**Q. After you appeared at the Traverse Hearings did anyone from Samserv ask you about the hearings?**

A. No.

**Q. Has anyone from Samserv disciplined you for any reason?**

A. No.

**Q. Does anyone from Samserv check your logbook?**

A. Yes.

**Q. How so?**

A. They may want to check to see what is going on as to the date, make sure that the entries are in.

**Q. Who checks your logbook?**

A. At the time the process server

Page 123

BENJAMIN LAMB

supervisor will do that.

**Q. Who is that?**

A. Miss Lewis.

**Q. How often would she check your logbook?**

A. I don't recall. Every couple of months maybe. She didn't do it all the time. She did do it.

**Q. What kind of procedure was that?**

A. What do you mean?

**Q. Would you sit down with her and she would go through the page by page in your logbook?**

A. Well, not exactly page by page. But we would sit down and she has done that already, and she would leave that and start from where we finished off. However long it has been since she checked it.

**Q. What was she checking for?**

A. Just to make sure that your stuff was in order, you kept everything right, you had the page number, things of that nature.

**Q. Did she ever make corrections to your logbook?**

A. Make corrections how?

Page 124

BENJAMIN LAMB

**Q. Did she tell you to fix anything in your logbook?**

A. Fix what?

**Q. You said she was checking for all of those?**

A. To make sure that I had everything put in like I was supposed to.

**Q. Was everything always the way it was supposed to be?**

A. Pretty much.

**Q. Were there ever any instances where you didn't have page numbers or there was some other sort of problem with your logbook?**

A. Sometimes, sometimes you don't -- sometimes you write and then you have to go back and number the pages, small stuff like that.

**Q. What would she say?**

A. She would let me know that I had to get that done, I had to put that in, it that to be right.

**Q. Did you ever see her checking other process servers logbooks?**

A. Sure.

**Q. Do you know whose?**

Page 125

**BENJAMIN LAMB**

A. Offhand, no.

**Q. When you photocopy your logbooks to attach for bills, do you photocopy them at Samserv's office?**

A. Yes.

**Q. Did anyone besides Miss Lewis ever check your logbook?**

A. Not that I remember, no.

**Q. Now, Miss Lewis you said she was a former supervisor, does anyone check your logbook now?**

A. Mr. Mlotok.

**Q. When was the time that he checked your logbook?**

A. Maybe a few weeks ago, a month or so ago.

**Q. Sorry?**

A. A few weeks, maybe a month, something like that.

**Q. Has he been checking your logbook ever since Miss Lewis left Samserv?**

A. Yes.

**Q. Does anyone else check your logbook?**

BENJAMIN LAMB

A. No.

**Q. How regularly does he check it?**

A. I can't say how regular it has been. Maybe every other month or so, something like that.

**Q. Has he told you to make any corrections or to fix anything that is wrong in your logbook?**

A. There is never any correction, because he is not telling me how to figure out the logbook. Just if I have some things that I didn't fill in and I know I need to fill in and he will point this out. But I haven't had that lately.

**Q. What would be something that you would have to fill in?**

A. Like we discussed, the numbers on the pages, things like that.

**Q. Aside from page numbers, was there anything else that you would have to fill in?**

A. Maybe an index number or an attorney.

**Q. Sorry, or?**

A. Or the attorney.

**Q. Did anyone from Samserv ever question you about an affidavit of service?**

A. In what way?

**Q. You said people from Samserv reviewed your logbooks and pointed out certain problems, did any of them ever point out an affidavit of service?**

A. I didn't say people did anything.

**Q. You said Mr. Lewis and Mr. Mlotok, that is two people?**

A. That was after. It was one.

**Q. Did anyone from Samserv ever ask you a question or point out a problem with an affidavit of service?**

A. I mean, they are the ones preparing it, I don't understand how they would ask me a question about an affidavit of service. Is there something else that you're trying to ask me because I'm not getting what you're saying?

**Q. I think that answered my question.**

**Mr. Lamb, have you ever been investigated by the Attorney General or the U.S. Attorney's Office for anything related to process serving?**

MR. SKLAR: Objection to form.

BENJAMIN LAMB

Whether he was investigated?

MS. COFFEY: That is the question.

**Q. Have you ever been investigated?**

A. By the Attorney General?

**Q. Correct.**

A. Not that I know of, no.

**Q. Have you been investigated by the U.S. Attorney's Office?**

A. Not that I know of.

**Q. Do you know if Samserv has ever been investigated by either of those agencies?**

A. No.

**Q. No, you don't know?**

A. No, I don't know.

**Q. I believe you have testified it is your regular practice to keep a logbook?**

A. Yes.

**Q. Where do you physically keep your current logbook, the one that you brought today?**

A. It is in the car with me riding around or sometimes in the house.

**Q. Do you regularly take it in your house at night or leave it the car?**

A. I do sometimes, but not always.

BENJAMIN LAMB

**Q. How long do you keep logbooks for?**

A. We were keeping them for three years and eight months.

**Q. Three years and eight months?**

A. Yes.

**Q. Do you know why you were keeping them for that long?**

A. I believe that was the law. That was the law that you had to keep those documents for three years eight months.

**Q. Who told you that?**

A. I can't remember who told me right now.

**Q. And now how long do you keep it?**

A. Seven years now.

**Q. Where are your old logbooks right now?**

A. I don't have them anymore.

**Q. Why not?**

A. Because my car was broken into and recently I had some situation where they were transpired they were left in a home and I'm no longer allowed to go into the home, and I don't know what happened to them.

Page 130

BENJAMIN LAMB

**Q. The only logbook that you have is the one that you brought today?**

A. Yes.

**Q. Have you ever destroyed any logbooks?**

A. No.

**Q. Were you ever told to destroy any logbooks?**

A. Never.

**Q. When was your car broken into?**

A. Several times over the last two years.

**Q. Can you tell me how many times?**

A. Four. Maybe, three or four.

**Q. To clarify your car was broken into or stolen?**

A. Broken into. And it wasn't just one car. I don't want to make it sound like it was one car. I had a couple of vehicles broken into over the last two years.

**Q. In 2009 to the present your car or cars had been broken into four times?**

A. About four times.

**Q. Items were stolen from inside your**

Page 131

**BENJAMIN LAMB**

**car?**

A. Yes.

**Q. Including your logbooks?**

A. Yes.

**Q. Were your logbooks taken all four times?**

A. Anything that I had in there that looked of value it was stolen.

**Q. Is that yes?**

A. Yes.

**Q. All four times your logbooks were stolen?**

A. Yes.

**Q. Do you think your logbooks look like something of value?**

A. Yes, what they were in.

**Q. What were they in?**

A. A bag.

**Q. What kind of bag?**

A. Like a Starter bag, a couple of other bags, regular carry bags.

**Q. What is a starter bag?**

A. It is the brand, it is the name.

**Q. Did you report your car being**

Page 132

**BENJAMIN LAMB**

**broken into to the police?**

A. Yes, I do.

**Q. Every time?**

A. Yes, I did.

**Q. Did you report your car being broken into and your logbooks stolen to the Department Of Consumer Affairs?**

A. I believe I did.

**Q. All four times?**

A. I believe I did.

**Q. Do you believe you did or you don't remember?**

A. I don't remember right now.

**Q. But you do remember filing police reports?**

A. I do, I had to.

**Q. Can you tell me the months, the actual dates that your car was broken into?**

A. Two years ago, no. My car was just broken into October of last year, October, November of last year.

**Q. What was the time before that, your car was broken into last October or November, what was the time before that?**

Page 133

**BENJAMIN LAMB**

A. I don't remember.

(Lamb Exhibit 2 for identification, Affidavit signed by Mr. Lamb on October 26, 2011.)

**Q. I show you what is marked as exhibit Lamb 2, can you take a look at that.**

**(Witness reviewing document.)**

**Q. Do you recognize in document?**

A. Yes, I do.

**Q. Is that an affidavit that you signed on October 26, 2011?**

A. Yes.

**Q. Do you see that paragraph four says that you state that in July 20th, '10 your car was broken into?**

A. Yes.

**Q. Is there a reason -- do you remember your car being broken into in July of 2010?**

A. Yes, I remember that time, yes.

**Q. But, just a few minutes ago you couldn't remember?**

A. I also told you that I also yesterday had held a piece paper and I don't

BENJAMIN LAMB

remember what that number was either.

MR. SKLAR: Just answer her question. If you remember, you remember. If you don't remember, you don't remember. We will proceed at that pace.

**Q. Is there a reason that you didn't include this in your affidavit, the most recent -- your car most recently being broken into?**

A. I thought I actually did, but I see I didn't.

**Q. What precinct did you report the car being broken into?**

A. The last one was the 30th precinct.

**Q. And the other ones?**

A. The others should have been the 30th as well. I don't remember what area I was in.

**Q. Do you know if anyone was arrested in connection with the breaking in of your car?**

A. No, I don't remember.

**Q. Were any of your items ever recovered?**

A. No.

(Lamb Exhibit 3 for identification, Page 12 of Mr. Lamb's logbook.)

BENJAMIN LAMB

**Q. I would like to go over your current logbook. I show you your current logbook which is opened to what looks like you have marked as page 12. And we have photocopied it, would you agree that that is the same page 12 as in your logbook?**

A. Yes.

**Q. I'm going to refer to the copy and you can keep your original?**

A. No problem.

MR. SKLAR: Note an objection on relevance. I believe this postdates the involvement of the other party in this lawsuit. So, I'm not instructing him not to answer at this point in time, but just noting my objection and we will see where this goes.

**Q. Mr. Lamb, do you have a logbook from 2005 to the present besides this logbook?**

A. No, I don't.

**Q. So I think we will use this, is this a fair representation of logbooks that you kept since 1999?**

A. Not entirely, no.

BENJAMIN LAMB

**Q. How have your logbooks changed over the years?**

A. The only thing is you asking me about this one and looking based on what you are talking about on this page, I don't normally keep it this way. This was like this for a particular reason.

**Q. You're talking about this particular page?**

A. I'm talking about page in particular to this but everything after the fact was different. Go ahead.

**Q. Just in general, the way that you keep this logbook?**

A. In general, yes.

**Q. This logbook is the same that you have been keeping your logbooks for several years?**

A. Yes.

**Q. Do you want to explain to me what makes this page different?**

A. Just because of the missing points, that's all.

**Q. Missing points meaning blank lines?**

A. Yes.

BENJAMIN LAMB

**Q. Can you tell me why there are blank lines on this page?**

A. These lines -- at the time like I said there was lot of things going on last year and I had a lot of things happening and this is before we had worksheets on everything. So, some stuff I had a worksheet for and some stuff I didn't. That is why you see stuff filled in. The stuff that I didn't have a worksheet on. The stuff that I had worksheets for I left space so I could fill it in. At the time end of my day I could fill the stuff in. That is what those blank spaces are, they shouldn't be there, but they are there.

**Q. Has the process that you described regarding worksheets, is that a different process now than in the past?**

A. The only thing different about it is that at one point in time it was certain work that had worksheets and other stuff that you had the actual paper, you had the paper be served and you wrote the information based on that.

**Q. When did that change?**

A. It changed maybe almost a year ago

BENJAMIN LAMB

now, he gave you a worksheet for everything. A few months now.

**Q. Do you remember which kind of cases got worksheets and which didn't in the past?**

A. I remember the Mel Harris papers having worksheets.

**Q. Just to clarify, you left certain lines blank without anything written at all in this page 12 of your logbook because you were going to go back in later and fill them in?**

A. Exactly.

**Q. Then there are a few lines that have what looks to be a date on the left-hand side, 10/11?**

A. Yes.

**Q. And those lines are also blank, is there a difference between the lines that have dates and lines that are just blank?**

A. The only difference is those are the same spaces like I said for the stuff that I had to fill in but the paper was done on that day. So I had that written as I had to finish putting a the rest of the information in the line.

**Q. Why haven't you gone back and**

**BENJAMIN LAMB**

**filled the information in?**

A. Because, again, like I said, I had a situation going on and I didn't have time to do -- to go back and do what I needed to do and I should have done it, but I didn't.

**Q. Can you turn to page 21 in your logbook.**

**(Lamb Exhibit 4 for identification, Page 21 of Mr. Lamb's logbook.)**

**Q. Page 21 is Lamb Exhibit 4. Does this page -- just to clarify, this is a photocopy of page 21, does that accurately reflect your page 21?**

A. Yes.

**Q. So does this page -- is this more of a typical page than the other page that we just looked at?**

A. Yes.

**Q. Can you just go through each column and just explain to me what is in each column starting at the left-hand side where it says 12/7?**

MR. SKLAR: The top line.

**Q. The top left I assume that means the date?**

**BENJAMIN LAMB**

A. Yes.

**Q. And this was 12/7, 2010; is that right?**

A. Yes.

**Q. And then the next column is time of the day, the time of service?**

A. Yes.

**Q. And then the next column is the address?**

A. Yes.

**Q. That you affected service?**

A. Yes.

**Q. And then the next column reflects the Defendant who you affected service on; is that right?**

A. Yes.

**Q. And the next column reflects the court in which the case was filed; is that right?**

A. Yes.

**Q. And the next column, can you tell me what those number are?**

A. The top number is the index number and the bottom number is the reference number for the attorney.

BENJAMIN LAMB

**Q. And then the next column there are some --**

A. It is attorneys.

**Q. There are attorneys, why are there not attorneys for every entry?**

A. They just weren't written in. I know what they are based on some of the numbers on the side. I could tell who they are.

**Q. The next column is the name of the person served; is that right?**

A. Yes.

**Q. And their description?**

A. Yes.

**Q. And the description includes generally it looks like whether or not the person is male or female and what color skin they have, their height and weight; is that right?**

A. Yes.

**Q. And the next column, does that describe what kind court papers you were serving?**

A. Yes.

**Q. Am I right that S-U-M-M refers to summons?**

A. Yes.

Page 142

BENJAMIN LAMB

**Q. And then the next column, is that your rate of pay?**

A. It's a personal note to myself.

**Q. About your rate of pay.**

A. Yes.

**Q. The parenthesis 8.5 refers to $8.50?**

A. Yes.

**Q. Are you aware that New York rules for maintaining logbooks according to Department Of Consumer Affairs requires certain information to be included in your logbook?**

A. Yes.

**Q. Are you aware that the name of the law firm is supposed to be included in the logbook?**

A. Yes.

**Q. But you agree that on several of these entries there is no law firm listed?**

A. Yes.

**Q. Are you aware for every entry there is supposed to be the name of the case, did you know that?**

A. What do you mean the name of the case.

Page 143

BENJAMIN LAMB

**Q. The caption of the case, the title of the case?**

A. Other than the Defendant you're saying?

**Q. Yes.**

A. No, I wasn't aware of that.

**Q. So, the other logbooks that you have been keeping since 1999, you no longer can find, they also do not have the name of the case in any of the entries?**

A. No.

MR. SKLAR: Objection to form.

**Q. You also testified before that it is your practice to fill out the logbook at the time of service, right, within minutes after you affect service you fill out the logbook in your car, right?**

A. Yes.

**Q. So the prior page that we were looking at was page 12 where there were those missing lines, is it safe to say that you did not fill those out right after you completed service?**

MR. SKLAR: Objection to form.

Page 144

BENJAMIN LAMB

A. I explained to you that I had a worksheet for it and that is why I wasn't filling it. It helped me to save time so I could do another service.

**Q. Are you also aware that the rules for effecting service require chronological entry of service in a logbook?**

MR. SKLAR: Objection to form. You can answer.

A. Are you saying it should be numbered from the service that I did and so on from the one service to the next one?

**Q. Yes.**

A. Yes.

**Q. Can you explain on this page two there are certain entries that go from 12/8 to 12/11 to 12/13 and back to 12/8?**

A. If it is like that, what probably happen because I don't remember at this time what probably happened it was written up before it was served. Like the first portion of it was written before it was served.

**Q. What portion was written?**

A. This portion.

Page 145

BENJAMIN LAMB

**Q. You have to remember everything has to be recorded.**

A. What I'm saying to you is the left-hand side which has the date and time and the address and things, that stuff was probably written and I didn't get a chance to do it then so I went and did it afterwards. So I probably wrote it for that date -- I probably wrote it in already and then I served it later on or served it before. That is how it probably got out of order that way.

**Q. So, you may have filled in some of this information before you affected service?**

A. Not. The only part of the information that was filled out before service is done is the beginning portion which includes the address, the name of the Defendant and the court and index numbers.

**Q. So, is that your general practice to just --**

A. It is not a general practice, but it is what happened.

**Q. In December of 2010 you filled in the address of the Defendant and the name of the Defendant and the court and the index number and**

**BENJAMIN LAMB**

**then do you remember what day you might have filled that out?**

A. No, I don't remember what day. Like I explained earlier, sometimes I go do certain days and I may get it done and I may not. And I may have filled it in on the day that I was doing it and I didn't get around to doing until later on.

**Q. On the date on the far left-hand list or far left-hand column reflects the actual date that you did do the service?**

A. Exactly.

**Q. For that line?**

A. Exactly.

**Q. And you also filled out the exact time that you did it?**

A. Exactly.

**Q. And then you filled in the information about who you served at that time as well?**

A. Exactly. Hold on, at what time?

**Q. Well, you tell me, you just asked me --**

MR. SKLAR: Hold on.

BENJAMIN LAMB

**Q. When did you fill in the columns on the right-hand page regarding who is served?**

A. When the pay was served.

**Q. The time that you wrote down and the date that you wrote down, those are written down at the same time that you entered the names and descriptions of people?**

A. Exactly.

**Q. Is it your testimony that you don't always fill out your logbook fully after doing the service?**

MR. SKLAR: Objection to form.

A. It is not a practice, no. It has happened, but it is not a practice.

**Q. How often does it happen?**

A. It doesn't happen regularly now. It happened before when things got hectic and I had things going on, but since then, no.

**Q. Since when, what period of time was that happening?**

A. This was all happening, like I said, I had personal issues and things going on and sometimes I had a heavy workload and sometimes not a heavy workload, depending what was going on

BENJAMIN LAMB

from the entire year, all of last year. These are things that were done before -- before the new year came in and a little bit later things started to get a little clearer, but I had to get it back together so I don't have a problem with it, this stuff. But this came about so you happen to see it the way it is.

**Q. If you could turn to page 9 in your logbook.**

**(Lamb Exhibit 5 for identification, Page 9 of Mr. Lamb's logbook.)**

**Q. If you could compare the photocopy of page 9 with your logbook and just confirm that it is the same. Does that photocopy reflect your logbook?**

A. Yes.

**Q. This is Lamb 11?**

MR. SKLAR: 11?

MS. COFFEY: I'm sorry, 5.

**Q. Do you see, Mr. Lamb, at the top of page 9 on the right there is an exhibit tab that says Plaintiff's 2?**

A. Yes.

**Q. Can you tell me what that is?**

**BENJAMIN LAMB**

A. It is from a Traverse Hearing.

**Q. When was that Traverse Hearing?**

A. I don't remember when it was right now.

**Q. Was it in 2011?**

A. I don't remember. Yes it had to be 2011. Because on this page it is 2010.

**Q. Do you know which entry the Traverse Hearing is about?**

A. I don't remember offhand right now.

**Q. Do you remember what court you were in?**

A. I think it was a civil case.

**Q. Do you remember what borough though?**

A. I think it was the Bronx.

**Q. Did you testify at that hearing?**

A. Yes.

**Q. What did you testify about?**

A. I think it was a lady saying that she didn't receive the papers or something like that, she didn't get them.

**Q. Do you remember what law firm was**

Page 150

BENJAMIN LAMB

**representing the Plaintiff?**

A. Not offhand, I don't remember.

**Q. Do you remember the name of the attorney?**

A. No.

**Q. There aren't that many entries on this page, so just reading through them doesn't jog your memory as to what case it was?**

A. Not offhand, no.

**Q. At the bottom of the page 9 there are blank lines with lines drawn through them. Can you explain what that is?**

A. Again, I was supposed to put these entries in later and after I wasn't able to put them back in because the car being broken into and stuff being stolen, I put these lines because it was showing there was nothing that I could put there and it was blank spaces. Instead of being questioned about the blank spaces there was nothing there, I put the lines across.

**Q. What does your car having been broken into have to do with this?**

A. Information that I needed -- as a matter of fact this wasn't even about the car

Page 151

BENJAMIN LAMB

being broken into. This was after I got kicked out of the house. This information was in the house.

**Q. What do you mean by this information?**

A. This is, again, worksheets that I had to fill information out on, I had to put the information in the book.

**Q. So the worksheets were in your home and you got kicked out of your home and didn't have access to worksheets?**

A. I didn't have access to anything, I wasn't allowed back in the home.

**Q. Why didn't you enter the information from the worksheets into your logbook at the time that you did service?**

A. Like I said, I being at the time I had work sheets I could put that stuff in after the fact. It wasn't anything that was going on that was detrimental that I had to put it in right then and there. I could have done it after the fact. I would work and put it in afterwards.

**Q. It is your testimony that you don't complete entries in the logbook contemporaneously**

Page 152

BENJAMIN LAMB

**with serving process?**

A. What does contemporaneously mean?

**Q. About the same time that you perform service, you don't record that service in your logbook?**

MR. SKLAR: Objection to form.

A. Actually it is not that it was a practice, but that is what was done.

**Q. Can you explain what you mean by that?**

A. What I mean by that, where I had worksheets, and I could sometimes get around having to put it in right then and there, I could do it after fact, that is what I would do, I would put it in after the fact to save time so I could get more work done.

**Q. Don't you always have worksheets?**

A. There was worksheets only for consumer debt and worksheets for everything came after the fact. At this point there were not worksheets on everything.

**Q. When were you doing -- when you didn't have worksheets for everything, did you record your entry at the same time as doing the**

Page 153

BENJAMIN LAMB

**service?**

A. When I didn't have worksheets, yes, I did.

**Q. So for consumer debt cases where you had worksheets, you might not record the information right at that same time that you did the service?**

A. Not all the time.

**Q. And now that you have worksheets for all service, you can wait to enter information into your logbooks?**

A. I can, but I don't.

**Q. But you have because we are looking at entries in your logbook when you just testified that you could wait and you didn't have anything pressing?**

A. I did. I don't anymore.

**Q. You mentioned some personal issues that have affected your ability to do your job. Can you describe what those personal issues are?**

MR. SKLAR: Objection to form. I instruct him not to answer. This doesn't have anything to do -- by counsel, domestic issues and has nothing to do with this case

Page 154

BENJAMIN LAMB

and nothing to do with his ability to do his job and so, next question.

MS. COFFEY: He did testify whatever is going on has affected his ability to do his job.

MR. SKLAR: To access pieces of paper.

MS. COFFEY: I believe he also testified that it affected his ability to record things in chronological order as well.

We are going to take a quick break.

(Recess taken.)

MR. SKLAR: I with would like to note we are back ready to go 42 minutes after the short break. I hope and trust everyone is okay, no medical emergencies, if we could proceed a little bit quicker it will be most helpful.

BY MS. COFFEY:

**Q. Mr. Lamb, just a couple of follow up questions about your car and the unfortunate incident where items were stolen from your car.**

**In addition to your logbooks, do you recall what else was stolen from your car?**

Page 155

**BENJAMIN LAMB**

A. My son's bike was stolen. My digital camera was stolen. I had two or three different game systems that were in there that were stolen. Clothing was stolen.

**Q. Is that one of the incidents?**

A. This is in all the incidents, different things were taken each time. Whatever was worth of value was stolen.

**Q. Were items stolen from your trunk as well or just inside the car?**

A. It wasn't stolen from the trunk because everything was inside the car or it was like -- the only car I had a regular car that was broken into was a Volkswagon, they stole the radio and things like that. The other cars that I had were broken into were trucks and minivan.

**Q. There were three different vehicles?**

A. Three or four different vehicles broken into.

**Q. You testified before that you kept your logbooks in a bag?**

A. They were in bags, yes.

**Q. Why were they kept in bags?**

Page 156

**BENJAMIN LAMB**

A. Why would they be all over the place?

MR. SKLAR: You can't ask her questions. You can only can answer her questions.

A. They are in a bag because I don't need to have it all over the place. I put it in a bag and put it to the side.

**Q. After the first time that your logbook was stolen, did you consider maybe bringing it into your home at night with you?**

A. I did bring things in the house, and it got cluttered and I had to move things back out. Nobody can predict that they are going to break in your car.

**Q. You testified before that you photocopied your logbook and attach it to your bill to get paid at Samserv?**

A. Yes.

**Q. When logbooks were stolen, were you able to get paid from Samserv?**

A. Yes, this all happen after the fact, these are old books that you're talking about.

Page 157

BENJAMIN LAMB

**Q. These are all old books?**

A. Yes.

**Q. So, a logbook that you were currently using at the time the vehicle was broken into was never stolen?**

A. I would keep it with me. That wasn't the case, no.

**Q. Just to clarify, there are still some logs at your former residence; is that right?**

A. No, that is not right.

**Q. No, it is not right?**

A. I don't know what is at my former residence right now. I was made not to go back in there. I don't know. I know there was a eviction process that took place, if there is anything in there I have no idea. If nothing is in there I don't know.

**Q. When you left your residence, were there logbooks at your home?**

A. No, the only thing that I remember being there when I left was some paperwork.

**Q. Paperwork for work?**

A. As far as like the worksheets and things that I had to put in the book or things

Page 158

BENJAMIN LAMB

related to -- things like that, I don't remember any logbooks being in there, I'm not sure about that.

**Q. Thank you for clarifying those things.**

**Am I correct that in New York you can do service personally, by substitute service and by what is known as nail and mail?**

A. That is right.

**Q. Do you tend to serve people by one form of service more than the other?**

MR. SKLAR: Objection to form. You can answer.

A. I mean I serve papers however I can serve it is how I serve it. However this happens it happens. It is how I serve it.

**Q. So, would you say you serve them all equally?**

MR. SKLAR: Objection to form.

A. I just explained that I serve the paper however it happens, it is however it happens. I will not say it is all equal, I don't know.

**Q. Do you ever serve by nail and mail?**

Page 159

**BENJAMIN LAMB**

A. I have.

**Q. Do you know how many times you have?**

A. If I can tell you that, I can tell you the rest.

**Q. Can you tell me how many times you have served by nail and mail in the last month?**

A. Not offhand, no.

**Q. But you believe you have served by nail and mail in the past month?**

A. Yes, I have.

**Q. You do serve people by personal service?**

A. Yes, I do.

**Q. Do you serve people personally more often than you served people by substitute service?**

A. You asked me the same question, I don't know. I don't keep a record of that. I just do it.

**Q. Technically you do keep a record?**

A. I mean I do keep a record. Look, I said I don't refer back to the notes that I did, I put the information in. I'm not keeping a record

Page 160

BENJAMIN LAMB

up here. I did this one personal or I don't do that. If I went back to I could say this is what it is, but offhand, I don't know.

**Q. Just to clarify, when you receive assignments from Samserv, each assignment should equal one affidavit of service, right?**

MR. SKLAR: Objection to form. You can answer.

A. If you actually -- no. If I think what you're asking me is that it should be one affidavit for each -- just one affidavit for that service, that service.

**Q. For each assignment?**

A. I mean, I don't really know if you -- I don't know what you mean, there are, sometimes there are multiple Defendants on one assignment. So I don't know.

**Q. That is a good point. So, you might have one assignment and there would be more than one affidavit of service?**

A. Right.

**Q. And in that instance would you get paid for each Defendant, for serving each Defendant?**

Page 161

**BENJAMIN LAMB**

A. That would depend on if that is how I got paid -- the way that I understand I get paid based on how he gets paid for the service. How Mr. Mlotok gets paid. So if Mr. Mlotok gets paid for each Defendant, then I'm sure based on what I would understand, he would pay me for each Defendant. If he doesn't, I get paid for what I get paid for what he gets paid.

**Q. You testified before that you get paid per paper, so, generally speaking is a paper per case or per Defendant?**

A. Generally speaking you're right, that would be the case. Like I said also, if there is multiple Defendants for the same case it is not always the way I would get paid for the extra Defendants that go along.

**Q. When there are multiple Defendants your pay rate can vary depending on how Mr. Mlotok is paid?**

A. Right.

**Q. There is also a possibility that you can't affect service on assignment and so there would be no particular affidavit of service, right?**

Page 162

BENJAMIN LAMB

A. No.

**Q. No, that is not true?**

A. No, I can't give an affidavit of service if I don't serve the paper.

**Q. I think we agree on that. Generally speaking the numbers of assignments and the numbers of affidavits should generally match up?**

A. Yes.

**Q. With the exceptions that we just talked about?**

A. Right, okay.

**Q. So you testified before that you reviewed the affidavits of service that you sign in Mr. Mlotok's office, right, but you don't check your logbook when you're checking the affidavits of service?**

A. Right.

**Q. Because, the service was usually done recently or recently to when you're signing those affidavits, so, you recall the particular instances of service, right?**

A. Recently as in what, like what? You're saying words you have been saying things

Page 163

BENJAMIN LAMB

that I didn't say. I need to understand what you you're saying.

**Q. Maybe you can explain to me?**

A. You have to explain to me first.

MR. SKLAR: Let her ask the question. If you don't understand the question she will do a great job rephrasing or whatever needs to be done.

**Q. Maybe if you can clarify with me why you don't review your logbook when you're reviewing the affidavit of service?**

MR. SKLAR: Objection to form. You can answer.

A. I just don't review my logbook. There is not particular reason why. Like I said, a lot times the service is not that far in between from the time I did it so -- but I also explained sometimes I don't always look over them as thoroughly as I should.

**Q. Have you ever been concerned about the fact that Samserv filing affidavits by you, these sworn statements that they are filing these in the court?**

A. Am I concerned about it?

Page 164

BENJAMIN LAMB

MR. SKLAR: Objection to form. You can answer.

A. I don't understand what you mean by concerned about it.

**Q. When you seen affidavits you're swearing that the information in the affidavit is true, right?**

A. Right.

**Q. So, are you concerned that there is information that may not be accurate and you're signing it anyway?**

A. Actually, no. I'm not really. I really wasn't worried about the fact about it not being accurate, no.

**Q. And you know that the affidavits are then filed in the courts, right? We talked about that before.**

A. Right, we did.

**Q. And do you know that falsely signing or signing something that is false that you swear to be true could be considered perjury?**

MR. SKLAR: Objection to form.

A. I think I kind of understand what you're saying, but in that particular instance I

Page 165

BENJAMIN LAMB

didn't -- I mean -- you're saying basically if there was a typo and I signed it, then I'm lying? Is that what you're saying?

**Q. I'm not the person who would make that decision. I'm just asking.**

A. That is the question that you're asking. I'm asking if that is what you're saying.

**Q. I'm asking if you understand signing something false can be considered perjury?**

A. And I'm asking you again, are you asking me if I signed a piece of paper and there was a typo, that I'm lying?

**Q. Do you think there are any error in the affidavits of service that you signed? The only errors are typos, is that your testimony?**

MR. SKLAR: Objection to form.

A. Would it be the only -- the would the only errors be typos, yes, it would be.

**Q. Do you have any estimates on how many services you make on a regular basis on a regular day on an average day?**

MR. SKLAR: Objection to form, asked and answered. You can answer it again.

A. I think you asked me before and I

BENJAMIN LAMB

told you I don't. Some days I have good days and some days I have okay days and some days I do almost nothing.

**Q. Do you know that Samserv's records show that on more than 200 days you affected more than 30 services?**

A. No, I don't know what their records show.

**Q. Does that sound plausible?**

A. You said on what. Say it again.

**Q. More than 30 services in one day?**

A. Sure.

**Q. How about more than 40?**

A. Sure.

**Q. How about more than 50?**

A. Yes.

**Q. More than 60?**

A. Yes.

**Q. More than 70?**

A. It can be.

**Q. More than 80?**

A. It depends.

**Q. You think it is possible that or likely that you serve more than 90 services on one**

**BENJAMIN LAMB**

**day?**

MR. SKLAR: Objection to form.

A. Basically I said it all depends. There is a lot of different things that come into play. If you serve from the start of the day to the close of the day, then, you know, I should say the close of my day, whatever that may be. I could be serving all hours. I serve papers, if I get a groove going and everything is kind of close by, sure you can.

**Q. Do you think that is true for specific -- you're capable of serving more than a hundred in a day?**

MR. SKLAR: Objection to form, you can answer.

A. I don't know about maybe over a hundred, close to that, maybe about that, sure you can, depending on what time you start and what time you finish.

**Q. You don't recall how often that may have happened?**

A. As far as what happening?

**Q. You served more than 90, more than 100?**

**BENJAMIN LAMB**

A. If there were a couple of days like that, I'm not really sure of it now, I mean it's a possibility, it may have been that, close to that. Over that, I don't know. I'm not going to say it was a regular basis that I was serving 90 papers a day, no.

(Lamb Exhibit 6 for identification, Affidavit of service from a case LR Credit 14 LLC against Marlen Gutierrez.)

(Lamb Exhibit 7 for identification, Affidavit of service in the case LR Credit 14 LLC against Carbett Green.)

**Q. I show whether you is marked as Lamb Exhibit 6. Do you recognize this document?**

A. This particular document, I recognize the document yes, but not this particular one, no.

**Q. What do you mean by that?**

A. I mean I know this is an affidavit of service for Samserv.

**Q. Is it an affidavit of service with your signature on it?**

A. Yes, it is.

**Q. What kind of service is alleged on**

**BENJAMIN LAMB**

**this affidavit?**

MR. SKLAR: For the record, Lamb Exhibit 6 is an affidavit of service from a case LR Credit 14 LLC against Marlen, M-a-r-l-e-n Gutierrez, G-u-t-i-e-r-r-e-z,.

Exhibit 7 is an affidavit of service in the case LR Credit 14 LLC Carbett, C-a-r-b-e-t-t, Green.

MS. COFFEY: I hadn't shown him Exhibit 7 yet.

MR. SKLAR: Okay, that's fine.

**Q. I think I had an outstanding question about what kind of service is alleged in this affidavit?**

A. Suitable age service.

**Q. What is the date that the service was affected?**

MR. SKLAR: Objection to form. You can answer.

A. The date says Saturday, December 8th, 2007.

**Q. What time does the affidavit say that service was affected?**

A. 7:00 a.m.

BENJAMIN LAMB

**Q. And you testified that you signed this affidavit and it's a form statement, right?**

A. Yes.

**Q. Now, I will show you Exhibit 7, Lamb Exhibit 7 is an affidavit LR Credit 14 versus Carbett Green. What kind of service is described as being affected on this affidavit?**

A. Suitable age service.

**Q. What is the date that service was affected?**

A. December 8th, 2007.

**Q. What is the time service was affected?**

A. 7:00 a.m.

**Q. The address that this service was affected?**

A. The address on this one -- which one 7 or 6?

**Q. Seven?**

A. Seven is 2979 Edison Avenue.

**Q. What was the address on Lamb 6 which is the Gutierrez affidavit of service?**

A. 887 Hunts Point Avenue.

**Q. So, would you agree that it is not**

**BENJAMIN LAMB**

**possible to have served process at these two different addresses on the same day at the exact same time?**

A. Yes, I would.

**Q. Do you have any explanation for why these two affidavits of service that you signed and are sworn to have the same date and time on them?**

A. The only thing that I could give you for an explanation, it's a typo. Typographical error.

(Lamb Exhibit 8 for identification, Affidavit of service in LR Credit 14 versus Natasha Santos.)

**Q. I show you what I marked as Lamb Exhibit 8, which is an affidavit of service in LR Credit 14 versus Natasha Santos, what kind of service is described as being affected in this affidavit?**

A. Suitable age.

**Q. What is the date of service?**

A. December 8th, 2007.

**Q. What time of service?**

A. 7:58 a.m.

BENJAMIN LAMB

**Q. What is the address?**

MR. SKLAR: Just to note for the record just to be complete the affidavit does say at approximately the time of 7:58 a.m.

**Q. Did you say what the address is?**

A. 1263 Boyton Avenue.

**Q. And you signed this affidavit, right?**

A. Yes.

(Lamb Exhibit 9 for identification, LR affidavit of service entitled Credit 14 versus David Jones.)

**Q. I show what is a marked as Lamb Exhibit 9 which is an LR Credit 14 versus David Jones, affidavit of service. Mr. Lamb, what kind of service is alleged to be affected in this case?**

A. Suitable age.

**Q. What is the date of service?**

A. December 8th, 2007.

**Q. And the time of service?**

A. 7:58 a.m.

**Q. What is the address of service?**

A. 1817 Story Avenue.

**Q. So, do you agree that these are two**

**BENJAMIN LAMB**

**affidavits of service that allege service was affected on the same day at the same time at two different addresses?**

MR. SKLAR: Objection. The document speaks for themselves, you can answer.

A. Exactly.

**Q. And again, it would be impossible to serve two people at these two different addresses at the same time, correct?**

A. Exactly.

**Q. Is it your testimony that the only explanation for the occurrence of two affidavits attesting to service at the exact same time is a typographical error?**

A. That is the only thing that it can be.

(Lamb Exhibit 10 for identification, Affidavit of service for LR Credit 14 versus Wanda Santiago.)

**Q. I show you Lamb Exhibit 10, LR Credit 14 versus Wanda Santiago. Can tell me what type of service is alleged to have been effected in that case?**

A. Suitable age.

Page 174

BENJAMIN LAMB

**Q. What is the date of service?**

A. December 8, 2007.

**Q. And what is the time of service?**

A. 11:30 a.m.

**Q. What is the address of service?**

A. 2245 Randall Avenue.

**Q. And you signed that affidavit of service, right?**

A. Yes, I did.

(Lamb Exhibit 11 for identification, Affidavit of service for LR Credit 14 versus Nicole Wallace.)

**Q. I show you Lamb Exhibit 11 LR Credit 14 versus Nicole Wallace. What is the date of service on this case according to this affidavit of service?**

A. This one that you just gave me.

**Q. Against Miss Wallace, yes?**

A. December 8th, 2007.

**Q. What is the time?**

A. 11:30 a.m.

**Q. And what is the address that is on this affidavit of service?**

A. 1570 Crotona Park East.

Page 175

BENJAMIN LAMB

**Q. Did you testify, I'm sorry if you already answered this, what kind of service is this?**

A. Suitable age.

**Q. And that affidavit was also signed by you, right?**

A. Yes.

**Q. So, Lamb 10 and Lamb 11 both state that service was affected at two different addresses on the same date at the same time?**

A. Yes.

MR. SKLAR: Let her finish.

**Q. It is your testimony that the only way these two affidavits would state that service was affected the same day at the same time at different addresses is because of a typographical error?**

A. Yes.

**Q. The typographical error is the actual date and the actual time that someone was supposedly served, right?**

MR. SKLAR: Objection to form. I don't understand the question.

MS. JAIN: He can say if he

Page 176

BENJAMIN LAMB

understands.

A. Ask me again, the actual what?

**Q. The typographical error that I don't remember referring to, is the actual date and the actual time that service was affected?**

A. Actually the only thing that I can say about it as far as the typographical error would be the time of service. Because I don't know -- I can't refer back now to tell you if the date is actually correct or not, because I don't remember. And which one was served at that point in time, at that time, I don't remember and I can't look back and prove it to show you the affidavit is an error. But it is definitely an error from one of those two things.

**Q. Meaning the date and/or the time?**

A. Yes.

THE WITNESS: Can I ask my attorney a question?

MR. SKLAR: There is no question pending. Let's take a two-minute break.

(Recess taken.)

MR. SKLAR: Do you want him to look for these to see if there is other typos

Page 177

BENJAMIN LAMB

other than the date that he mentioned, do you want him to look to see if there is anything else.

MS. JAIN: I don't understand are you asking her what questions you want her to ask?

MR. SKLAR: Just say you pointed out to me, if you want to mention it.

A. I was basically what it is, another I'm looking at it now and I'm seeing.

MR. SKLAR: Referring to Exhibit 11.

A. There was a Miss Mary. The woman as name it was Mary there is two Rs, I wouldn't have written that. There is no way for me to write that. It may be a small point but it is still a point and it is something that I missed in reading it.

**Q. I appreciate that, but would you agree that a typographical error where someone's name is misspelled where there is an extra R in this instance with Miss Mary, that could be considered a typographical error, but the error that we are talking about, the date and time of service is actually a little more serious than a**

Page 178

BENJAMIN LAMB

**typo?**

MR. SKLAR: Objection to form.

A. Actually I just said I don't know, it may be a small point but a point nonetheless that you can make those errors and I don't remember reading somebody's writing and don't understand what you're reading, it will or assume it to be one thing it will come out like that.

**Q. The point of an affidavit of service is to accurately describe when someone was served with notice about a court case, right?**

A. Right.

**Q. So, a fundamental part of the affidavit is getting the date and the time of the person served, correct, right?**

MR. SKLAR: Objection to form, you can answer.

A. Say that again.

**Q. An affidavit of service the whole point of it is to document when someone received notice about a court case, right?**

A. Yes.

**Q. So, the date and time that someone received notice about a court case is a critical**

Page 179

BENJAMIN LAMB

**part of the affidavit, right?**

MR. SKLAR: Objection to form.

A. Actually, yes. All of it is critical. But again, something passes you while you're doing things, I didn't notice them.

(Lamb Exhibit 12 for identification, Affidavit of service for LR Credit 14 versus Dulce Camilo.)

**Q. I give you Lamb Exhibit 12. LR Credit 14 versus Dulce Camilo. Can you tell me what kind of service was affected according to this affidavit of service?**

A. Suitable age service.

**Q. And on what date was service affected?**

A. December 8th, 2007.

**Q. At what time?**

A. 8:47 a.m.

**Q. What was address?**

A. 2526 Saint Raymond's Avenue.

**Q. You signed this affidavit swearing that the information in it was true; correct?**

A. Yes.

(Lamb Exhibit 13 for identification,

Page 180

BENJAMIN LAMB

Affidavit of Service for LR Credit 14 versus Jose Baldera.)

**Q. This is Lamb Exhibit 13. Which is LR Credit 14 versus Jose Baldera. Can you tell me what kind of service is affected in this case?**

A. This was suitable age service.

**Q. On what date?**

A. December 8th, 2007.

**Q. At what time?**

A. 8:47.

**Q. What address?**

A. 11:54 Elder Avenue.

**Q. So, Lamb Exhibit 12 and Lamb Exhibit 13 both indicate that service was affected on the same date at the same time at two different addresses, right?**

A. Yes.

**Q. And both of these affidavits are signed and sworn to by you?**

A. Yes.

(Lamb Exhibit 14 for identification, Affidavit of service for LR Credit 14 versus Thelma Williams.)

**Q. This is Lamb Exhibit 14. This is**

Page 181

BENJAMIN LAMB

**LR Credit 14 versus Thelma Williams. Can you tell me what kind of service was affected in this case?**

A. Suitable age.

**Q. And on what date?**

A. December 8th, 2007.

**Q. What time?**

A. 9:59 a.m.

**Q. What address was service affected at?**

A. 1553 Union Port Road.

(Lamb Exhibit 15 for identification, Affidavit of service for LR Credit 14 versus Anthony Vargas.)

**Q. I show you Lamb Exhibit 15 which is LR Credit 14 versus Anthony Vargas. Can you tell me what date service was affected?**

A. December 8, 2007.

**Q. What kind of service was affected?**

A. Suitable age.

**Q. At what time?**

A. 9:59 a.m.

**Q. What is the address that service was affected on?**

A. 729 Thieriot Avenue.

**Q. Would you agree that both of these affidavits indicate service was affected on the same day at the same time at two different addresses?**

A. Yes.

**Q. And you signed both of these affidavits swearing what they said was true, right?**

A. Yes..

(Lamb Exhibit 16 for identification, Affidavit of service for LR Credit 14 versus Bobby Garcia.)

**Q. I show you Lamb Exhibit 16 which is LR Credit 14 versus Bobby Garcia. Can you tell me what kind of service was affected in this case?**

A. Suitable age.

**Q. On what date?**

A. December 8th, 2007.

**Q. At what time?**

A. 12:00 p.m.

**Q. What address was service affected at?**

A. 2219 Sinatis Avenue

(Lamb Exhibit 17 for identification,

Affidavit of service for LR Credit 14 versus Carolyn Williams.)

**Q. I show you Lamb Exhibit 17 which is LR Credit 14 versus Carolyn Williams. Can you tell me what kind of service is affected in this case?**

A. Suitable age.

**Q. And on what date?**

A. December 8th, 2007.

**Q. What time?**

A. 12 p.m.

**Q. At what address?**

A. 1734 Adam Street.

**Q. So, again, these are two affidavits that you signed, right, you signed both of these affidavits?**

A. Yes, I did.

**Q. And they both indicate service at the same time on the same date at two different addresses which is impossible, right?**

A. Exactly.

**Q. I would like to also point your attention to the date that these affidavits were signed, do you see what date those affidavits were**

**signed by you?**

A. Signed by me, the 18th.

**Q. December 18th, 2007?**

A. November.

**Q. No, December 18th, 2007; is that right?**

A. The date that I signed it?

**Q. Both of them.**

A. I believe so. I'm not sure, but I believe so.

**Q. Do the affidavits show the date of December 18th, 2007?**

A. Do they show it, they show December 18th, 2007. It was served on the 8th and signed on 18th.

**Q. You signed them both on the same date?**

A. It was served on the 8th, what are you asking me.

**Q. I'm asking you the date that you signed the affidavit?**

MR. SKLAR: Each one was signed on the 18th.

A. The 18th not the 8th.

**Q. December 18th, 2007, you agree that you signed both of them on that day?**

A. Yes.

**Q. Is it odd that you signed them both on the same date and didn't notice the fact that they were both served at the same time on the same date?**

MR. SKLAR: Objection to form.

A. You're asking me is it odd that I didn't notice that?

**Q. Yes.**

A. No, it is not odd that I didn't notice that.

**Q. Why is that?**

A. Because as I explained before, I miss things in signing them and if it was a lot of them to go through, I probably didn't go through all of them like I should have. So no, it is nod odd.

**Q. Do the what you described as typographical errors on affidavits, might they also involve indicating the wrong type of service?**

MR. SKLAR: Objection to form.

A. No, I don't think that would be the

BENJAMIN LAMB

case, because if I served personally I would write personal on the worksheet. If I served suitable age, there is a person's name on the worksheet.

**Q. Mr. Lamb, have you ever been arrested?**

MR. SKLAR: Note my objection. You can ask him if he was ever convicted of anything having to do with a felony conviction or a conviction having to do with dishonesty or anything of that sort. That is permissible under the Federal Rules. But a fishing expedition will not happen here.

MS. JAIN: This isn't a trial. If your objection is to form. That is the question.

MR. SKLAR: It is an objection. Discovery is not unlimited and if want to ask him if he ever say convicted of a felony or convicted of anything having to do with dishonesty for false statements, you can ask him that, otherwise I instruct him not to answer.

**Q. Mr. Lamb, do you remember filling out a license application and license renewal for**

**BENJAMIN LAMB**

**your process serving license?**

A. Yes.

**Q. Do you recall one of the questions being whether you have been arrested for committing a crime.**

A. No.

(Lamb Exhibit 18 for identification, Renewal application for the Department Of Consumer Affairs.)

**Q. I show you what is marked as Lamb Exhibit 18 which is a renewal application for the Department Of Consumer Affairs. If you look at the bottom of the first page under part three you see a question number 1B. "Are you now facing any pending criminal or civil charge."**

A. Yes.

**Q. And it looks like you marked off both yes and no?**

A. Yes.

**Q. Can you explain why you marked yes and no?**

MR. SKLAR: Hold on a second. Okay. You can answer that.

A. Because the first question asked me

BENJAMIN LAMB

are you convicted of anything and I put no and the reason I think -- when was this, 2008, if I'm right, I'm not sure, I'm not really sure. As a matter of fact -- no, it was a mistake with the yes. That is a mistake, I don't remember at that time what it was. Maybe I hit that by mistake, I don't remember.

**Q. So in February of 2008 when you applied for a license renewal you were not facing any pending criminal or civil charges?**

A. Not that I recall at that time, no.

**Q. Since then have you been convicted of any crime?**

MR. SKLAR: Objection. Convicted of a felony or any crime having to do with dishonesty or false statements.

**Q. Can you answer that question?**

A. Are you asking what, have you been conflicted of a felony?

**Q. Yes.**

A. No.

**Q. Have you been convicted of any crime, Mr. Lamb?**

MR. SKLAR: I instruct him not to

BENJAMIN LAMB

answer that particular question.

MS. COFFEY: I think we are done, Mr. Lamb, but I want to confer with my colleagues for a moment and see if I have any additional follow-up questions.

(Recess taken.)

BY MS. COFFEY:

**Q. Mr. Lamb, just one more question. I know had it has been a long day. One more question before we part ways.**

**Have you discussed this lawsuit with Mr. Mlotok at all?**

A. No, we don't talk about it.

**Q. Have you ever talked with him about it?**

A. The only time I talked with him when he told me I had to meet with the lawyer.

**Q. How about when you found out about the lawsuit?**

A. No, we didn't go through all that. He told me he had to do what he had to and he told me that we had a lawyer.

**Q. What do you mean he had to do what he had to do?**

**BENJAMIN LAMB**

A. He started making phone calls trying to fine somebody to defend the situation.

**Q. In the beginning when you both found out about the lawsuit?**

A. Right.

MS. COFFEY: Thank you..

(TIME NOTED: 4:17 P.M.)

________________________
BENJAMIN LAMB

Subscribed and sworn to before me this _____ day of _________, 2011.

____________________________________

STATE OF NEW YORK ) Pg__ of__Pgs
ss:
COUNTY OF NEW YORK )

I wish to make the following changes, for the following reasons:

PAGE LINE

____ ____ CHANGE: ______________________
REASON: ______________________
____ ____ CHANGE: ______________________
REASON: ______________________
____ ____ CHANGE: ______________________
REASON: ______________________
____ ____ CHANGE: ______________________
REASON: ______________________
____ ____ CHANGE: ______________________
REASON: ______________________
____ ____ CHANGE: ______________________
REASON: ______________________
____ ____ CHANGE: ______________________
REASON: ______________________
____ ____ CHANGE: ______________________
REASON: ______________________

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, WILLIAM VISCONTI, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That BENJAMIN LAMB, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this ____ day of ___________, 2011.

__________________________
WILLIAM VISCONTI

E X H I B I T S

| DESCRIPTION | PAGE |
|---|---|
| (Lamb Exhibit 1 for identification, Document previously marked Lewis 2.) | 34 |
| (Lamb Exhibit 2 for identification, affidavit signed by Mr. Lamb on October 26, 2011.) | 133 |
| (Lamb Exhibit 3 for identification, Page 12 of Mr. Lamb's logbook.) | 134 |
| (Lamb Exhibit 4 for identification, page 21 of Mr. Lamb's logbook.) | 139 |
| (Lamb Exhibit 5 for identification, Page 9 of Mr. Lamb's logbook.) | 148 |
| (Lamb Exhibit 6 for identification, affidavit of service from a case LR Credit 14 LLC against Marlen Gutierrez.) | 168 |

E X H I B I T S

| DESCRIPTION | PAGE |
|---|---|
| (Lamb Exhibit 7 for identification, affidavit of service in the case LR Credit 14 LLC against Carbett Green.) | 168 |
| (Lamb Exhibit 8 for identification, affidavit of service in LR Credit 14 versus Natasha Santos.) | 171 |
| (Lamb Exhibit 9 for identification, LR affidavit of service entitled Credit 14 versus David Jones.) | 172 |
| (Lamb Exhibit 10 for identification, Affidavit of service for LR Credit 14 versus Wanda Santiago.) | 173 |
| (Lamb Exhibit 11 for identification, Affidavit of service for LR Credit 14 versus Nicole Wallace.) | 174 |

E X H I B I T S

| DESCRIPTION | PAGE |
|---|---|
| (Lamb Exhibit 12 for identification, affidavit of service for LR Credit 14 versus Dulce Camilo.) | 179 |
| (Lamb Exhibit 13 for identification, affidavit of Service for LR Credit 14 versus Jose Baldera.) | 179 |
| (Lamb Exhibit 14 for identification, affidavit of service for LR Credit 14 versus Thelma Williams.) | 180 |
| (Lamb Exhibit 15 for identification, Affidavit of service for LR Credit 14 versus Anthony Vargas.) | 181 |
| (Lamb Exhibit 16 for identification, Affidavit of service for LR Credit 14 versus Bobby Garcia.) | 182 |

E X H I B I T S

| DESCRIPTION | PAGE |
|---|---|
| (Lamb Exhibit 17 for identification, Affidavit of service for LR Credit 14 versus Carolyn Williams.) | 182 |
| (Lamb Exhibit 18 for identification, renewal application for the Department Of Consumer Affairs.) | 187 |