UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MONIQUE SYKES, RUBY COLON, REA
VEERABADREN, and FATIMA GRAHAM,
individually and on behalf of all others
similarly situated,

                                    Plaintiffs,

- against -

MEL S. HARRIS AND ASSOCIATES LLC; MEL
S. HARRIS; MICHAEL YOUNG; DAVID
WALDMAN; KERRY LUTZ; TODD
FABACHER; MEL HARRIS JOHN/JANE DOES
1-20; LEUCADIA NATIONAL CORPORATION;
L-CREDIT, LLC; LR CREDIT, LLC; LR CREDIT
10, LLC; LR CREDIT 12, LLC; LR CREDIT 18,
LLC; LR CREDIT, LLC; JOSEPH A. ORLANDO; PHILIP M.
CANNELLA; LR CREDIT JOHN/JANE DOES 1-
20; SAMSERV, INC.; WILLIAM MLOTOK;
BENJAMIN LAMB; MICHAEL MOSQUERA;
and SAMSERV JOHN/JANE DOES 1-20,

                                    Defendants.

ECF Case

No. 09 Civ. 8486(DC)



**AMENDED CLASS ACTION
COMPLAINT AND JURY DEMAND**

Plaintiffs Monique Sykes, Ruby Colon, Rea Veerabadren, and Fatima Graham, on

behalf of themselves and all others similarly situated, for their complaint, allege, upon personal

knowledge as to themselves and information and belief as to other matters, as follows:

### INTRODUCTION

1.      This class action seeks to vindicate the rights of more than 100,000 New

York City residents who have been victimized for years by a massive scheme to deprive them of

due process and fraudulently obtain and enforce thousands of default judgments worth millions

of dollars in violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*

("FDCPA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968

1

("RICO"), and New York General Business Law § 349.

      2.      The primary players in this fraudulent enterprise are (1) a law firm, Mel S. Harris and Associates LLC, and its principals (the "Mel Harris Defendants"); (2) a publicly traded corporation, Leucadia National Corporation, its shell and alter ego debt buying companies—L-Credit, LLC, LR Credit, LLC, LR Credit 10, 12, and 18 LLC—and their principals (the "Leucadia Defendants"); and (3) a process serving agency, Samserv, Inc., and its principal (the "Samserv Defendants").

      3.      Since 2006, the Leucadia Defendants have filed more than 100,000 "consumer credit actions," or debt collection lawsuits, in the Civil Court of the City of New York ("Civil Court"). The Mel Harris Defendants represent the Leucadia Defendants in virtually all of the debt collection lawsuits they bring. The vast majority of these lawsuits result in default judgments in favor of the Leucadia Defendants. On information and belief, more than 90% of the people sued by the Leucadia and Mel Harris Defendants do not appear in court.

      4.      On information and belief, in nearly all of these lawsuits, Defendants engage in "sewer service"—failing to serve the summons and complaint and then filing fraudulent affidavits of service. The Leucadia and Mel Harris Defendants regularly hire the Samserv Defendants to perform this task. Defendants' practice of sewer service deprives Plaintiffs and putative class members of due process; without notice of the lawsuit filed against them, Plaintiffs and putative class members are denied their day in court. On information and belief, sewer service is the primary reason so few of the people sued by Defendants appear in court to defend themselves.

      5.      On information and belief, in nearly all of these lawsuits, Defendants do not possess and cannot obtain proof that the people they sue owe the alleged debts.

6.      In order to secure default judgments, the Leucadia and Mel Harris Defendants file false affidavits of service claiming that people were served when they were not, and false affidavits of merit claiming that Defendants have personal knowledge of the facts necessary to secure a default judgment when they do not.  Relying on these false affidavits, the Civil Court issues default judgments against Plaintiffs and putative class members.

7.      After Defendants have fraudulently obtained default judgments, they proceed to wrongfully restrain bank accounts, garnish wages, threaten to seize personal property, and/or pressure people into unaffordable payment plans.  These fraudulent judgments appear on people's credit reports, preventing them from obtaining housing, employment, insurance, and affordable credit.

8.      Plaintiffs seek to end these abhorrent practices once and for all.  Plaintiffs and putative class members are entitled to preliminary and permanent injunctive relief, including disgorgement, declaratory relief, and damages.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1692k(d) and 18 U.S.C. §§ 1961-68, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965.

## PARTIES

*Plaintiffs*

10.      Plaintiff Monique Sykes is a 29-year-old mother of two who resides in Bronx, New York.  Ms. Sykes is a "consumer" as that term is defined in 15 U.S.C. § 1692a(3).

11.    Plaintiff Ruby Colon is 38-years-old and disabled.  She resides in Brooklyn, New York.  Ms. Colon is a "consumer" as that term is defined in 15 U.S.C. § 1692a(3).

12.    Plaintiff Rea Veerabadren is a 57-year-old Mauritian immigrant who resides in Queens, New York.  Ms. Veerabadren is a "consumer" as that term is defined in 15 U.S.C. § 1692a(3).

13.    Plaintiff Fatima Graham is a 30-year-old single mother who resides in New York, New York.  Ms. Graham is a "consumer" as that term is defined in 15 U.S.C. § 1692a(3).

**Defendants**

14.    Defendants Mel S. Harris and Associates LLC, Mel S. Harris, Michael Young, David Waldman, Kerry Lutz, Todd Fabacher, and Mel Harris John/Jane Does 1-20 are referred to collectively as the "Mel Harris Defendants."

15.    Defendant Mel S. Harris and Associates LLC ("Mel Harris LLC") is a New York limited liability company with its principal place of business at 5 Hanover Square, 8th Floor, New York, New York 10004.  Defendant is a law firm and is regularly engaged in the business of collecting consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits, on behalf of its clients and co-conspirators, including but not limited to Defendants L-Credit, LLC, LR Credit, LLC, and LR Credits 10, 12, and 18, LLC, who are also debt collectors.  Defendant Mel Harris LLC's principal business is debt collection.  It is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

16.    Defendant Mel S. Harris ("Harris") is a natural person, and the Senior

-4-

Member and a Manager of Defendant Mel Harris LLC. Defendant Harris regularly collects, directly or indirectly, consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits. Defendant Harris is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

17.     Defendant Todd Fabacher ("Fabacher") is a natural person who is employed by Defendants Mel Harris LLC, Leucadia National Corporation, L-Credit, LLC, LR Credit, LLC and/or LR Credits 10, 12, and 18, LLC. Defendant Fabacher claims to be the "authorized and designated custodian of records" for all or nearly all of the accounts on which Defendants file suit. Defendant Fabacher regularly collects, directly or indirectly, consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits. Defendant Fabacher is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

18.     Defendant Michael Young ("Young") is a natural person, and the Executive Director and Chief Operating Officer of Defendant Mel Harris LLC. Defendant Young notarizes all or nearly all of Defendant Fabacher's affidavits of merit. Defendant Young regularly collects, directly or indirectly, consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits. Defendant is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

19.     Defendant David Waldman ("Waldman") is a natural person, and a Member and Manager of Defendant Mel Harris LLC. Defendant Waldman regularly collects, directly or indirectly, consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits. Defendant Waldman is a "debt collector" as defined

by the FDCPA, 15 U.S.C. § 1692a(6).

      20.    Defendant Kerry Lutz ("Lutz") is a natural person, and a partner of Defendant Mel Harris LLC.  Defendant Lutz regularly collects, directly or indirectly, consumer debts alleged to be due to another via the mail, telephone, internet, and civil debt collection lawsuits.  Defendant Lutz is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

      21.    Defendants "Mel Harris LLC John/Jane Does 1-20" are persons associated with Defendant Mel Harris LLC who were involved in the violations of law alleged in this Complaint.

      22.    Defendants LR Credit 10, LLC, LR Credit 12, LLC, and LR Credit 18, LLC, are referred to collectively as "LR Credits 10, 12, and 18."

      23.    Defendants Leucadia National Corporation, L-Credit, LLC, LR Credit, LLC, LR Credits 10, 12, and 18, Joseph A. Orlando, Philip M. Cannella, and Leucadia John/Jane Does 1-20 are referred to collectively as the "Leucadia Defendants."

      24.    Defendants L-Credit, LLC, LR Credit, LLC, and LR Credits 10, 12, and 18 are also referred to collectively as the "LR Credit Defendants."

      25.    Defendant Leucadia National Corporation ("Leucadia") is a corporation with its principal place of business at 315 Park Avenue South, 20th Floor, New York, New York 10010.  Leucadia is the parent company of the LR Credit Defendants.  On information and belief, the LR Credit Defendants are wholly-owned subsidiaries of Leucadia.  The president and vice president of LR Credit, LLC and LR Credits 10, 12, and 18 are high-ranking Leucadia executives.  Leucadia and the LR Credit Defendants share the same address.  On information and belief, Leucadia has complete control over the LR Credit Defendants' debt collection activities,

and the LR Credit Defendants are mere instrumentalities of Leucadia.  On information and

belief, all of the profits of the LR Credit Defendants flow directly to Leucadia.  Accordingly,

through its wholly-owned subsidiaries, Leucadia is a purchaser and collector of defaulted

consumer debts; is regularly engaged in the business of collecting, directly or indirectly,

consumer debts alleged to be due to another via mail, telephone, internet, and civil debt

collection lawsuits; and is principally engaged in debt collection.  Defendant Leucadia is a "debt

collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

26.     Defendant L-Credit LLC ("L-Credit") is a Delaware limited liability

company.  L-Credit transacts business in New York and lists its address as 315 Park Avenue

South, New York, New York 10010.  However, L-Credit has no registered agent for service of

process in the State of New York and is not currently registered with the New York Department

of State.  On information and belief, L-Credit is a wholly-owned subsidiary of Leucadia.  In turn,

L-Credit is the sole corporate owner of Defendant LR Credit, LLC.  In legal pleadings, LR

Credit Defendants list their addresses as c/o L-Credit, LLC.  L-Credit is a purchaser and collector

of defaulted consumer debts; is regularly engaged in the business of collecting, directly or

indirectly, consumer debts alleged to be due to another via mail, telephone, internet, and civil

debt collection lawsuits; and is principally engaged in  debt collection.  Defendant L-Credit is a

"debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

27.     Defendant LR Credit, LLC is a Delaware limited liability company.  LR

Credit, LLC transacts business in New York and is located at 315 Park Avenue South, 20th

Floor, New York, New York 10010.  Defendant's registered agent in the State of New York is C

T Corporation System, 111 Eighth Avenue, New York, NY 10011.  LR Credit, LLC is wholly

owned by L-Credit.  LR Credit, LLC is also the sole owner of Defendants LR Credits 10, 12, and

18.  The President and Vice President of LR Credit, LLC are high-ranking Leucadia executives.

LR Credit, LLC is licensed as a debt collection agency by the New York City Department of

Consumer Affairs ("DCA").  LR Credit, LLC is a purchaser and collector of defaulted consumer

debts; is regularly engaged in the business of collecting, directly or indirectly, consumer debts

alleged to be due to another via mail, telephone, internet, and civil debt collection lawsuits; and

is principally engaged in debt collection.  Defendant LR Credit, LLC is a "debt collector" as

defined by the FDCPA, 15 U.S.C. § 1692a(6).

       28.      Defendants LR Credits 10, 12, and 18 are New York limited liability

companies.  They transact business in New York and are located at 315 Park Avenue South, 20th

Floor, New York, NY 10010.  Their registered agent in the State of New York is C T

Corporation System, 111 Eighth Avenue, New York, NY 10011.  LR Credits 10, 12 and 18 are

wholly owned by Defendant LR Credit, LLC.  The president and vice president of LR Credits

10, 12, and 18 are high-ranking Leucadia executives.  In legal pleadings, LR Credits 10, 12, and

18 each list their address as c/o L-Credit, LLC.  LR Credits 10, 12, and 18 are licensed as debt

collection agencies by the DCA.  They are purchasers and collectors of defaulted consumer

debts; are regularly engaged in the business of collecting, directly or indirectly, consumer debts

alleged to be due to another via mail, telephone, internet, and civil debt collection lawsuits; and

are principally engaged in debt collection.  Defendants LR Credits 10, 12, and 18 are "debt

collectors" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

       29.      Defendant Joseph A. Orlando ("Orlando") is a natural person.  Defendant

Orlando is Vice President and Chief Financial Officer of Leucadia, and President of LR Credit,

LLC and LR Credits 10, 12 and 18.  In his capacity as President of LR Credit, LLC and LR Credits 10, 12 and 18, Defendant Orlando is a purchaser and collector of defaulted consumer debts; is regularly engaged in the business of collecting, directly or indirectly, consumer debts alleged to be due to another via mail, telephone, internet, and civil debt collection lawsuits; and is principally engaged in debt collection.  Defendant Orlando is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

      30.     Defendant Philip M. Cannella ("Cannella") is a natural person.  Defendant Cannella is Assistant Vice President and Director of Taxes of Leucadia, and Vice President of LR Credit, LLC and LR Credits 10, 12 and 18.  In his capacity as Vice President of LR Credit, LLC and LR Credits 10, 12 and 18, Defendant Cannella is a purchaser and collector of defaulted consumer debts; is regularly engaged in the business of collecting, directly or indirectly, consumer debts alleged to be due to another via mail, telephone, internet, and civil debt collection lawsuits; and is principally engaged in debt collection.  Defendant Cannella is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

      31.     Defendants "Leucadia John/Jane Does 1-20" are persons associated with the Leucadia Defendants who were involved in the violations of law alleged in this Complaint.

      32.     Defendants Samserv, Inc., William Mlotok, Benjamin Lamb, Michael Mosquera and Samserv John/Jane Does 1-20 are referred to collectively as the "Samserv Defendants."

      33.     Defendant Samserv, Inc. ("Samserv") is a New York corporation with its principal place of business at 140 Clinton Street, LF, Brooklyn, New York 11201.  Defendant Samserv is a process serving agency regularly engaged in the business of collecting consumer

debts by assisting the other defendants in this case to file and maintain civil debt collection lawsuits and to obtain default judgments in those cases by utilizing the mail, telephone and internet. Samserv regularly collects, directly or indirectly, consumer debts alleged to be due to another via mail, telephone, internet, and civil debt collection lawsuits. Defendant Samserv is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

34. Defendant William Mlotok ("Mlotok") is a natural person who resides at 17 Hollywood Drive, Plainview, New York 11803. Defendant Mlotok is the Chairman and Chief Executive Officer of Defendant Samserv. Defendant Mlotok is regularly engaged in the business of collecting consumer debts by assisting the other defendants to file and maintain civil debt collection lawsuits and to obtain default judgments in those cases by utilizing the mail, telephone and internet. Defendant Mlotok regularly collects, directly or indirectly, consumer debts alleged to be due to another via mail, telephone, internet, and civil debt collection lawsuits. Defendant Mlotok is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

35. Defendant Benjamin Lamb ("Lamb") is a natural person who resides at 537 West 149th Street, New York, New York 10031 and works for Defendant Samserv as a process server. Defendant Lamb is regularly engaged in the business of collecting consumer debts by assisting the other defendants to file and maintain civil debt collection lawsuits and to obtain default judgments in those cases by utilizing the mail, telephone and internet. Defendant Lamb regularly collects, directly or indirectly, consumer debts alleged to be due to another via mail, telephone, internet, and civil debt collection lawsuits. Defendant Lamb is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

36. Defendant Michael Mosquera ("Mosquera") is a natural person who works

-10-

for Defendant Samserv as a process server.  Defendant Mosquera's address is unknown to Plaintiffs' counsel at this time.  Defendant Mosquera is regularly engaged in the business of collecting consumer debts by assisting the other defendants to file and maintain civil debt collection lawsuits and to obtain default judgments in those cases by utilizing the mail, telephone and internet.  Defendant Mosquera regularly collects, directly or indirectly, consumer debts alleged to be due to another via mail, telephone, internet, and civil debt collection lawsuits.  Defendant Mosquera is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

37.     Defendants "Samserv John/Jane Does 1-20" are persons associated with Defendant Samserv who were involved in the violations of law alleged in this Complaint.

## FACTS

### A.     *Background Facts*

#### 1.     *Debt Buyers*

38.     New York City is an epicenter for debt collection lawsuits.  According to records obtained from the Civil Court, debt collectors have been filing nearly 300,000 lawsuits *per year* since 2006.  A substantial number of these lawsuits were brought by debt buyers.

39.      "Debt buyers" are companies, like the Leucadia Defendants, that buy defaulted, charged-off debts for pennies on the dollar and then seek to collect the full face value of the debts for themselves.  Many debt buyers also resell debts to other debt buyers.  Thus it is not uncommon for debts to be bought and sold numerous times over.

40.     Debts are priced on a sliding scale, with freshly charged-off debts commanding a higher price than older debts that other debt buyers and collection agencies have previously tried and failed to collect.  There is even an active market for debts that are past the

-11-

statute of limitations and for debts that have previously been discharged in bankruptcy.

41.    A typical purchased portfolio of debts contains, for each account listed in the portfolio, the consumer's name, Social Security number, last known address and telephone number, and the account number, charge-off date, date and amount of last payment, and alleged amount owed.  This information is transmitted to the debt buyer electronically in the form of a spreadsheet and is often referred to as "media."  The debt buyer typically does not purchase or obtain documents showing an indebtedness between the original creditor and debtor, such as a contract and any subsequent amendments to the contract, account statements, customer service records, or customer dispute records.

42.    Some debt purchase and sale agreements provide that the debt buyer may go back to the original creditor and obtain account documentation for only a limited period of time and in only a limited number of accounts, such as 2% of accounts.  Other purchase and sale agreements provide that the debt buyer may *never* obtain *any* documentation for any debts in the portfolio.  In addition, each time a debt is resold, it becomes less likely that the purchaser will be able to obtain documentation of the debt.

43.    As a result, most debt buyers have significant difficulty substantiating their claims, which has been widely recognized as a problem for the industry and for consumers. *See*, *e.g.*, Federal Trade Commission, *Collecting Consumer Debts: The Challenges of Change* (2009) (discussing problem and proposing solutions).

44.    Debt buyers use multiple tools to collect consumer debts, including contacting consumers directly by mail, telephone, text message and e-mail, reporting the debt to credit reporting agencies, and hiring other debt collectors to collect the debt for them.

Increasingly, however, debt buyers have turned to the courts to collect consumer debts.

45.     Under New York law, debt buyers, like other plaintiffs in civil lawsuits, bear the burden of proof in legal actions. In order to prevail, the debt buyer must submit admissible evidence demonstrating that it is the rightful owner of the account and that the defendant actually owes the debt in the precise amount claimed. *See, e.g., Citibank v. Martin*, 807 N.Y.S.2d 284 (Civ. Ct. N.Y. County 2005).

46.     Debt buyers generally do not obtain additional account documentation prior to bringing a lawsuit against a consumer. Instead, debt buyers generally bring lawsuits based solely upon the skeletal "media" obtained upon purchase of the account portfolio. This "media" is not sufficient to meet the debt buyer's burden of proof as the plaintiff in a lawsuit.

47.     Furthermore, because purchase and sale agreements severely limit or wholly eliminate debt buyers' ability to obtain documentation of the debts from the original creditor, debt buyers are actually *unable* to obtain admissible evidence of the debt in the vast majority of cases that they file.

48.     Recent court decisions confirm that many debt buyers do not possess, and cannot obtain, the evidence required to make out a prima facie case. *See, e.g., PRA III, LLC v. Gonzalez*, 54 A.D.3d 917 (App. Div. 2d Dep't. 2008); *CACH, LLC v. Davidson*, 21 Misc. 3d 1106(A) (Civ. Ct. N.Y. County 2008); *PRA III, LLC v. McDowell*, 15 Misc.3d 1135(A) (Civ. Ct. Richmond County 2007); *Rushmore v. Skolnick*, 15 Misc.3d 1139(A) (Dist. Ct. Nassau County 2007); *Citibank v. Martin*, 11 Misc.3d 219 (Civ. Ct. N.Y. County 2005); *Palisades Collection, LLC v. Gonzalez*, 10 Misc.3d. 1058(A) (Civ. Ct. N.Y. County 2005); *Colorado Capital Investments, Inc. v. Villar*, 06/18/09 N.Y.L.J. 27, col. 3 (Civ. Ct. N.Y. County); *Palisades*

-13-

*Collection, LLC v. Haque*, 4/13/06 N.Y.L.J. 20 (Civ. Ct. Queens County); *CACV of Colorado, LLC v. Chowdhury*, Index No. 94642/07 (Civ. Ct. Bronx County Feb. 19, 2009) (unpublished); *CACH v. Cummings,* Index No. 2274/07 (Civ. Ct. N.Y. County Nov. 10, 2008) (unpublished); *CACV of Colorado Capital Investments v. Pierog*, No. 64449/05 (Civ. Ct. N.Y. County, Sep. 2, 2008) (unpublished).

49.     Because of the high rate of defaults by defendants in debt collection lawsuits, however, debt buyers are rarely put to their proof.

50.     Consumers appear to defend themselves in only about 10% of the cases in the Civil Court, and debt buyers obtain default judgments in the vast majority of lawsuits that they bring. On information and belief, sewer service is the primary reason so few defendants appear in court.

**B.     "Sewer Service"**

51.     The term "sewer service" is widely used to describe the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit of service. Sewer service deprives people of due process because they do not get notice of the lawsuits and are denied their day in court. Default judgments are then entered on the basis of defendants' failure to appear. As the affidavit of service often appears facially valid—indeed, its very purpose is to pass facial review—the fraud generally goes undetected unless the defendant discovers and challenges the fraudulent affidavit after a default judgment has been entered.

52.     Sewer service has a long history in New York City. During the late 1960s and early 1970s, the Civil Court was inundated with tainted consumer claims, many of which were reduced to judgment when the defendant defaulted as a result of sewer service. When the

-14-

court learned of the widespread fraud, it employed its general police powers to vacate thousands of default judgments.

53.    Sewer service remained "rampant" into the 1980s, according to a 1986 report issued by the Office of the New York State Attorney General and the New York City Department of Consumer Affairs (the "Joint Report"). The Joint Report concluded that 39% of all service in New York City was sewer service, and that "a staggering number of illegal default judgments—48,649, or one third of all default judgments—are entered annually."

54.    The Joint Report further concluded that low pay for process servers was the primary cause of sewer service. At the time, debt collection attorneys paid $6 to $12 to process serving agencies per service of process in a debt collection lawsuit. The agencies, in turn, generally paid only $3 to the individual process server who was assigned the task of serving the defendant. Moreover, the process server was paid only for completed services, not for unsuccessful attempts.

55.    The Joint Report detailed the experience of an investigator for the New York City Department of Consumer Affairs who worked for one month as a licensed process server in order to determine whether a process server could attempt to effect proper service and still make a living at the prevailing pay scales. During that month, the investigator was given over 400 papers to serve and was paid $3 per completed service.

56.    According to the Joint Report, the investigator was unable to serve almost one-half of the papers because the defendants no longer lived at the addresses provided for service. After making 537 attempts, the investigator was able to serve only 217 complaints, resulting in earnings of about $600 before deductions for taxes and expenses (such as gas).

Thus, the investigator made less than half of the minimum wage.

57.     The Joint Report concluded that process serving agencies, by underbidding the true cost of proper service, effectively sold sewer service.

58.     Finally, the Joint Report included a comprehensive review of the logs of 37 randomly selected process servers. The Joint Report found that 95% of the process servers reported duplicate, or "superman," services. That is, they claimed to have served process at two or more different places at the exact same time—a physical impossibility.

59.     In 1987, the New York Court of Appeals noted "a continuing and pervasive problem of unscrupulous service practices by licensed process servers." *Barr v. Dep't of Consumer Affairs*, 70 N.Y.2d 821, 822-23 (1987). The Court explained:

> These practices deprive defendants of their day in court and lead to fraudulent default judgments. Often associated with consumer debt collection and landlord-tenant litigation, questionable service practices have their greatest impact on those who are poor and least capable of obtaining relief from the consequences of an improperly imposed default judgment.

60.     Sewer service in debt collection cases remains rampant to this day.

61.     In April 2008, acknowledging the high rate of defaults in debt collection lawsuits, the Civil Court issued a new directive requiring that the clerk mail an additional notice to defendants in consumer credit actions.

62.     In June 2008, MFY Legal Services ("MFY") issued a report, *Justice Disserved* ("Justice Disserved"), documenting highly questionable process serving practices in consumer credit cases.

63.     On June 13, 2008, the New York City Department of Consumer Affairs held a public hearing on process servers in New York City ("DCA hearing"). Testimony at the

-16-

hearing revealed that: (a) process serving agencies generally charge between $15 and $45 for service of a summons and complaint in a consumer credit action in New York City; (b) the companies retain most of the fees to pay for overhead; (c) individual process servers were paid between $3 and $6 per completed service.

64.     Process servers in debt collection lawsuits today are thus paid basically the same wages as they were *23 years ago*.  In 1986, subway fare was $1 and a gallon of gas cost 93 cents.  Since 1986, the cost of living has increased substantially and the minimum wage has more than doubled, yet process server wages have remained stagnant at a rate that was insufficient to cover the costs of proper service even then.  Process servers in other types of legal actions are paid substantially more.

65.     At the DCA hearing, every process serving agency that testified said debt collection attorneys will not pay for service attempts that are not completed.  In other words, a process server who visits the last known address of a debtor and learns that the debtor has moved or died will only be paid if he perjures himself.  The Vice President of the New York State Professional Process Servers Association questioned the ethics of debt collectors paying only for completed service and will not accept contracts with such a condition.

66.     On information and belief, the Mel Harris and LR Credit Defendants will pay defendant Samserv and other process serving agencies only for completed service, thereby knowingly promoting the use of false affidavits of service.

67.     Moreover, at the DCA hearing, executives from three different process serving agencies testified that they refused to accept work from consumer debt collection attorneys because they could not make a profit based on the low fees the collection attorneys

-17-

demand unless their process servers engaged in sewer service. For those who testified, this meant that they cannot do business with operations like those run by the Mel Harris and LR Credit Defendants. Others, however, like the Samserv Defendants are less scrupulous and thus willing to join and further a fraudulent enterprise.

68.     In 2008 and 2009, after the DCA hearing, the Office of the New York State Attorney General ("Attorney General") audited the process server logs of a single process serving agency called American Legal Process ("ALP").

69.     The Attorney General found that: (a) ALP was paid $30-$35 by the debt collection law firms per service of a summons and complaint in a consumer matter (usually credit card related); and (b) ALP in turn paid its process servers as little as $3 per service and no more than $7 per service, for an average of $5.

70.     The Attorney General reviewed process server logs for internal inconsistencies and found countless examples of sewer service. For example, one process server claimed to have made 69 service attempts in a single day in two different New York counties that were 400 miles apart—at 8:19 a.m., he claimed to have attempted service on a defendant in Brooklyn, and one minute later, at 8:20 a.m., on another defendant in Western New York. The Attorney General found that the process server would have had to drive more than 10,000 miles that day to make all his purported service attempts, and further found that such physically impossible movements were documented repeatedly throughout the service logs of ALP's 20 busiest process servers.

71.     The Attorney General also uncovered significant notary fraud on the part of ALP's owner.

72.     In July 2009, the Attorney General and Chief Administrative Judge of the New York Courts sued American Legal Process and 37 debt collection law firms and debt collectors, seeking to overturn 100,000 default judgments that had been entered as a result of sewer service by ALP's process servers.

73.     On information and belief, the practices exposed by the Attorney General are not unique to ALP, but are standard practice throughout the debt collection and process serving industries.

74.     Debt collection law firms and their debt buyer clients plainly benefit from sewer service.  By not serving consumer debt defendants, debt collection firms like Defendant Mel Harris LLC and debt buyers like the LR Credit Defendants are able to generate hundreds of thousands of judgments by default on cases where they could never prevail on the merits because they do not have evidence to make out a prima facie case.  Once default judgments are fraudulently obtained, they are used to restrain people's bank accounts, garnish their wages, seize their property, damage their credit reports, and/or pressure them into unaffordable payment plans.

75.     Proceeds from the illegal scheme are then used to fund the purchase of new debts, which are then pursued by commencing new actions without the ability to actually prove that a debt is owed, using sewer service, which is followed by the filing of new perjurious affidavits of service and merit, thus securing new default judgments.  And, the cycle continues.

**C.      *Civil Court Procedures***

76.     In New York City, actions arising out of a consumer credit transaction, including debt collection actions, are primarily commenced in the Civil Court, which has

jurisdiction over actions seeking to recover monetary damages of $25,000 or less. N.Y. Civ. Ct. Act § 202.

77.     A plaintiff must serve the defendant with the summons and complaint in a manner authorized by CPLR 308. This can be done by: (1) "delivering the summons within the state to the person to be served," CPLR 308(1) ("Personal Service"); or (2) "delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served" and mailing the summons and complaint to the person's last known residence or actual place of business, CPLR 308(2) ("Substitute Service").

78.     A plaintiff must exercise due diligence to serve the defendant by personal or substitute service. CPLR 308(4). Courts have interpreted the term "due diligence" to mean three attempts on different days at different times of the day. When personal or substitute service "cannot be made with due diligence," a plaintiff may effect service by "affixing the summons to the door of either the actual place of business, dwelling place or usual place of abode" of the person and mailing the summons and complaint to the person's last known residence or actual place of business, CPLR 308(4) ("conspicuous place service" or "nail and mail service").

79.     When a defendant fails to appear in the action, the plaintiff may seek a default judgment. CPLR 3215(a).

80.     In order to obtain a default judgment, the plaintiff must submit (a) proof of service, in the form of an affidavit by the process server, and (b) proof of "the claim, the default, and the amount due by affidavit made by the party." CPLR 3215(f).

81.     In debt collection actions, the plaintiff also must submit an affidavit that additional notice has been given to the defendant at least twenty days prior to the plaintiff's application for a default judgment.  This additional notice consists of mailing a copy of the summons to the defendant at (in order of preference) the defendant's residence, place of employment, or last known residence.  The additional notice may be mailed simultaneously with service of the summons upon the defendant.  CPLR 3215(g)(3).

82.     In addition, section 130-1.1-a of the Rules of the Chief Judge of New York requires every pleading, written motion and other paper served or filed with the court to be signed by an attorney.  When an attorney signs a paper, he or she "certifies that, to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, (1) the presentation of the paper or the contentions therein are not frivolous . . . and (2) where the paper is an initiating pleading, (i) the matter was not obtained through illegal conduct . . .".  22 NYCRR § 130-1.1-a(b).

83.     Under the Soldiers' and Sailors' Civil Relief Act of 1940, as amended by the Servicemembers Civil Relief Act of 2003, codified at 50 U.S.C. App. § 500 *et. seq,* no default judgment in a civil action or proceeding may be entered unless the plaintiff first submits an affidavit "stating whether or not the defendant is in military service and showing necessary facts to support the affidavit."  50 U.S.C. App. § 521(b)(1).  The information necessary to complete this affidavit is typically, if not always, obtained via the internet from the Department of Defense Manpower Data Center.

84.     In debt collection actions filed in the Civil Court, a plaintiff must provide the clerk with an additional notice of the lawsuit and a stamped envelope addressed to the

-21-

defendant "at the address at which process was served." The clerk then mails this additional

notice to the defendant. 22 N.Y.C.R.R. 208.6(h).

85.    "The clerk, upon submission of the requisite proof, shall enter judgment

for the amount demanded in the complaint . . . plus costs and interest." CPLR 3215(a).

86.    Once a plaintiff obtains a default judgment against a person, it may

enforce the judgment by, among other things, restraining the person's bank account, garnishing

the person's wages, or seizing the person's personal property. *See, e.g.*, CPLR 5222, 5231, and

5232. A plaintiff's attorney may institute these proceedings directly "as officers of the court,"

without any judicial intervention or scrutiny.

### D.    *Defendants' Facts*

87.    Defendants routinely use the Civil Court to collect debts from consumers.

88.    On information and belief, the Leucadia Defendants brought 29,910 debt

collection actions in the Civil Court in 2008 alone. The Mel Harris Defendants represented the

Leucadia Defendants in all but three of these cases.

89.    When the figures for 2006, 2007 and 2008 are combined, the Leucadia

Defendants brought 104,341 debt collection actions in the Civil Court, and the Mel Harris

Defendants represented the Leucadia Defendants more than 99% of the time.

90.    When the Leucadia and Mel Harris Defendants file debt collection

lawsuits in the Civil Court, they frequently hire Defendant Samserv to "serve process," or, more

accurately stated, to provide an affidavit of service that Defendants know is highly likely to be

false. On information and belief, Defendant Samserv is the process service company in the

majority of cases filed by the Leucadia and Mel Harris Defendants. On information and belief,

the LR Credit and Mel Harris Defendants will pay Defendant Samserv for completed service, but will make no payment for unsuccessful attempts.

91.     On information and belief, Defendant Samserv and its individual process servers frequently engage in sewer service. When this happens, Plaintiffs and putative class members are deprived of due process because they do not receive notice of the lawsuit and therefore do not appear to defend themselves. The Mel Harris and Leucadia Defendants then apply for default judgments against the non-appearing individuals.

92.     In order to obtain the default judgments, Defendants file fraudulent affidavits of service with the court. In these affidavits, Defendant Samserv's process servers claim to have served defendants with legal process when they have not, in fact, done so.

93.     Furthermore, on information and belief, Defendant Mlotok, Samserv's Chairman and CEO, is personally involved in the fraud, as he notarizes all or most of these false affidavits.

94.     On information and belief, the Leucadia and Mel Harris Defendants all know or reasonably should know that most of the affidavits of service are false and that most of the default judgments they obtain are the result of sewer service.

95.     On information and belief, although Defendants secure default judgments in tens of thousands of lawsuits every year, service of process in the majority of those lawsuits is allegedly done by only a handful of individual process servers.

96.     Before seeking these tens of thousands of default judgments per year, Defendants are required to review each and every affidavit of service and file it with the court. As a small number of individual process servers claim to serve an astoundingly large number of

defendants, simply by undertaking this review, Defendants would have known that all of the alleged service could not possibly have occurred as claimed.

97.     On information and belief, Defendant Mel Harris LLC pays Defendant Samserv no more than $20 per completed service, of which the individual process servers are paid only $3 to $6.  On information and belief, Defendant Mel Harris LLC is or should be well aware that process servers are paid only $3 to $6.

98.     In addition, the MFY report on process server practices found that more than 90% of consumers allegedly served by process servers retained by Defendant Mel Harris LLC did not appear in court, suggesting a high rate of sewer service.

99.     In addition to a facially valid affidavit of service, the Mel Harris and Leucadia Defendants are required to submit two additional affidavits in order to obtain a default judgment—a military service affidavit stating that the Civil Court defendant is not in the military and an affidavit setting forth the empirical basis for the unpaid debt claim based on personal knowledge.

100.     On information and belief, the Mel Harris Defendants obtain the information necessary for completing the military service affidavit by accessing, over the internet, a database of military personnel maintained by the Department of Defense Manpower Data Center.  On information and belief, the Mel Harris Defendants utilize the internet and database to submit specific military status inquiries, and to retrieve military service information for specific individuals from the database.

101.     On information and belief, in addition to filing false affidavits of service, the Mel Harris and Leucadia Defendants also submit another kind of false affidavit to the court

-24-

when seeking a default judgment. This affidavit is usually titled "Affidavit of Merit."

102. Defendant Todd Fabacher, who claims to be "an authorized and designated custodian of records," is the witness in the vast majority of the affidavits of merit filed by Defendants Mel Harris and LR Credits 1 through 20.

103. On information and belief, Defendant Fabacher signs approximately 40,000 affidavits per year, or an average of 165 affidavits per work day. In these affidavits, Defendant Fabacher claims to be "fully and personally familiar with, and have personal knowledge of, the facts and proceedings relating to the within action."

104. On information and belief, Defendant Fabacher lacks personal knowledge of most of the facts, and all of the key facts, set forth in these affidavits. For example, Defendant Fabacher routinely swears that he has personal knowledge that the defendant had a credit account with a certain company; that the defendant incurred charges on the account; that statements were mailed to the defendant; that the defendant defaulted in payment; and that the amount alleged in the complaint is, in fact, due and owing. On information and belief, however, Defendant Fabacher does not have personal knowledge of these alleged "facts."

105. In these affidavits, Defendant Fabacher further claims to "maintain the daily records and accounts in the regular course of business, including records maintained by and obtained by plaintiff's assignor." He also identifies the Leucadia Defendants as "the assignee and purchaser of" an account owed to a particular creditor.

106. These statements are deceptive and misleading. Defendant Fabacher's affidavits are drafted in such a manner as to suggest that Defendant Fabacher and/or the other Defendants have obtained or could obtain documentation of the debt from the original creditor,

including evidence of an indebtedness between the original creditor and debtor, such as a contract and any subsequent amendments to the contract, account statements, customer service records, or customer dispute records. On information and belief, however, the Mel Harris and Leucadia Defendants have not obtained documentation from the original creditor, nor are they able or intending to obtain such documentation in the vast majority, if not all, cases.

107. On information and belief, the Mel Harris and Leucadia Defendants authorize and/or have knowledge of the deceptive and misleading nature of Defendant Fabacher's affidavits. On information and belief, the affidavits are purposely drafted in this manner in order to give court personnel the impression that the Mel Harris and Leucadia Defendants have met the statutory requirements for obtaining a default judgment, when in fact, Defendants have not and cannot meet those requirements.

108. On information and belief, the Mel Harris and Leucadia Defendants, working in concert, submit fraudulent and deceptive affidavits of merit to the court in order to obtain default judgments to which they are not entitled. Based on these affidavits, the Civil Court issues tens of thousands of default judgments every year in Defendants' favor against Plaintiffs and other similarly situated unsuspecting victims.

109. Plaintiffs and members of the putative class are substantially harmed when Defendants use the default judgments to freeze their bank accounts, garnish their wages, and pressure them into making settlement agreements on debts of dubious merit for which little or no documentation is available. They are also harmed when these judgments appear on their credit reports.

E. *Individual Plaintiff Facts*

-26-

1.    *Monique Sykes*

110.    Plaintiff Monique Sykes is 29 years old and lives in the Bronx with her husband and her two young children.  Ms. Sykes' husband is the family breadwinner.  He works as a union carpenter, but it has been difficult for him to find steady employment in the last year.  At the time of the events recounted here, Mr. Sykes was receiving Unemployment Benefits, which was the family's only source of income.  Ms. Sykes has no income of her own, as she stays home to care for their children.

111.    On or about June 27, 2008, Defendant Mel Harris commenced a lawsuit against Ms. Sykes in Bronx County Civil Court.  Defendant LR Credit 18 was the plaintiff in the suit.

112.    The suit alleged that Ms. Sykes owed money to LR Credit 18, which claimed that it was the assignee and purchaser of a debt originally owed to an entity identified as "JPMorgan Chase Bank."

113.    Ms. Sykes believes that it is possible she owes this debt, but she is not sure, as she does not recognize the amount.

114.    Samserv claimed that its employees and/or agents served the summons and complaint upon Ms. Sykes.

115.    Ms. Sykes was never served with a summons and complaint, either personally, by substitute service, or by nail and mail service.

116.    On or about July 25, 2008, Samserv prepared an affidavit attesting that Ms. Sykes had been served with process in accordance with New York law.  The affidavit was purportedly signed by Benjamin Lamb and notarized by William Mlotok.

117.    The affidavit of service contains false statements.  Specifically:

A.    The process server swore that he left the papers with a "Ms. Rolanda" at Ms.

Sykes' residence, but no such person resides with Ms. Sykes and her family.

B.    The process server swore that he spoke to "Ms. Rolanda" and confirmed that Ms.

Sykes was not in the military, but Ms. Sykes does not know "Ms. Rolanda," so

this person would be unable to confirm her military status.

C.    The process server swore that he went to Ms. Sykes' apartment on July 18, 2008,

at 7:15 pm, but Ms. Sykes would have been home at that time, and no process

server came to her door.  With two children under the age of three, the Sykes

family was always home in the evenings.

D.    The process server swore that he mailed a copy of the summons and complaint to

Ms. Sykes on July 24, 2008, but she never received a copy of the summons and

complaint by mail.

118.    On or about August 1, 2008, Defendants caused the fraudulent affidavit of

service described above to be filed with the court.

119.    In or about September or October 2008, Defendants sought a default

judgment against Ms. Sykes.

120.    As part of its application for a default judgment, Defendant Lutz

"affirm[ed] under the penalties of perjury that service of the summons and complaint has been

made."

121.    Defendant Lutz also affirmed that he sent a copy of the summons and

complaint to Ms. Sykes via U.S. mail on August 7, 2008.  Ms. Sykes did not receive this mailing.

122.    As part of its application for a default judgment, Defendants submitted a nonmilitary affidavit signed by Lillian Mathew stating her belief that Ms. Sykes was not in the military.  Ms. Mathew obtained the information necessary to complete this affidavit by accessing, over the internet, the Department of Defense Manpower Data Center.  This transaction took place on September 11, 2008, at 12:46:06.

123.    As part of its application for a default judgment, Defendants submitted an affidavit of merit which was purportedly signed by Defendant Fabacher and notarized by Defendant Young.

124.    In the Affidavit, Defendant Fabacher claims that he is "fully and personally familiar with, and [has] personal knowledge of, the facts and proceedings relating to the within action."  On information and belief, this claim is false.

125.    In the Affidavit, Defendant Fabacher claims that he maintains "the daily records and accounts in the regular course of business, including records maintained by and obtained from plaintiff's assignor."

126.    This claim is misleading, as it suggests that Defendant Fabacher and the other Defendants are in possession of documentation obtained from JPMorgan Chase Bank and that Defendants have evidence that Ms. Sykes owes this debt.  Upon information and belief, Defendants have no such evidence and have no information about this debt other than the "media," which is inadmissible in court.

127.    On October 7, 2008, the court entered a default judgment against Ms. Sykes.  In doing so, the court relied upon the fraudulent affidavit of service and affidavit of merit submitted to the court by Defendants.

128.    On or about July 2, 2009, Ms. Sykes learned about the lawsuit for the first time when she received a letter via U.S. mail from a New York City marshal threatening to take her personal property.  Defendant Mel Harris LLC caused the marshal to mail this letter to Ms. Sykes.

129.    On July 7, 2009, Ms. Sykes filed a motion seeking to vacate the default judgment and dismiss the case due to improper service.  The motion was granted on July 31, 2009, and the case was dismissed.

130.    Because the dismissal was "without prejudice," however, Ms. Sykes is at risk of being sued and subjected to improper service for a second time.

131.    In addition, Ms. Sykes has incurred economic harm because of Defendants' actions.  For example, Ms. Sykes had to spend money copying her file and on transportation to and from the courthouse.  She had to take a cab on at least one occasion because the MTA had suspended service on her subway line.  In addition, her husband had received offers of work, which he had to turn down so that he could stay home with the children while Ms. Sykes went to court.

### 2.    *Ruby Colon*

132.    Plaintiff Ruby Colon is 38 years old and lives in Brooklyn with her daughter, who is in college.  Ms. Colon is disabled and subsists on food stamps and Supplemental Security Income (SSI).  She has no other sources of income.

133.    On or about May 22, 2007, Defendant Mel Harris commenced a lawsuit against Ms. Colon in the Kings County Civil Court.  Defendant LR Credit 12, LLC was the plaintiff in the lawsuit.

134.    The suit alleged that Ms. Colon owed money to LR Credit 12, which claimed that it was the purchaser and assignee of a debt originally owed to an entity identified as "Chase Manhattan Bank."  According to LR Credit 12's complaint, Ms. Colon incurred $2,078.18 in charges on the Chase Manhattan account.

135.    Ms. Colon believes that it is possible she incurred charges on this account, but she is not sure, as she does not recognize the amount.

136.    Defendants hired Samserv to serve the summons and complaint upon Ms. Colon.

137.    Ms. Colon was never served with a summons and complaint, either personally, by substitute service, or by nail and mail service.

138.    On or about June 11, 2007, Samserv prepared an affidavit attesting that Ms. Colon had been served with process in accordance with New York law.  The affidavit was purportedly signed by Michael Mosquera and notarized by William Mlotok.

139.    The affidavit of service contains numerous false statements.  Specifically:

A.    The process server swore that he left the papers with a "Mr. Hector" at Ms. Colon's residence, but no such person resides with Ms. Colon and her daughter.

B.    The process server swore that he spoke to "Mr. Hector" and confirmed that Ms. Colon was not in the military or dependent on anyone in the military, but Ms. Colon does not know "Mr. Hector," so this person would be unable to confirm her military status.

C.    The process server swore that "Mr. Hector" was male with black hair and white skin, 36-50 years old, 5'9"-6'0", 161-200 lbs, and balding, but Ms. Colon does

-31-

not know anyone who fits this description.

D.        The process server swore that he mailed a copy of the summons and complaint to Ms. Colon on June 11, 2007, but she never received a copy of the summons and complaint by mail.

140.    On or about June 12, 2007, Defendants caused the fraudulent affidavit of service described above to be filed with the court.

141.    In or about July 2007, Defendants sought a default judgment against Ms. Colon.

142.    As part of its application for a default judgment, Defendant Lutz "affirm[ed] under the penalties of perjury that service of the summons and complaint had been made."

143.    Defendant Lutz also affirmed that he sent a copy of the summons and complaint to Ms. Colon via U.S. mail on June 20, 2007.  Ms. Colon did not receive this mailing.

144.    As part of its application for a default judgment, Defendants submitted a nonmilitary affidavit signed by Lillian Mathew stating her belief that Ms. Colon was not in the military.  Ms. Mathew obtained the information necessary to complete this affidavit by accessing, over the internet, the Department of Defense Manpower Data Center.  This transaction took place on July 19, 2007, at 16:13:18.

145.    As part of its application for a default judgment, Defendants submitted an affidavit of merit which was purportedly signed by Defendant Fabacher and notarized by Defendant Young.

146.    In the Affidavit, Defendant Fabacher claims that he is "fully and

-32-

personally familiar with, and [has] personal knowledge of, the facts and proceedings relating to the within action." Upon information and belief, this claim is false.

147.    In the Affidavit, Defendant Fabacher claims that he maintains "the daily records and accounts in the regular course of business, including records maintained by and obtained from plaintiff's assignor."

148.    This claim is misleading, as it suggests that Defendant Fabacher and the other Defendants are in possession of documentation obtained from Chase Manhattan Bank and that Defendants have evidence that Ms. Colon owes this debt. Upon information and belief, Defendants have no such evidence and have no information about this debt other than the "media," which is inadmissible in court.

149.    On July 31, 2007, the court entered a default judgment against Ms. Colon. In doing so, the court relied upon the fraudulent affidavit of service and affidavit of merit submitted to the court by Defendants.

150.    In about November 2008, Ms. Colon learned of the lawsuit when she discovered that her bank account had been frozen.

151.    On December 3, 2009, Ms. Colon filed a motion seeking to vacate the default judgment and dismiss the case on the grounds that she was not served with process. On December 10, 2009, Defendant Mel Harris consented to vacate the default judgment and dismiss the case without prejudice.

152.    However, because the dismissal was "without prejudice," Ms. Colon is at risk of being sued and subjected to improper service for a second time.

153.    Ms. Colon has suffered economic harm because of Defendants' actions.

Among other things, Ms. Colon has been unable to use her bank account, and instead has had to rely on a government debit card for her financial transactions and for access to her SSI benefits. The government debit card carries with it many fees and expenses not associated with a regular checking account. For example, Ms. Colon cannot write checks, and therefore has to purchase money orders. She has to pay fees when she withdraws money from an ATM, regardless of which bank she goes to. As a result, Ms. Colon has incurred significant expenses that she could have avoided had she been able to access her bank account.

### 3. *Rea Veerabadren*

154. Plaintiff Rea Veerabadren is a 57-year-old immigrant from Mauritius who lives in Queens, New York. Ms. Veerabadren has worked full-time as a nanny for 24 years to support herself and her daughter. During her years of employment, Ms. Veerabadren has steadily set aside a portion of her earnings for her retirement.

155. On or about April 12, 2006, Defendant Mel Harris LLC commenced a lawsuit against Ms. Veerabadren in Queens County Civil Court. Defendant LR Credit 10 was the plaintiff in the suit.

156. The suit alleged that Ms. Veerabadren owed money to LR Credit 10, which claimed that it was the assignee and purchaser of a debt originally owed to an entity identified as "Sears."

157. Samserv claimed that its employees and/or agents served the summons and complaint upon Ms. Veerabadren.

158. Ms. Veerabadren was never served with a summons and complaint, either personally, by substitute service, or by nail and mail service.

-34-

159.    On or about May 25, 2006, Samserv prepared an affidavit attesting that Ms. Veerabadren had been served with process in accordance with New York law.  The affidavit was purportedly signed by Michael Mosquera and notarized by William Mlotok.

160.    The affidavit of service contains false statements.  Specifically:

A.    Defendant Mosquera swore that he left the papers with a "Mr Victor" at Ms. Veerabadren's residence, but no such person resides with Ms. Veerabadren.

B.    Defendant Mosquera swore that he spoke to "Mr Victor" and confirmed that Ms. Veerabadren was not in the military, but Ms. Veerabadren does not know "Mr Victor," so this person would be unable to confirm her military status.

C.    Defendant Mosquera swore that he went to Ms. Veerabadren's apartment on May 11, 2006 at 9:23 p.m., but Ms. Veerabadren would have been home at that time, and no process server came to her door.

D.    The process server swore that he mailed a copy of the summons and complaint to Ms. Veerabadren on May 18, 2006, but she never received a copy of the summons and complaint by mail.

161.    On or about May 25, 2006, Defendants caused the fraudulent affidavit of service described above to be filed with the court.

162.    In or about July 2006, Defendants sought a default judgment against Ms. Veerabadren.

163.    As part of its application for a default judgment, Defendant Kerry Lutz "affirm[ed] under the penalties of perjury that service of the summons and complaint has been made."

-35-

164.    Defendant Lutz also affirmed that he sent a copy of the summons and complaint to Ms. Veerabadren via U.S. mail on June 7, 2006. Ms. Veerabadren did not receive this mailing.

165.    As part of its application for a default judgment, Defendants submitted a nonmilitary affidavit signed by Lillian Mathew stating her belief that Ms. Veerabadren was not in the military. Ms. Mathew obtained the information necessary to complete this affidavit by accessing, over the internet, the Department of Defense Manpower Data Center. This transaction took place on July 6, 2006, at 9:31:21.

166.    As part of its application for a default judgment, Defendants submitted an affidavit of merit which was purportedly signed by Defendant Fabacher and notarized by Defendant Young.

167.    In the Affidavit, Defendant Fabacher claims that he is "an authorized and designated custodian of records for the plaintiff's assignor." On information and belief, this claim is false and misleading, as it suggests that Defendant Fabacher is an authorized and designated custodian of records for Sears and that Defendants have evidence that Ms. Veerabadren owes this debt. On information and belief, Defendant Fabacher is not an authorized and designated custodian of records for Sears, and Defendants have no such evidence.

168.    In the Affidavit, Defendant Fabacher claims that he is "fully and personally familiar with, and have [sic] personal knowledge of, the facts and proceedings relating to the within action." On information and belief, this claim is false.

169.    In the Affidavit, Defendant Fabacher claims that he maintains "the daily records and accounts in the regular course of business, including records maintained by and

-36-

obtained from plaintiff's assignor."

170.   This claim is misleading, as it suggests that Defendant Fabacher and the other Defendants are in possession of documentation obtained from Sears and that Defendants have evidence that Ms. Veerabadren owes this debt.  On information and belief, Defendants have no such evidence and have no information about this debt other than the "media," which is inadmissible in court.

171.   On August 8, 2006, the court entered a default judgment against Ms. Veerabadren.  In doing so, the court relied upon the fraudulent affidavit of service and affidavit of merit submitted to the court by Defendants.

172.   In January 2008, Ms. Veerabadren learned about the lawsuit for the first time when she received a telephone call from an employee of Defendant Mel Harris LLC, who said that they had a judgment against her for a Sears debt and that they would restrain her bank account.

173.   Ms. Veerabadren previously owned a Sears account, but remembers that she had to stop making payments on that account in or around 1998 – eight years before Defendants Mel Harris LLC and LR Credit 10 commenced the lawsuit – because she could no longer afford to make payments.

174.   Furthermore, though Ms. Veerabadren remembered having had only one Sears account, she had already been sued by another debt buyer on a Sears account.  This other debt buyer had also obtained a default judgment against her and seized money from her bank account and filed a satisfaction of judgment.  (Ms. Veerabadren subsequently vacated this default judgment and recovered her money from this other debt buyer.)

175.    Because Ms. Veerabadren remembered having had only <u>one</u> Sears account, she did not understand how she could have two judgments against her for the same alleged debt.  She therefore informed Defendant Mel Harris LLC that another debt buyer had already sued her and seized money from her bank account for the same Sears debt.

176.    Defendant Mel Harris LLC told Ms. Veerabadren to send them proof.  She therefore obtained a copy of a satisfaction of judgment filed by attorneys for the other debt buyer in the other lawsuit, and faxed a copy to Defendant Mel Harris LLC.

177.    Ms. Veerabadren then called Defendant Mel Harris LLC to confirm that they had received her fax.  She was told that their judgment might be for a different Sears account, though Ms. Veerabadren remembered having had only one Sears account.  Defendant Mel Harris LLC told her to provide the Sears account number sued on in the other lawsuit, and she did.  Defendant Mel Harris LLC told her that they would look into the matter.

178.    Nevertheless, in or around February 2008, Ms. Veerabadren discovered that her bank account had been restrained by Defendant Mel Harris LLC.  Ms. Veerabadren was also charged a $125 legal processing fee by her bank because of the restraint.

179.    Ms. Veerabadren called Defendant Mel Harris LLC again to tell them that she did not owe the money that they claimed, but they said that she did owe the money.

180.    Defendant Mel Harris LLC then levied upon her bank account, seizing all of its contents.

181.    On December 12, 2008, Ms. Veerabadren filed a motion seeking to vacate the default judgment, recover her levied funds, and dismiss the case due to improper service.  On December 23, 2008, Ms. Veerabadren and Defendant Mel Harris LLC entered into a stipulation

-38-

vacating the default judgment and returning the levied funds to Ms. Veerabadren, though not reimbursing her for her bank's $125 legal processing fee. On December 16, 2009, Ms. Veerabadren and Defendant Mel Harris LLC entered into a stipulation discontinuing the lawsuit.

182.    Because the discontinuance was "without prejudice," however, Ms. Veerabadren is at risk of being sued and subjected to improper service for a second time.

183.    Ms. Veerabadren has incurred economic harm because of Defendants' actions. For example, Ms. Veerabadren was charged a $125 legal processing fee because of Defendants' restraint upon her bank account; lost the use of her levied funds for nearly one year; had to spend money on transportation to and from the courthouse, as well as to and from her lawyer's office; and had to miss numerous days of work to go to court and to her lawyer's office.

### 4.    *Fatima Graham*

184.    Plaintiff Fatima Graham is 30 years old and lives in Manhattan with her infant son. At the time of the events recounted here, Ms. Graham was pregnant and receiving Unemployment Insurance Benefits as her only income. Ms. Graham has since exhausted her unemployment benefits and now subsists entirely on Public Assistance and Food Stamps.

185.    On or about July 30, 2008, Defendant Mel Harris LLC commenced a lawsuit against Ms. Graham in New York County Civil Court. Defendant LR Credit 18 was the plaintiff in the suit.

186.    The suit alleged that Ms. Graham owed money to LR Credit 18, which claimed that it was the assignee and purchaser of a debt originally owed to an entity identified as "Providian Bank."

187.    Ms. Graham believes that it is possible she owes this debt, but she is not

sure, as she does not recognize the amount and the debt is quite old.

188.    Samserv claimed that its employees and/or agents served the summons and complaint upon Ms. Graham.

189.    Ms. Graham was never properly served with a summons and complaint, either personally, by substitute service, or by nail and mail service.

190.    Ms. Graham did receive a copy of the summons and complaint in the mail. On information and belief, this mailing was made by Defendant Mel Harris LLC and not a process server. Although Ms. Graham received the summons and complaint, she did not understand how to respond to it.

191.    On or about August 20, 2008, Samserv prepared an affidavit attesting that Ms. Graham had been served with process in accordance with New York law. The affidavit was purportedly signed by Benjamin Lamb and notarized by William Mlotok.

192.    The affidavit of service contains false statements. Specifically:

A.    The process server swore that he left the papers with a "Ms. Courtney" at Ms. Sykes's residence, but no such person resides with Ms. Graham and her family.

B.    The process server swore that he spoke to "Ms. Courtney" and confirmed that Ms. Graham was not in the military, but Ms. Graham does not know "Ms. Courtney," so this person would be unable to confirm her military status.

C.    The process server swore that he went to Ms. Graham's apartment on August 7, 2008, at 3:13 pm, but Ms. Graham would have been home at that time, and no process server came to her door. At the time, Ms. Graham was unemployed, pregnant and feeling extremely ill, so she was nearly always home.

-40-

D.    The process server swore that he mailed a copy of the summons and complaint to Ms. Graham on August 18, 2008, but she never received a copy of the summons and complaint by mail from a process server.

193.    On or about August 21, 2008, Defendants caused the fraudulent affidavit of service described above to be filed with the court.

194.    In or about September or October 2008, Defendants sought a default judgment against Ms. Graham.

195.    As part of its application for a default judgment, Defendant Kerry Lutz "affirm[ed] under the penalties of perjury that service of the summons and complaint has been made."

196.    Defendant Lutz also affirmed that he sent a copy of the summons and complaint to Ms. Graham via U.S. mail on August 29, 2008.

197.    As part of its application for a default judgment, Defendants submitted a nonmilitary affidavit signed by Lillian Mathew stating her belief that Ms. Graham was not in the military.  Ms. Mathew obtained the information necessary to complete this affidavit by accessing, over the internet, the Department of Defense Manpower Data Center.  This transaction took place on September 25, 2008, at 17:45:31.

198.    As part of its application for a default judgment, Defendants submitted an affidavit of merit which was purportedly signed by Defendant Fabacher and notarized by someone named Chantella Ulmer.

199.    In the Affidavit, Defendant Fabacher claims that he is "fully and personally familiar with, and have [sic] personal knowledge of, the facts and proceedings

-41-

relating to the within action." On information and belief, this claim is false.

200.    In the Affidavit, Defendant Fabacher claims that he maintains "the daily records and accounts in the regular course of business, including records maintained by and obtained from plaintiff's assignor."

201.    This claim is misleading, as it suggests that Defendant Fabacher and the other Defendants are in possession of documentation obtained from Providian Bank and that Defendants have evidence that Ms. Graham owes this debt. Upon information and belief, Defendants have no such evidence and have no information about this debt other than the "media," which is inadmissible in court.

202.    On October 7, 2008, the court entered a default judgment against Ms. Graham. In doing so, the court relied upon the fraudulent affidavit of service and affidavit of merit submitted to the court by Defendants.

203.    In February 2009, Ms. Graham learned about the judgment when her bank account was frozen. Ms. Graham's bank charged her $125 for restraining her account, and Ms. Graham's receipt of her unemployment benefits was delayed.

204.    On February 19, 2009, Defendant Mel Harris LLC sent Ms. Graham a letter via U.S. mail advising her of her frozen bank account and inviting her to contact it to resolve her debt.

205.    When Ms. Graham's bank account was frozen, she was due to give birth in one week, she had no food in her apartment, and she also needed to pay rent. Ms. Graham had no access to her funds and no family members or friends to help her. In order to meet her basic living expenses, Ms. Graham was forced to borrow money from a private individual, which she

-42-

had to repay the next week at 4% interest.

206.    When her bank account was frozen, Ms. Graham felt very depressed, helpless, and desperate.  Ms. Graham worried about her frozen bank account constantly, had tremendous anxiety, and difficulty sleeping and caring for her newborn baby.

207.    Because Ms. Graham lost $125 in bank fees, was delayed in receiving her unemployment checks, and had to repay her loan with interest, she fell behind in her rent.  Ms. Graham was never able to catch up.  Ultimately, her landlord sued her for nonpayment of rent, and she had to get a grant from the New York City Human Resources Administration to pay off her arrears.

208.    Ms. Graham's account remained frozen for the next ten months.  During this time, Ms. Graham has had no access to a bank account.  She has to pay for everything with money orders, which is expensive.

209.    In December 2009, Ms. Graham received a letter via U.S. mail from a New York City marshal threatening to take her personal property.  Defendant Mel Harris LLC caused the marshal to mail this letter to Ms. Graham.

210.    In December 2009, Ms. Graham obtained counsel and filed a motion seeking to vacate the default judgment and dismiss the case due to improper service.  Defendant Mel Harris LLC stipulated to vacate the default judgment on December 8, 2009, and to discontinue the case on December 15, 2009.

211.    However, because the dismissal was "without prejudice," Ms. Graham is at risk of being sued and subjected to improper service for a second time.

-43-

F.    *Class Action Allegations*

212.    Plaintiffs bring this case as a class action under three distinct subdivisions of Fed. R. Civ. P. 23(b).

213.    First, Plaintiffs seek certification of a Rule 23(b)(1)(A) and/or 23(b)(2) Class consisting of all persons who have been or will be sued by the Mel Harris Defendants as counsel for the Leucadia Defendants in actions commenced in New York City Civil Court and where a default judgment has been or will be sought.

214.    The prosecution of separate actions by individual members of the proposed (b)(1)(A) and (b)(2) class would create the risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for defendants.

215.    Defendants have acted, or failed to act, on grounds generally applicable to the Rule (b)(1)(A) and (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

216.    On information and belief, the Rule (b)(1)(A) and (b)(2) class includes thousands of members.  They are so numerous that joinder of all Class members is impracticable.

217.    Second, plaintiffs seek certification of a Rule 23(b)(3) class consisting of all persons who have been sued by the Mel Harris Defendants as counsel for the Leucadia Defendants in actions commenced in New York City Civil Court and where a default judgment has been entered against them.

218.    All of the members of the Rule (b)(3) class were injured as a result of defendants' conduct.

219.    On information and belief, the Rule (b)(3) class includes tens of thousands

-44-

of individuals. They are so numerous that joinder of all Class members is impracticable. There are numerous questions of law and fact common to the class. Chief among them are whether Defendants' actions, as described above, violate the Fair Debt Collection Practices Act, the Racketeer Influenced and Corrupt Organizations Act, and the New York Consumer Protection Act. These common issues predominate over any individual issues.

220.    Defendants' conduct towards Plaintiffs and all absent members of the proposed classes has resulted in fraudulently obtained judgments of default being entered, which has, in turn, caused serious harm. The claims and practices alleged in this complaint are common to all members of the class.

221.    The violations suffered by the individual plaintiffs are typical of those suffered by the class. The entire class will benefit from the remedial and monetary relief sought in this action.

222.    The individual plaintiffs have no conflict of interest with any putative absent class members, and will fairly and adequately protect the interests of the class. Counsel competent and experienced in federal class action and unfair debt collection practice litigation have been retained to represent the class. The Neighborhood Economic Development Advocacy Project (NEDAP) works to promote community economic justice and to eliminate discriminatory economic practices that harm communities and perpetuate inequality and poverty. Through its Consumer Law Project, NEDAP provides direct legal services to thousands of low income New Yorkers through a legal hotline and clinic, builds the capacity of legal services and community-based organizations to address consumer financial justice issues, and advocates for systemic reform. MFY Legal Services, Inc. ("MFY") provides advice and representation to over 10,000

New Yorkers each year, working in concert with neighborhood social service providers and

community advocates, and initiates affirmative litigation that impacts many thousands of people.

Through its Consumer Rights Project, MFY provides advice and representation to consumers

who are harassed by debt collectors, sued in New York courts, and affected in various ways by

consumer issues. Emery Celli Brinckerhoff & Abady LLP is a law firm with offices in New

York City with extensive experience in class action lawsuits and civil right litigation that has

served or is currently serving as class counsel in: *McBean v. City of New York*, 260 F.R.D. 120

(S.D.N.Y. 2009) (certifying Rule 23(b)(3) class of persons subjected to unlawful misdemeanor

pre-trial strip search policy); *Casale v Kelly*, 257 F.R.D. 396 (S.D.N.Y. 2009) (certifying Rule

23(b)(2) and (b)(3) classes of persons arrested for subsections of loitering statute declared

unconstitutional); *Coultrip v. Pfizer,* No. 06 Civ. 9952 (AKH) (counsel for thousands of sales

representatives in nationwide collective action under the Fair Labor Standards Act); *McBean v.

City of New York*, No. 02 Civ. 5426 (GEL), 2007 WL 2947448 (S.D.N.Y. Oct. 05, 2007)

(certifying Rule 23(b)(2) class of persons subjected to unlawful misdemeanor pre-trial strip

search policy); *Brown v. Kelly*, 244 F.R.D. 222 (S.D.N.Y. 2007) (certifying Rule 23(b)(2)

bilateral plaintiff and defendant classes and Rule 23(b)(3) plaintiff class of persons arrested for

loitering for the purpose of begging); *In re Nassau County Strip Search Cases*, 461 F.3d 219 (2d

Cir. 2006) (reversing and certifying Rule 23(b)(3) class of persons subjected to unlawful

misdemeanor pretrial strip search policy); *D.D. v. New York City Dep't of Educ.*, No. 03-CV-

2489 (DGT), 2004 WL 633222 (E.D.N.Y., Mar. 30, 2004) (certifying Rule 23(b)(2) class of New

York City preschool children seeking to enforce the Individuals with Disabilities Education Act);

*Ingles v. Toro,* No. 01 Civ. 8279 (DC), 2003 WL 402565 (S.D.N.Y. Feb. 20, 2003) (certifying

Rule 23(b)(1) and (2) class).

223.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members of the class is impracticable, and the damages suffered, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly unlikely that individual actions will be pursued.

224.     Managing this case as a class should not present any particular difficulty.

## FIRST CAUSE OF ACTION
### (FDCPA, 15 U.S.C. § 1692)

225.     Plaintiffs hereby restate, reallege, and incorporate by reference all foregoing paragraphs.

226.     Congress enacted the Fair Debt Collection Practices Act to stop "the use of abusive, deceptive and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a).

227.     A debt collector may not "use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Such a prohibition includes the false representation of "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A). Such a prohibition also includes the "use of any false representation or deceptive means to collect or attempt to collect any debt." 15 U.S.C. § 1692e(10).

228.     A debt collector may not "use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

229.     Nor may a debt collector "engage in any conduct the natural consequence

of which is to harass, oppress, or abuse any person in connection with the collection of a debt."

15 U.S.C. § 1692d.

      230.    A process server is exempted from the definition of a debt collector only

insofar as the process server is in fact "serving or attempting to serve legal process."  15 U.S.C. §

1692a(6)(D).

      231.    Defendants violated the FDCPA, 15 U.S.C. §§ 1692d, 1692e,

1692e(2)(A), 1692e(10) and 1692f by making false and misleading representations, and

engaging in unfair and abusive practices.  Defendants' violations include, but are not limited to:

    A.    Producing and filing fraudulent affidavits of service that falsely claim that

        Plaintiffs and class members were served with a summons and complaint when in

        fact they were not;

    B.    Producing and filing false attorney affirmations stating that service of the

        summons and complaint has been made, when it fact it was not;

    C.    Producing and filing fraudulent affidavits of merit that falsely claim that

        Defendants have personal knowledge of the facts necessary to obtain a default

        judgment, when in fact they do not;

    D.    Misrepresenting that Defendants are in possession of or could obtain

        documentation evidencing that Plaintiffs and class members owe a debt, when in

        fact they do not possess and cannot obtain such documentation;

    E.    Using fraudulent, deceptive, and misleading affidavits and affirmations to obtain

        default judgments against Plaintiffs and class members under false pretenses;

    F.    Using fraudulently obtained default judgments to extract money from Plaintiffs

and class members.

232.    As a direct and proximate result of Defendants' violations of the FDCPA,
Plaintiffs have sustained actual damages in an amount to be proved at trial and are also entitled
to statutory damages, costs and attorneys' fees.

## SECOND CAUSE OF ACTION
(Civil RICO, 28 U.S.C. § 1962(c) & (d))

233.    Plaintiffs hereby restate, reallege, and incorporate by reference all
foregoing paragraphs.

234.    Plaintiffs are natural persons, and as such are "persons" within the
meaning of 18 U.S.C. § 1961(3).

235.    Defendants are natural persons and corporate entities, and as such are
"persons" within the meaning of 18 U.S.C. § 1961(3).

*The Enterprise*

236.    On information and belief, the Mel Harris Defendants, the Leucadia
Defendants and the Samserv Defendants comprise three distinct groups of persons that together
form an enterprise within the meaning of 18 U.S.C. § 1961(4). Each and every defendant is
employed by or associated with the enterprise.

237.    On information and belief, each group of defendants, the Mel Harris
Defendants, the Leucadia Defendants and the Samserv Defendants, also qualify as separate and
distinct enterprises within the meaning of 18 U.S.C. § 1961(4). Each and every Mel Harris
Defendant is employed by or associated with the Mel Harris enterprise; each Leucadia defendant
is employed by or associated with the Leucadia enterprise; and each Samserv defendant is

-49-

employed by or associated with the Samserv enterprise.

238.    On information and belief, the individuals and entities that constitute the Mel Harris Defendants, the Leucadia Defendants and the Samserv Defendants taken together are an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

239.    The purpose of the enterprise and/or enterprises (collectively "Enterprise") is to secure default judgments through fraudulent means and to use those judgments to extract money from Plaintiffs and putative class members.  This is accomplished by the Leucadia Defendants buying debts for collection; the Mel Harris Defendants commencing actions in the Civil Court on behalf of the Leucadia Defendants; the Mel Harris and Leucadia Defendants obtaining default judgments against Plaintiffs and putative class members through fraudulent means; and the Samserv Defendants providing fraudulent affidavits of service in furtherance of the scheme.  The relationships between the three defendant groups are longstanding and ongoing.

240.    The Enterprise has for many, but no fewer than four, years been engaged in, and continues to be engaged in, activities that affect interstate commerce.  Defendants' unlawful Enterprise in violation of RICO has been and remains longstanding, continuous and open ended.

*Pattern of Racketeering Activity – Mail and Wire Fraud*

241.    Defendants, individually and collectively, as an Enterprise, have engaged, directly or indirectly, a pattern of racketeering activity, as described below, in violation of 18 U.S.C. § 1962(c) & (d).

242.    Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses

and representations.  The scheme includes but is not limited to:

    A.    Producing and filing fraudulent affidavits of service that falsely claim that Plaintiffs and class members were served with a summons and complaint when in fact they were not;

    B.    Producing and filing false attorney affirmations stating that service of the summons and complaint has been made, when it fact it was not;

    C.    Producing and filing fraudulent affidavits of merit that falsely claim that Defendants have personal knowledge of the facts necessary to obtain a default judgment, when in fact they do not;

    D.    Misrepresenting that Defendants are in possession of or could obtain documentation evidencing that Plaintiffs and class members owe a debt, when in fact they do not possess and cannot obtain such documentation;

    E.    Using fraudulent, deceptive, and misleading affidavits and affirmations to obtain default judgments against Plaintiffs and class members under false pretenses;

    F.    Using fraudulently obtained default judgments to extract money from Plaintiffs and class members.

    243.    Defendants, acting individually and as part of the Enterprise, have made fraudulent misrepresentations on specific occasions as follows:

    A.    On May 25, 2006, June 12, 2007, August 1, 2008, and August 21, 2008 Defendants filed fraudulent affidavits of service with the Civil Court falsely stating that service had been made, when it was not.

    B.    In July 2006, July 2007, and October 2008, Defendants filed false attorney

affirmations with the Civil Court stating that service had been made, when it was
not.

C.   In July 2006, July 2007, and October 2008, Defendants filed fraudulent affidavits
of merit with the Civil Court falsely claiming that Defendants have personal
knowledge of the facts necessary to secure a default judgment, when they do not.

244.   The fraudulent misrepresentations listed above involving the individual
named plaintiffs are described in more detail in paragraphs 110 to 211 of this Amended
Complaint.

245.   Defendants, acting individually and as part of the Enterprise, have used
the mails and wires and have caused the mails and wires to be used, or reasonably knew the
mails and wires would be used, in furtherance of their fraudulent scheme.  Specifically:

A.   In a sworn affidavit, Defendant Mosquera stated that he sent a summons and
complaint to Ms. Veerabadren via U.S. mail on May 18, 2006.

B.   In a sworn affirmation, Defendant Lutz stated that he sent a summons and
complaint to Ms. Colon via U.S. mail on June 7, 2006.

C.   On July 6, 2006, at 9:31 a.m., Lillian Mathews, an employee of Defendant Mel
Harris LLC, used the interstate wires to access the Department of Defense
Manpower Data Center in order to obtain information about Ms. Veerabadren's
military status.

D.   In a sworn affidavit, Defendant Mosquera stated that he sent a summons and
complaint to Ms. Colon via U.S. mail on June 11, 2007.

E.   In a sworn affirmation, Defendant Lutz stated that he sent a summons and

-52-

complaint to Ms. Colon via U.S. mail on June 20, 2007.

F. On July 19, 2007, at 4:13 pm., Lillian Mathews, an employee of Defendant Mel Harris LLC, used the interstate wires to access the Department of Defense Manpower Data Center in order to obtain information about Ms. Colon's military status.

G. In February 2008, Defendant Mel Harris LLC used the interstate wires to send an information subpoena with restraining notice to Ms. Veerabadren's bank, which resulted in the freezing of her bank account.

H. In a sworn affidavit, Defendant Lamb stated that he sent a summons and complaint to Ms. Sykes via U.S. mail on July 24, 2008.

I. In a sworn affirmation, Defendant Lutz stated that he sent a summons and complaint to Ms. Sykes via U.S. mail on August 7, 2008.

J. In a sworn affidavit, Defendant Lamb stated that he sent a summons and complaint to Ms. Graham via U.S. mail on August 18, 2008.

K. In a sworn affirmation, Defendant Lutz stated that he sent a summons and complaint to Ms. Graham via U.S. mail on August 29, 2008.

L. On September 11, 2008, at 12:46 pm., Lillian Mathews, an employee of Defendant Mel Harris LLC, used the interstate wires to access the Department of Defense Manpower Data Center in order to obtain information about Ms. Sykes' military status.

M. On September 25, 2008, at 17:45 pm., Lillian Mathews, an employee of Defendant Mel Harris LLC, used the interstate wires to access the Department of

Defense Manpower Data Center in order to obtain information about Ms. Graham's military status.

N.     In November 2008, Defendant Mel Harris LLC used the interstate wires to send an information subpoena with restraining notice to Ms. Colon's bank, which resulted in the freezing of her bank account.

O.     On or about February 2, 2009, Defendant Mel Harris LLC used the interstate wires to send an information subpoena with restraining notice to Ms. Graham's bank, which resulted in the freezing of her bank account.

P.     Defendant Mel Harris LLC sent a letter to Ms. Graham via U.S. mail on February 19, 2009, advising her that her bank account was frozen because she owed a debt.

Q.     At the direction of Defendant Mel Harris LLC, a New York City Marshal sent a notice of execution to Ms. Sykes via U.S. mail, which she received July 2, 2009.

R.     At the direction of Defendant Mel Harris LLC, a New York City Marshal sent a notice of execution to Ms. Graham via U.S. mail, which she received in December 2009.

S.     Defendants have used the mails and wires on tens, if not hundreds, of thousands of other occasions that Plaintiffs cannot identify at this time but are known to Defendants.

246.   Defendants have used the mails and wires in connection with every default judgment that they have fraudulently obtained, and each use of the mails and wires has furthered the fraudulent scheme and enabled Defendants to take money and property from Plaintiffs and putative class members by means of false pretenses and representations.

-54-

247.    On information and belief, each and every defendant has specific knowledge that the mails and wires are being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used because the CPLR and other governing statutes make use of the mails and wires mandatory. Indeed, no default judgment can be obtained without approximately half a dozen uses of the mail and wires, and frequently more.

248.    Each of the tens, if not hundreds, of thousands of uses of the mails and wires in connection with Defendants' schemes to defraud, spanning a period of no fewer than four years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. § 1341 and 1343, and thus is also a predicate act, which taken together, constitute "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

249.    In connection with Defendants' schemes, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 *et seq.*, and on countless occasions over a substantial time period within ten years of each other. The acts of racketeering are an ongoing part of Defendants' regular way of doing business. The predicate acts have been and will be repeated over and over again.

### Relationship of Pattern of Racketeering Activity to Enterprise

250.    As described, the goal of Defendants' Enterprise is to obtain default judgments through fraudulent means and to use those judgments to extract money and property from Plaintiffs and putative class members.

251.    The pattern of racketeering activity described above is integral to Defendants' scheme. Without engaging in mail and wire fraud, Defendants would be unable to

obtain the default judgments they seek.

252. Each Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. Accordingly, each defendant has violated 18 U.S.C. § 1962(c).

253. Moreover, each Defendant, has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including the numerous predicate acts of mail and wire fraud described above, and has thus violated 18 U.S.C. § 1962(d).

254. As a direct and proximate result of the RICO violations described in this Complaint, Plaintiffs and putative class members have suffered substantial injuries. Plaintiffs and putative class members have been deprived of due process and have had money judgments entered against them on default which have then been used to extract money from them by restraining and levying on their bank accounts, causing them to incur bank fees and miss work days, garnishing their wages, damaging their credit ratings, and/or leveraging these and other means to secure agreements to pay more money to Defendants, thus constituting an injury to Plaintiffs' property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants and their co-conspirators in violation of 18 U.S.C. § 1962(c) & (d).

255. Defendants' misrepresentations to the courts secured the default judgments that caused concrete injury to Plaintiffs' property. As a result, Plaintiffs have suffered damage to their property within the meaning of 18 U.S.C. § 1964, by the actions of defendants and their co-conspirators in violation of 18 U.S.C. § 1962(c) & (d).

256. Defendants' conduct has involved and continues to pose a threat of long

term criminality since it is believed to have commenced as long as a decade ago and has continued to the present. The pattern of racketeering activity has been directed towards hundreds of thousands of persons, including Plaintiffs, and the pattern has spanned many years.

257.    For the violations of 18 U.S.C. § 1962 described in this Complaint, Plaintiffs are entitled to recover compensatory and treble damages in an amount to be determined at trial, and to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future.

## THIRD CAUSE OF ACTION
### (GBL § 349)

258.    Plaintiffs hereby restate, reallege, and incorporate by reference all foregoing paragraphs.

259.    New York prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state. . . ." N.Y. Gen. Bus. Law § 349(a).

260.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(h).

261.    As enumerated above, Defendants violated § 349 of the New York General Business Law by using deceptive acts and practices in the conduct of their businesses.

262.    Defendants' conduct has a broad impact on consumers at large.

263.    Defendants committed the above-described acts willfully and/or knowingly.

264.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiffs and class members and unless enjoined, will cause further irreparable injury.

265.    Defendants' violations include, but are not limited to:

A.    Producing and filing fraudulent affidavits of service that falsely claim that Plaintiffs and class members were served with a summons and complaint when in fact they were not;

B.    Producing and filing false attorney affirmations stating that service of the summons and complaint has been made, when it fact it was not;

C.    Producing and filing fraudulent affidavits of merit that falsely claim that Defendants have personal knowledge of the facts necessary to obtain a default judgment, when in fact they do not;

D.    Misrepresenting that Defendants are in possession of or could obtain documentation evidencing that Plaintiffs and class members owe a debt, when in fact they do not possess and cannot obtain such documentation;

E.    Using fraudulent, deceptive, and misleading affidavits and affirmations to obtain default judgments against Plaintiffs and class members under false pretenses;

F.    Using fraudulently obtained default judgments to extract money from Plaintiffs and class members.

266.    As a direct and proximate result of these violations of § 349 of the General Business Law, Plaintiffs and class members have suffered compensable harm and are entitled to preliminary and permanent injunctive relief, and to recover actual and treble damages, costs and attorney's fees.

WHEREFORE, Plaintiffs and members of the class request the following relief jointly and severally as against all defendants:

1.    An order certifying this case as a class action under Fed. R. Civ. P. 23;

2.    A judgment declaring that Defendants have committed the violations of law alleged in this action;

3.    An order enjoining and directing Defendants to comply with the CPLR in their debt collection activities, including without limitation:

    A.    Directing Defendants to cease engaging in debt collection practices that violate the FDCPA, RICO, and NY GBL § 349;

    B.    Directing Defendants to locate class members and notify them that a default judgment has been entered against them and that they have the right to file a motion with the court to re-open their case, and to provide each class member with a copy of the affidavit of service filed in their action;

    C.    Directing that Defendants serve process in compliance with the law in any and all future actions;

    D.    Directing Defendants to produce and file affidavits of merit in future actions that truthfully and accurately reflect their personal knowledge of the facts, or lack thereof;

4.    Actual and/or compensatory damages against all Defendants in an amount to be proven at trial;

5.    Treble damages pursuant to RICO;

6.    Statutory damages pursuant to the FDCPA;

7.    An order awarding disbursements, costs, and attorneys' fees pursuant to the

FDCPA, RICO, and NY GBL § 349; and

8.    Such other and further relief that may be just and proper.

Dated: December 28, 2009
        New York, New York

NEIGHBORHOOD ECONOMIC
DEVELOPMENT ADVOCACY PROJECT
(NEDAP)

By: _____
        Claudia Wilner (CW 1995)

176 Grand Street, Suite 300
New York, NY 10013
212-680-5100

MFY LEGAL SERVICES, INC.

By: _____
        Carolyn E. Coffey (CC 6741)
        Andrew Goldberg (AG 1530)
        Anamaria Segura (AS 4847)

Of Counsel to Christopher D. Lamb, Esq.
299 Broadway, 4th Floor
New York, New York 10007
212-417-3701

EMERY CELLI BRINCKERHOFF
    & ABADY LLP

By: _Matthew D. Brinckerhoff_
Matthew D. Brinckerhoff (3552)

75 Rockefeller Plaza, 20th Floor
New York, New York 10019
(212) 763-5000

*Attorneys for Plaintiffs*