**Page 1**

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------------X
     JOSE GUZMAN,
 4              PLAINTIFF,
 5              Action No. 1
       -against-    Case No.:
 6              1:16-cv-03499-GBD
 7   MEL S. HARRIS & ASSOCIATES, LLC, et al.,
 8              DEFENDANTS,
     ------------------------------------------X
 9   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
10   ------------------------------------------X
     AGUSTINA BUENO,
11              PLAINTIFF,
12              Action No. 2
       -against-    Case No.:
13              1:16-cv-04737-WFK-VMS
14   MEL S. HARRIS & ASSOCIATES, LLC, et al.,
15              DEFENDANTS.
     ------------------------------------------X
16         DATE:  April 6, 2017
           TIME:  12:02 p.m.
17
18         VIDEOTAPED DEPOSITION of a Non-Party
19   Witness, TODD FABACHER, taken by the
20   respective parties, pursuant to the Federal
21   Rules of Civil Procedure, held at the Law
22   Office of Ahmad Keshavarz, 16 Court Street,
23   26th Floor, Brooklyn, New York 11241, before
24   Richard Aurelio, a Notary Public of the
25   State of New York.
```

**Page 2**

```
 1
 2   A P P E A R A N C E S:
 3
 4
     THE LAW OFFICE OF AHMAD KESHAVARZ, ESQS.
 5      Attorneys for the Plaintiff
        in both actions
 6      16 Court Street, 26th Floor
        Brooklyn, New York 11241
 7      BY: AHMAD KESHAVARZ, ESQ.
        -and-
 8      JESSICA MOODY, ESQ.
 9
10   HERBERT SMITH FREEHILLS, LLP
        Attorneys for the Defendants
11      LR CREDIT 13, LLC in Action No. 1
        LR CREDIT 18, LLC in Action No. 2
12      450 Lexington Avenue, 14th Floor
        New York, New York 10017
13      BY: BENJAMIN P. MILLS, ESQ.
14
15   O'HARE PARNAGIAN LLP
        Attorneys for the Defendants
16      SAMSERV, INC. and WILLIAM MLOTOK
        in both actions
17      82 Wall Street, Suite 300
        New York, New York 10005
18      BY: JEFFREY S. LICHTMAN, ESQ.
19
20   KAUFMAN DOLOWICH & VOLUCK, LLP
        Attorneys for the Non-Party Witness
21      TODD FABACHER
        135 Crossways Park Drive, Suite 201
22      Woodbury, New York 11797
        BY: BRETT A. SCHER, ESQ.
23
24         *    *    *
25
```

**Page 3**

```
 1
 2   F E D E R A L   S T I P U L A T I O N S
 3
 4      IT IS HEREBY STIPULATED AND AGREED by
 5   and between the counsel for the respective
 6   parties herein that the sealing, filing and
 7   certification of the within deposition be
 8   waived; that the original of the deposition
 9   may be signed and sworn to by the witness
10   before anyone authorized to administer an
11   oath, with the same effect as if signed
12   before a Judge of the Court; that an
13   unsigned copy of the deposition may be used
14   with the same force and effect as if signed
15   by the witness, 30 days after service of the
16   original & 1 copy of same upon counsel for
17   the witness.
18
19      IT IS FURTHER STIPULATED AND AGREED
20   that all objections except as to form, are
21   reserved to the time of trial.
22
23         *    *    *    *
24
25
```

**Page 4**

```
 1           T. FABACHER
 2      MR. KESHAVARZ:  Could you mark
 3   these as exhibits, please.
 4      (Whereupon, the aforementioned
 5   subpoenas were marked as Plaintiff's
 6   Exhibits 1 and 2 for identification as
 7   of this date by the Reporter.)
 8   T O D D   F A B A C H E R, called as a
 9   witness, having been first duly sworn by a
10   Notary Public of the State of New York, was
11   examined and testified as follows:
12   EXAMINATION BY
13   MR. KESHAVARZ:
14      Q.  Please state your name for the
15   record.
16      A.  Todd Fabacher, T-O-D-D,
17   F-A-B-A-C-H-E-R.
18      Q.  Where do you reside?
19      A.  447 West 18th Street, Apartment
20   7E, New York, New York 10011.
21      Q.  Thank you, Mr. Fabacher for your
22   time.  Appreciate it.
23      A.  Yes, sir.
24      Q.  You're here testifying in response
25   to two subpoenas, Exhibit 1 and Exhibit 2,
```

                                        1 (Pages 1 to 4)

5

```
1              T. FABACHER
2    for the Guzman and Bueno cases; is that
3    correct?
4         A.  I assume -- yes.  I got subpoenas,
5    so.
6         Q.  You got served Exhibits 1 and 2;
7    is that correct?
8         A.  Can I read them?
9         Q.  Take your time.
10        A.  Yeah.
11           (Perusing documents.)
12           I just want to make sure that this
13   is the -- yes, that's correct.
14        Q.  Okay.
15           MR. KESHAVARZ:  Do we have an
16   agreement, counsel, that this
17   deposition could be used for both the
18   Bueno and the Guzman cases?
19           MR. LICHTMAN:  I think this
20   deposition has been pursuant to
21   subpoenas served in each case.
22           MR. KESHAVARZ:  So, yes?
23           MR. LICHTMAN:  That's the fact
24   that it's been served as subpoenas in
25   both cases.
```

6

```
1              T. FABACHER
2           MR. KESHAVARZ:  I know but I just
3    want to make sure that --
4           MR. LICHTMAN:  And we'll talk
5    about the use when you seek to admit
6    whatever you want to admit in whatever
7    case.
8           MR. KESHAVARZ:  Do you really want
9    to go to -- with --
10          MR. MILLS:  I join.
11          MR. KESHAVARZ:  -- with the judge
12   on this?  All right.  Let's get the
13   judge on the phone.  This is a waste of
14   everyone's time.
15          MR. SCHER:  Ahmad, we have a
16   non-party witness here.
17          MR. KESHAVARZ:  Can we agree --
18          MR. SCHER:  The clock is ticking.
19          MR. MILLS:  You're an hour late.
20   Can you start this?
21          MR. KESHAVARZ:  Can we agree that
22   we can use this in both depositions --
23   in both cases or not?
24          MR. MILLS:  You know where we
25   stand.  If you want to call the judge,
```

7

```
1              T. FABACHER
2    it's --
3           MR. KESHAVARZ:  Where do --
4           MR. MILLS:  -- it's a waste of
5    time.
6           MR. KESHAVARZ:  You don't want to
7    agree to that?
8           MR. LICHTMAN:  You served a
9    subpoena in this case with a notice in
10   this case.  So, to the extent that this
11   is a properly noticed deposition
12   without objection prior to the
13   deposition, that's what it is.
14           But to the extent you might use
15   this for whatever purpose, I don't
16   know.
17           MR. KESHAVARZ:  All right.  Let's
18   get the judges on the phone.
19           MR. SCHER:  Just noting for the
20   record that this is counting against
21   your -- your time against -- my client
22   is here as a non-party witness.  I
23   don't care about what dispute you have
24   amongst counsel.
25           He's here, he's ready, willing and
```

8

```
1              T. FABACHER
2    able to testify.
3           MR. KESHAVARZ:  Understood.
4           THE WITNESS:  Just to let you
5    know, your subpoena's actually wrong.
6    Because --
7           MR. SCHER:  I'm -- there's --
8    there's no question.
9           THE WITNESS:  Oh.
10          MR. SCHER:  You're not answering
11   anything.
12        Q.  Did you have a concern that one of
13   the subpoenas -- there's an issue with the
14   subpoena, Mr. --
15        A.  No.  I'm going to listen to my
16   counsel.
17          MR. MILLS:  Sir, are we still on
18   the record or --
19          MR. KESHAVARZ:  Yes, we're still
20   on the record.  We're on the record.
21          MR. SCHER:  Not your problem.
22          THE WITNESS:  Yeah, it's not my
23   problem.
24        Q.  Is there an issue -- do you
25   believe there is an issue with the
```

                                    2 (Pages 5 to 8)

9

```
 1              T. FABACHER
 2   subpoenas?
 3       A.  No, no, no, no, no.  It's not my
 4   problem.
 5       Q.  I didn't understand -- I didn't
 6   say that.  Do you believe that there's an
 7   issue with the subpoenas?
 8       A.  I don't know.  I'm not an
 9   attorney, man.
10       Q.  Do you believe there's --
11       A.  I'm --
12       Q.  -- an issue with the subpoenas?
13       A.  -- I'm not an attorney.  So, how
14   can I tell you whether it's a -- wrong or
15   not?
16       Q.  Do you have an opinion about
17   whether there's --
18       A.  I have no opinion.
19           (Whereupon, a telephone call was
20       made to the Chambers of the Hon. Vera
21       M. Scanlon, U.S. Magistrate and the
22       following proceedings were had.)
23           MR. KESHAVARZ:  Hi, this is Ahmad
24       Keshavarz.  I'm calling in the Bueno
25       case with Judge Scanlon.  We're on the
```

10

```
 1              T. FABACHER
 2   record in a deposition, and we have a
 3   dispute for the Judge to resolve if
 4   she's available.  And I can go off the
 5   record if you would like at any point.
 6           LAW SECRETARY:  The judge is
 7       actually about to head down to
 8       arraignment.  She's on criminal duty.
 9       If you -- let me see if -- here, can
10       you hold for one moment?
11           (Whereupon, the telephone call was
12       placed on a brief hold.)
13           LAW SECRETARY:  Hi.  The Clerk at
14       Chambers again.  So, the judge can give
15       -- or we can give you a call back --
16       the Judge's ruling later.  But if you
17       could describe the dispute to me now?
18           MR. KESHAVARZ:  So, this is in
19       Bueno versus LR Credit.  And the issue
20       is, we noticed the deposition of a
21       non-party witness named Todd Fabacher.
22       We noticed it for both this case and a
23       parallel case in the Southern District
24       named Guzman versus LR Credit.  We
25       noticed it to be held jointly.  The
```

11

```
 1              T. FABACHER
 2   defendants did not object.  But now,
 3   they won't agree that I could use the
 4   deposition in both cases.
 5           So, the request for relief is an
 6       order from the Court to authorize me to
 7       use this deposition in -- in both the
 8       Guzman and the Bueno cases.
 9           And as soon as we get off the
10       phone, I'm going to call the District
11       -- the Magistrate in Guzman and request
12       the same relief.  So, that's the -- the
13       relief requested.
14           LAW SECRETARY:  Okay.  Just so I
15       understand -- make sure I understand
16       it.  You -- a dep of a non-party
17       witness in this and another case, the
18       SDNY.  And you noticed it to be held
19       jointly.  Defendants in both cases
20       didn't object.  But now, they do not
21       want you to use the deposition in both
22       cases?
23           MR. KESHAVARZ:  They won't agree
24       that I can use the depositions in both
25       cases.  They want to be able to object
```

12

```
 1              T. FABACHER
 2   to its use.  So, that's the dispute.
 3           MR. LICHTMAN:  Well, that's
 4       actually -- hi.  This is Jeff Lichtman.
 5       I'm representing the defendant.  That's
 6       a slightly mischaracterization.
 7           We did -- we put on the record
 8       that we received notices that we know
 9       that this witness has been subpoenaed.
10       But with regard to stipulations with
11       regard to the depositions' use, without
12       knowing to what specific use it's going
13       to be put, I think it's an -- it's an
14       unnecessary stipulation, to the extent
15       that there are objections that should
16       have been asserted to the subpoena.
17       And we have not raised them.  We
18       haven't raised them.  So, I'm not
19       really sure why this is even necessary.
20           MR. MILLS:  This is Ben Mills --
21           LAW SECRETARY:  Okay.
22           MR. MILLS:  -- LR Credit 18.  And
23       I have the -- join of Mr. Lichtman's
24       comments.
25           LAW SECRETARY:  Sorry?  I couldn't
```

3 (Pages 9 to 12)

13

```
1              T. FABACHER
2   quite hear you.
3        MR. MILLS:  Benjamin Mills,
4   representing LR Credit 18, another
5   defendant in this action.  And I join
6   Mr. Lichtman's comments in full.
7        LAW SECRETARY:  Okay.  You think
8   it's unnecessary to stipulate for the
9   deposition testimony.  But you agree
10  that it was set -- it was noticed in
11  the way that plaintiff's attorney
12  describes it?
13       MR. MILLS:  Well, I would say -- I
14  don't know -- jointly means -- We
15  received two notices.  One in this
16  action, one in Guzman.  So, we received
17  two notices for the deposition.  And I
18  agree there's no need.  And it's --
19  (inaudible) -- making would do.
20       LAW SECRETARY:  Okay.
21  Can I get a call-back number?
22       MR. KESHAVARZ:  Yes.  Let me give
23  you the number where we are at right
24  now.  It is 347-308-4859.
25       LAW SECRETARY:  Okay.
```

14

```
1              T. FABACHER
2        And what's the docket number on
3   this case, and then the one in the
4   SDNY?
5        MR. KESHAVARZ:  One moment,
6   please.
7        Pardon me (retrieves documents
8   from in front of Mr. Fabacher).
9        THE WITNESS:  That's all right.
10  Oh, I thought these were mine.
11       MR. KESHAVARZ:  For the one in the
12  Eastern District before your
13  magistrate, it is 16-CV-4737.  And in
14  the --
15       LAW SECRETARY:  Okay.
16       MR. KESHAVARZ:  -- Southern
17  District, it is 16-CV-3499.
18       LAW SECRETARY:  Okay.
19       What -- who -- which magistrate on
20  that?
21       MR. KESHAVARZ:  Oh, that's
22  Magistrate Ellis.
23       LAW SECRETARY:  Ellis.  Okay.
24       MR. KESHAVARZ:  And we're --
25       LAW SECRETARY:  Umm --
```

15

```
1              T. FABACHER
2        MR. KESHAVARZ:  Go ahead.
3        LAW SECRETARY:  No.  Continue.
4        MR. KESHAVARZ:  Oh.  I was going
5   to -- I was going to call Magistrate
6   Ellis next to get a parallel ruling but
7   we can hold off on that.
8        I guess the question is, how long
9   do you think it might take to call
10  back?  Not to be pushy.  But I'm -- I
11  just need to call the other magistrate.
12  So, that's why I was --
13       LAW SECRETARY:  Yeah.  It's --
14  it's just tough to say.  The Judge is
15  going now to take a plea.  But -- she's
16  on criminal duty.  So, it sort of
17  depends on how much stuff they have
18  down there.  And it's never clear to us
19  up here how much they'll have.
20       MR. KESHAVARZ:  Okay.  All right.
21  Well, thank you very much.
22       LAW SECRETARY:  Sure.  No problem.
23       MR. KESHAVARZ:  Bye-bye.
24       LAW SECRETARY:  Okay.
25       (Thereupon, the telephone ruling
```

16

```
1              T. FABACHER
2   concluded.)
3        (Whereupon, a telephone call was
4   made to the Chambers of the Hon. Vera
5   M. Scanlon, Magistrate, and the
6   following proceedings were had.)
7        MR. KESHAVARZ:  All right.  Now,
8   I'm calling the Chambers of Magistrate
9   Ellis in the Guzman case.
10       LAW SECRETARY:  Good afternoon
11  (inaudible).
12       MR. KESHAVARZ:  Good afternoon.
13  This is Ahmad Keshavarz, the attorney
14  for the plaintiff in Guzman versus LR
15  Credit.  We're currently on the record
16  in a deposition.  And I can get off the
17  record if you would like me to.
18       But we have a deposition -- a
19  dispute in a deposition that we need a
20  ruling on.
21       LAW SECRETARY:  Hold on.  For what
22  cases?
23       MR. KESHAVARZ:  Yes.  The case is
24  Guzman versus LR Credit, et al., Index
25  Number 16-CV-3499.
```

4 (Pages 13 to 16)

17

```
1              T. FABACHER
2         LAW CLERK:  Chambers of Judge
3    Ellis.
4         MR. KESHAVARZ:  Good afternoon,
5    this is Ahmad Keshavarz, the plaintiff
6    -- attorney for the plaintiff in Guzman
7    versus LR Credit.  We are currently on
8    the record in a deposition.  I can take
9    us off the record immediately, if you
10   would like.
11        But we have a deposition dispute
12   that we need the magistrate to rule on,
13   please.
14        LAW CLERK:  Okay.  Okay.  Well,
15   I'll take notes first.  And then I'll
16   give the background to the judge.  And
17   the judge will get on the phone with
18   you all.
19        MR. KESHAVARZ:  Okay.
20        LAW CLERK:  So, what is the
21   dispute?
22        MR. KESHAVARZ:  The dispute is
23   that we noticed the deposition --
24        LAW CLERK:  Plaintiff?
25        MR. KESHAVARZ:  -- plaintiff
```

18

```
1              T. FABACHER
2    noticed the deposition of a non-party
3    witness named Todd Fabacher.  We
4    noticed it at the same time for this
5    the case and a parallel case with
6    essentially --
7         LAW CLERK:  The one in the Eastern
8    District?
9         MR. KESHAVARZ:  Exactly.  That one
10   is Bueno versus LR Credit.
11        And I thought we had an agreement
12   that we could use the single deposition
13   transcript for the same non-party
14   witness in both cases.  And that was my
15   understanding.
16        But on the record, the defense
17   attorneys will not stipulate to that.
18   And they want to reserve the right to
19   make whatever objections to the
20   deposition transcript they'd like at a
21   future point, although they haven't
22   served any objections up to now.  So,
23   the request for relief is an order from
24   the magistrate that I can use this
25   deposition transcript in both the
```

19

```
1              T. FABACHER
2    Guzman case and the Bueno case.
3         And we have a request for that
4    same relief to the magistrate in Bueno.
5    So, I'm trying to get an order from
6    both of the magistrates that I can use
7    one transcript for both cases.  Or else
8    I have to take the same deposition, and
9    ask the same set of questions twice
10   which is going to be a waste of
11   everyone's time.
12        MR. LICHTMAN:  So --
13        LAW CLERK:  Okay.  And this is
14   something that you need to have
15   resolved right now?
16        MR. KESHAVARZ:  Yes, or else we're
17   going to waste everyone's -- I'm going
18   to have to ask two sets of questions.
19   And I don't want to have to do that.
20   And nobody -- so, that's the reason why
21   I think the answer is yes.
22        And now the other attorneys want
23   to say something.
24        All right.
25        MR. LICHTMAN:  Yes.  Hi.  This is
```

20

```
1              T. FABACHER
2    Jeffrey Lichtman representing
3    defendants Samserv and Mlotok in the
4    Guzman case.
5         I just see this as unnecessary.
6    And we have -- there have been
7    subpoenas that were served on the
8    witness in both cases.  Notices that
9    were served on the witness in both
10   cases.  We have had an opportunity to
11   object, and we haven't objected.
12        So, as far as I'm concerned, these
13   are depositions that are taken pursuant
14   to subpoenas in each of the two cases.
15   I don't know why it's even necessary
16   for me to stipulate about the use in
17   each case -- hasn't been an issue.  And
18   I'm not sure how they might be used,
19   that I might then later object to.  But
20   the fact that they're being taken
21   simultaneously is not something I'm
22   objecting to.
23        So, I just see this as totally
24   unnecessary, respectfully, to ask for a
25   stipulation in the course of the
```

5 (Pages 17 to 20)

21

```
 1              T. FABACHER
 2   deposition, when the deposition is
 3   designed to ask questions of the
 4   witness we're here attending.  And it's
 5   pursuant to subpoenas in two different
 6   cases without objection.
 7        LAW CLERK:  Okay.
 8        MR. MILLS:  And this is --
 9        LAW CLERK:  So --
10        MR. MILLS:  -- sorry -- this is
11   Benjamin Mills representing LR Credit
12   13, a co-defendant.  I would just like
13   to join Mr. Lichtman's comments in
14   full.
15        LAW CLERK:  Okay.  So, what is the
16   actual dispute then -- (inaudible) --
17   is it -- that they don't feel the need
18   to have to stipulate to the use because
19   you're not objecting to the deposition
20   being simultaneously --
21        MR. KESHAVARZ:  I believe their
22   position -- they can speak for
23   themselves -- but I believe their
24   position is that they want to be able
25   to reserve the right at a future point
```

22

```
 1              T. FABACHER
 2   to -- objecting to the use of a single
 3   transcript for both cases.
 4        That's -- that's my understanding,
 5   that they want to reserve that right
 6   for that objection.  So, if they're
 7   reserving that right, I -- I would like
 8   to get that resolved at the front end
 9   or else I might need to ask two sets of
10   the same questions which is going to
11   waste everyone's time.
12        MR. LICHTMAN:  Well, no, that's --
13   that's actually not my objection.  My
14   objection is the broad term of the word
15   using the deposition in both cases.
16        This -- this applies in each of
17   the two cases.  I have no problem with
18   that.
19        I -- but, you know, to begin the
20   deposition asking for a stipulation
21   about the prospective use of the
22   deposition when we haven't objected to
23   anything is unnecessary.  And I'm not
24   really sure what I'm being asked to
25   agree to.
```

23

```
 1              T. FABACHER
 2        I mean, in point of fact, one
 3   deposition -- one case has a protective
 4   order ordered by the judge.  Another
 5   case has a stipulation not yet ordered
 6   by the judge.  There are two different
 7   avenues there.
 8        But I'm not objecting to the
 9   simultaneous asking in -- of -- of
10   questions.  I'm not objecting to one
11   transcript being generated in both
12   cases.
13        If -- if that's the question, I --
14   I will stipulate that this one
15   transcript refers to both cases
16   pursuant to the subpoena.  That's fine.
17        But the broad term of use, I -- I
18   -- right now, I'm not sure what I'm
19   being asked to agree to.  And I just
20   think it's -- I -- I -- I do think it's
21   unnecessary.
22        MR. MILLS:  And I agree with Mr.
23   Lichtman.
24        LAW CLERK:  Okay.
25        MR. KESHAVARZ:  So, I guess --
```

24

```
 1              T. FABACHER
 2        LAW CLERK:  Do you have anything
 3   to say to that?
 4        MR. KESHAVARZ:  -- I guess the
 5   dispute is, what the word use means.
 6   They don't understand what I mean by
 7   the use of this transcript in both
 8   depositions.
 9        So, that's the issue.  Can I use
10   this deposition in both cases?  If
11   they'll say the answer is yes, then
12   we're good.
13        Can we use this transcript for
14   both cases or not?
15        MR. LICHTMAN:  I am fine with you
16   using this deposition as you would a
17   subpoenaed non-party deposition.  To
18   the extent that it might have other
19   infirmities to it, I reserve my right
20   to object.
21        But to the extent that you're
22   saying is -- is two different subpoenas
23   being served on one witness for one day
24   valid in both cases, I'm okay with
25   that.  And I have never voiced an
```

25

T. FABACHER

1 objection to that.
2 MR. MILLS:  Agree.
3 MR. KESHAVARZ:  All right. I
4 think that resolves our dispute then.
5 LAW CLERK: Okay.  So, you don't
6 need the judge?
7 MR. KESHAVARZ:  No.  But
8 apparently you being on the phone
9 helped facilitate everything.  So, I
10 appreciate your time.
11 LAW CLERK: Of course.
12 MR. KESHAVARZ:  Thank you.
13 LAW CLERK: Have a good one.
14 MR. KESHAVARZ:  Bye-bye.
15 (Thereupon, the telephone ruling
16 concluded and the following proceedings
17 were had.)
18 (Whereupon, an off-the-record
19 discussion was held.)
20 MR. KESHAVARZ:  On the record, my
21 Law Clerk is calling Judge Scanlon's
22 Chambers to withdraw the issue for a
23 ruling.
24 Q.  Now --

26

T. FABACHER

1 A.  Yes, sir.
2 Q.  Let's start from the beginning,
3 sir.  Again, I do thank you for your time.
4 A.  Yes.
5 Q.  During the course of the
6 deposition, your attorney might make an
7 objection, particularly an objection to
8 form.  But unless you're instructed
9 otherwise, you're still required to answer
10 the question.  Do you understand that?
11 A.  Yeah, I'll answer as best I can.
12 Q.  But do you understand if he says
13 objection to form that you're still required
14 to answer?
15 A.  That's correct.
16 Q.  All right.
17 (Whereupon, an off-the-record
18 discussion was held.)
19 Q.  That was the next thing that I was
20 about to ask.  Because the court reporter's
21 scowling at me.  But anyway, my --
22 A.  That's not a problem.
23 Q.  -- my point being, I'm going to
24 ask a question.  Will you attempt to

27

T. FABACHER

1 articulate an answer as opposed to nodding
2 your head or shaking your head?  Will you
3 do --
4 A.  Yes, as best I can.
5 Q.  Okay.  And it's also normal for
6 someone to anticipate the end of the
7 question and begin answering it.  But so the
8 court reporter has a clear record, will you
9 please try to wait until I'm done with the
10 question before answering it?
11 A.  Yes.
12 Q.  Okay.  If you don't understand any
13 of my questions, will you please ask me to
14 rephrase it?
15 A.  I will.
16 Q.  If I ask you a question and you
17 don't ask me to rephrase it, is it
18 reasonable for me to assume that you
19 understood the question?
20 MR. SCHER:  Note my objection.
21 A.  Can you repeat that?
22 Q.  Sure.
23 A.  I'm slow.
24 Q.  Take your time.

28

T. FABACHER

1 A.  Okay.
2 Q.  If I ask you a question and you
3 don't ask me to rephrase it or clarify it,
4 is it reasonable for me to assume that you
5 understood the question?
6 MR. SCHER:  Same objection.
7 You can answer.
8 A.  Okay.
9 Q.  All right.  And that's one of the
10 examples of an objection I was referring to.
11 A.  I understand.
12 Q.  Now, have you ever had your
13 deposition taken before?
14 A.  Yes.
15 Q.  How many times?
16 A.  Twice.
17 Q.  Was one of those -- one of those
18 times in the Sykes, S-Y-K-E-S, class action
19 lawsuit?
20 A.  Yes.
21 Q.  Approximately, how long was that
22 deposition?
23 A.  I don't remember.
24 Q.  All day?

7 (Pages 25 to 28)

29

```
 1              T. FABACHER
 2      A.  Yes.
 3      Q.  Felt like three days?
 4      A.  No, it was good.
 5      Q.  All right.  And what was the other
 6  case that you were deposed in?
 7      A.  It was two days for the same case.
 8      MR. SCHER:  Sykes?
 9      THE WITNESS:  Sykes, yeah.
10      A.  But there was two days.  Actually,
11  it was two days.
12      Q.  It didn't just feel like two days?
13  It actually --
14      A.  It actually was two days.  Because
15  we had -- just like here, we had a lot of
16  delays.  So --
17      Q.  All right.
18      A.  -- it turned into two days.
19      Q.  All right.  Fair enough.  Now,
20  have you ever been known by any other name
21  other than Todd Fabacher?
22      A.  No.
23      Q.  Am I pronouncing your name
24  correctly?
25      A.  Yes, you are actually.  Thank you.
```

30

```
 1              T. FABACHER
 2      Q.  Okay.  I'm doing my best.
 3          (Perusing document.)
 4          Now, looking at Exhibits 1 and 2,
 5  the subpoenas to testify at the deposition,
 6  if you turn your attention to the
 7  next-to-last page of both, in Exhibit A --
 8  well, let's take them one at a time.
 9  Exhibit A -- excuse -- Exhibit A attached to
10  Plaintiff's Exhibit 1 which is the Guzman
11  subpoena asks for three sets of documents;
12  is that correct?
13      A.  (Perusing document.)
14          Can I read it?
15      Q.  Please take your time.
16          (Whereupon, an off-the-record
17  discussion was held.)
18      A.  No, I -- I --
19      MR. SCHER:  No.  There's no
20  question.
21      Q.  Were you about to say something?
22      A.  No, no.  I said I read it.
23      Q.  Okay.  Did you do a search for
24  each of the three items listed in Exhibit A
25  to deposition three -- deposition Exhibit 1
```

31

```
 1              T. FABACHER
 2  -- Guzman affidavit.  Did you look for those
 3  documents?
 4      A.  I have no documents.
 5      Q.  I understand that.  But did you
 6  look?  Did you try to obtain the documents
 7  that are listed in Exhibit A of Plaintiff's
 8  Exhibit 1?
 9      MR. LICHTMAN:  Objection.
10      A.  Yeah, I . . .
11      MR. SCHER:  You can answer.
12      A.  Yes.  I looked around the room,
13  and I didn't see them.  I mean how -- how do
14  I look for -- where? -- I also looked --
15  Sykes case for the e-mail, and I had no
16  attachments.
17      Q.  Well, that's what I was trying to
18  ask.
19      A.  Oh, okay.  So no, I -- I -- I did
20  not find anything.
21      Q.  Okay.  I'm just asking you what
22  search you took.  Was one search you took to
23  determine if the -- documents responsive to
24  Exhibit A in the Guzman subpoena, one step
25  you took was to look at e-mails, correct?
```

32

```
 1              T. FABACHER
 2      A.  Yes.  I have -- yes.  I have
 3  nothing.
 4      Q.  Okay.  And -- that be true for
 5  Exhibit A in the subpoena in the Bueno case?
 6      A.  Can I read it?
 7      Q.  Take your time.
 8      A.  (Perusing document.)
 9          Yes, I did search and I found
10  nothing.
11      Q.  Okay.  So, let me just clarify
12  because I started with one subpoena and I
13  should have just done both.  So, for both
14  the Bueno subpoena and the Guzman subpoena,
15  you did a search for responsive documents to
16  both of the Exhibit A's in the subpoenas,
17  right?
18      A.  That's correct.
19      Q.  Okay.  And you were unable to
20  obtain or to discover documents responsive
21  to either subpoena, correct?
22      A.  That's correct.
23      Q.  Okay.  And one step you took was
24  to check your e-mails, correct?
25      A.  Correct.
```

8 (Pages 29 to 32)

33

T. FABACHER

Q. What is your e-mail address?
A. Tfabacher@gmail.com.
Q. Is that the only e-mail address that you use?
A. Yes. It's my personal e-mail.
Q. Do you have any other e-mail addresses that you use?
A. Yes, I do. I have tfabacher@digitalpomegranate.com.
Q. Any other e-mail addresses --
A. No.
Q. -- that you use?
A. That's it.
Q. Okay. Have you used any other e-mail addresses from 2011 to the present?
A. No. Those would be the only two e-mails that I've used.
Q. Okay. And did you get e-mail --
A. No, that's it.
Q. -- did you get e-mail correspondence regarding the Sykes case on your Gmail account?
A. Yes.
Q. Did you get e-mail correspondence

34

T. FABACHER

regarding the Sykes case on your Digital Pomegranate account?
A. Never.
Q. Okay. And do you know how long your Gmail is retained? The e-mails.
A. I delete everything over a year always.
Q. Do you manually do that?
A. Yes.
Q. And why do you do that?
A. I do it always.
Q. Is there any particular reason?
A. It's -- it's -- I use the free account in my -- I size up. And they always tell me I'm running out of space. So, I just take everything from a year over and delete it.
Q. All right.
A. Because I don't want to pay.
Q. Okay. And do you use Outlook generally for your Gmail account?
A. Never.
Q. You never download any of your e-mails onto a hard drive?

35

T. FABACHER

A. Never.
Q. Or download it onto a cloud somewhere?
A. Never.
Q. Okay.
A. On my phone, on my iPhone.
Q. Okay. Do you have e-mails that go back to 2012 in your Gmail account?
A. I said I -- I have -- everything over a year has been deleted. But I can't -- I wouldn't know a hundred percent but I would think not because that would have been deleted.
Q. Okay.
A. So, I'm going to speculate no.
Q. All right. Do you have your phone with you today?
A. I do.
Q. During the -- during a break, can you just see if you have any e-mails that go back that far, 2012. And then we could take the next step and see --
A. I would prefer to do it on my computer. I don't prefer to do it on the

36

T. FABACHER

phone because that -- the phone doesn't show you everything. So, I -- that's my preference.
Q. Well, I know. But I'm trying to get this done.
MR. SCHER: He's already testified that he searched his e-mails and had nothing related to the Sykes case. So, I don't know why you're going with this continued questioning about having him go and look again to see if he has anything from 2012.
Q. When you say you searched your Gmail account, do you mean you searched it on a computer browser?
A. That's correct.
Q. You didn't search it on your phone?
A. Did not.
Q. Your phone has Gmail e-mails going further back than your browser, correct?
A. No. It's on the cloud. The -- it's everything -- from my understanding, the phone does not retain anything. It's --

9 (Pages 33 to 36)

37

T. FABACHER
1
2  Gmail is not -- it's cloud-based, from my
3  understanding.
4      Q.  Well, can you just check your cell
5  phone now and see if you have Gmail e-mails
6  going back to 2012?
7          MR. SCHER:  No, he can't.
8      A.  As I said, I wouldn't -- I would
9  not because I'm not -- you know, I would
10  prefer to do it on my desktop.
11      Q.  Some of the e-mails --
12      A.  You're asking me to testify
13  whether -- on grounds of perjury whether I
14  have a -- an -- a -- an e-mail from 2012.
15  And I'm telling you the iPhone is not
16  sufficient to do that.  I would -- if you
17  want me to -- to testify, I would want to do
18  it on my -- on my desktop.
19      Q.  So, are you saying that some of
20  your Gmail e-mails from 2012 may have been
21  downloaded onto your computer?
22      A.  No.  I do not download the
23  e-mails.
24      Q.  Okay.  So, when you say you would
25  want to look on your desktop, you mean to

38

T. FABACHER
1
2  look on your desktop to go through the Gmail
3  browser on the website?  On the Gmail
4  website?  Is that what you mean?
5      A.  I'd prefer -- that would be
6  correct.
7      Q.  Okay.  Would there be anything
8  else that you would do on your home computer
9  to check if there any Gmail e-mails from
10  2012 that you couldn't do on your phone or
11  somewhere else?
12      A.  Well, again, I don't have -- I'm
13  not going to -- to access my -- my personal
14  e-mail right now from -- from here.  Because
15  for purposes -- for security purposes, I'm
16  not willing to do that unless I'm -- unless
17  I'm subpoenaed to -- forced to.
18      Q.  Well, how would you go about doing
19  that?
20      A.  I would do it on my home computer.
21      Q.  No, but you -- I believe you said
22  something about accessing it from my phone.
23  Maybe I misunderstood.  Is there a way to
24  access those e-mails here, from here?  Is
25  there -- put aside the issue about whether

39

T. FABACHER
1
2  you would want to or not.  Is there a way to
3  access Gmail --
4      A.  Well, then I would have to give
5  you my personal security on your computer.
6  And I'm -- personally, I am not willing to
7  do that.
8      Q.  I'm not asking you to do that at
9  this point.  I --
10      A.  Yes, you are.  Because for me to
11  log in here, I would have to give you on one
12  of your computers access to my user name and
13  password.
14      Q.  User name and password to what?
15      A.  To the Gmail account.  You cannot
16  access your Gmail account without a user
17  name or a password.
18      Q.  Well, I guess what I'm trying to
19  figure out is, if you accessed your Gmail
20  account from your home computer, is there
21  anything that makes you think that you may
22  have Gmail e-mails from 2012?
23      A.  No.
24      Q.  Thank you.
25          Do you recall if your deposition

40

T. FABACHER
1
2  transcript was e-mailed to you in the Sykes
3  case?
4      A.  I searched -- I do not recall if
5  it was searched.  But I did check.  I did
6  seek for the Sykes case and I did not find
7  it.
8      Q.  My question is, do you recall --
9      A.  I said no.  I said no.  And I
10  searched.  I'm sorry.  I apologize.
11      Q.  No, that's okay.  You're doing
12  what's normal, particularly in New York, is
13  that you're anticipating what I'm going to
14  ask and --
15      A.  Well, you asked.  And -- and I
16  said no.  And then you said -- you -- you --
17  you contradicted what I said.
18      Q.  I'm just trying to ask you then --
19  I think -- I think you answered a different
20  question than what I'm asking.  But --
21      A.  Okay.
22      Q.  -- in any case, let me just ask
23  the question specifically.
24      A.  Okay.
25      Q.  Even if you do not have your Gmail

10 (Pages 37 to 40)

41

T. FABACHER

1  accounts today from 2012, do you remember
2  one way or the other whether at some point
3  you saw your deposition transcript on Gmail?
4      A.  No.
5      Q.  Did you review your deposition
6  transcript in the Sykes case?
7      A.  I did.
8      Q.  And did you have an opportunity to
9  make changes to that deposition testimony?
10      A.  I -- no.
11      Q.  Okay.  Did you -- whether after
12  reading it, did you believe that there were
13  any changes that you needed to make to make
14  your answers fully truthful?
15      A.  I don't recall.  But I do not
16  remember making any exceptions.
17      Q.  Thank you.
18          So, let's go to your background a
19  little bit.  Did you go to college?
20      A.  I did.
21      Q.  And where did you go?
22      A.  Miami University.  It's at Miami
23  of Ohio.
24      Q.  Did you get a degree there?

42

T. FABACHER

1      A.  I did.
2      Q.  What was your degree in?
3      A.  BA in Political Science and
4  Industrial Engineering.
5      Q.  And did you get any other
6  education after college?
7      A.  No.
8      Q.  No graduate school?
9      A.  No.
10      Q.  Any other formal training
11  particularly in terms of the use of computer
12  programming?
13      A.  No.
14      Q.  What do you do now?
15      A.  I write computer software.
16      Q.  And how did you learn to write
17  computer software?
18      A.  I taught myself.
19      Q.  Over how long of a period of time
20  were you learning to write computer
21  software?
22      A.  You -- I -- well, you have to ask
23  a particular question.  Like -- you know,
24  there's so -- aspects -- how -- how long

43

T. FABACHER

1  have you done -- be an attorney?  It's --
2  it's constant.  So, I don't know.  Since --
3  I would probably -- if you want when I
4  started programming?
5      Q.  Yes.
6      A.  I started programming in 1995.
7      Q.  Okay.  And in what capacity did
8  you start programming?
9      A.  I picked up a book and started
10  learning.
11      Q.  Okay.  Did you work for someone
12  when you started doing computer programming?
13      A.  No, I worked for myself.
14      Q.  Okay.  So beginning in 1995, what
15  did you do in terms of computer programming?
16      A.  I'm sorry?
17      Q.  Beginning in 1995 when you -- let
18  me -- back it up.  When did you graduate
19  from college?
20      A.  In 1989.
21      Q.  And what did you do after you
22  graduated from college?
23      A.  I went to work -- directly out of
24  college?  I went -- moved to Denver, and

44

T. FABACHER

1  sold PC's.
2      Q.  What did you do next?
3      A.  I bought a one-way ticket to
4  Taiwan.
5      Q.  What did you do in Taiwan?
6      A.  I -- I don't remember.  I -- I was
7  bumming around.  I don't know -- taught
8  English, you know.  What else did I do.
9  That's basically it.  Just bums --
10      Q.  That's fine.
11      A.  Yeah.
12      Q.  So, about how long were you in
13  Taiwan for?
14      A.  Well, I -- I was everywhere.
15      Q.  You were traveling around?
16      A.  Yeah, just traveling around.
17      Q.  Okay.  Did you get a job after you
18  were traveling around?
19      A.  Yes.  I -- I worked for a year,
20  one year, in Kuala Lumpur, Malaysia.
21      Q.  About when was that?  Roughly,
22  what year?
23      A.  I don't remember.
24      Q.  About how old were you?

11 (Pages 41 to 44)

45

T. FABACHER
1
2     A.   I'm trying to think, man.  That
3  was so long ago.  I'm an old guy.  All
4  right.  So, that was in 1992 maybe --
5  nineteen ninety -- no, that was 1995.
6  Nineteen -- 1995.
7     Q.   And not to ask an offensive
8  question, but I'm going to ask how old you
9  are now?
10     A.   I am 50.
11     Q.   Okay.  You look mighty good for
12  50, I have to say.
13     A.   Well, my wife -- she's
14  complaining.  I got a gym membership for my
15  birthday.
16     Q.   Sir, what did you do beginning in
17  1995 in --
18     A.   That's when I started programming.
19     Q.   Okay.  You started working for
20  yourself in programming?
21     A.   Yes.  And there was a company in
22  Malaysia.  The name of it is I & J -- I,
23  ampersand, J -- LLC.
24     Q.   And you worked for yourself, and
25  did work for them?

46

T. FABACHER
1
2     A.   Yes.  Yes, they -- that's where I
3  decided to be a programmer.  And I worked
4  basically for free.  And they taught me how
5  to -- you know -- in a sense, I started on
6  my own.  And I would just sit in the office,
7  and just kind of hang out.
8     Q.   What type of programming did you
9  do there?
10     A.   DBase.
11     Q.   And just in layman's terms, what
12  is that?
13     A.   It's a database.  It's a -- it's
14  called D, just the letter D, B-A-S-E.
15     Q.   And how long did you do that for?
16     A.   About -- about a year.
17     Q.   And then what did you do after
18  that?
19     A.   I went to -- I met a -- a girl.
20  And then I moved to Pune, India.
21     Q.   Okay.  And how long were you in
22  Pune, India for?
23     A.   For about five months.
24     Q.   What did you do there?
25     A.   Hung out.

47

T. FABACHER
1
2     Q.   Okay.
3     A.   I did a lot of hanging out.
4     Q.   That's fine.  It's nice.  I'm
5  jealous.
6     A.   Yeah.  So -- yes.
7     Q.   That's around 1996?
8     A.   Well, yes, pretty close.
9     Q.   All right.  And then what did you
10  do after that?
11     A.   Then I met a -- a gentleman at a
12  party who said he wants to create day spas
13  around the world.  He wanted to change the
14  world.
15     Q.   Okay.  So, you were involved in
16  that somehow?
17     A.   Yeah.  He said he -- he's, like,
18  let's do a software together.
19     Q.   And is that what you did?
20     A.   That's what I did.
21     Q.   In layman's terms, when you say
22  did software together, what do you mean?
23     A.   So, he is a company.  He wanted to
24  write a software to manage hair salons and
25  spas.

48

T. FABACHER
1
2     Q.   I see.  And how long did you do
3  that for?
4     A.   I did that from 1996 possibly --
5  '95 -- I'm not sure -- I -- I can't remember
6  -- no, I --
7     Q.   Roughly speaking?
8     A.   Maybe '96 to 2000.
9     Q.   Right around there?
10     A.   Yeah.
11     Q.   All right.  Did you do any other
12  programming other than for the day spa?
13     A.   No, that was it.
14     Q.   That was your full-time job?
15     A.   That was it.
16     Q.   From '96 to 2000?
17     A.   Yes.
18     Q.   What did you do after that?
19     A.   I moved to New York.
20     Q.   What did you do when you moved to
21  New York?
22     A.   I programmed.
23     Q.   Who did you program for?
24     A.   A company named Borrels.  I don't
25  know how to spell it.

12 (Pages 45 to 48)

49

T. FABACHER

1     Q.   And how long did you do computer
2  programming for Borrels when you came to New
3  York around 2000?
4     A.   I don't know.  Maybe a year and a
5  half.
6     Q.   Okay.  And in layman's terms, when
7  you say you did programming for Borrels,
8  give me a general idea about what you mean
9  by that, please?
10    A.   Programming.  I -- I don't know
11 how else to describe it.
12    Q.   Programming and managing a
13 database -- information?
14    A.   No, I did not manage a database.
15 So, it's programming which is coding --
16    Q.   Okay.  Coding to do what?
17    A.   To show news clips.
18    Q.   In what way?  Like, search the
19 Internet and pull together news clips, or --
20 what do you mean?
21    A.   Well, I -- wasn't my part.
22 Someone else did that.  I just showed them
23 on the screen.
24    Q.   And what do you mean by that?

50

T. FABACHER

1     A.   So, they -- so, when they --
2  someone would download a news clip.  And
3  then we would write -- we wrote a -- a --
4  what's called a text reader.
5     Q.   Okay.
6     A.   So, if someone is looking for a
7  key word out of a news clip, like -- you
8  know, like, David Bowie, okay?  So, then
9  they would scan the image.  And it would
10 turn it into a text file.  And I wrote the
11 software to look for David Bowie.
12    Q.   So, that was before the time when
13 newspaper articles were largely text on the
14 Internet?
15    A.   That's right.
16    Q.   So, there were --
17    A.   Just getting started.  You know,
18 2000.
19    Q.   So, they're physically newspaper
20 articles scanned.  And then you would have
21 some sort of optical reader that would break
22 down the text into words?  The search.
23    A.   It wasn't my -- that's not what I
24 did.  So, I don't -- I'm assuming that's

51

T. FABACHER

1  what they did.  They -- they gave me the
2  text.  I'm not -- I -- I believe that's what
3  they did but that wasn't my function.
4     Q.   Your function was, again -- I'm
5  sorry --
6     A.   Yeah.
7     Q.   -- specifically make it so the
8  text -- the articles are searchable?
9     A.   No.  I did not do that.  I
10 searched -- I wrote the codes to search the
11 text.
12    Q.   All right.  Did you do any other
13 major work when you were at Borrels for a
14 year and a half beginning in 2000?
15    A.   No.  That was pretty much it.
16 That's what they did.  They were a clipping
17 service.
18    Q.   Okay.  So, what did you do after
19 you left Borrels?  Was that your -- let me
20 do one step at a time.  Was Borrels a
21 full-time job?
22    A.   Yes.
23    Q.   Did you have any other major jobs
24 during that time you worked with Borrels?

52

T. FABACHER

1     A.   No.
2     Q.   What did you do after Borrels?
3     A.   I worked for the law office of Mel
4  Harris.
5     Q.   And that would be around 2001,
6  2002?
7     A.   It was actually 9/11.  So, it
8  would be probably two thousand -- I don't
9  remember exactly the date.
10    Q.   So, sometime in 2012 (sic), you
11 think?
12    A.   2002.
13    Q.   Oh.  2002.  Excuse me.
14    A.   Yeah.  Sure.
15    Q.   And how did you come about to get
16 that job?
17    A.   I applied.
18    Q.   How did you find out about the
19 position?
20    A.   A friend had said someone was
21 looking for something.
22    Q.   All right.  And how long did you
23 work at Mel Harris?
24    A.   I don't even remember when I left.

13 (Pages 49 to 52)

53

T. FABACHER
1   T. FABACHER
2   It was a number of years ago.
3       Q.   Did you leave around 2012?
4       A.   I don't even remember, to be
5   honest with you.
6       Q.   All right.  Did you have a title
7   while you were at Mel Harris?
8       A.   I was -- I don't remember.  I
9   think it's M -- MIS, management information
10  system.
11      Q.   And --
12      A.   On my card, if I can remember.
13      Q.   -- did your job responsibilities
14  change in any major way from when you
15  started and when you stopped working there?
16      A.   No.
17      Q.   Okay.  What were your major
18  responsibilities when you worked at Mel
19  Harris beginning approximately 2002?
20      A.   My major responsibility was --
21  starting in 2002 was to do -- to read a
22  database, and create subpoenas, information
23  subpoenas.
24      Q.   By read a database, what do you
25  mean?

54

T. FABACHER
1   T. FABACHER
2       A.   I mean to read a database.  I
3   don't know how else to explain it.
4       Q.   To gather information from a
5   database, and have it spit out information
6   subpoenas?  Is that what you mean?
7       A.   No.  It would mean to read a
8   database.  That's -- the technical term,
9   that's -- I don't know how else to explain
10  it.
11      Q.   Well, just in a layman's term?  I
12  don't need the technical term.
13      A.   I don't know layman's term.  I'm
14  not a layman.  The -- technical term is
15  to read a database.
16      Q.   And what does it mean to read a
17  database?  What does --
18      A.   It means to read a database.  I --
19  I -- I don't understand how -- I -- to read,
20  just like you read a piece of paper.
21      Q.   Okay.  You read the data that's in
22  the database?
23      A.   That's correct.
24      Q.   And what do you do with the data
25  in the database when you read it?

55

T. FABACHER
1   T. FABACHER
2       A.   And then I read it.  And then in
3   this case, I took the data, and printed
4   information subpoenas.
5       Q.   And in this case, what do you
6   mean?  When you say in this case.
7       A.   For this particular task -- to say
8   -- to read a database is to -- to acquire
9   the data out of the database, and then to
10  then take that data, and put it in a
11  document.  Similar to mail merge.  If you're
12  looking for a layman term.  There you go.
13  Mail merge.  How's that?
14      Q.   Okay.  So, you have a -- you set
15  up a computer system that there's some sort
16  of -- something like a mail merge of data?
17      A.   Correct, that's -- would be
18  correct.
19      Q.   And that would be a mail merge of
20  names, account numbers, amounts due, and
21  that type of information, and to form
22  letters like information subpoenas?  Is that
23  what you mean?
24      A.   That's correct.
25      Q.   Okay.  Did you develop any

56

T. FABACHER
1   T. FABACHER
2   programs while you were at Mel Harris?
3       A.   Yes, I did.
4       Q.   Were there names to these
5   programs?
6       A.   There were.
7       Q.   What were the names of the
8   programs?
9       A.   Pinpoint, P-I-N-P-O-I-N-T.
10      Q.   And was Pinpoint the only program
11  that you developed while you were at Mel
12  Harris?
13      A.   I think a number of utilities.  We
14  didn't have names for them.
15      Q.   What do you mean by utilities?
16      A.   Well, you -- these would be
17  applications that read data.
18      Q.   So, basically, another version of
19  a mail merge?  Is that what you mean?
20      A.   Depending on the situation -- some
21  were mail merges.  Some could be exporting a
22  file.
23      Q.   All right.  What were your --
24  roughly speaking, what were your hours at
25  Mel Harris?

14  (Pages 53 to 56)

57

T. FABACHER

1
2     A.   Nine to 5.
3     Q.   Was that here in Manhattan?
4     A.   There -- (indicating) -- in
5  Manhattan, yes.  Yes.
6     Q.   Okay.
7     A.   I believe we were on John Street.
8  And then -- yeah.
9     Q.   All right.  Fine.  Fair enough.
10        What was your -- just generally
11  speaking, ballpark --
12     A.   Sure.
13     Q.   -- about what percentage of your
14  time would you spend doing, say, computer
15  programming?
16     A.   Oh, I don't know.
17     Q.   Most of the time?  Only a little
18  bit of the time?
19     A.   I -- you know . . .
20        MR. SCHER:  Want to put a time
21     frame on it?
22     A.   Yeah.  Can you give me an exact --
23  you know --
24     Q.   That's fine.  I -- I appreciate
25  that because you're doing exactly what I

58

T. FABACHER

1
2  asked you to do which is asking me
3  questions.
4     A.   Yeah.
5     Q.   Were you -- my understanding is
6  that your responsibilities while you were at
7  Mel Harris were largely the same; is that
8  correct?  Or did it change in any
9  significant way?
10     A.   I would say largely the same.
11     Q.   Okay.  Is the breakdown -- just
12  generally speaking, about the tasks that you
13  would do while you were at Mel Harris, would
14  that breakdown change in any way
15  significantly over that time?
16     A.   Not significant.
17     Q.   Okay.  So, just ballpark idea,
18  what percentage of your time would you spend
19  doing what -- would you spend half your time
20  doing computer programming?  Five percent of
21  your time?  Just ballpark --
22     A.   Yeah, because it -- it's -- you
23  know, each time frame -- like, if I had a
24  task to do at one time, it could be 50
25  percent.  Sometimes it could be zero

59

T. FABACHER

1
2  percent.  It could be -- more like working
3  on PC's.  PC's are not working, you know,
4  putting in -- putting in a copying machine.
5  Yeah, you know just -- we ordered a new
6  copying machine.  Now, you would think you
7  would just plug it in.  But no, copying
8  machines can actually be quite difficult.
9     Q.   All right.  So, were you the tech
10  person at Mel Harris?
11     A.   I was the MIS director -- the --
12  management information system, that's what I
13  was.
14     Q.   So, you were managing all the
15  computer programs at Mel Harris; is that
16  right?
17     A.   I installed them.  I don't know
18  about manage -- yeah, okay.
19     Q.   Is that right?  I mean just
20  generally speaking, you installed the
21  software at Mel Harris, correct?
22     A.   Yes.
23     Q.   You -- you designed the --
24  generally speaking, you designed the
25  software that Mel Harris used?

60

T. FABACHER

1
2     A.   No, I did not.
3     Q.   This database --
4     A.   One -- one of it.
5     Q.   Okay.  You did -- you designed
6  Pinpoint?
7     A.   That's correct.
8     Q.   Okay.
9     A.   That's -- that was not the system
10  of record.
11     Q.   What do you mean by system of
12  record?
13     A.   A system of record is -- is the --
14  is the -- the -- system of -- it's the --
15  the -- the -- the main data.
16     Q.   So, are you saying you designed a
17  database to maintain --
18     A.   I didn't say I designed a
19  database.
20     Q.   So, what do you mean by that?
21     A.   I said I read a database.
22     Q.   Okay.  Because you're talking to a
23  person who barely knows how to turn on his
24  computer.
25     A.   Okay.  Well, then see -- see --

15 (Pages 57 to 60)

61

T. FABACHER

1  I'm telling you.  Copy machines are
2  difficult.  There's a difference between
3  reading a database and designing a database.
4      Q.  In what way?
5      A.  Okay.  So, like, for example, to
6  read this document (indicating).  And
7  another one is to actually craft a document,
8  to actually write the document.  One is to
9  read, one is to write.
10         So, I did not create the -- the --
11  what's called the system of record -- where
12  the information lived, for example, the --
13  the case information, any payment
14  information, I did not write that.
15      Q.  Where did that information come
16  from?
17      A.  That lived in a program called
18  Debtmaster.  D-E-B-T-M-A-S-T-E-R.
19  Debtmaster.
20         (Whereupon, an off-the-record
21  discussion was held, and a portion of the
22  testimony was read back.)
23      Q.  So, I apologize if I'm going to
24  ask you the same question.  Because I'm

62

T. FABACHER

1  still trying to figure out how to turn on my
2  computer and the -- too big a stretch on
3  getting the water.  So, Pinpoint, what does
4  that do?
5      A.  That reads -- that reads the
6  database.
7      Q.  And Debtmaster, what does that do?
8      A.  I didn't write it.  So, my -- it
9  stores the database.
10      Q.  It stores the information such as
11  names, addresses, amounts due, and so forth?
12      A.  Yes.
13      Q.  Are those the main two functions
14  between Pinpoint and Debtmaster?
15      A.  I don't understand the question.
16      Q.  So, you said Pinpoint reads the
17  database, correct?
18      A.  Correct.
19      Q.  And Debtmaster stores the
20  information, the data such as names,
21  addresses, and so forth, correct?
22      A.  Correct.
23      Q.  Okay.  Are those the two main
24  functions of these programs?

63

T. FABACHER

1      A.  I'm not -- I didn't really use
2  Debtmaster, so I can't answer to that.  So,
3  I was not a real Debtmaster user.  I just
4  knew that it was the database.  So, I don't
5  know its main functions.  So, I don't know
6  how you say function in that sense.  But
7  it's the database.  That's all I know.
8      Q.  And your design of Pinpoint
9  integrates the data from Debtmaster into a
10  mail merge; is that right?
11      A.  I don't know if it integrates it.
12  Reads the data.
13      Q.  It uses the data?
14      A.  It reads the data.  I -- you know,
15  it is what it is.  It reads the data.
16      Q.  And what is --
17      A.  I don't know why you can't -- we
18  just can't say, read the data.  It's pretty
19  plain.  I think it's pretty plain.  It's --
20  reads the data.  Because use is -- is very
21  different.
22      Q.  In what way?
23      A.  Use is, like, manipulates or
24  something -- it reads the data.

64

T. FABACHER

1      Q.  It puts the data in somewhere --
2  does it --
3      A.  It reads the data.  That's what --
4  you want me to be particular.  I'm trying to
5  -- to -- it reads the data.
6      Q.  And I know for you reads the data
7  is entirely clear because this is what you
8  do for a living.
9      A.  Right.
10      Q.  So, to a layperson, can you
11  elaborate on what you mean by reads the
12  data?
13      A.  Okay.  It queries the data.
14      Q.  It pulls the data information from
15  the database, and does something with it?
16      A.  Okay.  I guess that's query.  Is
17  that your definition of query?
18      Q.  I'm just asking you in layman's
19  terms --
20      A.  I'm giving you layman's terms.
21  Read the data.  I don't know how much more
22  layman I can be.  I -- I'm -- I'm -- I don't
23  mean to be, you know -- but reading the
24  data.  I don't -- I don't -- I don't

16 (Pages 61 to 64)

65

T. FABACHER

1  understand how that's inefficient.
2
3      Q.  Okay.  So, roughly speaking, in a
4  month, a year doing computer installation,
5  copier installation, working on software,
6  working on computer issues, in a year, or a
7  month, roughly speaking, what percentage of
8  time did that take?
9      A.  It varies.
10     Q.  From what to what?
11     A.  It varies.  Sometimes, as I -- as
12 I testified earlier, sometimes it could be
13 80 percent.  Sometimes it could be zero.
14     Q.  On average over the year, what
15 would it be approximately?
16     A.  I -- maybe -- I don't know.  It
17 would be speculation.
18     Q.  Approximately, what do you think
19 it would be?
20     A.  I -- I'd have to think about it.
21     Q.  Take your time.  So, the question
22 is approximately what percentage of your
23 time, generally speaking, say, over the
24 course of a year would you spend doing
25 computer-related work, installing computers,

66

T. FABACHER

1
2  doing software work, that type of thing?
3  Roughly speaking.
4      A.  I don't know.  Maybe -- maybe 20
5  percent.  I mean it's -- I -- I -- you know,
6  it's so long ago.  You know, I don't know
7  rough.  You're asking me to give you an
8  answer at a deposition to say, you hereby
9  testify that -- you know, like -- that --
10 that -- so, I mean I don't know because each
11 year's different.  In the beginning, it was
12 a little bit more.  As the years went on,
13 less programming, it was less.  I mean you
14 -- you -- if you ask me a reasonable
15 question, I could give you a reasonable
16 answer.
17     Q.  I thought you had testified that
18 your major responsibilities and the
19 breakdown of your major responsibilities did
20 not change in any significant way during the
21 time period that you worked at Mel Harris;
22 is that correct?
23     A.  Well, you used the word
24 significant.
25     Q.  Did it change in any significant

67

T. FABACHER

1
2  way?
3      A.  No.  I said -- no, it didn't --
4  not in a significant way.  But you're asking
5  me to put a number on it.
6      Q.  Okay.  Ballpark for the time you
7  worked there, approximately 20 percent of
8  your time was doing computer work?
9  Ballpark, is that approximately right?
10     A.  That's accurate.
11     Q.  Thank you.
12         What were your other major tasks
13 other than doing what I'm going to call
14 computer work?  What were the -- the major
15 part of the time that you spent?  Just
16 generally speaking.
17     A.  Major part was just maintaining
18 the PC's, you know.
19     Q.  Is that what you mean by general
20 20 percent, or do you mean on top of the 20
21 percent?
22     A.  Yeah, I would -- I would say 20
23 percent was probably coding.
24     Q.  Okay.
25     A.  You have a lot of things.  You

68

T. FABACHER

1
2  have to do backups every day, server
3  maintenance -- server maintenance, wiring,
4  buying new scanners.
5      Q.  Generally speaking, approximately,
6  how much of your time was doing backups,
7  servers, maintaining?  Roughly speaking, was
8  that another 20 percent?
9      A.  I don't know.  I mean -- I mean I
10 -- I can't give you a solid number because
11 -- I mean this was ten years ago.
12     Q.  I'm not asking for a solid number.
13 I just asking --
14     A.  You're asking me for a solid
15 number.
16     Q.  Rough estimate --
17     A.  You just asked me -- I can't give
18 you -- I can't give you a number.  You're
19 asking me for a number that you want me to
20 testify for.  And I -- how do I give you an
21 exact -- you tell me 10 percent, and I can't
22 ask you -- I --
23     Q.  I'm not --
24     A.  -- can't answer that.
25     Q.  Roughly speaking, you did 20

17 (Pages 65 to 68)

69

T. FABACHER

percent of doing computer work that we
talked about before?
   A.   We said coding.
   Q.   Coding.  About 20 percent of your
time, roughly speaking, is coding?
   A.   Correct.
   Q.   What you just talked about,
backing up, server, would that be more or
less -- significantly more, or less, or
roughly the same amount of time that you
spent coding, generally speaking?
   A.   No, it would be more.
   Q.   Okay.  Would it be twice as long,
roughly speaking, than you would spend
coding?
   A.   Probably.
   Q.   Okay.  What -- would you say it
would be about half the time that you worked
is doing backup, server maintenance, and so
forth?
   A.   Yes, and -- and maintaining the
data.  Yeah, just in the sense making sure
the data -- you know, the integrity of the
data, the security.

70

T. FABACHER

   Q.   So, that would be, roughly
speaking, about half the time you would
spend while you were at Mel Harris, correct?
   A.   Again, I . . .
   Q.   Roughly speaking, would it --
would it -- is it fair to say -- you tell
me.  I'm asking you.
   A.   I don't know.
   Q.   What --
   A.   You're asking me.  I told you I
can't really remember.  You're asking me, do
you remember a case from ten years back?  I
don't know.  What did you do ten years ago?
I don't know, man.  You're asking me to give
you a -- you say roughly.  I don't know.  I
mean can I say anywhere between 30 and 70
percent?  Is that rough?
   Q.   Is that within that range?
   A.   Yeah.  I would say between 30 and
70 percent.  How's that?
   Q.   All right.  And how would you
describe -- it's not called coding.  Is
there a phrase that you would use to
describe that work that you --

71

T. FABACHER

   A.   Management --
   Q.   -- do for --
   A.   -- information system which was my
job title.
   Q.   In addition to coding and
management information system, was there any
major part of your responsibilities while
you worked at Mel Harris?
   A.   The only other thing that I did
was -- besides maintaining the data.  And
then I did the -- the affidavits to verify
the data.
   Q.   And ballpark --
   A.   Can't give you a ballpark on that
one because it varied -- it varied.  There's
-- there's no ballpark.
      MR. SCHER:  Let him finish his
   question.
      THE WITNESS:  Oh, I'm sorry.
   Q.   When you say affidavits, what do
you mean?
   A.   It's an affidavit of merit.
   Q.   The 20 percent for coding, the 30
to 70 percent for management information

72

T. FABACHER

systems, and the time you spent doing
affidavits of merit, were there any other
major responsibilities that you had while
working at Mel Harris?
   A.   No.
   Q.   Okay.  When you say the amount of
time that you spent doing affidavits of
merit varied, what do you mean by that?
   A.   That's -- just what I said.  It
varied.
   Q.   Okay.  Did you do affirmations
(sic) of merit from 2002 onward?
   A.   I don't remember at that time
frame.
   Q.   Okay.
      MR. KESHAVARZ:  If you could mark
   this.
      (Whereupon, the aforementioned
   Affidavit of Merit (LR Credit 18, LLC
   vs. Agustina Bueno) was marked as
   Plaintiff's Exhibit 3 for
   identification as of this date by the
   Reporter.)
   Q.   (Perusing document.)

18 (Pages 69 to 72)

73

T. FABACHER

1    I am showing you what's been
2 marked as Plaintiff's Exhibit Number 3. Is
3 this an example of an affidavit of merit
4 that you were just testifying about?
5    A.  Can I read it?
6    Q.  Please.
7    A.  (Perusing document.)
8    Correct.
9    Q.  Okay.  Now, would you do
10 affidavits of merit for all of the
11 collection lawsuits that Mel Harris filed?
12    A.  No.
13    Q.  Would you do it for most of the
14 collection lawsuits that Mel Harris filed?
15    A.  I don't know.
16    Q.  Would you execute the affidavits
17 of merit for all of the cases filed under
18 the name of -- one of the LR Credit
19 entities?
20    MR. MILLS:  Objection.
21    A.  I'm sorry.  Repeat the question?
22    Q.  I'm going to use the term LR
23 Credit entities.  And I'm --
24    A.  We need --

74

T. FABACHER

1    Q.  -- going to be --
2    A.  -- to use specific.  They're very
3 different.
4    Q.  I was about to get to that.
5    A.  Okay.
6    Q.  When I say LR Credit entities,
7 there are LR Credits 1 through something
8 like 23?  Is that about right?
9    MR. MILLS:  Objection.
10    A.  I don't know.
11    Q.  For cases where the plaintiff uses
12 the word LR Credit, regarding LR Credit 1,
13 or 8, or 18, whatever the number is, would
14 you be the person that would sign the
15 affidavits of merit at Mel Harris?
16    MR. MILLS:  Objection.
17    MR. SCHER:  You're asking for
18 every -- if he did it for every LR
19 Credit case that ever --
20    A.  Do you have a list of the LR
21 Credits for my -- to jog my memory?  I don't
22 even remember the -- I don't even remember
23 all the -- the numbers.
24    Q.  You don't have to remember the

75

T. FABACHER

1 numbers.  What I'm asking you is this --
2    A.  Well, you're asking me to testify
3 upon it.
4    Q.  Let me be specific.
5    A.  Yeah, please.
6    Q.  Whoever the plaintiff is, if the
7 plaintiff used the word LR Credit,
8 regardless of the number, if the plaintiff
9 used the word LR Credit, would you be the
10 person at Mel Harris who would execute the
11 affidavits of merit for those lawsuits?
12    MR. MILLS:  Objection.
13    A.  I don't know because you haven't
14 given me the list.  So, you're asking me for
15 every LR Credit -- I -- I don't know.  I was
16 -- they were -- I had already left.  So,
17 they -- I'm going to go with no.
18    Q.  When did you leave?
19    A.  I don't remember the date.
20    Q.  While you were there at Mel
21 Harris, were you the person who was
22 executing the affidavits of merit for the
23 collection lawsuits Mel Harris filed where
24 the plaintiff included the name LR Credit?

76

T. FABACHER

1    MR. MILLS:  Objection.
2    Q.  Regardless of whatever number it
3 was.
4    MR. MILLS:  Objection.
5    A.  I -- I'm going to go -- I -- I was
6 not -- I -- I don't remember.  I mean I -- I
7 did -- I did the ones -- I knew the ones
8 that I was in charge of it.  That's all I
9 know.
10    Q.  Okay.  Were you in charge of all
11 the ones that you used the words LR Credit
12 in the plaintiff?
13    MR. MILLS:  Objection.
14    A.  I don't know.  You don't -- give
15 me the list of the names.  You're asking me
16 to say -- how can I do it?  You have the
17 list of the names, I'm happy to answer the
18 question.
19    Q.  You mean the list of the names of
20 the -- the numbers of the LR Credit
21 entities?  Is that what you mean?
22    A.  You are asking me to answer for an
23 array of names that you're not even giving
24 me.  How can I testify, on grounds of

19 (Pages 73 to 76)

77

T. FABACHER

1
2  perjury, on that? You want me to perjure
3  myself? No, counsel?
4       MR. SCHER: No. I think you mean
5    under the penalty of perjury.
6    A.  Under the penalty of perjury.
7  Whatever it is. I'm not an attorney. See
8  -- no, no, no -- but I'm not going to
9  testify to something that -- unless you can
10  provide me a list. I'm sorry, counselor. I
11  -- just because you're asking me to swear,
12  you know, with the right arm on something
13  that, you know, I can't answer.
14    Q.  By the list, you mean the list of
15  numbered LR Credit entities --
16    A.  No. If you want --
17       MR. MILLS: Objection. Note my
18    objection before that.
19    A.  -- if you want me to testify on
20  something, you have to give me the list.
21    Q.  Okay. I'm asking you a slightly
22  different question.
23    A.  Okay.
24    Q.  While you worked at Mel Harris,
25  and you signed affidavit of merit --

78

T. FABACHER

1
2    A.  Correct.
3    Q.  -- did you sign the affidavits of
4  merit where the plaintiff used the words LR
5  Credit regardless of whatever came after LR
6  Credit? Were you the person who did the
7  signings of the affidavits of merit?
8       MR. SCHER: Objection.
9    Asked and answered.
10       MR. MILLS: Objection.
11    A.  I can't answer that question. I
12  can't answer that.
13    Q.  Did you do affidavits of merit for
14  any lawsuits that Mel Harris filed other
15  than those where the plaintiff had the name
16  LR Credit?
17       MR. MILLS: Objection.
18    A.  All right. Repeat that question
19  again?
20    Q.  Sure. I'd be glad to.
21    Did you sign affidavits of merit
22  for collection lawsuits filed by Mel Harris
23  for cases other than when the plaintiff used
24  the words LR Credit?
25       MR. MILLS: Objection.

79

T. FABACHER

1
2    A.  Yes.
3    Q.  Were you the person who did all of
4  the signings of the -- all or almost all the
5  signings of the affidavits of merit for the
6  collection lawsuits Mel Harris filed while
7  you worked there?
8       MR. SCHER: Objection to form.
9    You can answer.
10    A.  I don't know. I know what I
11  signed. That's it. I -- I -- I was not in
12  charge -- you know, I don't know what other
13  people signed. So, how can I know whether
14  it's a majority? You're asking me for a
15  number. How do I know?
16    Q.  There was -- was there anyone
17  else, to your knowledge, at LR -- at Mel
18  Harris who was in charge of signing
19  affidavits of merit?
20    A.  There were other people but I
21  don't remember their name.
22    Q.  Do you know if that was a major
23  thing that they did at Mel Harris?
24       MR. SCHER: Objection.
25    A.  Don't know.

80

T. FABACHER

1
2    Q.  Who were the other people?
3    A.  I don't remember their name.
4    Q.  Were they lawyers or non-lawyers?
5    A.  I think a non-lawyer.
6    Q.  Was one of them named Michael
7  Young?
8    A.  I believe -- I'm -- I don't
9  remember. I -- I don't remember.
10    Q.  Okay. What steps, if any, did you
11  take to determine whether the facts asserted
12  in an affidavit of merit such as Exhibit 3
13  were true?
14       MR. MILLS: Objection.
15       MR. LICHTMAN: Before we answer
16    the question, can we give a stipulation
17    that an objection by one is an
18    objection by all?
19       MR. KESHAVARZ: Yes.
20       MR. LICHTMAN: Thank you.
21    A.  Can you repeat the question?
22    Q.  And I'd be glad to.
23    A.  Okay.
24    Q.  The facts that are -- well, strike
25  that.

20 (Pages 77 to 80)

81

T. FABACHER

1    Exhibit 3 is the -- is the
2    template form used for the affidavits of
3    merit that you executed, correct?
4        A.  Correct.
5        MR. SCHER:  At what point in time?
6        A.  Yeah, for . . .
7        Q.  So, for the time period that you
8    worked at Mel Harris, is Exhibit 3 the basic
9    template for the affidavits of merit that
10   you signed?
11       A.  For this particular case.  But
12   they -- it depend -- there were different
13   affidavits.
14       Q.  Different affidavits of merit?
15       A.  That's correct.
16       Q.  And the templates for the
17   affidavits of merit, some of them were
18   different than Exhibit 3?  Is that what
19   you're saying?
20       A.  Mm-hmm.
21       Q.  You have to --
22       A.  That's correct.
23       Q.  Generally speaking, how many
24   different types of affidavits of merit were

82

T. FABACHER

1    there?
2        A.  I -- I can't answer that.  There's
3    no generally speaking.
4        Q.  And did the affidavits of merit
5    that were used change over time?  In other
6    words, you know, for a three-year period, it
7    would be one template, and then the next
8    three-year period, it would be another
9    template?
10       A.  It's situational.
11       Q.  What do you mean by that?
12       A.  I mean the laws changed.  The
13   types of -- of -- of -- of data was
14   different.  So -- so, I'm going to say that
15   -- was it the same as this (indicating)?
16   No.
17       Q.  I mean the template of the text,
18   putting aside the issue about the names of
19   the --
20       A.  That's what it is, right?  You
21   read the data.
22       MR. MILLS:  I object to the use of
23       the word template throughout this line
24       of questioning.

83

T. FABACHER

1        Q.  Is there a template that use for
2    the affidavits of merit?
3        A.  No.  It's -- it's not -- no, I
4    wouldn't call it a template.
5        Q.  What would you call it?
6        A.  I would call it a database.
7        Q.  Okay.  And what do you mean by
8    that?
9        A.  The data in here (indicating) --
10   so I -- this is -- to me, this is a
11   database.  And so the -- so, it's -- it's --
12   it's data.  That's what I'm attesting to,
13   the data.
14       Q.  (Perusing document.)
15       The affidavits of merit that you
16   signed at Mel Harris say that you are fully
17   and personally familiar and have
18   personal knowledge of the facts and
19   proceedings related to the within action?
20       A.  Yes.
21       MR. SCHER:  I think -- I'm just
22       going to object to the fact that you
23       quoted part of the affidavit out of
24       context.

84

T. FABACHER

1        MR. KESHAVARZ:  Okay.
2        THE WITNESS:  Can I send an e-mail
3    real quick?
4        MR. KESHAVARZ:  You want to take a
5    quick break?
6        THE WITNESS:  Can we take a quick
7    break?
8        MR. KESHAVARZ:  Yeah.
9        (Whereupon, a short recess was
10   taken.)
11       MR. KESHAVARZ:  Back on the
12   record.  You can mark this as an
13   exhibit, please.
14       (Whereupon, the aforementioned
15   Opinion in Monique Sykes  vs. Mel
16   Harris was marked as Plaintiff's
17   Exhibit 4 for identification as of this
18   date by the Reporter.)
19       Q.  (Perusing document.)
20       Okay.  Mr. Fabacher, I am showing
21   you what's been marked as Plaintiff's
22   Exhibit Number 4.  It's quite long.  Feel
23   free to take as much time as you want to
24   take a look at it.  I'm going to ask you

21 (Pages 81 to 84)

85

T. FABACHER

1
2  to --
3     A.  Do I get to read it?
4     Q.  Of course.  I --
5     A.  The whole thing?
6     Q.  If you'd like.
7     A.  Sure.
8     Q.  I was -- do you know if that --
9     A.  Most of it.
10     Q.  -- all right -- do you know if --
11     A.  Am I allowed to read the whole
12  thing?
13     Q.  You are.  Let me ask you a
14  question first.  Do you know if that is one
15  of the orders issued in the Sykes case?
16     A.  I do not -- even read any of the
17  orders.
18     Q.  Hmm?
19     A.  I didn't read any of the orders.
20     Q.  Okay.  You don't know?
21     A.  Don't know.
22     Q.  Fine.  Fine.
23     A.  I never read -- this would be the
24  first one I've actually read --
25     Q.  Okay.  I'm going to ask you

86

T. FABACHER

1
2  questions about pages seven through --
3     A.  But I want to read the whole thing
4  first.
5     Q.  -- I know -- just -- I'm going to
6  ask you about pages seven through eleven.
7  Take as much time as you would like to read
8  the whole thing if you would like.  I'm
9  really only going to ask you about those
10  pages.
11     A.  Okay.
12     Q.  But feel free to read --
13     A.  Read it --
14     Q.  -- it to --
15     A.  -- up to somewhere around there.
16  Sorry.
17     Q.  Okay.
18     A.  (Perusing document.)
19        We're not going past fifteen,
20  correct?
21     Q.  I'm not going to ask you past
22  fifteen.  But you can feel free to review as
23  much as you would like.
24     A.  Okay.  As long as we don't go past
25  fifteen -- unless we -- just sit here.

87

T. FABACHER

1
2     Q.  It's up to you.  Okay.  So, have
3  you had a chance to read through Exhibit 4,
4  at least through page fifteen?
5     A.  I did read to page fifteen.
6     Q.  Okay.  So, let me start with page
7  seven.  If you see where it goes, on the
8  last line where it says 3/1/11 Fabacher dep?
9     A.  Mm-hmm -- yes.  Broke the rules.
10     Q.  I represent to you when the --
11  when the Opinion references the Fabacher
12  dep, it means your deposition in the Sykes
13  case -- represent that to you.
14        MR. KESHAVARZ:  Do we -- can we
15     have a stipulation as to that?
16        MR. LICHTMAN:  I'm not stipulating
17     to that.
18        MR. KESHAVARZ:  All right.  Fine.
19     Q.  The fact -- let me ask you a
20  general question, then we can go line by
21  line if you would like.  It's fine with me
22  either way.  Where it says Affidavits of
23  Merit, beginning on page seven, all the way
24  through page 11 up to the point where it
25  says Procedural History, are the facts

88

T. FABACHER

1
2  stated in those paragraphs true?
3        MR. MILLS:  Objection.
4        MR. SCHER:  Same objection.
5     A.  Can I read it again --
6     Q.  Yes.
7     A.  -- just to make sure?
8        (Perusing document.)
9        Say -- so, you're saying number
10  five on page seven to B, Procedural History,
11  on --
12     Q.  Yes.
13     A.  -- eleven?
14        Well, number one, my -- my title
15  is wrong.  It was -- management
16  information --
17     Q.  Well --
18     A.  -- you asked me a question.  I'm
19  giving you an answer.
20     Q.  Well, let me pull the answer back.
21  Let me rephrase the question.  Let me just
22  go through one at a time, and you just tell
23  me if the facts are true.  Let's go through
24  the first sentence.  The --
25     A.  Go ahead.

22 (Pages 85 to 88)

89

T. FABACHER

1      Q.   -- affidavits of merit submitted
2  by (sic) Mel Harris and Leucadia defendants
3  in New York City Civil Court follow a
4  uniform format.  Is that true?
5      A.   I don't know what uniform format
6  is.
7      Q.   Okay.  Well, why don't you read
8  all the pages, and then let me know when
9  you're done.
10      A.   Okay.
11         (Perusing document.)
12         Okay.
13      Q.   Ready to go?
14      A.   (Indicating.)
15      Q.   Yes.  My question is, are the
16  facts stated beginning on page seven after
17  where it says Affidavits of Merit through
18  page eleven above where it says Procedural
19  History, are the facts stated between those
20  pages true?
21         MR. MILLS:  Objection.
22         MR. LICHTMAN:  Objection.
23         MR. SCHER:  Note my objection.
24      A.   I don't agree with them.  I mean

90

T. FABACHER

1  true is truth -- am I -- my truth, for me
2  personally?  No.  I could tell a few -- a
3  few things.  He used the word template.  I
4  did not use the word template.  He used the
5  word template -- he said would you call it a
6  template.
7         And I -- I believe he just quoted
8  the word template out of it.  I'm not really
9  sure -- I don't remember using the word
10  template.  But clearly he quoted.  But he
11  kept on calling it a template.  And I was
12  trying -- again, as in here, tried to
13  explain to him that it -- it -- it's -- it's
14  not necessarily a template.  That's his
15  layman's term.  But that's not a template.
16  So, that's the -- that's the -- my -- a big
17  objection on that.
18         The second objection, there are
19  several of them I have.  Do-do-do.  Let's
20  see her.  So --
21         MR. SCHER:  I just want to --
22      A.   -- so, there's --
23         MR. SCHER:  -- before you --
24      A.   -- many things.  So, I'm not going

91

T. FABACHER

1  to -- I can't answer.
2         MR. SCHER:  When I start talking,
3  you stop.
4         THE WITNESS:  Yeah.
5         MR. KESHAVARZ:  Brett, I -- I
6  think you can say objection as to form.
7  If you're going to make an objection
8  beyond that, that's fine.  But I would
9  ask to exclude the witness while you do
10  that because I don't want it to --
11         MR. SCHER:  My objection is not as
12  to form.  My objection is to the fact
13  that you're asking him to testify with
14  regard to the truthfulness of
15  statements that are supported by -- in
16  the Court's decision by documents which
17  you're not providing to him.  So,
18  that's my objection.  I'm letting him
19  answer.
20         MR. MILLS:  I also object on that
21  ground.
22         MR. KESHAVARZ:  Jeff, you didn't
23  -- you didn't . . .
24         MR. LICHTMAN:  I don't need to

92

T. FABACHER

1  because an objection by one is an
2  objection by all.  And now you're
3  defeating the purpose by extending the
4  number of lines in the transcript.  Not
5  from me.
6      A.   So --
7      Q.   As --
8      A.   -- so ask me a specific question.
9      Q.   So, other than the word template,
10  are there any facts -- strike that.
11         Other than the use of the word
12  template, are all the facts stated on page
13  seven under the term Affidavits of Merit
14  through page eleven above the Procedural
15  History, other than the use of the word
16  template, are there any other facts that you
17  believe are not true?
18         MR. MILLS:  Objection.
19      A.   Do we want to go line by line?
20      Q.   That's -- however you want to do
21  it.
22      A.   No, let's go line by line.
23      Q.   That's fine --
24      A.   That's -- because I'm not going to

23 (Pages 89 to 92)

93

```
1              T. FABACHER
2    say yes to it.
3        Q.  Take your time.  That's fine.
4        A.  Okay.
5            (Perusing document.)
6            Go ahead.
7        Q.  Well, I'm -- I'm just asking you
8    -- you can read --
9        A.  I -- understand, I'm not going to
10   answer that question -- I mean I'm going to
11   -- I'm -- can't say a yes or no on that.
12       Q.  Well, other than the use of the
13   term template that you disagree -- disagree
14   with, can you -- reviewing pages seven
15   through eleven, is there anything that you
16   see in those pages that you -- that you --
17   that is a -- that, as a fact, you disagree
18   with?
19       A.  Yes.
20           MR. MILLS:  Objection.
21       Q.  Which -- other than the word
22   template --
23       A.  Okay.  Well, let's -- let's go
24   through sentence through sentence.
25       Q.  Go ahead.
```

94

```
1              T. FABACHER
2        A.  Okay.  The affidavits of merit
3    submitted by the Mel Harris and Leucadia
4    defendants in New York City Civil Court
5    follow a uniform format.
6            What is a uniform format?
7        Q.  Okay.  What else?
8        A.  (No response.)
9        Q.  That's your -- so, your -- your
10   concern about the first sentence on page
11   seven is that -- your concern is the use of
12   the term uniform format; is that right?
13           MR. MILLS:  Objection.
14       A.  My concern is I don't know what a
15   uniform format is.
16       Q.  So, other than the term uniform
17   format that you say you don't understand
18   what it means, is there any other fact
19   asserted in the first sentence that you
20   disagree with?
21           MR. MILLS:  Objection.
22       A.  Okay.  So, I -- the affidavits of
23   merits (sic) submitted by the Mel Harris and
24   Leucadia defendants in New York City Court
25   (sic), that I agree to.
```

95

```
1              T. FABACHER
2        Q.  Go ahead.
3        A.  Can I -- can I write on it, say
4    what I don't agree to?
5            MR. SCHER:  No.  Just --
6            THE WITNESS:  Okay.
7            MR. SCHER:  -- just say what you
8    agree with.
9            THE WITNESS:  Okay.
10       A.  Next?
11       Q.  Okay.
12       A.  We go down to the next sentence?
13       Q.  Yes.
14       A.  Okay.  Defendant Todd Fabacher,
15   (sic) director of information technology for
16   Mel Harris, serves -- serves the affidavit
17   (sic).  Okay.  So . . .
18           MR. MILLS:  Sorry.  I think you
19   read it incorrectly.
20           THE WITNESS:  Okay.  How did I
21   read that incorrectly?
22       A.  Oh.  Serves as the affidavit --
23   affiant.  Affiant.
24       Q.  Right.
25       A.  I'll read it again.  Serving --
```

96

```
1              T. FABACHER
2    I'm not serving.  Okay.  Defendant Todd
3    Fabacher, the director of information
4    technology for Mel Harris serves as the
5    affiant.
6            Okay.  So, one, my -- the -- the
7    title, I believe, is incorrect.  And serves
8    as the affiant, I -- just to -- to -- to
9    clarify, who is that affiant for what?  I
10   mean am I the affiant for Mel Harris?  I was
11   not the affiant for Mel Harris.
12       Q.  I believe --
13       A.  You believe.
14       Q.  Well, let me ask you this.
15       A.  What am I -- what am -- who am I
16   the affiant for?
17       Q.  All right.  Well, I think the
18   prior sentence says the Leucadia defendants.
19       A.  Okay.
20       Q.  I guess --
21       A.  So, who is that for?
22       Q.  So, let me ask you.  Were you the
23   affiant, the person who signed the
24   affidavits of merit, where the plaintiff in
25   the affidavit of merit used the words LR
```

24  (Pages 93 to 96)

97

T. FABACHER

1  Credit?
2  MR. MILLS:  Objection.
3  MR. SCHER:  Same objection as
4  before.
5  Asked and answered.
6  A.  I -- I . . .
7  Q.  You can answer.
8  A.  I'm sorry.  Say that -- say that
9  -- could you repeat that for me?
10  Q.  So, was -- serves as affiant
11  apparently as to Leucadia defendants.  So,
12  let me ask you this --
13  A.  I signed no affidavit for
14  Leucadia.  I could tell you that.
15  Q.  Okay.  You signed affidavits of
16  merit such as Exhibit 3 where it says the
17  plaintiff is LR Credit -- used the word LR
18  Credit.  Is that --
19  A.  I signed this affidavit, yes.
20  MR. MILLS:  Objection before that
21  answer.
22  Q.  Okay.  I'm just trying to get to
23  what the word affiant.  So, let me just ask
24  this question.  When the affidavit of merit

98

T. FABACHER

1  that you signed lists the plaintiff with the
2  word LR Credit --
3  A.  Okay.
4  Q.  -- do you sign affidavits of merit
5  where the words LR Credit are listed as the
6  plaintiff?
7  MR. MILLS:  Objection.
8  A.  Do I?  I -- I -- I sign as an
9  affiant for the cases that I managed.
10  Q.  Okay.  And those cases that you
11  find -- signed affidavits of merit for
12  included cases where the plaintiff had the
13  words LR Credit, correct?
14  MR. MILLS:  Objection.
15  A.  Correct.
16  Q.  Okay.
17  The next sentence --
18  A.  That -- but again, that doesn't
19  say that here.  So, I'm -- can I object?
20  Because I -- I'm going to say is --
21  MR. SCHER:  Just say --
22  A.  -- it's not clear.  So, I -- I --
23  I can't say that this is accurate because it
24  doesn't tell me who I'm -- I answered your

99

T. FABACHER

1  question.  But I -- I -- I can't say that
2  this is accurate.
3  Q.  Fair enough.
4  A.  Fair enough?  Okay.
5  Q.  Moving on to page --
6  A.  Moving on.
7  Q.  -- is the next sentence on page
8  eight true?
9  MR. MILLS:  Objection.
10  Q.  Well, actually, I think you
11  testified as to that already but --
12  A.  Which sentence is that?
13  Q.  Beginning on the --
14  A.  Okay.  Okay.  In -- in each
15  affidavit, he attests that he is, quote, an
16  authorized and designated custodian of
17  records for the plaintiff, one of many
18  Leucadia debt collections entities.
19  MR. SCHER:  Same objection.
20  Again, it's talking about specific
21  affidavits, and you're not providing
22  them to him to --
23  A.  That's correct.  How do I --
24  MR. MILLS:  Same.

100

T. FABACHER

1  A.  I mean I can attest to this one
2  (indicating).
3  Q.  When you signed affidavits of
4  merit, you testified -- you signed them as
5  the authorized designated custodian of
6  records, right?
7  MR. MILLS:  Objection.
8  A.  I can attest to this one
9  (indicating).  I mean --
10  Q.  You signed the affidavits of
11  merit.  And you -- you swear under oath that
12  the facts there are true, correct?
13  A.  In -- in general terms?  When --
14  when I sign an affidavit, yes, I'm -- I'm --
15  I'm swearing that the facts are true.
16  Q.  Okay.  And the affidavit of merit
17  that you signed -- excuse me -- yes, the
18  affidavits of merit that you signed while
19  you were at Mel Harris stated that you are
20  the authorized and designated custodian of
21  record.  Is that true?
22  MR. MILLS:  Objection.
23  MR. SCHER:  Same.  Objection.
24  Q.  For whichever plaintiff there was

25 (Pages 97 to 100)

101

1    T. FABACHER
2  in the collection lawsuits, are the
3  affidavits of merit that you signed at Mel
4  Harris, did they say that you were the
5  authorized and designated custodian of
6  records --
7        MR. MILLS: Objection.
8        Q.  -- for the plaintiff in those
9  affidavits of merit that you signed?
10       MR. MILLS: Objection.
11       A.  Correct. Everything that I signed
12  that I maintained the data, I was the -- an
13  authorized and designated custodian of
14  records.
15       Q.  So, let me just clarify that --
16       A.  Yes.
17       Q.  -- a little bit.
18       A.  Please.
19       Q.  So, are you saying that any
20  affidavits of merit that you signed while
21  you were at Mel Harris said that you were an
22  authorized and designated custodian of
23  records for the plaintiff that filed that
24  suit; is that correct?
25       MR. MILLS: Objection.

102

1    T. FABACHER
2        A.  I -- I couldn't -- unless you
3  produce something -- I -- you know, you want
4  me to attest to something that -- I mean
5  this -- the -- the -- we had many
6  affidavits. We had affidavit of service,
7  affidavits. You know, there's -- there's --
8  because he just says each affidavit. There
9  are various affidavits. There's -- there is
10  -- there's tons of affidavits.
11       Q.  Okay. Well, let -- let me ask you
12  a question.
13       A.  Yes. Please.
14       Q.  Put this aside. And I thought I
15  had asked before but I -- let me just ask
16  you again.
17       A.  Yes. Please.
18       Q.  Okay. The affidavits of merit,
19  the -- specifically the affidavits of
20  merit --
21       A.  Doesn't say that here.
22       Q.  I understand that. But --
23       A.  Yeah.
24       Q.  -- let me -- let's -- I have --
25  for a second.

103

1    T. FABACHER
2        A.  Okay. Okay.
3        Q.  Let me ask you the question. The
4  affidavits of merit that you signed while
5  you were at Mel Harris, those affidavits of
6  merit said that you were the authorized and
7  designated custodian of the records for the
8  plaintiff in that affidavit of merit?
9        MR. MILLS: Objection.
10       A.  I cannot answer that question that
11  -- because I -- I -- I would have to look
12  through all those affidavits.
13       Q.  Well, the forms that you used said
14  that they were affidavits -- the forms that
15  you used for custodian --
16       A.  (Indicating) -- Okay. I'm sorry.
17  Go ahead.
18       Q.  -- the forms that you used that
19  were the affidavits of merit, did they or
20  did they not say that you were the
21  authorized and designated custodians of
22  record for the plaintiff?
23       A.  I can't --
24       MR. MILLS: Objection before you
25  answer.

104

1    T. FABACHER
2        A.  -- recall.
3        Q.  Okay. Can you think of a specific
4  instance where the affidavit of merit that
5  you signed did not say that you were the
6  authorized and designated custodian of
7  records for the plaintiff?
8        MR. MILLS: Objection.
9        A.  I can't recall.
10       Q.  Okay. But you can't recall -- the
11  only times that you can recall signing an --
12  affidavits of merit included the words
13  authorized and designated use -- custodian
14  of records for the plaintiff; is that
15  correct?
16       MR. MILLS: Objection.
17       A.  Can you rephrase the question?
18       Q.  The only affidavits of merit that
19  you recall signing while you were at Mel
20  Harris said that you were the authorized and
21  designated custodian of records for the
22  plaintiff; is that correct?
23       MR. MILLS: Objection.
24       A.  I can -- I can tell you that --
25  that the one that I'm handing here

26 (Pages 101 to 104)

105

T. FABACHER

1                T. FABACHER
2   (indicating), yes, it says that.
3       MR. KESHAVARZ:  Do you have the
4   affidavits of merit for the other
5   cases?
6       MS. MOODY:  Sure.
7       (Perusing documents.)
8       No, I don't.
9       THE WITNESS:  I'm not trying to be
10  difficult.  But you're asking me to
11  attest to something that is very broad.
12      (Whereupon, an off-the-record
13  discussion was held.)
14      MR. KESHAVARZ:  Let's mark this as
15  the next exhibit, please.
16      (Whereupon, the aforementioned
17  Affidavit of Merit (LR Credit 13, LLC
18  vs. Jose Guzman) was marked as
19  Plaintiff's Exhibit 5 for
20  identification as of this date by the
21  Reporter.)
22  Q.  (Perusing document.)
23     I'm showing you what's been marked
24  as Plaintiff's Exhibit Number 5.  Is this
25  the affidavit of merit that you signed in

106

T. FABACHER

1                T. FABACHER
2   the case of LR Credit against Jose Guzman?
3     A.  Can I read it?
4     Q.  Take your time.  Please.
5     A.  That's fine.
6     (Perusing document.)
7   Okay.
8     Q.  So, the question is, looking at
9   Exhibit 5, is that the affidavit of merit in
10  the case of LR Credit 13 versus Jose Guzman
11  that you signed?
12     A.  That is my signature, correct.
13     Q.  And is there some sort of
14  electronic form that was somewhere on Mel
15  Harris's computer system that had the text
16  as Exhibit 3 and 5, other than the specific
17  information for the plaintiff and defendant,
18  like, the name of the original creditor, the
19  name of the defendant, the name of the
20  plaintiff, the amount of the debt, and so
21  forth?  Is there a form that existed on Mel
22  Harris's computer system that is Exhibit 3
23  and 5 without all that specific identifying
24  information?
25     MR. MILLS:  Objection.

107

T. FABACHER

1                T. FABACHER
2     A.  So, I'm trying to find out -- so,
3  can I ask back to say -- if I understand
4  your --
5     Q.  If you --
6     A.  -- question --
7     Q.  -- want to clarify --
8       MR. SCHER:  Just answer the
9  question.
10     Q.  -- if you want -- clarify, I'll
11  ask him.
12     A.  Yes, please clarify.  Because
13  you're saying that all of this is one
14  document.
15     Q.  Other than the -- the specific
16  texts that refers to the plaintiff -- the
17  specific defendant, the specific account
18  number --
19     A.  Okay.  Can I -- can --
20     Q.  Take your time.
21     A.  Yeah.  So, can I mark on it?
22     Q.  No.  But you could point to
23  something if --
24     A.  Okay.
25     Q.  -- you don't --

108

T. FABACHER

1                T. FABACHER
2     A.  So, you're talking about LR Credit
3  13.  You're talking about Jose Guzman, the
4  defendant?
5     Q.  Yes.
6     A.  My name (indicating)?
7     Q.  Yes -- well, not your name.  Well,
8  go ahead.
9     A.  No, I'm --
10     Q.  Yes.
11     A.  Okay.  The plaintiff (indicating)?
12     Q.  Yes.
13     A.  The type of company?
14     Q.  Yes.
15     A.  Are you also referring to the --
16  the plaintiff?
17     Q.  The --
18     A.  -- the original creditor?
19     Q.  Okay.
20     A.  Okay.  And the balances?
21     Q.  Yes.
22     A.  Okay.  So, are you saying
23  everything else comes from one document?
24     Q.  One document or merged from --
25  well, let's take it one at a time.

27 (Pages 105 to 108)

109

T. FABACHER
1
2       A.  Right.
3       Q.  Is there one document that is
4   everything -- strike that.
5           I'm going to take it one at a
6   time.  The specific items you just
7   identified, can I just call it the specific
8   -- specific items?  Would you understand
9   that to mean --
10      A.  Can we --
11      Q.  -- shorthand?
12      A.  -- can we call it a -- data from
13  the database?
14      Q.  Okay.  So, the items you just
15  listed, we'll call that data from the
16  database.  Because that's what it is, right?
17  It's data from the database?
18      A.  Not all of it but.
19      Q.  Pretty much?
20      A.  Yes.
21      Q.  Okay.  Now, other than the data
22  from the database, is there a document that
23  contains the other information that is on
24  Exhibit 3 and 5?
25          MR. MILLS:  Objection.

110

T. FABACHER
1
2       A.  Now, what do you mean by other?
3   Like, everything else?
4       Q.  Yes.
5           MR. MILLS:  Objection.
6       A.  No.
7       Q.  Most of the other information --
8       A.  What does most mean?
9       Q.  You don't know what the word most
10  means?
11      A.  No, but -- you know, you -- I'm --
12  I'm a computer programmer.  Most is -- most
13  does not exist in computer programs.
14  That's, like, about paying your taxes.
15  Somehow the IRS doesn't like it.  It has to
16  be exact.
17      Q.  The information other than what
18  we're calling the data from the database
19  that exists in the affidavits of merit that
20  are Exhibit 3 and 5, where does that
21  information come from?
22          MR. MILLS:  Objection.
23      A.  Which information?
24      Q.  The information on the -- on the
25  affidavits of merit, other than the data

111

T. FABACHER
1
2   from the database.
3           MR. MILLS:  Objection.
4       A.  Okay.  But it comes from a hard
5   drive.
6       Q.  Okay.  A hard drive.  In what way?
7       A.  It depends -- which -- which --
8   which one are you -- the -- it's -- it's
9   everything.  So, what are you -- are you
10  talking about the notary?  The notary
11  information?
12      Q.  All right.  The notary
13  information, that would not be data from the
14  database, or would it?
15      A.  That is not.
16      Q.  Okay.  So, we'll just call that
17  the notary information, okay?
18      A.  Okay.
19      Q.  Other than the notary information
20  and the data from the database, where does
21  the rest of the information that goes on the
22  affidavit of merit come from?
23          MR. MILLS:  Objection.
24      A.  Can we -- want to go through --
25  line by line and go through it?

112

T. FABACHER
1
2       Q.  If you'd like, sure.
3       A.  Great.  So -- so, my name.  So,
4   when I generated this, it would ask me my
5   name.
6       Q.  Yes.
7       A.  So, I typed it in, all right?  And
8   then I -- so, I'm -- I take this out.  And
9   all of the -- the -- the data from the
10  database, I -- I verify independently before
11  the affidavit is printed, okay?  And then
12  there's a lot of conditional logic.  Like,
13  for example, retail charge account?
14      Q.  Yes.
15      A.  Okay.  I have to -- that is
16  entered.  That has to be -- you know, to --
17  it's -- it's not on a form.
18      Q.  Okay.  But the rest of the
19  information other than the data from the
20  database, the notary, your name, and whether
21  it says retail charge account, that comes
22  from a form?  Is that what you're saying?
23  Because you used the word form.  So, what
24  did you mean by the word form, the way you
25  just used it?

28 (Pages 109 to 112)

113

T. FABACHER

1
2      A.  Okay.  It --
3              MR. MILLS:  Objection.
4      A.  -- for a form, there's text.
5   That's -- the technical word we'll use for
6   text is a form.  So, anything that deals
7   with a -- a form or a string -- we call it a
8   string.  Actually, it's a -- the technical
9   word is a string.
10      Q.  So, is a string for the affidavits
11  of merit everything -- that you signed
12  everything other than the data from the
13  database, the notary, your name, and --
14      A.  So, just these two (indicating)?
15  I'm -- I'm -- I'm just attesting to these
16  two, correct?
17      Q.  Well, let's start here
18  (indicating)?
19      A.  Okay.
20      Q.  Is -- is everything else that
21  you're -- that goes into this -- these
22  documents come from what you called a form a
23  moment ago?
24              MR. MILLS:  Objection.
25      A.  Is that one form, or multiple

114

T. FABACHER

1
2   forms?
3      Q.  You tell me.
4      A.  Okay.  It's all conditional.  So,
5   it's -- it's everything -- is it -- for a --
6   how -- if it's a retail charge agreement,
7   that's -- that could -- that could come from
8   one logic part.  If it's a loan, it -- then
9   the affidavit is different.  If it's
10  medical, the affidavit is different.  If
11  it's a health club, the affidavit is
12  different.
13      Q.  Okay.  Well, let me ask you a -- a
14  more narrow question then.
15      A.  Okay.
16      Q.  Does the form, as you used the
17  term form --
18      A.  Yeah, yeah, yeah.
19      Q.  -- that wasn't my word --
20      A.  No, that's fine.  You -- you keep
21  on asking me to use -- can we just use the
22  word string?
23      Q.  Well, I think . . .
24      A.  Because the technical -- I'm
25  trying -- you're asking me to give you --

115

T. FABACHER

1
2      Q.  Can I -- if you -- if I used the
3   word form, would you understand that to mean
4   the same technical term --
5      A.  I --
6      Q.  -- as string?
7      A.  -- I would prefer if I use the
8   word string.  Because the string is the
9   proper word, so.
10      Q.  The string.
11      A.  Correct.  So --
12      Q.  Let's call it the string.
13      A.  String text.  Okay.
14      Q.  String.  Is the string text that
15  goes into the affidavits of merit that you
16  signed, are the words in the paragraph
17  underneath your name (indicating), is that
18  string the same for all the affidavits that
19  you -- merit that you signed while at Mel
20  Harris?
21              MR. MILLS:  Objection.
22      A.  I can't answer that.
23      Q.  Is the string something that --
24  okay.  Why not?
25      A.  Because I can't see them.

116

T. FABACHER

1
2      Q.  Do you remember if it -- well, for
3   the affidavits of merit that you did sign,
4   they said that -- that you were the
5   authorized and designated custodian of
6   records for the plaintiff.
7              MR. MILLS:  Objection.
8      Q.  Is that true?
9      A.  I -- I can't testify to something
10  that I can't see.  I can attest to these
11  two.
12      Q.  Okay.  Do you remember if the
13  terms authorized and designated custodian of
14  records for plaintiff was part of the string
15  for the affidavits of merit that you signed?
16              MR. MILLS:  Objection.
17      A.  On which affidavits?
18      Q.  Any of the affidavits of merit
19  that you signed at Mel Harris, did they all
20  include the string authorized and designated
21  custodian of records for the plaintiff?
22              MR. MILLS:  Objection.
23      A.  Any, or all?
24      Q.  All.
25      A.  No, you said any.  So, that's why

29 (Pages 113 to 116)

117

```
 1              T. FABACHER
 2   I want to be clear.
 3        Q.  Did any of them say that?
 4        A.  Yes.
 5           MR. MILLS:  Objection.
 6        A.  Here are two right here
 7   (indicating).
 8        Q.  Did all of them say that?
 9        A.  No.
10        Q.  Did most of the affidavits of
11   merit that you signed while you were at Mel
12   Harris --
13        A.  Can you define most?
14        Q.  The majority.
15        A.  I can't attest to that because I
16   -- I -- I can't remember.  I mean I -- I
17   can't attest to something -- what's a number
18   -- what's the majority?
19        Q.  More than 50 percent.
20        A.  I don't know.
21           MR. MILLS:  Objection.
22        Q.  Let me ask the question.
23        A.  Yes.
24        Q.  Did more than 50 percent of the
25   affidavits of merit that you signed while at
```

118

```
 1              T. FABACHER
 2   Mel Harris include the phrase that you were
 3   the authorized and designated custodian of
 4   records for the plaintiff?
 5           MR. MILLS:  Objection.
 6        A.  Could you repeat that?
 7        Q.  Sure.  Would more than 50 percent
 8   of the affidavits of merit that you signed
 9   while you were working at Mel Harris include
10   the phrase that you were the authorized and
11   designated custodian of records for the
12   plaintiff?
13        A.  I can't remember.
14           MR. MILLS:  Objection.
15        Q.  If we wanted to go and find out
16   which string was used for the affidavits of
17   merit that you signed while at Mel Harris,
18   how would we go about in finding that?
19        A.  I'd have to look at the code.  I
20   -- it -- it would be in the -- I'm not sure.
21        Q.  It would be in the code?
22        A.  It could be.  I'm not -- I -- I
23   don't -- I haven't seen the code in -- in
24   years.
25        Q.  But sitting here today, you
```

119

```
 1              T. FABACHER
 2   believe it would be in the code?
 3        A.  I'm not sure.
 4        Q.  Would your testimony that you gave
 5   back in Sykes five years ago be more
 6   accurate in terms of what you did at Mel
 7   Harris than it is now?
 8        A.  I don't know.
 9           MR. MILLS:  Objection.
10        A.  Are you speculating that --
11        Q.  I'm asking since that was closer
12   to the time five years ago when you worked
13   there, do you think that that might be more
14   accurate in terms of what your memory is?
15           MR. MILLS:  Objection.
16        A.  No.  I'd have to read the
17   testimony.  Correct?  Testimony to what?
18        Q.  Well, you -- generally speaking,
19   do you think your memory of what you did
20   while you were at Mel Harris would be more
21   accurate in 2012 than it would be today?
22           MR. MILLS:  Objection.
23           MR. SCHER:  You can answer.
24        A.  I don't know.
25        Q.  Next sentence, being on page
```

120

```
 1              T. FABACHER
 2   eight, is that next sentence true?
 3           MR. MILLS:  Objection.
 4        A.  Which -- which one are we on,
 5   again?
 6        Q.  He further states --
 7        A.  Okay.  I'll read it.
 8           He further states that he, quote,
 9   maintains the daily records and accounts,
10   bracket, for the collection entities (sic),
11   end of bracket, in the regular course of
12   business, including records maintained by
13   and obtained from, bracket, the collection
14   entity's, close bracket, assignor, end
15   quote.
16        Q.  Is that sentence true?
17           MR. MILLS:  Objection.
18           MR. SCHER:  Same objection.
19        A.  I -- I don't know what that's in
20   reference to.  If they have -- I don't --
21   how do you -- do you want me to -- to make
22   it -- the -- in reference to what?
23        Q.  Well, reading that sentence, is
24   the statements in that sentence true or
25   false?
```

30 (Pages 117 to 120)

T. FABACHER

1    MR. MILLS: Objection.
2    MR. SCHER: Same objection.
3    A.  But I -- I have to know the -- the
4    relativity.  So, I further stated -- so, it
5    has an ID.  Can I see the line on the -- in
6    the -- it has an ID here.  Can I see --
7    MR. SCHER: It's an Id.
8    THE WITNESS: Id?
9    MR. SCHER: It's not an ID, no.
10   THE WITNESS: See, I'm a
11   programmer.  Got to have a reference
12   number.
13   Q.  So, I guess -- well, it means what
14   it means.  But let me ask you, the
15   affidavits of merit that you signed while
16   you were at Mel Harris, did it say that you
17   maintained the records and accounts,
18   bracket, for the collection agency, close
19   bracket, in the regular course of business?
20   A.  What does that mean?  I actually
21   quoted for the collection entities?
22   Q.  I think the bracket means that you
23   insert that data from there.
24   So, the question is, in the

T. FABACHER

1    affidavits of merit that you signed while
2    you were at Mel Harris, did it state that
3    you maintained the daily records and
4    accounts for the collection agency in the
5    regular course of business including the --
6    the records maintained by and obtained from
7    collection agency's assignor?  Is that true
8    or false?
9    MR. MILLS: Objection.
10   MR. SCHER: Same objection.
11   A.  I can say that it matches this
12   Exhibit Number 3.
13   Q.  And the question is, does -- the
14   sentence I just stated, is that in the
15   affidavits of merit that you signed while
16   you were at Mel Harris?
17   A.  I'd have to see those affidavits.
18   I mean I signed a lot -- you know -- I'd
19   have to see those affidavits.
20   Q.  All right.  Or you could see the
21   code that's on the computer that's at Mel
22   Harris, right?
23   A.  Well, that wouldn't be possible.
24   Because the code actually changed over time.

T. FABACHER

1    So, there is no timestamp of the code.  So,
2    the code evolved also.  So, you -- it -- you
3    can't say, this is the code -- that it did
4    it at this date.  That would be impossible.
5    It's a -- it's a live document -- just like
6    any document -- it -- it doesn't keep --
7    from my understanding, it doesn't keep the
8    -- I don't believe they kept historical
9    records for the code at the time for -- for
10   the affidavits when they were signed.
11   Q.  Okay.  Next sentence.  Is that
12   next sentence true or false?
13   MR. MILLS: Objection.
14   MR. SCHER: Same objection.
15   A.  (Perusing document.)
16   Fabacher affirms that he is
17   thereby fully and personally -- okay --
18   Fabacher affirms that he is thereby -- a
19   quote -- thereby fully and personally
20   familiar with, and has personal knowledge
21   of, the facts and proceedings related (sic)
22   to the, bracket, the debt collections agency
23   (sic) a -- action, end quote.
24   Let's see here.

T. FABACHER

1    (Perusing documents.)
2    See, it doesn't -- this is quoted
3    -- doesn't even match this affidavit.  So,
4    the quote under id, number two doesn't even
5    match this affidavit.
6    MR. SCHER: When you're saying
7    this affidavit, you're --
8    THE WITNESS: The one -- Exhibit
9    Number 3.  So, this is a quote, and it
10   doesn't match the affidavit you
11   presented me.
12   Q.  When you -- did you ever work for
13   any of the -- well, strike that.
14   Did you ever work for LR Credit 1
15   through 23?
16   A.  Was I employed?
17   Q.  Were you ever employed by them?
18   A.  No.
19   Q.  Did you ever work for them?
20   MR. MILLS: Objection.
21   A.  What does work mean?
22   Q.  Do work on their behalf.
23   MR. MILLS: Objection.
24   A.  What does that mean?

31 (Pages 121 to 124)

125

T. FABACHER

1  Q.  Were you ever the custodian of
2  records for any of the LR Credit entities 1
3  through 23?
4       MR. MILLS:  Objection.
5       You asked about 20 times.
6  Q.  You can answer.
7  A.  I was the custodian of record for
8  LR 18.
9  Q.  Well, what do you mean by L -- LR
10  -- custodian of record for LR 18?
11       MR. MILLS:  Objection.
12  A.  The custodian of records.
13  Q.  So --
14  A.  It's a title.
15  Q.  -- when you signed the affidavits
16  that are -- of merit that are Exhibit 3 and
17  Exhibit 4 (sic), both of them say that
18  you're the authorized and designated
19  custodian of records for the plaintiff,
20  correct?
21  A.  Sentence number one?
22  Q.  Yes.
23  A.  Okay.  It says, I am the -- I am
24  -- I am an authorized, not the.  That was

*(Line numbers 1–25 shown in left margin)*

126

T. FABACHER

1  incorrect.
2  Q.  Go ahead.
3  A.  I am an authorized and designated
4  custodian of record (sic) for the plaintiff
5  in the State of New York, that I maintain
6  the daily records and accounts in the
7  regular course of business, including the
8  records maintained by and obtained for (sic)
9  plaintiff's assignor, which were made and
10  maintained in the regular course of
11  business, and that I am thereby fully and
12  personally familiar with, and have personal
13  knowledge of, the facts and proceedings
14  relating to (sic) within action.
15  Q.  Okay.  And that language you just
16  read is the same for both Exhibit 3 and
17  Exhibits 4 (sic) the affidavit of merit for
18  Bueno and for Guzman, correct?
19  A.  That's correct.
20  Q.  Okay.
21       MR. MILLS:  That's Exhibit 5, I
22  believe.
23       MR. KESHAVARZ:  Oh.  Three and 5.
24  Q.  Now, let's take them one at a

127

T. FABACHER

1  time.  And when you say in Exhibit 3 and 5
2  that you are the authorized and designated
3  custodian of records for the plaintiff in
4  New York -- State of New York, what do you
5  mean by that?  What do you mean by custodian
6  of records?
7       MR. MILLS:  Objection.
8  A.  I mean I'm the custodian of
9  records.
10  Q.  What do you mean by that?
11  A.  The custodian of records.
12  Q.  You don't work for any of the LR
13  Credit entities 1 through 23, correct?
14       MR. MILLS:  Objection.
15  A.  Can you -- what are 1 to 23?
16  There is no 1.  From my understanding, there
17  is no LR Credit 1, LLC.
18  Q.  What are the LR Credit entities
19  that you are aware of?
20       MR. MILLS:  Objection.
21  A.  I'm aware LR Credit 18, comma,
22  LLC.
23  Q.  Anything else?
24  A.  I do remember LR Credit 15, comma,

128

T. FABACHER

1  LLC.  I remember LR Credit 10, comma, LLC.
2  That's -- I don't specifically recall the
3  exact names of each LLC.
4  Q.  And by custodian of records, do
5  you mean that you have the -- the computer
6  system that you used at Mel Harris -- the
7  data that was transferred on behalf of LR
8  Credit 13 and 18?
9       MR. MILLS:  Objection.
10  Q.  Is that what you mean by custodian
11  of records?
12       MR. MILLS:  Objection.
13  A.  Could you repeat the question?
14  Q.  I'm just trying to get --
15  A.  No, I'm -- I'm just -- because
16  you're asking me a specific question.  And
17  it has a specific title.  It's custodian of
18  records.
19  Q.  Okay.  What records were you a
20  custodian of for LR Credit 18 and LR Credit
21  13 for Exhibits 3 and 5?
22       MR. MILLS:  Objection.
23  A.  I was the custodian for the data
24  that you see here on this affidavit.

32 (Pages 125 to 128)

129

T. FABACHER

1  Q.  Okay.  Were you the custodian for
2  any other records for LR Credit 13 in
3  Exhibit 3 or LR Credit -- excuse me.  Strike
4  that.
5      Other than the data that is in
6  Exhibit 3 and 5, were you the custodian of
7  any other records for LR Credit 18 or 13?
8  A.  What do you mean by any other
9  records?
10  Q.  Well, you said -- well, you tell
11  me.
12  A.  I mean you want me -- their --
13  their home address, their telephone numbers?
14  Q.  Okay.
15  A.  I mean I . . .
16  Q.  When you say the records for
17  Exhibit 3 and Exhibit 5, what do you mean by
18  records?
19  MR. SCHER:  Objection.
20  A.  For here, I mean the records that
21  you see here on the affidavit.  That's what
22  I -- what I'm attesting to.
23  Q.  Do you mean anything else other
24  than that?

130

T. FABACHER

1  MR. MILLS:  Objection.
2  A.  From my understanding, what I
3  signed, I'm attesting to what is on this
4  affidavit.
5  Q.  So, when you say records in
6  Exhibit 3 and 5, you mean the data that is
7  on Exhibit 3 and 5?
8  A.  That's correct.
9  Q.  Do you mean anything else?
10  MR. MILLS:  Objection.
11  A.  No.
12  Q.  Okay.  So, when you say -- and by
13  custodian, what do you mean?
14  MR. MILLS:  Objection.
15  A.  Custodian.  It's a definition.
16  Q.  Well, what do you mean by that?
17  A.  I mean -- well, if you give me
18  a --
19  MR. MILLS:  Objection.
20  A.  -- a dictionary, I'll read the
21  definition.  How do you -- how do you mean
22  by custodian?  It has a legal definition,
23  sir.
24  Q.  But -- well, you signed it.  What

131

T. FABACHER

1  does it mean to you?
2  A.  I -- means I'm the custodian of
3  record.
4  MR. MILLS:  Objection before the
5  answer.
6  Q.  Anything else?
7  MR. MILLS:  Objection.
8  A.  It means what I signed --
9  Q.  Okay.
10  A.  -- which is custodian of record.
11  Q.  Moving on to the next -- the next
12  sentence -- the -- continuing that sentence
13  from both Exhibit 3 and 5, by the daily
14  records, you mean the information that's in
15  the affidavits of merit that's -- that's 3
16  and 5, correct?
17  A.  Can you -- the sentence?  I'm
18  sorry.  I apologize.  Which sentence are you
19  referring to?
20  Q.  Continuing on, where it says, I
21  maintain the daily records and accounts in
22  the regular course of business.  And then it
23  says, including the records maintained and
24  obtained from the plaintiff's assignor.

132

T. FABACHER

1  Other -- do you mean anything other than the
2  information that's reflected in the
3  affidavits of merit that's Exhibit 3 and 5?
4  MR. SCHER:  Note my objection.
5  MR. MILLS:  Opinion as well.
6  A.  No.  I'm only attesting to -- to
7  whatever the -- what I mean here is -- is --
8  I'm basically saying that I maintain this
9  data.
10  Q.  So, the -- when you say records
11  and accounts, you -- as you say in Exhibit 3
12  and 5, you mean only the information in the
13  affidavit of merit; is that correct?
14  MR. SCHER:  Note my objection.
15  MR. MILLS:  Objection.
16  A.  No.  I am saying -- no, I -- I am
17  basically saying that I'm attesting to what
18  you see here.  It doesn't say only.
19  Q.  What else are you attesting to?
20  What other records or accounts --
21  A.  I don't --
22  Q.  -- do you have --
23  A.  -- I can't give you an answer.  If
24  you ask me a specific question, I will

33 (Pages 129 to 132)

133

T. FABACHER

1  answer you.
2  
3      Q.  Do you have -- when you said --
4  we've already established -- right? -- that
5  when you say the words of records, you mean
6  the information that's in the text of the
7  affidavit of merit that's Number 3 and
8  Number 5, correct?  We've established it?
9      A.  I said it included it.
10     Q.  But it -- does it mean anything
11 else?  When you say the -- the records, do
12 you mean anything else?
13         MR. MILLS:  Objection.
14     A.  I don't know -- what do you mean
15 by anything else?
16     Q.  You mean the data that's in
17 Exhibit 3 and 5, correct?
18     A.  I think the -- what are you --
19 talking -- you know, sir, you want their ZIP
20 Code?  You want their -- their -- there are
21 five -- I'm a computer programmer.  You have
22 to give me the field, and you have to give
23 me the string which I can attest to.
24     Q.  Well --
25     A.  I mean what are you looking for?

134

T. FABACHER

1  Their -- their -- their -- their -- their
2  GPS coordinates?
3      Q.  I have no idea.  I'm trying to
4  figure --
5      A.  So, I'm --
6      Q.  -- out --
7      A.  -- asking you --
8      Q.  -- when you swear under oath --
9      A.  And I --
10     Q.  -- that --
11     A.  -- take that seriously.  And
12 you're asking me -- very general.
13         (Whereupon, an off-the-record
14     discussion was held.)
15     Q.  So, my question is very specific.
16     A.  (Indicating.)
17         MR. SCHER:  You're ready to jump
18     in and give more answer.
19         THE WITNESS:  I didn't.
20         MR. SCHER:  Let him ask the
21     question.
22         THE WITNESS:  I know.  My mother
23     would not be happy.  Okay.
24     Q.  When you say in the first

135

T. FABACHER

1  paragraph of the -- of the affidavits of
2  merit that are Exhibit 3 and 5, the word --
3      A.  Could I see Number 5, please?
4  You're asking me to testify to something I
5  can't see.
6      Q.  The first paragraph in Exhibit 3
7  and 5 are the same; is that correct?
8      A.  Well, I -- can you -- can I see
9  it, please?
10     Q.  Please take your time
11 (indicating).
12     A.  (Perusing documents.)
13         Okay.  Please.
14     Q.  Those two paragraphs are the same,
15 correct?
16     A.  Let me read it.
17         (Perusing documents.)
18         Yes, they are the same.  Yes, they
19 are the same.
20     Q.  Okay.  So, when you say custodian
21 of records, let's take them one at a time,
22 what do you mean by the term records?
23         MR. MILLS:  Objection.
24     A.  I mean the term records.

136

T. FABACHER

1      Q.  Do you mean the records of
2  anything other than what's reflected in the
3  affidavits of merit themselves that's
4  Exhibit 3 and 5?
5          MR. MILLS:  Objection.
6      A.  I don't know what you mean by
7  means of records but -- do you have the
8  specific example?
9      Q.  Well, you used the word records.
10 So, I'm trying to find out what specific
11 records do you mean.
12     A.  Do you -- if you ask me a specific
13 question, I'll give you a specific answer.
14     Q.  Okay.  In the affidavit of merit
15 that's Exhibit 3, when you use the word
16 records, what do you mean?
17         MR. MILLS:  Objection.
18     A.  Records.
19     Q.  Do you mean records other than the
20 information that's reflected in Exhibit 3?
21         MR. MILLS:  Objection.
22     A.  I mean records.  I didn't -- I
23 don't mean anything other -- other than it
24 says.  It says, the records for the

34 (Pages 133 to 136)

137

T. FABACHER

1  plaintiff.
2      Q.  I understand that but my question
3  is this.  When you use the word records, do
4  you mean records of anything other than
5  what's Exhibit 3?
6          MR. MILLS:  Objection.
7      A.  In this particular reference?
8      Q.  Yes.
9      A.  I believe I am referencing --
10  well, I can't -- I don't know this.  Because
11  in this case, I am saying that I am
12  maintaining the records, and I am attesting
13  to this value.  I -- I don't think I am
14  saying I am maintaining all of their
15  records, all of their data.
16      Q.  That's fine.  I'm -- I'm not
17  trying to say you are.  I'm just trying to
18  figure out when you use the words of
19  records, you use it twice --
20      A.  Actually, I use it --
21      Q.  -- three times --
22      A.  Four.  Four times, actually.
23      Q.  All right.  Four times.  The four
24  times you used the word records in the

138

T. FABACHER

1  affidavits of merit that are Exhibit 3 and
2  Exhibit 5 for these specific affidavits of
3  merit --
4      A.  For these specific affidavits.
5      Q.  -- what do you mean by the words
6  records as -- specifically as to Exhibits 3
7  and 5?
8      A.  I --
9          MR. MILLS:  Objection.
10      A.  -- specifically mean records.
11  That's what they are.  It's a -- it's a --
12  it's a definition.  It is a record.
13      Q.  Okay.  And you mean the records
14  that are reflected in the affidavits of
15  merit themselves; is that right?
16      A.  I don't understand that question.
17      Q.  Do you mean -- by records, do you
18  mean anything else other than the
19  information that's reflected in Exhibit 3
20  and 5?
21      A.  I -- I'm -- do I -- do I -- what
22  is mean?  You know, I -- I don't know what I
23  mean.  I don't know what I mean.  What does
24  mean mean?  Like, what do I mean?  Am I --

139

T. FABACHER

1  are you saying, am I speculating, that I --
2  I -- I maintain more than what is here?  I
3  can't answer that question.
4      Q.  Well, I -- I didn't put the words
5  records down -- the word records down --
6      A.  I did.  And that's -- and that's a
7  definition.  You're asking me to define
8  records.  And I'm giving you the definition.
9  If you get a Webster dictionary, we can look
10  it up.
11      Q.  Well, I'm -- I'm not trying to use
12  the word records generally.  You swore as to
13  what records four times?
14      A.  That's correct.  And I used the
15  same word.  And I'm giving you back the word
16  I used four times which is records.
17      Q.  Okay.  My question is this --
18      A.  Yes, sir.
19      Q.  -- when you use the word records
20  in these two affidavits of merit --
21      A.  That's correct.
22      Q.  -- do you mean anything other than
23  the information that's in these two specific
24  affidavits of merit?

140

T. FABACHER

1      A.  Can you give me an example of
2  another?
3      Q.  I don't know.  But you said
4  records.  So --
5      A.  And I'm --
6      Q.  -- did you --
7      A.  -- giving you record -- I'm sorry.
8  Go ahead.  I'm sorry.
9      Q.  Did you mean records of anything
10  other than the affidavits of merits
11  themselves?
12      A.  I -- I -- I don't know how to
13  answer that question.
14      Q.  Sure.  When you use the records,
15  specifically --
16      A.  Right there.
17      Q.  -- as to Mr. -- Miss Bueno and Mr.
18  Guzman, specifically as to these people --
19      A.  That's correct.
20      Q.  -- okay -- do you mean anything
21  other than the information that is reflected
22  in the affidavits of merits themselves?
23      A.  I don't -- I -- I -- I don't know
24  what it infers -- I don't -- I -- I --

35 (Pages 137 to 140)

141

T. FABACHER
1
2  records stands for records.
3      Q.  I'm not trying to get the
4  definition of records generally --
5      A.  Well, I -- but you're -- you're
6  asking me under -- to -- something that I --
7  that I signed under oath.  And now I'm
8  testifying for -- and you're asking me to
9  give you a general definition.  If you -- I
10  -- I -- I -- I can't answer that question
11  because . . .
12      Q.  What records -- and I'm going to
13  try to get at it in a different way.
14      A.  There you go.
15      Q.  I might succeed.  I might fail.
16  But at least try.
17      A.  Try.
18      Q.  When you say records in Exhibit 3
19  and 5, you mean electronic information
20  that's transferred to Mel Harris; is that
21  right?
22          MR. MILLS:  Objection.
23      A.  No.  Not only electronic.
24      Q.  Well, let me just strike -- ask
25  the question again.  I --

142

T. FABACHER
1
2      A.  Okay.
3      Q.  -- it might be the same question.
4  Maybe it's not the same.  Let me just ask
5  you this.
6      A.  Okay.
7      Q.  When --
8          MR. SCHER:  I'm not saying
9  anything.  I --
10          MR. KESHAVARZ:  You're going to
11  say it.
12          MR. SCHER:  (Inaudible.)  Ask him
13  if it included electronic records,
14  electronic information as opposed to --
15  I think that's what he's getting at --
16  ask him -- ask him if it included
17  electronic records or electronic --
18          MR. KESHAVARZ:  Well, I'm trying
19  to get to -- that's not what I'm trying
20  to get at.  But I appreciate it.
21      Q.  Are you, in fact -- were you, in
22  fact, the custodian of records for LR Credit
23  18 and 13?
24          MR. MILLS:  Objection.
25      A.  For these two cases?

143

T. FABACHER
1
2      Q.  Yes.
3      A.  The word the.
4      Q.  Okay.
5      A.  I was a, not -- not -- I was not
6  the.  The means singular.  I -- you want me
7  to testify?  I'm --
8      Q.  I'm listening.  I'm listening.
9      A.  -- I mean I'm not an attorney but
10  this is crazy.  Are you guys going to --
11  have me testify and get me in trouble.
12      Q.  I'm just trying to figure out --
13      A.  Well, I'm --
14      Q.  -- these --
15      A.  -- not going to testify and put
16  myself in trouble, sir.  I was one of the
17  custodian of records.
18      Q.  For LR Credit 18 and 13?
19      A.  That's correct.
20      Q.  Are you aware who were any other
21  custodian of records?
22      A.  I'm not.
23      Q.  So, you are a custodian.  And so,
24  when you -- for Exhibit 3 and 5, when you
25  say records, do you mean the records that

144

T. FABACHER
1
2  are the information reflected in Exhibit 3
3  and 5; is that correct?
4      A.  It includes.
5      Q.  What else, if anything, do the
6  records for Exhibit 3 and 5 include?
7      A.  Say that again?
8      Q.  When you use the word records for
9  Exhibit 3 and 5, do you -- do you -- do you
10  mean anything other than the information
11  that's reflected in the Affidavits of Merit
12  that is Exhibit 3 and 5?
13          MR. MILLS:  Objection.
14      A.  What do you mean by -- see, I'm
15  being -- I'm trying to -- to get -- for
16  example, I -- here, on the third paragraph,
17  it says retail charge account, okay?  So,
18  you know, are you talking about something
19  like that?  What do you mean by records?  We
20  can go through every single field.  I need
21  you to -- explain to me.  Because I'm a
22  computer person.  Is it -- you're saying
23  it's coming from a database?  Did I read it?
24  You're asking me to speculate?
25      Q.  I'm not.  I'm not trying to do

36 (Pages 141 to 144)

145

```
 1              T. FABACHER
 2   that.
 3        A.  That's what you're doing.
 4        Q.  All right.
 5            (Whereupon, an off-the-record
 6   discussion was held, and a luncheon
 7   recess was taken.)
 8            (Thereupon, the following
 9   proceedings were had without Jessica
10   Moody in the deposition suite.)
11            MR. MILLS:  Before you start, I
12   would just like to pose an objection to
13   the video recording of the deposition
14   of the witness.  We object to that.
15   That's on the record.
16            MR. KESHAVARZ:  All right.
17            MR. SCHER:  Well, while we're
18   stating things on the record, I just
19   wanted to make sure that we know that
20   the witness is reserving the right to
21   review his transcript.
22            MR. KESHAVARZ:  All right.  Not
23   really an objection.
24            Let's mark this as the next
25   exhibit, please.
```

146

```
 1              T. FABACHER
 2            (Whereupon, the aforementioned
 3   Todd Fabacher LinkedIn page was marked
 4   as Plaintiff's Exhibit 6 for
 5   identification as of this date by the
 6   Reporter.)
 7        Q.  (Perusing document.)
 8            Take a look at Exhibit 6, and let
 9   me know when you're done, sir.
10        A.  (Perusing document.)
11            2001.  Okay.  I see it.
12        Q.  Can you identify what Number 6 is?
13        A.  It's -- it's mine -- it's me.
14        Q.  It's your LinkedIn page?
15        A.  Uh-huh.
16        Q.  LinkedIn page -- of the
17   information on your LinkedIn page, is
18   Exhibit 6 true and correct?
19        A.  Okay.
20        Q.  Is it?
21        A.  It looks like it, yeah.
22        Q.  All right.  So, let me go down to
23   the bottom of the first page where it says
24   Mel Harris & Associates -- Technologies --
25   2011 (sic) to 2012.  Does that refresh your
```

147

```
 1              T. FABACHER
 2   memory?  Did you -- excuse me -- 2001 to
 3   2012.  Does that refresh your memory?  Do
 4   you believe you worked at Mel Harris between
 5   2001-2012?
 6            MR. SCHER:  Objection to form.
 7        A.  Yeah.  I guess.  I don't -- yeah.
 8   I guess -- I don't remember the dates but
 9   yeah.  I guess I put it in there.  Sure.
10        Q.  Okay.  All right.  Now, who is
11   Pinpoint Technologies?
12        A.  It's a company.
13        Q.  Okay.  What's the relationship
14   between Pinpoint Technologies and Mel
15   Harris?
16        A.  There is -- actually, I did not
17   work for Pinpoint Technologies.  I was not
18   an employee.  I -- I was -- I was a small
19   shareholder of it.
20        Q.  Okay.  What is Pinpoint
21   Technologies?
22        A.  It was a -- it's a debt -- I
23   believe it's a debt holding company.
24        Q.  Buyer of charged-off consumer
25   debts?  Is that what you mean?
```

148

```
 1              T. FABACHER
 2        A.  Yes.
 3        Q.  Who are the other owners of
 4   Pinpoint?
 5            MR. SCHER:  Objection.
 6        A.  I'm not sure.  I'm not -- I'm just
 7   a member.  I'm not -- I'm not a -- an
 8   officer in it.
 9        Q.  Who are the other members?
10            MR. SCHER:  Objection.
11        A.  I'm not sure.  I'm not an officer
12   in the -- in the -- in the company.
13        Q.  I understand.  Do you know who are
14   -- the other members are?
15        A.  I think -- do I -- do I know one?
16   Yeah.  I know Michael Young.
17        Q.  Anyone else?
18        A.  I don't -- this is speculation --
19   I don't -- I'm not -- again, I don't -- I
20   don't have the records to say, like, you
21   know, who is an actual member.  I never -- I
22   don't know who the -- the -- all the owners
23   are.
24        Q.  You don't remember any of the
25   members, other than yourself and Mr. Young?
```

37 (Pages 145 to 148)

149

T. FABACHER

1    A.  I believe Kerry Lutz.  But again,
2  it's speculation.
3    Q.  Well, I'm just asking, do you know
4  if Kerry Lutz is one of the members of
5  Pinpoint Technologies?
6    A.  I believe so.
7    Q.  Okay.  Other than Kerry Lutz,
8  Michael Young, and yourself, are there any
9  other members of Pinpoint Technologies?
10    A.  I don't know.  You'd need to check
11  the records.
12    Q.  You don't know --
13    A.  Yeah, I don't know.  As I said,
14  we're just -- I was an investor.
15    Q.  Okay.  Is that still running?  Is
16  that a -- still an active company?
17    A.  I believe it is, yes.
18    Q.  Okay.  It's an LLC?  Pinpoint
19  Technologies is an LLC?
20    A.  I'm going to speculate.  I -- I
21  don't know.
22    Q.  You don't know.  That's fine.
23    A.  I don't know.  Yeah, I'd have to
24  check on my tax returns.  But I am -- I

150

T. FABACHER

1  would assume.
2    Q.  All right.  And how long has Pin
3  -- strike that -- Pinpoint Technologies is
4  the plaintiff in collection lawsuits, or do
5  you know?
6    A.  Yes.
7    Q.  Okay.  And do you know if
8  judgments entered in the name of any of the
9  LR Credit entities were transferred into the
10  name of Pinpoint?
11    MR. MILLS:  Objection.
12    A.  I don't know of any.
13    Q.  All right.
14    A.  I cannot think of any, no.
15    Q.  All right.  The -- the -- the same
16  stuff that you did at Mel Harris is the same
17  stuff you did at Mel -- at Pinpoint
18  Technologies, generally speaking?
19    A.  No.
20    Q.  In what way they -- were they
21  different?
22    A.  Pinpoint is -- is a -- is an LLC
23  -- that it -- it's a -- it doesn't write
24  software.

151

T. FABACHER

1    Q.  Okay.  All right.  Who is the law
2  firm that Pinpoint Technologies uses to do
3  debt collection litigation?
4    A.  One of the -- I think we use
5  several -- I think one of the firms was Mel
6  Harris.
7    Q.  Okay.  Was that the main firm you
8  used while Mel Harris was in existence?
9    A.  I'm not an officer.  I don't know.
10  I'm an investor.
11    MR. SCHER:  Start -- start
12  wrapping it up.  Pinpoint, they --
13    MR. KESHAVARZ:  That's fine.
14    MR. SCHER:  -- have nothing to do
15  with --
16    MR. KESHAVARZ:  All right.
17    MR. SCHER:  -- the litigation.
18  He's --
19    MR. KESHAVARZ:  That's fine.
20    MR. SCHER:  -- a non-party.
21    A.  Yeah, I don't -- I mean -- I'm
22  not -- I'm just an investor.
23    Q.  That's fine.  That's fine.
24    A.  Okay.

152

T. FABACHER

1    Q.  Thank you.
2    A.  I just --
3    Q.  That's fine.  That's good for the
4  technology --
5    A.  Yeah.
6    Q.  -- that's -- that's the whole
7  point of me bringing --
8    A.  Yeah.
9    Q.  -- this up.
10    A.  Okay.
11    Q.  Read the description of the work
12  you did at Mel Harris, and --
13    A.  It's not very clear.  Hold on.
14    (Perusing document.)
15    Q.  -- and let me know when you're
16  done.
17    A.  Okay.
18    Q.  And all the statements in that
19  paragraph are true and correct?
20    A.  Yes.
21    Q.  Okay.  And is all that information
22  in that paragraph, does that apply to your
23  work at Mel Harris?
24    A.  I would say yes.

38 (Pages 149 to 152)

153

T. FABACHER

1  Q.  Okay.  So, the last sentence where
2  it says, these creative programs range from
3  state of the art restraining notice and
4  information subpoena automation to complete
5  litigation strategy, and comprehensive
6  collection programming, what do you mean by
7  that?
8  A.  So, these are -- what I'm
9  speculating -- what I'm saying here is post
10  judgment.  I'm -- I'm -- I'm not -- it's not
11  -- this is -- this is not regarding to
12  litigation.  This would be all post
13  judgment.
14  Q.  Okay.  But is the computer program
15  you're talking about, that applies to
16  creating affidavits of merit --
17  A.  No.
18  Q.  It doesn't?
19  A.  That's not what I'm -- they had --
20  did not have affidavits.  These are
21  information subpoenas.  I'm not writing
22  anything about affidavit of merits (sic)
23  here.
24  Q.  Okay.  Well, why is there a
25

154

T. FABACHER

1  different programming for post-judgment
2  collections as opposed to doing affidavits
3  of merit?
4  A.  Because it's a different
5  application.
6  Q.  But you -- you created both
7  applications?
8  A.  Did I create both?  I was one of
9  the programmers.
10  Q.  Okay.  Were you the main
11  programmer?
12  A.  Depends what time of the year.
13  Some I was less.  Some I would -- I would
14  say, you know -- yeah, it depends on the
15  time frame.
16  Q.  All right.  And the -- is there a
17  different name for the program for
18  pre-judgment and post-judgment collections?
19  A.  Yeah, we -- we called it RNIS.
20  Q.  And do you know what that stands
21  for?
22  A.  Restraining notice information
23  subpoena.
24  Q.  That's the name of the program?
25

155

T. FABACHER

1  A.  I believe.  It's -- rnis.exe is
2  the name of the program.
3  Q.  Okay.  And what about for
4  pre-judgment litigation?
5  A.  Pre-judgment is handled by
6  Debtmaster which I did not create.
7  Q.  Do you know why they're two
8  different softwares?
9  A.  No.
10  Q.  Okay.
11  A.  It was prior to me.
12  Q.  The Debtmaster is prior to you?
13  A.  Yes.
14  Q.  And then you did the post-judgment
15  collection after that?
16  A.  Correct.
17  Q.  Okay.  Now, the information that
18  goes into Mel Harris's computer system, is
19  there an integration between the data that's
20  in Samserv's electronic information and Mel
21  Harris's?
22  A.  Could you be clear on that
23  question?
24  Q.  Sure.  I'm just -- what I'm trying
25

156

T. FABACHER

1  to get at is, like, affidavits of service
2  with dates and times and locations, in prior
3  testimony, I -- I think it was established
4  that that information is typed into a
5  database.  Now --
6  A.  What -- again -- again, be very
7  specific for me.  So, what information?
8  Q.  So --
9  A.  Can I write this down?  I want to
10  be clear.
11  Q.  Whatever you like.  I mean don't
12  write on the exhibits.
13  A.  Yeah.
14  Q.  But if you want to write it on a
15  piece of paper, it's fine --
16  A.  Right.
17  Q.  -- with me.  It's up to you.
18  So, my understanding is, from
19  Samserv that they give a process server to go
20  out, and comes back.  And he says he served
21  the process.  And he fills out a form --
22  A.  Okay.  I -- I don't know any of
23  that.
24  Q.  I know.  I understand that.
25

39 (Pages 153 to 156)

157

T. FABACHER

1
2     A.  Okay.
3     Q.  I'm just trying to get to the data
4  part.
5         They fill out a form and -- where
6  they claim to have made service in a certain
7  way.  People at Samserv typed the
8  information into their database, a Microsoft
9  Access database apparently --
10    A.  Okay.
11    Q.  -- is the name of the process
12  serve, the date of the service, the location
13  of the service, any other information that
14  goes to an affidavit of merit.  So, were you
15  aware of that?
16        MR. LICHTMAN:  Objection to form.
17    A.  I was not.
18    Q.  Okay.  Now, do you know if any of
19  the information from Samserv regarding who
20  the process server is, the dates of service,
21  the locations of service, do you know if
22  that electronic information is integrated
23  with Mel Harris in any way?
24    A.  It wasn't --
25        MR. LICHTMAN:  Objection.

158

T. FABACHER

1
2     A.  -- it wasn't my area.
3     Q.  Do you -- but even if it's not
4  your area, do you know if there was some
5  sort of integration between electronic
6  information from Samserv and the -- Mel
7  Harris's database --
8         MR. LICHTMAN:  Objection --
9     Q.  -- of programming?
10        MR. LICHTMAN:  -- objection.
11    A.  Could -- could you repeat the
12  question?
13    Q.  Sure.  The reason I -- I brought
14  this Exhibit 6 out was I was interested in
15  this program that automates the collection
16  process --
17    A.  That's a post-judgment collection.
18    Q.  Okay.
19    A.  It's only post-judgment.
20    Q.  That's the reason I brought it
21  out.
22    A.  Yeah.
23    Q.  So, I'm -- that was bringing me to
24  this line of questioning.  So, for
25  example --

159

T. FABACHER

1
2         MR. KESHAVARZ:  Mark this as
3  Exhibit 7.
4         (Whereupon, the aforementioned
5  Affidavit of service (LR Credit 18, LLC
6  vs. Agustina Bueno) was marked as
7  Plaintiff's Exhibit 7 for
8  identification as of this date by the
9  Reporter.)
10    Q.  (Perusing document.)
11        So, I'm showing you what's been
12  marked as Plaintiff's Exhibit 7.  This is
13  the affidavit of service by Samserv for my
14  client Agustina Bueno.  Can you take a look
15  at that document, and let me know when
16  you're done.
17        MR. MILLS:  Just to note, there
18  are no copies for me and counsel to
19  look at.
20        MR. KESHAVARZ:  Here goes another.
21  There you go (handing document).
22        MR. MILLS:  (Perusing document.)
23    A.  (Perusing document.)
24        Okay.
25    Q.  Okay.  So, my question is, the

160

T. FABACHER

1
2  information that's in the Samserv affidavit,
3  in terms of the -- you know, the location of
4  service, the date, and --
5     A.  Where is --
6     Q.  -- time of service --
7     A.  -- okay --
8     Q.  -- and so forth --
9     A.  -- where would that be?  I just
10  see that -- that it says summons and -- oh,
11  you're saying -- it says -- so, I'm just
12  going to read it so I make sure I'm clear.
13        MR. SCHER:  Well, don't read it
14  out loud if -- if you're just trying to
15  read -- understand it.
16    A.  (Perusing document.)
17        So, I'm not an attorney.  So, I
18  don't understand service -- so, I'm a --
19    Q.  I just want -- I'm just interested
20  in the data.
21    A.  Want me to read something, and you
22  can't -- I --
23        MR. SCHER:  Hold on.
24    A.  -- I don't understand?
25        MR. SCHER:  Let him ask a

40 (Pages 157 to 160)

161

T. FABACHER
1    question.
2
3         THE WITNESS:  Okay.
4    Q.  So --
5         MR. SCHER:  He interrupted you in
6    the middle of your question.
7    Q.  All right.  So, the data -- the
8    question is, is the data in the affidavit of
9    service, Exhibit 7, the location of service,
10   the name of the process server, the name of
11   the consumer, is all that information
12   somehow integrated between Samserv and Mel
13   Harris' system?
14        MR. LICHTMAN:  Objection.
15   A.  What do you mean by integrated?
16   Q.  Can Mel Harris access
17   electronically the information that's in
18   Exhibit 7?
19        MR. LICHTMAN:  Objection.
20   A.  Electronically?
21   Q.  Yes.
22   A.  No.
23   Q.  Can Mel Harris access the
24   information that's in Exhibit 7 in some
25   other way --

162

T. FABACHER
1
2         MR. LICHTMAN:  Objection.
3    Q.  -- other than electronic?
4    A.  By paper.
5    Q.  Okay.  And Mel Harris does -- did
6    Mel Harris keep a scanned copy of the
7    affidavits of service?
8         MR. LICHTMAN:  Objection.
9    A.  I -- I -- I -- I -- possibly.  I
10   don't -- I think -- I know -- I -- I don't
11   know if this one they did.  I know they --
12   they did scan but I don't know what they
13   scanned.
14   Q.  I mean one reason I'm asking you,
15   you talked about the post-judgment program
16   that you set up, right?  One thing that
17   happens in post-judgment is -- and a
18   consumer sometimes has to -- moves to try to
19   vacate a judgment.  And Mel Harris files a
20   -- a motion to oppose that.  My -- my point
21   is that sometimes Mel Harris attaches an
22   affidavit of service.  So, that's why I'm
23   wondering in your program, your
24   post-judgment program, does that integrate
25   anything about orders to show cause to

163

T. FABACHER
1
2    vacate judgments --
3    A.  No.  The --
4         MR. LICHTMAN:  Objection.
5    Q.  Okay.
6    A.  -- the restraint program, that
7    would be the legal.  That's a different
8    department.  So, once it's -- goes to there,
9    then it's -- it's -- it would not be in my
10   program.
11   Q.  Okay.
12   A.  So, it -- it only deals with
13   active judgments.  So, that -- the answer to
14   that would be no, from my understanding.
15   Q.  All right.  Well, let me ask you
16   this.  If -- strike that.
17        If Mel Harris wanted to find out
18   the dates of service and locations of
19   service for Samserv serving for Mel Harris
20   -- okay? -- if they wanted to find that out
21   to see if the process servers were serving
22   at the same time in more than one location,
23   is there any way for Mel Harris to determine
24   that?
25   A.  I don't know.  I -- it was not my

164

T. FABACHER
1
2    department.
3    Q.  Do you know who might know that?
4    A.  Mel Harris.
5    Q.  Anyone else?
6    A.  I don't.
7    Q.  Does Mel Harris himself do any of
8    the computer work?
9    A.  What do you mean by computer work?
10   Q.  I don't know.  The programming,
11   the data management.  Because -- because you
12   asked -- Mel Harris to ask him.
13   A.  Well, he would know.
14   Q.  Were you the -- who -- who did the
15   tech work at Mel Harris other than yourself?
16   A.  Over the years, probably, like,
17   maybe seven or eight different people.  I
18   don't even remember the names.
19   Q.  Was there another main person that
20   did tech while you were there?
21   A.  One guy was Oleg.  He -- yeah,
22   Oleg.  I don't know his last name.
23   Q.  Does Mr. Harris himself do the
24   tech work at all for --
25   A.  No.

41 (Pages 161 to 164)

165

T. FABACHER

Q. Okay. So, would Mel Harris -- to your knowledge, would Mr. Harris know the tech as to whether Samserv's information is accessible by Mel Harris's firm?

A. You --

MR. LICHTMAN: Objection.

A. -- would have to ask him.

Q. Okay. He would -- he would be the person most likely to know?

A. I don't know. I mean it was his -- his law firm.

Q. All right. Let's see if we can finish up. Going back to Exhibit 4 -- see if we can finish up a couple of items on there.

A. Okay.

Q. (Perusing document.)

Go to page seven -- no, eight.

A. (Perusing document.)

Eight.

Q. Where were we at?

A. We were on the second id -- I said ID -- which -- they quoted me. And that's actually not accurate. So, I just -- for

166

T. FABACHER

the record.

Q. Which quotes?

A. Well, they put it -- this in quotes, and it's not what's on these affidavits --

Q. Okay.

A. -- it's not -- it's -- it's not verbatim.

Q. The next sentence, it says each affidavit. Is that sentence true?

MR. MILLS: Objection.

Q. I need -- read it --

A. Yeah. Each affidavit then provides information on the underlying debt, including the relevant account number, original creditor, and outstanding balance.

Q. Okay. Is that statement true?

A. No, it's not.

Q. In what way?

A. Well, because it makes an assumption that they're all credit card debts. You don't have -- you know, you have all kinds of debt. You have loans. You have gym membership. You have all

167

T. FABACHER

varieties. So, that's inaccurate.

Q. But that statement would be true for credit card debts?

A. Not necessarily. Because I'm looking at your affidavit, and it doesn't.

Q. Looking at Exhibit 5.

A. Exhibit 5.

Q. So, the next sentence, is the next sentence true?

MR. MILLS: Objection.

A. In preparing affidavit (sic) of merits (sic), Fabacher uses various database and software programs to import, sort, and check the competencies (sic) of electronic --

MR. SCHER: (Inaudible.)

A. -- I'm sorry? -- oh -- completeness -- I'm sorry -- I apologize -- I can't -- I don't have my glasses -- I didn't think I was going to read -- completeness of electronic data received by the Leucadia -- that is spelled L-E-U-C-A-D-I-A -- defendants from the various creditors and debt sellers from whom

168

T. FABACHER

they purchase debt, period.

Q. Is that statement true?

A. Let me go through that again and make sure. Preparing affidavit (sic) of merit, Fabacher uses -- that is true.

Q. Okay. One down.

A. One down.

Q. The next sentence, is the next sentence true?

MR. MILLS: Objection.

A. (Perusing document.)

Typically, Fabacher does not receive the original credit agreement (sic) between the account holders and the creditors.

Q. Is that statement true?

MR. MILLS: Objection.

A. I don't agree with that.

Q. In what way?

A. I don't like typically. That's -- that's -- that's speculative. And that's -- that -- that's not necessarily -- I don't -- I don't agree with it.

Q. Do you think you typically do look

42 (Pages 165 to 168)

169

T. FABACHER
1
2  at it?
3      A.  I --
4      Q.  Or you just --
5      A.  -- the typically -- can you tell
6  me some percentage?  What's a percentage?
7  Are we talking 14 percent, 12 percent, 12 --
8  62 percent?  What does typically mean?
9      Q.  So, your dispute with the sentence
10  is you don't understand what the word
11  typically means; is that right?
12      A.  That's correct.
13      Q.  Okay.  Are the majority -- the
14  instances -- is it true that a majority of
15  the instances, you don't receive the
16  original credit agreement between the
17  account holders and the creditors?
18      A.  Well, what do you mean by original
19  agreement?
20      Q.  I mean -- I'm just -- I'm just
21  trying to nail down the word --
22      A.  No --
23      Q.  -- typically.  You don't know what
24  the --
25      A.  -- no, because -- original

170

T. FABACHER
1
2  agreement, that's inaccurate.  Because a lot
3  of times, the agreement is done over the
4  phone.  You can get credit access over the
5  phone -- at the checkout counter now.
6  Get -- is that?
7      Q.  Okay.  All right.
8      A.  It's -- it's not accurate.
9      Q.  Okay.  The next sentence, is the
10  next sentence true?
11      MR. MILLS:  Objection.
12      A.  (Perusing document.)
13      Instead, he receives a bill of
14  sale for the portfolio of debt (sic)
15  purchased that includes sample credit
16  agreements and warranties made by the seller
17  regarding the debts in the portfolio.
18      Q.  Is that statement true?
19      MR. MILLS:  Objection.
20      A.  That's actually not true either.
21      Q.  In what way?
22      A.  Well, you have a whole chain of
23  title.  You have from a -- a -- you have
24  billing statements.  You have charge-off
25  statements.  That's not accurate.

171

T. FABACHER
1
2      Q.  Okay.  But for the -- when LR
3  Credit gets -- when -- strike that.
4      When Mel Harris gets an account to
5  sue on -- gets an account to sue a consumer
6  on, it doesn't generally get the credit card
7  statements, right?
8      MR. SCHER:  Are you talking about
9  the -- the Sykes decision?  Are you
10  talking about now?  Are --
11      MR. KESHAVARZ:  I'm just --
12      MR. SCHER:  -- not now but --
13      MR. KESHAVARZ:  -- I'm just --
14      Q.  Put aside -- put aside the order
15  for a second.  I'm just asking you --
16      A.  Okay.
17      Q.  -- because you used the word
18  credit card statements.  So, I'm just going
19  to ask you, isn't it true that for the vast
20  majority of the accounts that Mel Harris
21  sues upon that when it gets the account, it
22  doesn't have the credit card agreements; is
23  that true?
24      MR. MILLS:  Objection.
25      A.  That is not true.

172

T. FABACHER
1
2      Q.  Okay.  What percentage of the
3  accounts --
4      A.  I have no idea.  But I could tell
5  you that it's not true.
6      Q.  But you don't know how much?
7      A.  No, I don't.
8      Q.  Next sentence, is the next
9  sentence true?
10      MR. MILLS:  Objection.
11      A.  So, that would be, in many
12  instances, such agreements do not exist.
13  And what is that?  What agreements are we
14  speculating about now?  That's actually very
15  untrue.
16      Q.  In what way?
17      A.  Are they -- from an agreement, are
18  you saying -- is that a chain of title?
19      Q.  I don't know.
20      A.  I don't know.
21      Q.  Do you know if the warranties and
22  the sale of debts for -- that Mel Harris
23  sued upon?
24      MR. MILLS:  Objection.
25      A.  I do not.

43 (Pages 169 to 172)

173

T. FABACHER

1
2    Q.   Okay.  And are -- warranty, I mean
3    warranty of the accuracy of the information
4    for the debts that Mel Harris sues on, does
5    Mel -- let me restate the question.
6       A.   Please.
7       Q.   Are there warranties of the
8    accuracy of the information for the accounts
9    that are transferred to Mel Harris to sue
10   upon?  Are there warranties of the accuracy
11   of the information?
12      MR. MILLS:  Objection.
13      A.   I'm not aware.
14      Q.   Okay.  Are there --
15      A.   Well --
16      Q.   Go ahead.
17      A.   -- let me rephrase that.  You have
18   the chain of title.  But I -- I mean I --
19   I've -- that's the only -- I'm not aware of
20   other warranty . . .
21      Q.   From other warranty --
22      A.   I'm not aware of any.
23      Q.   So, the specific question is, in
24   the sale -- in the sales of the accounts for
25   which Mel Harris sues, the chain in the --

174

T. FABACHER

1
2    is the chain of title make a -- warranties
3    about the accuracy of the data that's being
4    sent?
5       A.   I don't know.  I'm --
6       MR. MILLS:  Object --
7       A.   -- not an attorney.
8       MR. MILLS:  -- objection before
9       that answer.
10      Q.   Well, let me rephrase it
11   differently.
12      A.   Yeah, please.
13      Q.   No, no.  That's fine.
14      A.   So, that sentence is inaccurate.
15      Q.   All right.  So, let me -- like,
16   maybe I should just ask you the question
17   since it seems to make more sense.  So, when
18   you get affidavits of merit to sign, is it
19   accurate that you get a stack of affidavits
20   of merit, you sign them, like, once out of
21   every 50 or so, you compare the data with
22   the affirmation -- affidavit with the -- the
23   screen?  Is that essentially how you sign
24   the affidavits of merit?
25      MR. SCHER:  When?

175

T. FABACHER

1
2    Q.   While you worked at Mel Harris?
3       A.   That's inaccurate.
4       MR. MILLS:  Objection before the
5       answer.
6       Q.   In what way?
7       A.   Well, it's -- it's not -- you're
8    -- you're -- you're not -- everything is --
9    like that.
10      Q.   Okay.  How is it generally done?
11      A.   Well, they are -- we get --
12   they're in batches.  They're not always 50.
13      Q.   Yes.
14      A.   Sometimes it's one.  It's a
15   maximum of 50.
16      Q.   Per?
17      A.   A maximum of 50.  Never more than
18   50 at one time.
19      Q.   Well --
20      A.   In the agreement, you will see I
21   only do 350 a week, as is my testimony.
22      Q.   Okay.  And that's accurate?
23      A.   That's my testimony.
24      Q.   That's accurate?
25      A.   That is my testimony.

176

T. FABACHER

1
2    Q.   Okay.
3       A.   Speculating that I'm lying?
4       Q.   No.  I was just trying -- no, I
5    wasn't -- I -- sir, I was not trying to --
6       A.   Okay.  Fine.
7       Correct?  I read 350.  I have it
8    on the record.
9       Q.   That's fine.  If you could go back
10   to page nine --
11      A.   Okay.
12      Q.   -- where it says, if it does exist
13   -- if they do exist -- where it starts
14   saying, if they do exist, is that sentence
15   true?
16      A.   Okay.  I'll read the sentence.
17      MR. MILLS:  Objection.
18      A.   (Perusing document.)
19      If they do exist, Fabacher's
20   standard practice does not entail reviewing
21   them before endorsing the (sic) affidavit of
22   merits (sic).
23      So, let -- let me -- because let's
24   read this sentence --
25      Q.   Well, let -- I withdraw the

44 (Pages 173 to 176)

177

T. FABACHER
1
2  question.
3      Let me just ask -- let me just ask
4  you.  What's the process like in filing --
5  signing -- filing -- tell me about the
6  process that you go through in signing the
7  affidavits of merit?  Let me just ask you
8  straightaway.
9      A.  Okay.
10     Q.  Tell me what --
11     A.  I'm a --
12     Q.  -- the process is?
13     A.  -- I approach the affidavits.  So,
14 I maintain, you know.  And we -- when we get
15 the data, I would get it.  And then I would
16 look at this.  And I would look in -- in --
17 in Debtmaster.
18     Q.  So, you -- are you saying you
19 would compare the information in the printed
20 affidavit of merit and make sure the
21 information in the affidavit of merit
22 matches what's on the computer screen from
23 Debtmaster, correct?
24     A.  That would be one thing.
25     Q.  What else?  What else would you

178

T. FABACHER
1
2  normally do in executing the affidavits of
3  merit?
4      A.  I would read -- I would attempt to
5  read the retail charge agreement.
6      Q.  You would attempt to do that.  If
7  you sign a batch -- let me go back.  When
8  you say you -- 50 at a time, what do --
9      A.  No.
10     Q.  -- you mean --
11     A.  I didn't say 50 at a time.
12     Q.  Go ahead.
13     A.  I said a maximum of 50.  And this
14 is what we ran into last time.  I -- he
15 said, would you search at least one?  I
16 said, yes.  So, then what does the judge
17 write?  He only reads one -- which is total
18 bullshit.
19     You got -- I'm not getting myself
20 put in this hole again, sir.
21     Q.  I --
22     A.  You guys stuck me last time.  And
23 I'm not going to do it.
24     Q.  I didn't -- stuck me last time.  I
25 wasn't involved in Sykes.

179

T. FABACHER
1
2      A.  Because half of this stuff is
3  inaccurate.
4      Q.  Okay.  All right.  So, you signed
5  350 affidavits of merit a week, correct?
6      A.  That's correct.
7      Q.  Okay.  Tell me about the normal
8  process about when do you sign them?  You
9  sign them -- you said no more than 50 a day,
10 or -- you --
11     A.  No.
12     Q.  -- tell me.
13     A.  I said 50 at a time.
14     Q.  What do you mean by at a time?
15     A.  They would never present me -- I
16 refused to sign more than 50 at a batch.
17 And a batch is at one time.
18     Q.  I see.  So, you might sign more
19 than one batch a day, you're just reading it
20 in one batch?
21     A.  Potentially, yes.
22     Q.  But I'm just asking because --
23     A.  Yeah, sure.  Potentially.
24     Q.  Okay.  So, you signed a batch --
25 no more than 50 at --

180

T. FABACHER
1
2      A.  That's correct.
3      Q.  -- per batch?  Okay.  Now, tell me
4  the normal process you go through in
5  executing the affidavit of merit?
6      MR. MILLS:  Objection.
7      A.  Okay.  So, I would read the
8  affidavit --
9      Q.  Yes.
10     A.  -- like I've done here.  I would
11 validate the data.  And I would check if --
12 for example, if we had the retail charge
13 agreement, I would read the retail charge
14 agreement.  I would read -- (perusing
15 documents) -- I would read the chain of
16 title if it was available.  And all of these
17 vary.
18     Q.  I'm just asking for typically.
19 Just --
20     A.  Can't do it typically, sir.  I --
21 I can't -- I'm not -- I -- with HIPAA laws
22 with medical, I'm not able to read the
23 patient -- I mean you can't say typically,
24 sir.  It's -- it's -- because it's against
25 the law for me to read the medical

45 (Pages 177 to 180)

181

T. FABACHER
1       T. FABACHER
2   conditions for a HIPAA case. And I didn't
3   -- you know -- it's -- it's -- it's not a
4   typical situation.
5       Q. All right. So, do you normally --
6   when you do 350 affidavits of merit a week,
7   do you normally do them spread out over the
8   week? Do you normally do them on the same
9   day? Normally, how --
10      A. I would --
11      Q. -- does it --
12      A. -- I would do -- I -- I would
13  never do more than 50 a batch. And usually
14  I would do -- I would spread it throughout
15  the week.
16      Q. How many batches would you
17  normally do in a day?
18      A. I don't recall. It's -- it
19  varies. Sometimes one, sometimes more.
20      Q. Sometimes -- what's the range that
21  you would normally -- the batches that you
22  would normally do in a day?
23      A. I -- I can't -- I don't recall. I
24  -- this was ten -- over ten years. But not
25  more than a few.

182

1       T. FABACHER
2       Q. And not more than a few batches of
3   up to 50 a day?
4       A. I don't -- I don't recall.
5       Q. All right. Now, just -- looking
6   at my iPhone -- 350 divided by five is 70.
7   So, on average, you would do 70 affidavits
8   of merit a week -- a day -- excuse me --
9   right?
10      A. Okay.
11      Q. All right. So, how long do you
12  spend typically on each affidavit of merit?
13      MR. MILLS: Objection.
14      A. It depends on the affidavit of
15  merit. It depends on the affidavit of
16  merit.
17      Q. All right. I'm just -- if you're
18  doing 70 a day, I'm trying to see if you
19  normally just check the data from the
20  affidavit of merit with the screen? Is that
21  the normal process that you take when you
22  sign an affidavit of merit?
23      A. It's included.
24      Q. But is that the normal process
25  you'd take?

183

1       T. FABACHER
2       MR. MILLS: Objection.
3       A. It's not possible because you also
4   have -- there's -- there's other documents.
5   You have credit card statements. You have
6   chain of titles. You have credit card
7   agreements.
8       Q. I understand that the database --
9   the system has some of that information.
10  But if you're doing 70 a day, on average --
11      A. Okay.
12      Q. -- and 20 --
13      A. Each one --
14      Q. -- 20 percent of your day is doing
15  coding, 30 to 70 percent is doing management
16  information systems, it's not leaving a
17  whole bunch of time on a -- on a typical day
18  to do 70 affidavits of merit. So --
19      A. I don't know what -- see you're --
20      MR. SCHER: Wait for a question.
21      THE WITNESS: Well, no. He's --
22  he's --
23      MR. SCHER: Wait for a question,
24  please.
25      Q. Given that you -- not the only job

184

1       T. FABACHER
2   you do, the -- for most, the large majority,
3   90 percent-plus of the affidavits of merit
4   that you signed, you just compare the
5   information in the affidavit of merit with
6   what's on the Debtmaster screen; is that
7   true?
8       A. Ninety percent? No, that's not
9   true.
10      Q. How often?
11      A. I -- you know, it's not. You gave
12  me a number, 90 percent. And that is not
13  accurate.
14      Q. Okay. What is the accurate
15  amount?
16      A. I could -- don't know. It depends
17  on the affidavit. Is it a medical case? Is
18  it a health case? Is it a credit card case?
19      Q. Well, the vast -- like, 98
20  percent-plus of the collection lawsuits
21  filed by Mel Harris are for collect -- debt
22  -- credit card accounts, right?
23      A. I'm not --
24      MR. MILLS: Objection.
25      A. -- aware of that, no.

46 (Pages 181 to 184)

185

T. FABACHER
1
2     Q.   Well, you signed the affidavits of
3  merit, right?
4           MR. MILLS:  Objection.
5     Q.   You -- you would know because you
6  signed the affidavits --
7     A.   If you're --
8     Q.   -- of merit --
9     A.   -- asking me if it's a 98 percent,
10  98.1 percent?  No, I'm not aware of the
11  exact percentage.
12    Q.   But --
13          MR. MILLS:  Objection before that
14     previous answer.
15    Q.   But I mean you would -- would you
16  agree or not that almost all of the lawsuits
17  that Mel Harris files are for collection of
18  credit card debts?
19          MR. MILLS:  Objection.
20          MR. LICHTMAN:  Objection.
21          MR. SCHER:  Objection.
22    A.   I think it's speculation.  No.
23    Q.   You don't know?
24    A.   No, that's -- that's -- line of
25  credits, it's speculation.  That's -- no,

186

T. FABACHER
1
2  that's not accurate.
3     Q.   You don't know one way or the
4  other?
5     A.   Right.
6     Q.   All right.
7     A.   Telephone bills, it's not
8  accurate.
9     Q.   I'm just asking, do you know one
10  way or the other --
11    A.   No.
12    Q.   -- if --
13    A.   I do not.
14    Q.   That's all on --
15    A.   Yeah.
16    Q.   All right.  The chain of title, if
17  available, do you know if chain of title
18  were typically available for the -- when you
19  sign affidavits of merit?
20          MR. MILLS:  Objection.
21    A.   Typically, yes.
22    Q.   Okay.  And how many pages is a
23  chain of title?
24    A.   It depends how many are in the
25  chain.

187

T. FABACHER
1
2     Q.   Normally, how many -- what's the
3  range?
4     A.   Could be one, could be three.
5     Q.   Okay.  And a chain of title would
6  be sold from the original creditor to one
7  debt buyer to another debt buyer, ultimately
8  to the plaintiff who files the lawsuit,
9  right?
10    A.   That's inaccurate.
11    Q.   In what way is that inaccurate?
12    A.   It could also go to another bank.
13    Q.   Yes?
14    A.   One bank acquires another bank.
15    Q.   Yes?  Anything else that would
16  make that inaccurate?
17    A.   Depend -- I'd have to look at it.
18  I don't -- I don't recall.  But I could tell
19  you that it was not -- that was not an
20  accurate statement.
21    Q.   All right.  And what does chain of
22  title say?
23          MR. MILLS:  Objection.
24    A.   I don't -- it's been ten years.
25  How am I going to remember what a change of

188

T. FABACHER
1
2  title said?
3     Q.   All right.  What's a retail charge
4  agreement?
5           MR. MILLS:  Objection.
6     Q.   You used the term yourself, and --
7     A.   Yes.
8     Q.   I didn't know what that meant.
9  So, I'm just wondering what you meant?
10    A.   A retail charge agreement is an
11  agreement that -- that is between the -- the
12  credit card holder and -- and the
13  credit-issuing institution.
14    Q.   The card member agreement?
15    A.   That's correct.
16    Q.   But you don't know if a specific
17  card member agreement relates to a specific
18  consumer when you sign an affidavit of
19  merit, correct?
20          MR. MILLS:  Objection.
21    A.   That's inaccurate.
22    Q.   In what way is that inaccurate?
23    A.   The banks have their retail credit
24  card agreements by time.  So, we are able to
25  know at a particular time what credit card

47 (Pages 185 to 188)

189

T. FABACHER

1  agreements are applied to the bank.
2      Q.  You mean the way it should work.
3  But you don't know specifically if that's
4  the card member agreement that Miss Bueno
5  had, for example?
6          MR. MILLS:  Objection.
7      A.  Again, I -- I -- I gave you my
8  testimony.  My understanding is that the --
9  the credit card agreement for that time,
10  what is universal.  That is my
11  understanding.
12      Q.  Okay.  But you don't know if a
13  specific credit card agreement is
14  specifically tied to Miss Bueno, for
15  example, or Mr. Guzman; is that true?
16          MR. MILLS:  Objection.
17      A.  It depends on the case.  You know,
18  sometimes -- sometimes we do.  It depends.
19      Q.  The chain of title that you're
20  talking about, they don't specifically
21  reference the consumer for whose affidavit
22  of merit you signed, correct?
23      A.  No, they do not.
24      Q.  Okay.  So, looking at the chain of

190

T. FABACHER

1  title, you don't know one way or the other
2  whether that chain of title includes the
3  consumer like Mr. Guzman or Miss Bueno?  You
4  don't know if that specific chain of title
5  applies to that, right?
6      A.  No, that's --
7          MR. MILLS:  Objection.
8      A.  -- inaccurate.
9      Q.  In what way is it inaccurate?
10      A.  In the -- because the chain of
11  title references an electronic file.
12      Q.  Yes.  And?
13      A.  It's on the -- it's part of the --
14  the -- of the chain of title.
15      Q.  I know.  But nothing in the chain
16  of title says Miss Bueno or Mr. Guzman,
17  right?
18          MR. MILLS:  Objection.
19      Q.  It says one company sold a batch
20  of debt to another --
21      A.  No.  It references --
22          MR. MILLS:  Objection.
23      A.  -- it references a -- my -- I -- I
24  -- I don't remember.  It -- it -- my

191

T. FABACHER

1  understanding is that it referenced a -- a
2  portfolio with -- with -- that references a
3  file, that it's in the file.
4      Q.  What do you mean --
5      A.  I --
6      Q.  -- by that?  References a file
7  that's in the file --
8      A.  No.  I mean -- I'm sorry -- it --
9  it references an electronic file -- I --
10  from the best of my memory.
11      Q.  Well, do you remember one way or
12  the other if when you get a chain of title
13  if it says the name Miss Guzman (sic) -- LR
14  Credit 14 sold the Guzman account to LR 6,
15  who sold it to LR 18?  Do you know -- the
16  chain of title doesn't reference the
17  specific consumer, right?
18      A.  It --
19          MR. MILLS:  Objection.
20      A.  -- references a file.
21      Q.  It references a file.  And a file
22  is what?
23      A.  It's a file.
24      Q.  A spreadsheet?

192

T. FABACHER

1      A.  It's electronic representation --
2  it's an electronic representation of data
3  strings.
4      Q.  Spreadsheet of data?  The name,
5  address, phone --
6      A.  It's not --
7      Q.  -- number --
8      A.  -- a spreadsheet.
9      Q.  It's information such as name,
10  address, phone number, date of birth, things
11  like that, right?
12      A.  And more.
13          MR. KESHAVARZ:  Let's go off the
14  record for a second.
15          (Whereupon, a short recess was
16  taken.)
17      Q.  Back on the record.  Okay.  So,
18  the computer program at Mel Harris's system
19  generates a judgment packet, correct?
20      A.  What is a packet?
21      Q.  Is a judgment packet included in
22  an affidavit of merit -- well, strike that.
23          The documents that are generated
24  like the affidavit of merit, is that --

48 (Pages 189 to 192)

193

T. FABACHER
1
2     A.   Which -- which exhibit are we
3   talking about?
4     Q.   Three.
5     A.   Exhibit 3.  Okay.
6     Q.   Is that generated by using
7   something called a fixed document with --
8   with fields?
9     A.   I mean -- I don't -- I mean --
10  does it have fields?  I think -- are you
11  talking about the database, or are you
12  talking about the document?
13    Q.   Well, why don't we do this.  Does
14  Exhibit 3 and 7, the -- no -- excuse me -- 3
15  and 5, the affidavits of merit --
16    A.   So, this is yours.  Hold on.  Let
17  me give you that back -- (handing and
18  perusing documents) -- so, Exhibits 3 and 5.
19    Q.   Okay.  That's generated by using a
20  -- basically a mail merge system, correct?
21  In layman's terms.
22    A.   Very simplification of it.  I'll
23  go with yes.
24    Q.   Okay.
25    A.   Very simplification.

194

T. FABACHER
1
2     Q.   And it merges information about an
3   account in some sort of form -- into some
4   sort of form --
5     A.   String.
6     Q.   -- string -- form -- whatever --
7   and that generates Exhibit 3 and 5, correct?
8     A.   That's correct.
9     Q.   All right.  And that's the only
10  source of generating 3 -- Exhibits 3 and 5,
11  correct?
12    A.   What do you mean by the only
13  source?
14         MR. MILLS:  Objection.
15    Q.   This mail merge is the source of
16  the information that leads to Exhibit 3 and
17  5 being signed; is that true?
18    A.   Oh --
19         MR. MILLS:  Objection.
20    A.   -- absolutely not.
21    Q.   In what way is it not true?
22    A.   We drafted the . . .
23    Q.   Go ahead.
24    A.   The paralegal would draft
25  affidavits sometimes.

195

T. FABACHER
1
2     Q.   Yes?
3     A.   You know -- you know, we would --
4   we would manually -- sometime I would
5   manually type them.
6     Q.   Yes?  Is that it?
7     A.   Yeah.  We would . . .
8     Q.   Other than that, that -- it would
9   be a true statement?
10         MR. MILLS:  Objection.
11    Q.   The mail merge would --
12    A.   Okay.
13    Q.   Go ahead.
14    A.   Yeah.  I mean they would -- you
15  either -- we either manually did it, or we
16  did it in the -- in the software.
17    Q.   And the -- that mail merge system
18  is the only source of the information --
19    A.   I --
20    Q.   -- that generates the affidavit of
21  merit that's Exhibit 3 and 5?
22    A.   That's --
23         MR. MILLS:  Objection.
24    A.   -- inaccurate.
25    Q.   In what way?

196

T. FABACHER
1
2     A.   I just said.  It -- sometimes we
3   manually type them.
4     Q.   Okay.  Anything else?
5     A.   Well, how else am I going to --
6   how else --
7     Q.   And, again --
8     A.   Yes, sometimes they're manually
9   typed.  I don't know how else -- I did not
10  handwrite them.
11    Q.   Got it.  Thank you.  All right.
12    A.   So, the only way?  No.
13    Q.   Because sometimes you manually do
14  it?
15    A.   Sometimes you manually do it.
16  Sure.  Of course.
17    Q.   All right.  Thank you.
18         MR. KESHAVARZ:  Let's mark this as
19  Exhibit 8.
20         (Whereupon, the aforementioned
21  data file produced by LR Credit in the
22  Guzman case (about 45 pages) was marked
23  as Plaintiff's Exhibit 8 for
24  identification as of this date by the
25  Reporter.)

49 (Pages 193 to 196)

197

T. FABACHER

1  Q.  (Perusing document.)
2  I'm showing you what's been marked
3  as Exhibit 8.  It's a document that's been
4  produced by LR Credit in the Guzman case.
5  When you spoke a few minutes about a data
6  file that's associated with the bills of
7  sale, do you mean -- and I said, do you mean
8  a spreadsheet, and you said, no, I mean a
9  data file.  Is Exhibit Number 8 the type of
10  data file that you mean?
11  MR. LICHTMAN:  Objection.
12  A.  I have to look.
13  Q.  Take your time.
14  A.  (Perusing document.)
15  Okay.  Could you ask the question
16  again?
17  Q.  Sure.  Is Exhibit Number --
18  MR. SCHER:  8.
19  Q.  -- 8 the type of -- is it
20  information that's in that data file that
21  you were mentioning being transferred with
22  the chain of accounts -- chain of title?
23  MR. MILLS:  Objection.
24  A.  No.  It's not.

198

T. FABACHER

1  Q.  Do you know what Exhibit 8 is?
2  A.  It looks like data.
3  Q.  Do you know if Exhibit 8 is used
4  in some manner --
5  A.  I -- I wouldn't know --
6  Q.  -- by Mel Harris --
7  A.  -- that would be speculation on my
8  part.
9  Q.  -- by Mel Harris?
10  A.  No.  I --
11  MR. MILLS:  Objection.
12  A.  -- no.  I don't know.  It's
13  speculation.
14  Q.  You don't know?
15  A.  Yeah, I don't know.
16  Q.  That's fine.
17  A.  It could have been manually
18  entered.  It could have been copied.  I
19  don't -- I don't know.
20  Q.  Okay.
21  A.  But that would not be --
22  that's . . .
23  Q.  That would not be what?
24  A.  That -- it's not -- this is not a

199

T. FABACHER

1  file.
2  Q.  Okay.  What information is in the
3  file that you -- that is not in Exhibit 8,
4  or that is in Exhibit 8?
5  MR. MILLS:  Objection.
6  MR. LICHTMAN:  Objection.
7  MR. SCHER:  Objection.
8  A.  Excuse me?
9  (Whereupon, an off-the-record
10  discussion was held, and a portion of
11  the testimony was read back.)
12  Q.  So, what basically I'm trying to
13  get at is the data file that you talked
14  about that goes into the affidavit of merit,
15  right?
16  MR. MILLS:  Objection.
17  A.  Say that again?
18  Q.  Strike that.  Just let's move on
19  from the line.
20  (Whereupon, an off-the-record
21  discussion was held.)
22  MR. KESHAVARZ:  Now, let's go off
23  the record so I can check my notes, and
24  I think we're done.

200

T. FABACHER

1  (Whereupon, a short recess was
2  taken.)
3  Q.  Okay.  Back on the record.  I'm
4  just going through a checklist of --
5  A.  Sure.
6  Q.  -- final questions I have.  We
7  talked all the way at the beginning of the
8  deposition about what steps you took to
9  determine if you had any of the documents
10  asked for in the subpoena.  And one thing
11  you did to check was check your Gmail
12  account, correct?
13  A.  That's correct.
14  Q.  Did you take any other steps to
15  determine whether you had or had access to
16  any of the documents that were subpoenaed to
17  be brought here today?
18  A.  I looked.  I have a little storage
19  closet -- and -- and just double-checked.
20  But I -- I knew I didn't but I -- I -- I
21  did check but I did not.
22  Q.  Okay.
23  A.  The only -- only time I had -- I
24  had one.  They -- I was in a room.  They

50 (Pages 197 to 200)

201

T. FABACHER

1 dropped it. I read it. And that was it.
2 No changes --
3 Q. Okay.
4 A. -- no changes, no nothing.
5 Q. Did you take any other steps to
6 look for documents?
7 A. No.
8 Q. Okay. Did you ask your other law
9 firm that represented you in the Sykes case
10 to give you a copy of the transcript from
11 your deposition?
12 A. No, I did not.
13 Q. Okay. When you got the subpoena
14 in this case, what is the first thing that
15 you did?
16 A. I looked in my e-mail for -- did
17 you call me?
18 Q. (Indicating.)
19 A. You did.
20 Q. That was the first -- yeah.
21 A. And said check your e-mail, thank
22 you, come on in, do the best you can.
23 Q. Was I nice to you?
24 A. You were very nice.
25

202

T. FABACHER

1 Q. All right. So, are you paying Mr.
2 Scher to represent you today?
3 A. I don't know. Actually, to be
4 honest with you -- he's not going to be --
5 no -- well, actually -- I don't know. We
6 haven't worked it out. I think he's here on
7 his own. I didn't -- we don't have a -- me
8 personally? No, I'm not.
9 Q. Do you know who might be?
10 A. No, I don't.
11 Q. All right. How did you get Mr.
12 Scher to represent you for your deposition
13 today?
14 A. I didn't even know he was coming.
15 Q. All right.
16 A. I found out. And he basically --
17 the e-mail said, I'll see you there. I'm,
18 like, oh, okay. I was going to come by
19 myself.
20 Q. Other than speaking with me, did
21 you speak with anyone else about the -- the
22 subpoena that you got --
23 A. No.
24 Q. -- on the deposition? Okay. Now,
25

203

T. FABACHER

1 the data that was all in Mel Harris's
2 database, I believe you want to call it the
3 system, do you know if the information -- do
4 you know where that information is now?
5 A. No.
6 Q. Do you know if some of that
7 information has been transferred to Einstein
8 law -- Einstein & Associates law firm? Do
9 you know?
10 A. I -- I -- I -- I left Mel Harris
11 almost four years before. So, I -- I -- I
12 was not part of any -- you know -- I was not
13 there when they transferred, or anything
14 like that.
15 Q. But do you know if information was
16 transferred from Mel Harris to Einstein, or
17 do you not know?
18 A. The -- the gentleman -- I do know
19 Dick -- Dick -- I know his first name was
20 Dick. I don't know his last name. But he
21 passed away.
22 Q. Was he the tech guy at --
23 A. He is the tech guy.
24 Q. -- at Mel Harris --
25

204

T. FABACHER

1 A. At Mel Harris. And he came over,
2 and then he passed away. So, you're out of
3 luck on that one. And he did the conversion
4 to -- I -- so, he's the only one that would
5 know. And he's dead.
6 Q. Well, I can't depose him.
7 A. You can't depose him.
8 Q. But you didn't --
9 A. And he had run Mel Harris
10 throughout the entire Sykes case -- through
11 the Sykes case. I -- I did not prepare any
12 of the materials. Dick did all of that.
13 Q. All right. But do you know one
14 way or the other --
15 A. I don't know.
16 Q. -- well, listen to the question --
17 A. Oh.
18 Q. -- if information was transferred
19 from the Mel Harris law firm to the Einstein
20 firm? Do you know one way --
21 A. I don't know.
22 Q. -- or the other? Okay. It's --
23 fair enough.
24 A. Yeah.
25

51 (Pages 201 to 204)

205

T. FABACHER

2 Q. Was there any particular reason
3 why you left Mel Harris?
4 A. I wanted to open up my own -- to
5 do mobile apps.
6 Q. So -- and just very briefly, what
7 do you do now?
8 A. I am the CEO of Digital
9 Pomegranate.
10 Q. I should look at your --
11 A. It's right there. Digital
12 Pomegranate is a -- a project for USAID and
13 World Bank. So, I decided to volunteer my
14 -- well, not volunteer -- but actually turn
15 it into a company. And it's kind of like a
16 Peace Corps. So -- yeah --
17 Q. Okay.
18 A. It's nice -- helping out poor
19 countries, I guess.
20 Q. Did you ever work for any of the
21 original creditors referenced in the
22 affidavits of merit like Sears, Chase Bank?
23 A. No.
24 Q. Were you ever a custodian of
25 records for the original creditors like

206

T. FABACHER

2 Sears or --
3 A. No. No, I was not.
4 MR. KESHAVARZ: All right. All
5 right. That's all I have. I pass you
6 to the opposing counsels, and they get
7 to ask you up to seven hours of
8 questions.
9 (Whereupon, an off-the-record
10 discussion was held while counsel
11 changed seats.)
12 MR. KESHAVARZ: Before the
13 questions start, can you try to pause
14 for a second between when he asks you a
15 question and when you answer, in case I
16 need to say objection, okay?
17 THE WITNESS: All right.
18 EXAMINATION BY
19 MR. MILLS:
20 Q. Mr. Fabacher, my name is Benjamin
21 Mills. I represent LR Credit 13, LLC in the
22 Guzman action, and LR Credit 18, LLC in the
23 Bueno action. I want to just turn your
24 attention back to Exhibits 3 and 5 that we
25 talked about today.

207

T. FABACHER

2 A. (Perusing documents.)
3 Okay.
4 Q. And you recognize, these are the
5 affidavits of merit?
6 A. I do.
7 Q. And one of them is LR Credit 13
8 versus Jose Guzman. That's Exhibit 3, I
9 think -- sorry -- it's Exhibit 5. And the
10 other one is LR Credit 18 against Agustina
11 Bueno. Those are the two affidavits you
12 have in front of you?
13 A. That's correct.
14 Q. Okay. We discussed -- you
15 discussed that the affidavits -- both
16 affidavits include a statement from you that
17 you were the authorized and designated
18 custodian of records for the plaintiff in
19 each action; is that correct?
20 A. That's correct.
21 Q. Okay. And you understand what
22 custodian of records means?
23 MR. KESHAVARZ: Objection to form.
24 A. I do.
25 Q. All right. How did you -- how did

208

T. FABACHER

2 you come to become the custodian of records
3 for the plaintiff in those actions?
4 A. I became -- I maintained the
5 database. And so, they -- they asked me to
6 be the custodian of records.
7 Q. Who is they when you refer --
8 A. I don't remember.
9 Q. Was it a person who asked you?
10 A. I believe it was.
11 Q. Let me --
12 A. Yeah, I don't -- I believe it was
13 Mel Harris.
14 Q. You believe Mel Harris asked you
15 to serve as custodian of record for LR
16 Credit 13 in the Guzman action, and LR
17 Credit 18 in the Bueno action; is that
18 correct?
19 A. That's correct.
20 Q. Okay. Did anybody else speak to
21 you about your role as custodian of records
22 aside from Mel Harris?
23 A. I don't recall.
24 Q. Anybody from LR Credit 13?
25 A. No.

52 (Pages 205 to 208)

209

```
 1              T. FABACHER
 2      Q.  Anybody from LR Credit 18?
 3      A.  No.
 4      Q.  Did you ever speak to anybody who
 5   worked for LR Credit 13?
 6      A.  Never.
 7      Q.  Did you ever speak to anybody who
 8   worked for LR Credit 18?
 9      A.  Never.
10      Q.  So, it's fair to assume nobody
11   from LR Credit 13 -- is it fair to assume
12   that nobody from LR Credit 13, LLC assisted
13   you in drafting the affidavit of merit in
14   the Guzman action?
15          MR. KESHAVARZ:  Objection to form.
16      A.  Could you repeat the question?
17      Q.  Okay.  Sure.  Is it fair to assume
18   that nobody who worked at LR Credit 13
19   assisted you in drafting the affidavits of
20   merit in the Guzman action?
21          MR. KESHAVARZ:  Objection.
22          Form.  Calls for speculation.
23      A.  That's accurate.
24      Q.  And the same question as to LR
25   Credit 18 as to the Bueno action?
```

210

```
 1              T. FABACHER
 2          MR. KESHAVARZ:  Objection.
 3          Form.
 4      A.  That's accurate.
 5      Q.  So, nobody from LR Credit 13, LLC
 6   instructed you to create the document of --
 7   affidavit of merit in the Guzman action?
 8          MR. KESHAVARZ:  Objection to form.
 9      A.  That's correct.
10      Q.  And the same question I'll ask,
11   the LR Credit 18 in the Bueno action?
12          MR. KESHAVARZ:  Objection.
13          Form.
14      A.  Correct.
15      Q.  And you never discussed -- you
16   never -- you never discussed Jose Guzman
17   with anybody at LR Credit 13, correct?
18      A.  The particulars of the case?
19      Q.  Correct.
20      A.  That's correct.
21      Q.  And I have the same question as to
22   LR Credit 18 in the Bueno action.  You --
23   you never discussed Mrs. -- or Miss Bueno
24   with anybody at LR Credit 18, correct?
25      A.  That's correct.
```

211

```
 1              T. FABACHER
 2          MR. MILLS:  Nothing further.
 3          MR. LICHTMAN:  I just have a
 4      couple.
 5   EXAMINATION BY
 6   MR. LICHTMAN:
 7      Q.  Good afternoon, Mr. Fabacher.  My
 8   name is Jeffrey Lichtman.  I am representing
 9   Samserv, Inc. and William Mlotok in the
10   Guzman case, and in the Bueno case.
11          Did you ever participate in any
12   discussions with anyone at Samserv, Inc.
13   with regard to service of process in
14   connection with any case that was brought by
15   the Mel Harris law firm?
16      A.  What -- what -- can you be
17   specific?  Like, what do you mean?  Like,
18   any discussion?
19      Q.  Yes.  Did you have any discussions
20   with anyone at Samserv about their service
21   of process on behalf of Mel Harris?
22      A.  So, again -- so, their -- about
23   their service.  Like, their -- their -- what
24   do you mean about their service of process?
25      Q.  About the method of service or
```

212

```
 1              T. FABACHER
 2   process --
 3      A.  No.
 4      Q.  -- in that -- cases.
 5      A.  No.
 6      Q.  When you did speak to people at
 7   Samserv, Inc. what was the general topics of
 8   conversation?
 9      A.  The only --
10          MR. KESHAVARZ:  Objection to form.
11      A.  -- the only person I ever spoke to
12   was -- was Bill, Bill Mlotok.
13      Q.  Okay.  And -- and what was the
14   general nature of the conversation?
15          MR. KESHAVARZ:  Object to the
16      form.
17      A.  How are you doing.
18      Q.  So, they were all personal in
19   nature?
20      A.  All personal in nature.  I -- I
21   can't -- I do remember one or two things
22   like -- no, I -- I -- I can't remember any
23   particular -- it wasn't my area.  So, I
24   didn't -- again, that was all
25   pre-litigation.  It wasn't my area.
```

53 (Pages 209 to 212)

213

T. FABACHER

1
2     Q.  Okay.  So, just to summarize, tell
3   me if I'm saying this correctly, that
4   because the service of process function
5   happened earlier in the case as opposed to
6   post-judgment, that was not an area that you
7   would get involved with in the context of
8   your -- your working for Mel Harris, fair?
9     A.  It's -- okay.  I remember one
10   conversation about taking photos.  That was
11   it.
12     Q.  Okay.  What --
13     A.  So --
14     Q.  -- was that conversation about?
15     A.  That was, basically, that Bill was
16   going to -- he asked some questions about
17   the GPS, if he could do the GPS and take the
18   photos.
19     Q.  Okay.  So, just then to frame this
20   so that we could have a better transcript,
21   was there a time at which process servers
22   for Samserv were equipped with a type of
23   device that would allow them to record GPS
24   data when they were serving process?
25     A.  Correct.

214

T. FABACHER

1
2     Q.  And by GPS data, we mean some type
3   of digital record of a location where the
4   process server was at the time of serving
5   process?
6     A.  From my understanding, correct.
7     Q.  And then this would be stored
8   somewhere so it could corroborate exactly
9   where the process server was in connection
10   with a particular job that was attached to a
11   specific location, correct?
12     A.  As -- as the -- as the phone
13   company report, correct.
14     Q.  Okay.  And other than that, do you
15   remember having any conversations other than
16   hello, how are you, and GPS conversations
17   with Mr. Mlotok?
18     A.  Nothing.  Again, it wasn't my
19   area.  No, I can't really recall much.
20     MR. LICHTMAN:  Okay.  Thank you
21   very much.
22     MR. KESHAVARZ:  Just -- just
23   quickly.  And I'll say it really loud.
24     Do you know who had the main
25   relationship at Mel Harris with

215

T. FABACHER

1
2   Samserv, or do you know?
3     THE WITNESS:  No, I don't know.
4   That wasn't my area.
5     MR. KESHAVARZ:  Okay.  That's it.
6     MR. SCHER:  Good?
7     MR. KESHAVARZ:  Yes.
8     Off the record.
9     (Whereupon, at 4:37 p.m., the
10   examination of this witness was
11   concluded.)
12

13   _____
   TODD FABACHER
14

15

16   Subscribed and sworn to before me
17   this _____ day of _____ 20__.
18

19   _____
   NOTARY PUBLIC
20

21

22

23

24

25

216

1     T. FABACHER
2       E X H I B I T S
3
4   PLAINTIFF EXHIBITS:
5   EXHIBIT   EXHIBIT
6   NUMBER    DESCRIPTION        PAGE
7   1    Fabacher subpoena      4
       in Guzman action
8
9   2    Fabacher subpoena      4
       in Bueno action
10   3    Affidavit of Merit     72
       (LR Credit 18, LLC
11       vs. Agustina Bueno)
12   4    Opinion in Monique     84
       Sykes  vs. Mel
13       Harris
14   5    Affidavit of Merit    105
       (LR Credit 13, LLC
15       vs. Jose Guzman)
16   6    Todd Fabacher         146
       LinkedIn page
17
18   7    Affidavit of          159
       service (LR Credit
       18, LLC vs.
19       Agustina Bueno)
20   8    Data file produced    196
       by LR Credit in the
21       Guzman case (about
       45 pages)
22
23   (Exhibits retained by Counsel.)
24
25

54 (Pages 213 to 216)

217

1              T. FABACHER
2                I N D E X
3
4     EXAMINATION BY          PAGE
5     MR. KESHAVARZ            4
6     MR. MILLS               206
7     MR. LICHTMAN            211
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

218

1              T. FABACHER
2            C E R T I F I C A T E
3
4     STATE OF NEW YORK )
               : SS.:
5     COUNTY OF KINGS   )
6
7        I, RICHARD AURELIO, a Notary Public for
8     and within the State of New York, do hereby
9     certify:
10       That the witness whose examination is
11    hereinbefore set forth was duly sworn and
12    that such examination is a true record of
13    the testimony given by that witness.
14       I further certify that I am not related
15    to any of the parties to this action by
16    blood or by marriage and that I am in no way
17    interested in the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto set
19    my hand this 18th day of April 2017.
20
21
22

23    _____
              RICHARD AURELIO
24
25

55 (Pages 217 to 218)

**A**

**able (5)**
8:2 11:25 21:24
180:22 188:24
**absolutely (1)**
194:20
**access (10)**
38:13,24 39:3,12,16
157:9 161:16,23
170:4 200:16
**accessed (1)**
39:19
**accessible (1)**
165:5
**accessing (1)**
38:22
**account (23)**
33:23 34:3,15,22
35:9 36:15 39:15
39:16,20 55:20
107:17 112:13,21
144:17 166:16
168:15 169:17
171:4,5,21 191:15
194:3 200:13
**accounts (14)**
41:2 120:9 121:18
122:5 126:7 131:22
132:12,21 171:20
172:3 173:8,24
184:22 197:23
**accuracy (4)**
173:3,8,10 174:3
**accurate (19)**
67:10 98:24 99:3
119:6,14,21 165:25
170:8,25 174:19
175:22,24 184:13
184:14 186:2,8
187:20 209:23
210:4
**acquire (1)**
55:8
**acquires (1)**
187:14
**action (24)**
1:5,12 2:11,11 13:5

13:16 28:19 83:20
123:24 126:15
206:22,23 207:19
208:16,17 209:14
209:20,25 210:7,11
210:22 216:7,9
218:15
**actions (3)**
2:5,16 208:3
**active (2)**
149:17 163:13
**actual (2)**
21:16 148:21
**addition (1)**
71:6
**address (5)**
33:2,4 129:14 192:6
192:11
**addresses (5)**
33:8,11,16 62:12,22
**administer (1)**
3:10
**admit (2)**
6:5,6
**affiant (12)**
95:23,23 96:5,8,9,10
96:11,16,23 97:11
97:24 98:10
**affidavit (75)**
31:2 71:23 72:20
73:4 77:25 80:12
83:24 95:16,22
96:25 97:14,20,25
99:16 100:15,17
102:6,8 103:8
104:4 105:17,25
106:9 111:22
112:11 114:9,10,11
124:4,6,8,11 126:18
128:25 129:22
130:5 132:14 133:7
136:15 153:23
157:14 159:5,13
160:2 161:8 162:22
166:11,14 167:6,12
168:5 174:22
176:21 177:20,21

180:5,8 182:12,14
182:15,20,22 184:5
184:17 188:18
189:22 192:23,25
195:20 199:15
209:13 210:7
216:10,14,17
**affidavits (116)**
71:12,21 72:3,8
73:11,17 74:16
75:12,23 78:3,7,13
78:21 79:5,19 81:3
81:10,14,15,18,25
82:5 83:3,16 87:22
89:2,18 92:14 94:2
94:22 96:24 97:16
98:5,12 99:22
100:4,11,19 101:3,9
101:20 102:6,7,9,10
102:18,19 103:4,5
103:12,14,19
104:12,18 105:4
110:19,25 113:10
115:15,18 116:3,15
116:17,18 117:10
117:25 118:8,16
121:16 122:2,16,18
122:20 123:11
125:16 131:16
132:4 135:2 136:4
138:2,3,5,15 139:21
139:25 140:11,23
144:11 153:17,21
154:3 156:2 162:7
166:6 174:18,19,24
177:7,13 178:2
179:5 181:6 182:7
183:18 184:3 185:2
185:6 186:19
193:15 194:25
205:22 207:5,11,15
207:16 209:19
**affirmation (1)**
174:22
**affirmations (1)**
72:12
**affirms (2)**

123:17,19
**aforementioned (7)**
4:4 72:19 84:15
105:16 146:2 159:4
196:20
**afternoon (4)**
16:10,12 17:4 211:7
**agency (3)**
121:19 122:5 123:23
**agency's (1)**
122:8
**ago (8)**
45:3 53:2 66:6 68:11
70:14 113:23 119:5
119:12
**agree (18)**
6:17,21 7:7 11:3,23
13:9,18 22:25
23:19,22 25:3
89:25 94:25 95:4,8
168:19,24 185:16
**AGREED (2)**
3:4,19
**agreement (21)**
5:16 18:11 114:6
168:14 169:16,19
170:2,3 172:17
175:20 178:5
180:13,14 188:4,10
188:11,14,17 189:5
189:10,14
**agreements (7)**
170:16 171:22
172:12,13 183:7
188:24 189:2
**Agustina (7)**
1:10 72:21 159:6,14
207:10 216:11,19
**ahead (13)**
15:2 88:25 93:6,25
95:2 103:17 108:8
126:3 140:9 173:16
178:12 194:23
195:13
**Ahmad (7)**
1:22 2:4,7 6:15 9:23
16:13 17:5

**al (3)**
1:7,14 16:24
**allow (1)**
213:23
**allowed (1)**
85:11
**amount (4)**
69:11 72:7 106:20
184:15
**amounts (2)**
55:20 62:12
**ampersand (1)**
45:23
**answer (46)**
19:21 24:11 26:10,12
26:15 27:2 28:8
31:11 63:3 66:8,16
68:24 76:18,23
77:13 78:11,12
79:9 80:15 82:3
88:19,20 91:2,20
93:10 97:8,22
103:10,25 107:8
115:22 119:23
125:7 131:6 132:24
133:2 134:19
136:14 139:4
140:14 141:10
163:13 174:9 175:5
185:14 206:15
**answered (4)**
40:19 78:9 97:6
98:25
**answering (3)**
8:10 27:8,11
**answers (1)**
41:15
**anticipate (1)**
27:7
**anticipating (1)**
40:13
**anybody (7)**
208:20,24 209:2,4,7
210:17,24
**anyway (1)**
26:22
**Apartment (1)**

4:19
**apologize (4)**
40:10 61:24 131:19
167:19
**apparently (3)**
25:9 97:12 157:9
**application (1)**
154:6
**applications (2)**
56:17 154:8
**applied (2)**
52:18 189:2
**applies (3)**
22:16 153:16 190:6
**apply (1)**
152:23
**appreciate (4)**
4:22 25:11 57:24
142:20
**approach (1)**
177:13
**approximately (8)**
28:22 53:19 65:15,18
65:22 67:7,9 68:5
**apps (1)**
205:5
**April (2)**
1:16 218:19
**area (7)**
158:2,4 212:23,25
213:6 214:19 215:4
**arm (1)**
77:12
**arraignment (1)**
10:8
**array (1)**
76:24
**art (1)**
153:4
**articles (3)**
50:14,21 51:9
**articulate (1)**
27:2
**aside (6)**
38:25 82:19 102:14
171:14,14 208:22
**asked (16)**

22:24 23:19 40:15
58:2 68:17 78:9
88:18 97:6 102:15
125:6 164:12
200:11 208:5,9,14
213:16
**asking (48)**
22:20 23:9 31:21
37:12 39:8 40:20
58:2 64:19 66:7
67:4 68:12,13,14,19
70:8,11,12,15 74:18
75:2,3,15 76:16,23
77:11,21 79:14
91:14 93:7 105:10
114:21,25 119:11
128:17 134:8,13
135:5 139:8 141:6
141:8 144:24 149:4
162:14 171:15
179:22 180:18
185:9 186:9
**asks (2)**
30:11 206:14
**aspects (1)**
42:25
**asserted (3)**
12:16 80:11 94:19
**assignor (4)**
120:14 122:8 126:10
131:25
**assisted (2)**
209:12,19
**associated (1)**
197:7
**Associates (4)**
1:7,14 146:24 203:9
**assume (7)**
5:4 27:19 28:5 150:2
209:10,11,17
**assuming (1)**
50:25
**assumption (1)**
166:22
**attached (2)**
30:9 214:10
**attaches (1)**

162:21
**attachments (1)**
31:16
**attempt (3)**
26:25 178:4,6
**attending (1)**
21:4
**attention (2)**
30:6 206:24
**attest (8)**
100:2,9 102:4 105:11
116:10 117:15,17
133:23
**attesting (8)**
83:13 113:15 129:23
130:4 132:7,18,20
137:13
**attests (1)**
99:16
**attorney (11)**
9:9,13 13:11 16:13
17:6 26:7 43:2 77:7
143:9 160:17 174:7
**attorneys (6)**
2:5,10,15,20 18:17
19:22
**Aurelio (3)**
1:24 218:7,23
**authorize (1)**
11:6
**authorized (22)**
3:10 99:17 100:6,21
101:5,13,22 103:6
103:21 104:6,13,20
116:5,13,20 118:3
118:10 125:19,25
126:4 127:3 207:17
**automates (1)**
158:15
**automation (1)**
153:5
**available (4)**
10:4 180:16 186:17
186:18
**Avenue (1)**
2:12
**avenues (1)**

23:7
**average (3)**
65:14 182:7 183:10
**aware (9)**
127:20,22 143:20
157:15 173:13,19
173:22 184:25
185:10
**A's (1)**
32:16

**B**

**B (3)**
4:8 88:10 216:2
**BA (1)**
42:4
**back (23)**
10:15 15:10 35:9,22
36:22 37:6 43:19
61:23 70:13 84:12
88:20 107:3 119:5
139:16 156:21
165:14 176:9 178:7
192:18 193:17
199:12 200:4
206:24
**background (2)**
17:16 41:19
**backing (1)**
69:9
**backup (1)**
69:20
**backups (2)**
68:2,6
**balance (1)**
166:17
**balances (1)**
108:20
**ballpark (8)**
57:11 58:17,21 67:6
67:9 71:14,15,17
**bank (6)**
187:12,14,14 189:2
205:13,22
**banks (1)**
188:23
**barely (1)**

60:23
**basic (1)**
81:9
**basically (9)**
44:10 46:4 56:18
132:9,18 193:20
199:13 202:17
213:15
**batch (9)**
178:7 179:16,17,19
179:20,24 180:3
181:13 190:20
**batches (4)**
175:12 181:16,21
182:2
**beginning (11)**
26:3 43:15,18 45:16
51:15 53:19 66:11
87:23 89:17 99:14
200:8
**behalf (3)**
124:23 128:8 211:21
**believe (29)**
8:25 9:6,10 21:21,23
38:21 41:13 51:3
57:7 80:8 90:8
92:18 96:7,12,13
119:2 123:9 126:23
137:10 147:4,23
149:2,7,18 155:2
203:3 208:10,12,14
**Ben (1)**
12:20
**Benjamin (4)**
2:13 13:3 21:11
206:20
**best (5)**
26:12 27:5 30:2
191:11 201:23
**better (1)**
213:20
**beyond (1)**
91:9
**big (2)**
62:3 90:17
**bill (4)**
170:13 212:12,12

213:15
**billing (1)**
170:24
**bills (2)**
186:7 197:7
**birth (1)**
192:11
**birthday (1)**
45:15
**bit (4)**
41:20 57:18 66:12
101:17
**blood (1)**
218:16
**book (1)**
43:10
**Borrels (8)**
48:24 49:3,8 51:14
51:20,21,25 52:3
**bottom (1)**
146:23
**bought (1)**
44:4
**Bowie (2)**
50:9,12
**bracket (8)**
120:10,11,13,14
121:19,20,23
123:23
**break (4)**
35:20 50:22 84:6,8
**breakdown (3)**
58:11,14 66:19
**Brett (2)**
2:22 91:6
**brief (1)**
10:12
**briefly (1)**
205:6
**bringing (2)**
152:8 158:23
**broad (3)**
22:14 23:17 105:11
**Broke (1)**
87:9
**Brooklyn (2)**
1:23 2:6

**brought (4)**
158:13,20 200:18
211:14
**browser (3)**
36:16,22 38:3
**Bueno (31)**
1:10 5:2,18 9:24
10:19 11:8 18:10
19:2,4 32:5,14
72:21 126:19
140:18 159:6,14
189:5,15 190:4,17
206:23 207:11
208:17 209:25
210:11,22,23
211:10 216:9,11,19
**bullshit (1)**
178:18
**bumming (1)**
44:8
**bums (1)**
44:10
**bunch (1)**
183:17
**business (6)**
120:12 121:20 122:6
126:8,12 131:23
**buyer (3)**
147:24 187:7,7
**buying (1)**
68:4
**Bye-bye (2)**
15:23 25:15
**B-A-S-E (1)**
46:14

**C**

**C (4)**
2:2 4:8 218:2,2
**call (22)**
6:25 9:19 10:11,15
11:10 15:5,9,11
16:3 67:13 83:5,6,7
90:6 109:7,12,15
111:16 113:7
115:12 201:18
203:3

**called (9)**
4:8 46:14 50:5 61:12
  61:18 70:23 113:22
  154:20 193:7
**calling (5)**
9:24 16:8 25:22
  90:12 110:18
**Calls (1)**
209:22
**call-back (1)**
13:21
**capacity (1)**
43:8
**card (19)**
53:12 166:22 167:4
  171:6,18,22 183:5,6
  184:18,22 185:18
  188:12,14,17,24,25
  189:5,10,14
**care (1)**
7:23
**case (62)**
1:5,12 5:21 6:7 7:9
  7:10 9:25 10:22,23
  11:17 14:3 16:9,23
  18:5,5 19:2,2 20:4
  20:17 23:3,5 29:6,7
  31:15 32:5 33:22
  34:2 36:9 40:3,6,22
  41:7 55:3,5,6 61:14
  70:13 74:20 81:12
  85:15 87:13 106:2
  106:10 137:12
  181:2 184:17,18,18
  189:18 196:22
  197:5 201:10,15
  204:11,12 206:15
  210:18 211:10,10
  211:14 213:5
  216:21
**cases (33)**
5:2,18,25 6:23 11:4,8
  11:19,22,25 16:22
  18:14 19:7 20:8,10
  20:14 21:6 22:3,15
  22:17 23:12,15
  24:10,14,24 73:18

74:12 78:23 98:10
  98:11,13 105:5
  142:25 212:4
**cause (1)**
162:25
**cell (1)**
37:4
**CEO (1)**
205:8
**certain (1)**
157:6
**certification (1)**
3:7
**certify (2)**
218:9,14
**chain (24)**
170:22 172:18
  173:18,25 174:2
  180:15 183:6
  186:16,17,23,25
  187:5,21 189:20,25
  190:3,5,11,15,16
  191:13,17 197:23
  197:23
**Chambers (6)**
9:20 10:14 16:4,8
  17:2 25:23
**chance (1)**
87:3
**change (8)**
47:13 53:14 58:8,14
  66:20,25 82:6
  187:25
**changed (3)**
82:13 122:25 206:11
**changes (4)**
41:10,14 201:3,5
**charge (13)**
76:9,11 79:12,18
  112:13,21 114:6
  144:17 178:5
  180:12,13 188:3,10
**charged-off (1)**
147:24
**charge-off (1)**
170:24
**Chase (1)**

205:22
**check (14)**
32:24 37:4 38:9 40:5
  149:11,25 167:15
  180:11 182:19
  199:24 200:12,12
  200:22 201:22
**checklist (1)**
200:5
**checkout (1)**
170:5
**City (3)**
89:4 94:4,24
**Civil (3)**
1:21 89:4 94:4
**claim (1)**
157:6
**clarify (7)**
28:4 32:11 96:9
  101:15 107:7,10,12
**class (1)**
28:19
**clear (9)**
15:18 27:9 64:8
  98:23 117:2 152:14
  155:23 156:11
  160:12
**clearly (1)**
90:11
**Clerk (16)**
10:13 17:2,14,20,24
  18:7 19:13 21:7,9
  21:15 23:24 24:2
  25:6,12,14,22
**client (2)**
7:21 159:14
**clip (2)**
50:3,8
**clipping (1)**
51:17
**clips (2)**
49:18,20
**clock (1)**
6:18
**close (3)**
47:8 120:14 121:19
**closer (1)**

119:11
**closet (1)**
200:20
**cloud (2)**
35:3 36:23
**cloud-based (1)**
37:2
**club (1)**
114:11
**code (11)**
118:19,21,23 119:2
  122:22,25 123:2,3,4
  123:10 133:20
**codes (1)**
51:11
**coding (12)**
49:16,17 67:23 69:4
  69:5,6,12,16 70:23
  71:6,24 183:15
**collect (1)**
184:21
**collection (20)**
73:12,15 75:24 78:22
  79:6 101:2 120:10
  120:13 121:19,22
  122:5,8 150:5
  151:4 153:7 155:16
  158:15,17 184:20
  185:17
**collections (4)**
99:19 123:23 154:3
  154:19
**college (5)**
41:20 42:7 43:20,23
  43:25
**come (9)**
52:16 61:16 110:21
  111:22 113:22
  114:7 201:23
  202:19 208:2
**comes (4)**
108:23 111:4 112:21
  156:21
**coming (2)**
144:23 202:15
**comma (3)**
127:22,25 128:2

**comments (3)**
12:24 13:6 21:13
**company (11)**
45:21 47:23 48:24
108:13 147:12,23
148:12 149:17
190:20 205:15
214:13
**compare (3)**
174:21 177:19 184:4
**competencies (1)**
167:15
**complaining (1)**
45:14
**complete (1)**
153:5
**completeness (2)**
167:19,22
**comprehensive (1)**
153:6
**computer (39)**
35:25 36:16 37:21
38:8,20 39:5,20
42:12,16,18,21
43:13,16 49:2
55:15 57:14 58:20
59:15 60:24 62:3
65:4,6 67:8,14 69:2
106:15,22 110:12
110:13 122:22
128:6 133:21
144:22 153:15
155:19 164:8,9
177:22 192:19
**computers (2)**
39:12 65:25
**computer-related (...**
65:25
**concern (4)**
8:12 94:10,11,14
**concerned (1)**
20:12
**concluded (3)**
16:2 25:17 215:11
**conditional (2)**
112:12 114:4
**conditions (1)**

181:2
**connection (2)**
211:14 214:9
**constant (1)**
43:3
**consumer (8)**
147:24 161:11
162:18 171:5
188:18 189:22
190:4 191:18
**contains (1)**
109:23
**context (2)**
83:25 213:7
**Continue (1)**
15:3
**continued (1)**
36:11
**continuing (2)**
131:13,21
**contradicted (1)**
40:17
**conversation (4)**
212:8,14 213:10,14
**conversations (2)**
214:15,16
**conversion (1)**
204:4
**coordinates (1)**
134:3
**copied (1)**
198:19
**copier (1)**
65:5
**copies (1)**
159:18
**copy (5)**
3:13,16 61:2 162:6
201:11
**copying (3)**
59:4,6,7
**Corps (1)**
205:16
**correct (98)**
5:3,7,13 26:16 30:12
31:25 32:18,21,22
32:24,25 36:17,22

38:6 54:23 55:17
55:18,24 58:8
59:21 60:7 62:18
62:19,22,23 66:22
69:7 70:4 73:9 78:2
81:4,5,16,23 86:20
98:14,16 99:24
100:13 101:11,24
104:15,22 106:12
113:16 115:11
119:17 125:21
126:19,20 127:14
130:9 131:17
132:14 133:8,17
135:8,16 139:15,22
140:20 143:19
144:3 146:18
152:20 155:17
169:12 176:7
177:23 179:5,6
180:2 188:15,19
189:23 192:20
193:20 194:7,8,11
200:13,14 207:13
207:19,20 208:18
208:19 210:9,14,17
210:19,20,24,25
213:25 214:6,11,13
**correctly (2)**
29:24 213:3
**correspondence (2)**
33:22,25
**corroborate (1)**
214:8
**counsel (9)**
3:5,16 5:16 7:24 8:16
77:3 159:18 206:10
216:23
**counselor (1)**
77:10
**counsels (1)**
206:6
**counter (1)**
170:5
**counting (1)**
7:20
**countries (1)**

205:19
**COUNTY (1)**
218:5
**couple (2)**
165:15 211:4
**course (12)**
20:25 25:12 26:6
65:24 85:4 120:11
121:20 122:6 126:8
126:11 131:23
196:16
**court (11)**
1:2,9,22 2:6 3:12
11:6 26:21 27:9
89:4 94:4,24
**Court's (1)**
91:17
**co-defendant (1)**
21:12
**craft (1)**
61:8
**crazy (1)**
143:10
**create (6)**
47:12 53:22 61:11
154:9 155:7 210:6
**created (1)**
154:7
**creating (1)**
153:17
**creative (1)**
153:3
**credit (103)**
2:11,11 10:19,24
12:22 13:4 16:15
16:24 17:7 18:10
21:11 72:20 73:19
73:24 74:7,13,13,20
75:8,10,16,25 76:12
76:21 77:15 78:5,6
78:16,24 97:2,18,19
98:3,6,14 105:17
106:2,10 108:2
124:15 125:3
127:14,18,19,22,25
128:2,9,21,21 129:3
129:4,8 142:22

143:18 150:10
159:5 166:22 167:4
168:14 169:16
170:4,15 171:3,6,18
171:22 183:5,6
184:18,22 185:18
188:12,23,25
189:10,14 191:15
196:21 197:5
206:21,22 207:7,10
208:16,17,24 209:2
209:5,8,11,12,18,25
210:5,11,17,22,24
216:10,14,18,20
**creditor (4)**
106:18 108:18
166:17 187:6
**creditors (5)**
167:25 168:16
169:17 205:21,25
**credits (3)**
74:8,22 185:25
**credit-issuing (1)**
188:13
**criminal (2)**
10:8 15:16
**Crossways (1)**
2:21
**currently (2)**
16:15 17:7
**custodian (50)**
99:17 100:6,21 101:5
101:13,22 103:7,15
104:6,13,21 116:5
116:13,21 118:3,11
125:2,8,11,13,20
126:5 127:4,6,9,12
128:5,11,18,21,24
129:2,7 130:14,16
130:23 131:3,11
135:21 142:22
143:17,21,23
205:24 207:18,22
208:2,6,15,21
**custodians (1)**
103:21

**D**

**D (6)**
3:2 4:8,8 46:14,14
217:2
**daily (5)**
120:9 122:4 126:7
131:14,22
**data (81)**
54:21,24 55:3,9,10
55:16 56:17 60:15
62:21 63:10,13,14
63:15,16,19,21,25
64:2,4,6,7,13,14,15
64:22,25 69:23,24
69:25 71:11,13
82:14,22 83:10,13
83:14 101:12
109:12,15,17,21
110:18,25 111:13
111:20 112:9,19
113:12 121:24
128:8,24 129:6
130:7 132:10
133:16 137:16
155:20 157:3
160:20 161:7,8
164:11 167:22
174:3,21 177:15
180:11 182:19
192:3,5 196:21
197:6,10,11,21
198:3 199:14 203:2
213:24 214:2
216:20
**database (50)**
46:13 49:14,15 53:22
53:24 54:2,5,8,15
54:17,18,22,25 55:8
55:9 60:3,17,19,21
61:4,4 62:7,10,18
63:5,8 64:16 83:7
83:12 109:13,16,17
109:22 110:18
111:2,14,20 112:10
112:20 113:13
144:23 156:6 157:8
157:9 158:7 167:13

183:8 193:11 203:3
208:5
**date (14)**
1:16 4:7 52:10 72:23
75:20 84:19 105:20
123:5 146:5 157:12
159:8 160:4 192:11
196:24
**dates (4)**
147:8 156:3 157:20
163:18
**David (2)**
50:9,12
**day (18)**
24:23 28:25 47:12
48:12 68:2 179:9
179:19 181:9,17,22
182:3,8,18 183:10
183:14,17 215:17
218:19
**days (8)**
3:15 29:3,7,10,11,12
29:14,18
**DBase (1)**
46:10
**dead (1)**
204:6
**deals (2)**
113:6 163:12
**debt (15)**
99:19 106:20 123:23
147:22,23 151:4
166:15,24 167:25
168:2 170:14
184:21 187:7,7
190:21
**Debtmaster (13)**
61:19,20 62:8,15,20
63:3,4,10 155:7,13
177:17,23 184:6
**debts (7)**
147:25 166:23 167:4
170:17 172:22
173:4 185:18
**decided (2)**
46:3 205:13
**decision (2)**

91:17 171:9
**defeating (1)**
92:4
**defendant (8)**
12:5 13:5 95:14 96:2
106:17,19 107:17
108:4
**defendants (13)**
1:8,15 2:10,15 11:2
11:19 20:3 89:3
94:4,24 96:18
97:12 167:24
**defense (1)**
18:16
**define (2)**
117:13 139:8
**definition (9)**
64:18 130:16,22,23
138:13 139:8,9
141:4,9
**degree (2)**
41:25 42:3
**delays (1)**
29:16
**delete (2)**
34:7,18
**deleted (2)**
35:11,14
**Denver (1)**
43:25
**dep (3)**
11:16 87:8,12
**department (2)**
163:8 164:2
**depend (2)**
81:13 187:17
**Depending (1)**
56:20
**depends (10)**
15:17 111:7 154:13
154:15 182:14,15
184:16 186:24
189:18,19
**depose (2)**
204:7,8
**deposed (1)**
29:6

deposition (54)
1:18 3:7,8,13 5:17,20
  7:11,13 10:2,20
  11:4,7,21 13:9,17
  16:16,18,19 17:8,11
  17:23 18:2,12,20,25
  19:8 21:2,2,19
  22:15,20,22 23:3
  24:10,16,17 26:7
  28:14,23 30:5,25,25
  39:25 41:4,6,10
  66:8 87:12 145:10
  145:13 200:9
  201:12 202:13,25
depositions (5)
6:22 11:24 12:11
  20:13 24:8
describe (4)
10:17 49:12 70:23,25
describes (1)
13:12
description (2)
152:12 216:6
design (1)
63:9
designated (20)
99:17 100:6,21 101:5
  101:13,22 103:7,21
  104:6,13,21 116:5
  116:13,20 118:3,11
  125:19 126:4 127:3
  207:17
designed (6)
21:3 59:23,24 60:5
  60:16,18
designing (1)
61:4
desktop (4)
37:10,18,25 38:2
determine (5)
31:23 80:11 163:23
  200:10,16
develop (1)
55:25
developed (1)
56:11
device (1)

213:23
Dick (4)
203:20,20,21 204:13
dictionary (2)
130:21 139:10
difference (1)
61:3
different (24)
21:5 23:6 24:22
  40:19 63:22 66:11
  74:4 77:22 81:13
  81:15,19,25 82:15
  114:9,10,12 141:13
  150:22 154:2,5,18
  155:9 163:7 164:17
differently (1)
174:11
difficult (3)
59:8 61:3 105:10
digital (4)
34:2 205:8,11 214:3
directly (1)
43:24
director (3)
59:11 95:15 96:3
disagree (4)
93:13,13,17 94:20
discover (1)
32:20
discussed (5)
207:14,15 210:15,16
  210:23
discussion (11)
25:20 26:19 30:17
  61:22 105:13
  134:15 145:6
  199:11,22 206:10
  211:18
discussions (2)
211:12,19
dispute (12)
7:23 10:3,17 12:2
  16:19 17:11,21,22
  21:16 24:5 25:5
  169:9
District (9)
1:2,2,9,9 10:23 11:10

  14:12,17 18:8
divided (1)
182:6
docket (1)
14:2
document (45)
30:3,13 32:8 55:11
  61:7,8,9 72:25 73:8
  83:15 84:20 86:18
  88:8 89:12 93:5
  105:22 106:6
  107:14 108:23,24
  109:3,22 123:6,7,16
  146:7,10 152:15
  159:10,15,21,22,23
  160:16 165:18,20
  168:12 170:12
  176:18 193:7,12
  197:2,4,15 210:6
documents (23)
5:11 14:7 30:11 31:3
  31:4,6,23 32:15,20
  91:17 105:7 113:22
  124:2 135:13,18
  180:15 183:4
  192:24 193:18
  200:10,17 201:7
  207:2
doing (25)
30:2 38:18 40:11
  43:13 57:14,25
  58:19,20 65:4,24
  66:2 67:8,13 68:6
  69:2,20 72:2,8
  145:3 154:3 182:18
  183:10,14,15
  212:17
DOLOWICH (1)
2:20
double-checked (1)
200:20
download (4)
34:24 35:3 37:22
  50:3
downloaded (1)
37:21
Do-do-do (1)

90:20
draft (1)
194:24
drafted (1)
194:22
drafting (2)
209:13,19
drive (4)
2:21 34:25 111:5,6
dropped (1)
201:2
due (2)
55:20 62:12
duly (2)
4:9 218:11
duty (2)
10:8 15:16
D-E-B-T-M-A-S-T... (1)
61:19

E

E (9)
2:2,2 3:2,2 4:8 216:2
  217:2 218:2,2
earlier (2)
65:12 213:5
Eastern (3)
1:9 14:12 18:7
education (1)
42:7
effect (2)
3:11,14
eight (5)
99:9 120:2 164:17
  165:19,21
Einstein (4)
203:8,9,17 204:20
either (5)
32:21 87:22 170:20
  195:15,15
elaborate (1)
64:12
electronic (17)
106:14 141:19,23
  142:13,14,17,17
  155:21 157:22
  158:5 162:3 167:16

167:22 190:12
191:10 192:2,3
**electronically (2)**
161:17,20
**eleven (5)**
86:6 88:13 89:19
92:15 93:15
**Ellis (5)**
14:22,23 15:6 16:9
17:3
**employed (2)**
124:17,18
**employee (1)**
147:18
**endorsing (1)**
176:21
**Engineering (1)**
42:5
**English (1)**
44:9
**entail (1)**
176:20
**entered (3)**
112:16 150:9 198:19
**entire (1)**
204:11
**entirely (1)**
64:8
**entities (12)**
73:20,24 74:7 76:22
77:15 99:19 120:10
121:22 125:3
127:14,19 150:10
**entity's (1)**
120:14
**equipped (1)**
213:22
**ESQ (5)**
2:7,8,13,18,22
**ESQS (1)**
2:4
**essentially (2)**
18:6 174:23
**established (3)**
133:4,8 156:4
**estimate (1)**
68:16

**et (3)**
1:7,14 16:24
**everyone's (4)**
6:14 19:11,17 22:11
**evolved (1)**
123:3
**exact (5)**
57:22 68:21 110:16
128:4 185:11
**exactly (4)**
18:9 52:10 57:25
214:8
**examination (7)**
4:12 206:18 211:5
215:10 217:4
218:10,12
**examined (1)**
4:11
**example (11)**
61:6,13 73:4 112:13
136:9 140:2 144:16
158:25 180:12
189:6,16
**examples (1)**
28:11
**exceptions (1)**
41:17
**exclude (1)**
91:10
**excuse (8)**
30:9 52:14 100:18
129:4 147:2 182:8
193:14 199:9
**execute (2)**
73:17 75:11
**executed (1)**
81:4
**executing (3)**
75:23 178:2 180:5
**exhibit (97)**
4:25,25 30:7,9,9,10
30:24,25 31:7,8,24
32:5,16 72:22 73:3
80:12 81:2,9,19
84:14,18,23 87:3
97:17 105:15,19,24
106:9,16,22 109:24

110:20 122:13
124:9 125:17,18
126:17,22 127:2
129:4,7,18,18 130:7
130:8 131:14 132:4
132:12 133:17
135:3,7 136:5,16,21
137:6 138:2,3,20
141:18 143:24
144:2,6,9,12 145:25
146:4,8,18 158:14
159:3,7,12 161:9,18
161:24 165:14
167:7,8 193:2,5,14
194:7,16 195:21
196:19,23 197:4,10
197:18 198:2,4
199:4,5 207:8,9
216:5,5
**exhibits (13)**
4:3,6 5:6 30:4 126:18
128:22 138:7
156:13 193:18
194:10 206:24
216:4,23
**exist (6)**
110:13 172:12
176:12,13,14,19
**existed (1)**
106:21
**existence (1)**
151:9
**exists (1)**
110:19
**explain (4)**
54:3,9 90:14 144:21
**exporting (1)**
56:21
**extending (1)**
92:4
**extent (5)**
7:10,14 12:14 24:18
24:21
**e-mail (16)**
31:15 33:2,4,6,7,11
33:16,19,21,25
37:14 38:14 84:3

201:17,22 202:18
**e-mailed (1)**
40:2
**e-mails (16)**
31:25 32:24 33:18
34:6,25 35:8,21
36:8,21 37:5,11,20
37:23 38:9,24
39:22

---

**F**

**F (3)**
3:2 4:8 218:2
**Fabacher (240)**
1:19 2:21 4:1,16,21
5:1 6:1 7:1 8:1 9:1
10:1,21 11:1 12:1
13:1 14:1,8 15:1
16:1 17:1 18:1,3
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1,21
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1,21
85:1 86:1 87:1,8,11
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
95:14 96:1,3 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1

119:1 120:1 121:1
122:1 123:1,17,19
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1,3
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
167:13 168:1,6,13
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1,20
207:1 208:1 209:1
210:1 211:1,7
212:1 213:1 214:1
215:1,13 216:1,7,8
216:16 217:1 218:1
**Fabacher's (1)**
176:19
**facilitate (1)**
25:10
**fact (10)**
5:23 20:20 23:2
83:23 87:19 91:13
93:17 94:18 142:21
142:22
**facts (14)**
80:11,24 83:19 87:25

**fill (1)**
157:5
**fills (1)**
156:22
**final (1)**
200:7
**find (9)**
31:20 40:6 52:19
98:12 107:2 118:15
136:11 163:17,20
**finding (1)**
118:18
**fine (27)**
23:16 24:15 44:11
47:4 57:9,24 85:22
85:22 87:18,21
91:9 92:24 93:3
106:5 114:20
137:17 149:23
151:14,20,24,24
152:4 156:16
174:13 176:6,9
198:17
**finish (3)**
71:18 165:14,15
**firm (9)**
151:3,8 165:5,12
201:10 203:9
204:20,21 211:15
**firms (1)**
151:6
**first (14)**
4:9 17:15 85:14,24
86:4 88:24 94:10
94:19 134:25 135:7
146:23 201:15,21
203:20
**five (7)**
46:23 58:20 88:10
119:5,12 133:21
182:6
**fixed (1)**
193:7
**Floor (3)**
1:23 2:6,12
**follow (2)**
89:4 94:5

**fill (1)**
157:5

**following (4)**
9:22 16:6 25:17
145:8
**follows (1)**
4:11
**force (1)**
3:14
**forced (1)**
38:17
**form (37)**
3:20 26:9,14 55:21
79:8 81:3 91:7,13
106:14,21 112:17
112:22,23,24 113:4
113:6,7,22,25
114:16,17 115:3
147:6 156:22 157:5
157:16 194:3,4,6
207:23 209:15,22
210:3,8,13 212:10
212:16
**formal (1)**
42:11
**format (7)**
89:5,6 94:5,6,12,15
94:17
**forms (4)**
103:13,14,18 114:2
**forth (6)**
62:12,22 69:21
106:21 160:8
218:11
**found (2)**
32:9 202:17
**four (7)**
137:23,23,24,24
139:14,17 203:12
**frame (5)**
57:21 58:23 72:15
154:16 213:19
**free (5)**
34:14 46:4 84:24
86:12,22
**FREEHILLS (1)**
2:10
**friend (1)**
52:21

**fail (1)**
141:15
**fair (10)**
29:19 57:9 70:7 99:4
99:5 204:24 209:10
209:11,17 213:8
**false (3)**
120:25 122:9 123:13
**familiar (3)**
83:18 123:21 126:13
**far (2)**
20:12 35:22
**Federal (1)**
1:20
**feel (5)**
21:17 29:12 84:23
86:12,22
**Felt (1)**
29:3
**field (2)**
133:22 144:20
**fields (2)**
193:8,10
**fifteen (5)**
86:19,22,25 87:4,5
**figure (5)**
39:19 62:2 134:5
137:19 143:12
**file (21)**
50:11 56:22 190:12
191:4,4,7,8,10,21
191:22,22,24
196:21 197:7,10,11
197:21 199:2,4,14
216:20
**filed (9)**
73:12,15,18 75:24
78:14,22 79:6
101:23 184:21
**files (3)**
162:19 185:17 187:8
**filing (3)**
3:6 177:4,5

**fact (10)**
88:23 89:17,20
92:11,13,17 100:13
100:16 123:22
126:14

**front (3)**
14:8 22:8 207:12
**full (2)**
13:6 21:14
**fully (5)**
41:15 83:17 123:18
123:20 126:12
**full-time (2)**
48:14 51:22
**function (4)**
51:4,5 63:7 213:4
**functions (3)**
62:14,25 63:6
**further (7)**
3:19 36:22 120:6,8
121:15 211:2 218:14
**future (2)**
18:21 21:25
**F-A-B-A-C-H-E-R...**
4:17

---

**G**

**gather (1)**
54:4
**general (8)**
49:9 67:19 87:20
100:14 134:13
141:9 212:7,14
**generally (17)**
34:22 57:10 58:12
59:20,24 65:23
67:16 68:5 69:12
81:24 82:4 119:18
139:13 141:4
150:19 171:6
175:10
**generated (5)**
23:11 112:4 192:24
193:6,19
**generates (3)**
192:20 194:7 195:20
**generating (1)**
194:10
**gentleman (2)**
47:11 203:19
**getting (4)**
50:18 62:4 142:15

178:19
**girl (1)**
46:19
**give (30)**
10:14,15 13:22 17:16
39:4,11 49:9 57:22
66:7,15 68:10,17,18
68:20 70:15 71:15
76:15 77:20 80:16
114:25 130:18
132:24 133:22,22
134:19 136:14
140:2 141:9 193:17
201:11
**given (3)**
75:15 183:25 218:13
**giving (6)**
64:21 76:24 88:19
139:9,16 140:8
**glad (2)**
78:20 80:22
**glasses (1)**
167:20
**Gmail (20)**
33:23 34:6,22 35:9
36:15,21 37:2,5,20
38:2,3,9 39:3,15,16
39:19,22 40:25
41:4 200:12
**go (54)**
6:9 10:4 15:2 35:8,21
36:12 38:2,18
41:19,20,22 55:12
75:18 76:6 86:24
87:20 88:22,23,25
89:14 92:20,23
93:6,23,25 95:2,12
103:17 108:8
111:24,25 118:15
118:18 126:3 140:9
141:14 144:20
146:22 156:20
159:21 165:19
168:4 173:16 176:9
177:6 178:7,12
180:4 187:12
192:14 193:23

194:23 195:13
199:23
**goes (9)**
87:7 111:21 113:21
115:15 155:19
157:14 159:20
163:8 199:15
**going (56)**
8:15 11:10 12:12
15:4,5,15 19:10,17
19:17 22:10 26:24
35:16 36:10,21
37:6 38:13 40:13
45:8 61:24 67:13
73:23 74:2 75:18
76:6 77:8 82:15
83:23 84:25 85:25
86:5,9,19,21 90:25
91:8 92:25 93:9,10
98:21 109:5 141:12
142:10 143:10,15
149:21 160:12
165:14 167:21
171:18 178:23
187:25 196:5 200:5
202:5,19 213:16
**good (10)**
16:10,12 17:4 24:12
25:14 29:4 45:11
152:4 211:7 215:6
**GPS (6)**
134:3 213:17,17,23
214:2,16
**graduate (2)**
42:9 43:19
**graduated (1)**
43:23
**Great (1)**
112:3
**ground (1)**
91:22
**grounds (2)**
37:13 76:25
**guess (11)**
15:8 23:25 24:4
39:18 64:17 96:20
121:14 147:7,8,9

205:19
**guy (4)**
45:3 164:21 203:23
203:24
**guys (2)**
143:10 178:22
**Guzman (41)**
1:3 5:2,18 10:24 11:8
11:11 13:16 16:9
16:14,24 17:6 19:2
20:4 30:10 31:2,24
32:14 105:18 106:2
106:10 108:3
126:19 140:19
189:16 190:4,17
191:14,15 196:22
197:5 206:22 207:8
208:16 209:14,20
210:7,16 211:10
216:7,15,21
**gym (2)**
45:14 166:25

---

**H**

**H (2)**
4:8 216:2
**hair (1)**
47:24
**half (6)**
49:6 51:15 58:19
69:19 70:3 179:2
**hand (1)**
218:19
**handing (3)**
104:25 159:21
193:17
**handled (1)**
155:6
**handwrite (1)**
196:10
**hang (1)**
46:7
**hanging (1)**
47:3
**happened (1)**
213:5
**happens (1)**

162:17
**happy (2)**
76:18 134:24
**hard (3)**
34:25 111:4,6
**Harris (112)**
1:7,14 52:5,24 53:7
53:19 56:2,12,25
58:7,13 59:10,15,21
59:25 66:21 70:4
71:9 72:5 73:12,15
74:16 75:11,22,24
77:24 78:14,22
79:6,18,23 81:9
83:17 84:17 89:3
94:3,23 95:16 96:4
96:10,11 100:20
101:4,21 103:5
104:20 115:20
116:19 117:12
118:2,9,17 119:7,20
121:17 122:3,17,23
128:7 141:20
146:24 147:4,15
150:17 151:7,9
152:13,24 157:23
161:13,16,23 162:5
162:6,19,21 163:17
163:19,23 164:4,7
164:12,15,23 165:2
165:3 171:4,20
172:22 173:4,9,25
175:2 184:21
185:17 198:7,10
203:11,17,25 204:2
204:10,20 205:3
208:13,14,22
211:15,21 213:8
214:25 216:13
**Harris's (8)**
106:15,22 155:19,22
158:7 165:5 192:19
203:2
**head (3)**
10:7 27:3,3
**health (2)**
114:11 184:18

**hear (1)**
13:2
**held (13)**
1:21 10:25 11:18
25:20 26:19 30:17
61:22 105:13
134:15 145:6
199:11,22 206:10
**hello (1)**
214:16
**helped (1)**
25:10
**helping (1)**
205:18
**HERBERT (1)**
2:10
**hereinbefore (1)**
218:11
**hereunto (1)**
218:18
**hi (4)**
9:23 10:13 12:4
19:25
**HIPAA (2)**
180:21 181:2
**historical (1)**
123:9
**History (4)**
87:25 88:10 89:20
92:16
**Hmm (1)**
85:18
**hold (7)**
10:10,12 15:7 16:21
152:14 160:23
193:16
**holder (1)**
188:12
**holders (2)**
168:15 169:17
**holding (1)**
147:23
**hole (1)**
178:20
**home (4)**
38:8,20 39:20 129:14
**Hon (2)**

9:20 16:4
**honest (2)**
53:5 202:5
**hour (1)**
6:19
**hours (2)**
56:24 206:7
**How's (2)**
55:13 70:21
**hundred (1)**
35:12
**Hung (1)**
46:25

---
**I**
**id (8)**
121:6,7,8,9,10 124:5
165:23,24
**idea (4)**
49:9 58:17 134:4
172:4
**identification (7)**
4:6 72:23 84:18
105:20 146:5 159:8
196:24
**identified (1)**
109:7
**identify (1)**
146:12
**identifying (1)**
106:23
**image (1)**
50:10
**immediately (1)**
17:9
**import (1)**
167:14
**impossible (1)**
123:5
**inaccurate (13)**
167:2 170:2 174:14
175:3 179:3 187:10
187:11,16 188:21
188:22 190:9,10
195:24
**inaudible (5)**
13:19 16:11 21:16

142:12 167:17
**include (5)**
116:20 118:2,9 144:6
207:16
**included (8)**
75:25 98:13 104:12
133:9 142:13,16
182:23 192:22
**includes (3)**
144:4 170:15 190:3
**including (5)**
120:12 122:6 126:8
131:24 166:16
**incorrect (2)**
96:7 126:2
**incorrectly (2)**
95:19,21
**independently (1)**
112:10
**Index (1)**
16:24
**India (2)**
46:20,22
**indicating (18)**
57:4 61:7 82:16
83:10 89:15 100:3
100:10 103:16
105:2 108:6,11
113:14,18 115:17
117:7 134:17
135:12 201:19
**Industrial (1)**
42:5
**inefficient (1)**
65:2
**infers (1)**
140:25
**infirmities (1)**
24:19
**information (87)**
49:14 53:9,22 54:4,5
55:4,21,22 59:12
61:13,14,15,16
62:11,21 64:15
71:4,7,25 88:16
95:15 96:3 106:17
106:24 109:23

110:7,17,21,23,24
111:11,13,17,19,21
112:19 131:15
132:3,13 133:6
136:21 138:20
139:24 140:22
141:19 142:14
144:2,10 146:17
152:22 153:5,22
154:23 155:18,21
156:5,8 157:8,13,19
157:22 158:6 160:2
161:11,17,24 165:4
166:15 173:3,8,11
177:19,21 183:9,16
184:5 192:10 194:2
194:16 195:18
197:21 199:3 203:4
203:5,8,16 204:19
**insert (1)**
121:24
**installation (2)**
65:4,5
**installed (2)**
59:17,20
**installing (1)**
65:25
**instance (1)**
104:4
**instances (3)**
169:14,15 172:12
**institution (1)**
188:13
**instructed (2)**
26:9 210:6
**integrate (1)**
162:24
**integrated (3)**
157:22 161:12,15
**integrates (2)**
63:10,12
**integration (2)**
155:20 158:5
**integrity (1)**
69:24
**interested (3)**
158:14 160:19

218:17
**Internet (2)**
49:20 50:15
**interrupted (1)**
161:5
**investor (3)**
149:15 151:11,23
**involved (3)**
47:15 178:25 213:7
**iPhone (3)**
35:7 37:15 182:6
**IRS (1)**
110:15
**issue (11)**
8:13,24,25 9:7,12
10:19 20:17 24:9
25:23 38:25 82:19
**issued (1)**
85:15
**issues (1)**
65:6
**items (5)**
30:24 109:6,8,14
165:15

---

**J**

**J (2)**
45:22,23
**jealous (1)**
47:5
**Jeff (2)**
12:4 91:23
**Jeffrey (3)**
2:18 20:2 211:8
**Jessica (2)**
2:8 145:9
**job (8)**
44:18 48:14 51:22
52:17 53:13 71:5
183:25 214:10
**jobs (1)**
51:24
**jog (1)**
74:22
**John (1)**
57:7
**join (4)**

6:10 12:23 13:5
21:13
**jointly (3)**
10:25 11:19 13:14
**Jose (8)**
1:3 105:18 106:2,10
108:3 207:8 210:16
216:15
**judge (17)**
3:12 6:11,13,25 9:25
10:3,6,14 15:14
17:2,16,17 23:4,6
25:7,22 178:16
**judges (1)**
7:18
**Judge's (1)**
10:16
**judgment (5)**
153:11,14 162:19
192:20,22
**judgments (3)**
150:9 163:2,13
**jump (1)**
134:18

---

**K**

**KAUFMAN (1)**
2:20
**keep (4)**
114:20 123:7,8 162:6
**kept (2)**
90:12 123:9
**Kerry (3)**
149:2,5,8
**Keshavarz (91)**
1:22 2:4,7 4:2,13
5:15,22 6:2,8,11,17
6:21 7:3,6,17 8:3
8:19 9:23,24 10:18
11:23 13:22 14:5
14:11,16,21,24 15:2
15:4,20,23 16:7,12
16:13,23 17:4,5,19
17:22,25 18:9
19:16 21:21 23:25
24:4 25:4,8,13,15
25:21 72:17 80:19

84:2,5,9,12 87:14
87:18 91:6,23
105:3,14 126:24
142:10,18 145:16
145:22 151:14,17
151:20 159:2,20
171:11,13 192:14
196:18 199:23
206:4,12 207:23
209:15,21 210:2,8
210:12 212:10,15
214:22 215:5,7
217:5
**key (1)**
50:8
**kind (2)**
46:7 205:15
**kinds (1)**
166:24
**KINGS (1)**
218:5
**knew (3)**
63:5 76:8 200:21
**know (207)**
6:2,24 7:16 8:5 9:8
12:8 13:14 20:15
22:19 34:5 35:12
36:5,10 37:9 42:24
43:3 44:8,9 46:5
48:25 49:5,11 50:9
50:18 54:3,9,13
57:16,19,23 58:23
59:3,5,17 63:6,6,8
63:12,15,18 64:7,22
64:24 65:16 66:4,5
66:6,6,9,10 67:18
68:9 69:24 70:9,14
70:15,16 73:16
74:11 75:14,16
76:10,15 77:12,13
79:10,10,12,12,13
79:15,22,25 82:7
85:8,10,14,20,21
86:5 89:6,9 94:14
102:3,7 110:9,11
112:16 117:20
119:8,24 120:19

121:4 122:19
133:14,19 134:23
136:7 137:11
138:23,23,24 140:4
140:13,24 144:18
145:19 146:9
148:13,15,16,21,22
149:4,11,13,14,22
149:23,24 150:6,8
150:13 151:10
152:16 154:15,21
155:8 156:23,25
157:18,21 158:4
159:15 160:3
162:10,11,11,12
163:25 164:3,3,10
164:13,22 165:3,10
165:11 166:23
169:23 172:6,19,20
172:21 174:5
177:14 181:3
183:19 184:11,16
185:5,23 186:3,9,17
188:8,16,25 189:4
189:13,18 190:2,5
190:16 191:16
195:3,3 196:9
198:2,4,6,13,15,16
198:20 202:4,6,10
202:15 203:4,5,7,10
203:13,16,18,19,20
203:21 204:6,14,16
204:21,22 214:24
215:2,3
**knowing (1)**
12:12
**knowledge (5)**
79:17 83:19 123:21
126:14 165:3
**known (1)**
29:20
**knows (1)**
60:23
**Kuala (1)**
44:21

───────── L ─────────

**L (3)**
3:2,2 125:10
**language (1)**
126:16
**large (1)**
184:2
**largely (3)**
50:14 58:7,10
**late (1)**
6:19
**law (44)**
1:21 2:4 10:6,13
11:14 12:21,25
13:7,20,25 14:15,18
14:23,25 15:3,13,22
15:24 16:10,23
17:2,14,20,24 18:7
19:13 21:7,9,15
23:24 24:2 25:6,12
25:14,22 52:4
151:2 165:12
180:25 201:9 203:9
203:9 204:20
211:15
**laws (2)**
82:13 180:21
**lawsuit (2)**
28:20 187:8
**lawsuits (11)**
73:12,15 75:12,24
78:14,22 79:6
101:2 150:5 184:20
185:16
**lawyers (1)**
80:4
**layman (3)**
54:14 55:12 64:23
**layman's (9)**
46:11 47:21 49:7
54:11,13 64:19,21
90:16 193:21
**layperson (1)**
64:11
**leads (1)**
194:16
**learn (1)**
42:17

**learning (2)**
42:21 43:11
**leave (2)**
53:3 75:19
**leaving (1)**
183:16
**left (5)**
51:20 52:25 75:17
203:11 205:3
**legal (2)**
130:23 163:7
**letter (1)**
46:14
**letters (1)**
55:22
**letting (1)**
91:19
**let's (26)**
6:12 7:17 26:3 30:8
41:19 47:18 88:23
90:20 92:23 93:23
93:23 102:24
105:14 108:25
113:17 115:12
123:25 126:25
135:22 145:24
165:13 176:23
192:14 196:18
199:19,23
**Leucadia (8)**
89:3 94:3,24 96:18
97:12,15 99:19
167:23
**Lexington (1)**
2:12
**Lichtman (37)**
2:18 5:19,23 6:4 7:8
12:3,4 19:12,25
20:2 22:12 23:23
24:15 31:9 80:15
80:20 87:16 89:23
91:25 157:16,25
158:8,10 161:14,19
162:2,8 163:4
165:7 185:20
197:12 199:7 211:3
211:6,8 214:20

217:7
**Lichtman's (3)**
12:23 13:6 21:13
**line (14)**
82:24 87:8,20,21
92:20,20,23,23
111:25,25 121:6
158:24 185:24
199:20
**lines (1)**
92:5
**LinkedIn (5)**
146:3,14,16,17
216:16
**list (9)**
74:21 75:15 76:16,18
76:20 77:10,14,14
77:20
**listed (4)**
30:24 31:7 98:6
109:15
**listen (2)**
8:15 204:17
**listening (2)**
143:8,8
**lists (1)**
98:2
**litigation (5)**
151:4,18 153:6,13
155:5
**little (5)**
41:20 57:17 66:12
101:17 200:19
**live (1)**
123:6
**lived (2)**
61:13,18
**living (1)**
64:9
**LLC (23)**
1:7,14 2:11,11 45:23
72:20 105:17
127:18,23 128:2,2,4
149:19,20 150:23
159:5 206:21,22
209:12 210:5
216:10,14,18

**LLP (3)**
2:10,15,20
**loan (1)**
114:8
**loans (1)**
166:24
**location (6)**
157:12 160:3 161:9
163:22 214:3,11
**locations (3)**
156:3 157:21 163:18
**log (1)**
39:11
**logic (2)**
112:12 114:8
**long (18)**
15:8 28:22 34:5
42:20,25 44:13
45:3 46:15,21 48:2
49:2 52:23 66:6
69:14 84:23 86:24
150:3 182:11
**look (23)**
31:2,6,14,25 36:12
37:25 38:2 45:11
50:12 84:25 103:11
118:19 139:10
146:8 159:14,19
168:25 177:16,16
187:17 197:13
201:7 205:10
**looked (4)**
31:12,14 200:19
201:17
**looking (10)**
30:4 50:7 52:22
55:12 106:8 133:25
167:6,7 182:5
189:25
**looks (2)**
146:21 198:3
**lot (6)**
29:15 47:3 67:25
112:12 122:19
170:2
**loud (2)**
160:14 214:23

**LR (92)**
2:11,11 10:19,24
12:22 13:4 16:14
16:24 17:7 18:10
21:11 72:20 73:19
73:23 74:7,8,13,13
74:19,21 75:8,10,16
75:25 76:12,21
77:15 78:4,5,16,24
79:17 96:25 97:18
97:18 98:3,6,14
105:17 106:2,10
108:2 124:15 125:3
125:9,10,11 127:13
127:18,19,22,25
128:2,8,21,21 129:3
129:4,8 142:22
143:18 150:10
159:5 171:2 191:14
191:15,16 196:21
197:5 206:21,22
207:7,10 208:15,16
208:24 209:2,5,8,11
209:12,18,24 210:5
210:11,17,22,24
216:10,14,18,20
**luck (1)**
204:4
**Lumpur (1)**
44:21
**luncheon (1)**
145:6
**Lutz (3)**
149:2,5,8
**lying (1)**
176:3
**L-E-U-C-A-D-I-A ...**
167:24

---
**M**

**M (3)**
9:21 16:5 53:9
**machine (2)**
59:4,6
**machines (2)**
59:8 61:2
**magistrate (12)**

9:21 11:11 14:13,19
14:22 15:5,11 16:5
16:8 17:12 18:24
19:4
**magistrates (1)**
19:6
**mail (11)**
55:11,13,16,19 56:19
56:21 63:11 193:20
194:15 195:11,17
**main (8)**
60:15 62:14,24 63:6
151:8 154:11
164:19 214:24
**maintain (6)**
60:17 126:6 131:22
132:9 139:3 177:14
**maintained (9)**
101:12 120:12
121:18 122:4,7
126:9,11 131:24
208:4
**maintaining (6)**
67:17 68:7 69:22
71:11 137:13,15
**maintains (1)**
120:9
**maintenance (3)**
68:3,3 69:20
**major (13)**
51:14,24 53:14,17,20
66:18,19 67:12,14
67:17 71:8 72:4
79:22
**majority (7)**
79:14 117:14,18
169:13,14 171:20
184:2
**making (3)**
13:19 41:17 69:23
**Malaysia (2)**
44:21 45:22
**man (3)**
9:9 45:2 70:15
**manage (3)**
47:24 49:15 59:18
**managed (1)**

98:10
**management (8)**
53:9 59:12 71:2,7,25
88:15 164:11
183:15
**managing (2)**
49:13 59:14
**Manhattan (2)**
57:3,5
**manipulates (1)**
63:24
**manner (1)**
198:5
**manually (9)**
34:9 195:4,5,15
196:3,8,13,15
198:18
**mark (8)**
4:2 72:17 84:13
105:14 107:21
145:24 159:2
196:18
**marked (12)**
4:5 72:21 73:3 84:17
84:22 105:18,23
146:3 159:6,12
196:22 197:3
**marriage (1)**
218:16
**match (3)**
124:4,6,11
**matches (2)**
122:12 177:22
**materials (1)**
204:13
**matter (1)**
218:17
**maximum (3)**
175:15,17 178:13
**mean (151)**
23:2 24:6 31:13
36:15 37:25 38:4
47:22 49:9,21,25
53:25 54:2,6,7,16
55:6,23 56:15,19
59:19 60:11,20
64:12,24 66:5,10,13

67:19,20 68:9,9,11
70:17 71:22 72:9
76:7,20,22 77:4,14
82:12,13,18 83:8
89:25 93:10 96:10
100:2,10 102:4
109:9 110:2,8
112:24 115:3
117:16 121:21
122:19 124:22,25
125:10 127:6,6,9,11
128:6,11 129:9,13
129:16,18,21,24
130:7,10,14,17,18
130:22 131:2,15
132:2,8,13 133:5,10
133:12,14,16,25
135:23,25 136:2,7
136:12,17,20,23,24
137:5 138:6,11,14
138:18,19,23,24,24
138:25,25,25
139:23 140:10,21
141:19 143:9,25
144:10,14,19
147:25 151:22
153:7 156:12
161:15 162:14
164:9 165:11 169:8
169:18,20 173:2,18
178:10 179:14
180:23 185:15
189:3 191:5,9
193:9,9 194:12
195:14 197:8,8,9,11
211:17,24 214:2

**means (15)**
13:14 24:5 54:18
87:12 94:18 110:10
121:14,15,23 131:3
131:9 136:8 143:6
169:11 207:22

**meant (2)**
188:8,9

**medical (4)**
114:10 180:22,25
184:17

**Mel (120)**
1:7,14 52:4,24 53:7
53:18 56:2,11,25
58:7,13 59:10,15,21
59:25 66:21 70:4
71:9 72:5 73:12,15
74:16 75:11,21,24
77:24 78:14,22
79:6,17,23 81:9
83:17 84:16 89:3
94:3,23 95:16 96:4
96:10,11 100:20
101:3,21 103:5
104:19 106:14,21
115:19 116:19
117:11 118:2,9,17
119:6,20 121:17
122:3,17,22 128:7
141:20 146:24
147:4,14 150:17,18
151:6,9 152:13,24
155:19,21 157:23
158:6 161:12,16,23
162:5,6,19,21
163:17,19,23 164:4
164:7,12,15 165:2,5
171:4,20 172:22
173:4,5,9,25 175:2
184:21 185:17
192:19 198:7,10
203:2,11,17,25
204:2,10,20 205:3
208:13,14,22
211:15,21 213:8
214:25 216:12

**member (5)**
148:7,21 188:14,17
189:5

**members (5)**
148:9,14,25 149:5,10

**membership (2)**
45:14 166:25

**memory (6)**
74:22 119:14,19
147:2,3 191:11

**mentioning (1)**
197:22

**merge (10)**
55:11,13,16,19 56:19
63:11 193:20
194:15 195:11,17

**merged (1)**
108:24

**merges (2)**
56:21 194:2

**merit (129)**
71:23 72:3,9,13,20
73:4,11,18 74:16
75:12,23 77:25
78:4,7,13,21 79:5
79:19 80:12 81:4
81:10,15,18,25 82:5
83:3,16 87:23 89:2
89:18 92:14 94:2
96:24,25 97:17,25
98:5,12 100:5,12,17
100:19 101:3,9,20
102:18,20 103:4,6,8
103:19 104:4,12,18
105:4,17,25 106:9
110:19,25 111:22
113:11 115:15,19
116:3,15,18 117:11
117:25 118:8,17
121:16 122:2,16
125:17 126:18
131:16 132:4,14
133:7 135:3 136:4
136:15 138:2,4,16
139:21,25 144:11
153:17 154:4
157:14 168:6
174:18,20,24 177:7
177:20,21 178:3
179:5 180:5 181:6
182:8,12,15,16,20
182:22 183:18
184:3,5 185:3,8
186:19 188:19
189:23 192:23,25
193:15 195:21
199:15 205:22
207:5 209:13,20
210:7 216:10,14

**merits (6)**
94:23 140:11,23
153:23 167:13
176:22

**met (2)**
46:19 47:11

**method (1)**
211:25

**Miami (2)**
41:23,23

**Michael (3)**
80:6 148:16 149:9

**Microsoft (1)**
157:8

**middle (1)**
161:6

**mighty (1)**
45:11

**Mills (154)**
2:13 6:10,19,24 7:4
8:17 12:20,20,22
13:3,3,13 21:8,10
21:11 23:22 25:3
73:21 74:10,17
75:13 76:2,5,14
77:17 78:10,17,25
80:14 82:23 88:3
89:22 91:21 92:19
93:20 94:13,21
95:18 97:3,21 98:8
98:15 99:10,25
100:8,23 101:7,10
101:25 103:9,24
104:8,16,23 106:25
109:25 110:5,22
111:3,23 113:3,24
115:21 116:7,16,22
117:5,21 118:5,14
119:9,15,22 120:3
120:17 121:2
122:10 123:14
124:21,24 125:5,12
126:22 127:8,15,21
128:10,13,23 130:2
130:11,15,20 131:5
131:8 132:6,16
133:13 135:24

136:6,18,22 137:7
138:10 141:22
142:24 144:13
145:11 150:12
159:17,22 166:12
167:11 168:11,18
170:11,19 171:24
172:10,24 173:12
174:6,8 175:4
176:17 180:6
182:13 183:2
184:24 185:4,13,19
186:20 187:23
188:5,20 189:7,17
190:8,19,23 191:20
194:14,19 195:10
195:23 197:24
198:12 199:6,17
206:19,21 211:2
217:6
**mine (2)**
14:10 146:13
**minutes (1)**
197:6
**MIS (2)**
53:9 59:11
**mischaracterizatio...**
12:6
**misunderstood (1)**
38:23
**Mlotok (5)**
2:16 20:3 211:9
212:12 214:17
**Mm-hmm (2)**
81:21 87:9
**mobile (1)**
205:5
**moment (3)**
10:10 14:5 113:23
**Monique (2)**
84:16 216:12
**month (2)**
65:4,7
**months (1)**
46:23
**Moody (3)**
2:8 105:6 145:10

**mother (1)**
134:23
**motion (1)**
162:20
**move (1)**
199:19
**moved (4)**
43:25 46:20 48:19,20
**moves (1)**
162:18
**Moving (3)**
99:6,7 131:12
**multiple (1)**
113:25

---

**N**

**N (3)**
2:2 3:2 217:2
**nail (1)**
169:21
**name (38)**
4:14 29:20,23 39:12
39:14,17 45:22
73:19 75:25 78:15
79:21 80:3 106:18
106:19,19 108:6,7
112:3,5,20 113:13
115:17 150:9,11
154:18,25 155:3
157:11 161:10,10
164:22 191:14
192:5,10 203:20,21
206:20 211:8
**named (5)**
10:21,24 18:3 48:24
80:6
**names (13)**
55:20 56:4,7,14
62:12,21 76:16,18
76:20,24 82:19
128:4 164:18
**narrow (1)**
114:14
**nature (3)**
212:14,19,20
**necessarily (3)**
90:15 167:5 168:23

**necessary (2)**
12:19 20:15
**need (15)**
13:18 15:11 16:19
17:12 19:14 21:17
22:9 25:7 54:12
73:25 91:25 144:20
149:11 166:13
206:16
**needed (1)**
41:14
**never (18)**
15:18 24:25 34:4,23
34:24 35:2,5 85:23
148:21 175:17
179:15 181:13
209:6,9 210:15,16
210:16,23
**new (27)**
1:2,9,23,25 2:6,12,12
2:17,17,22 4:10,20
4:20 40:12 48:19
48:21 49:3 59:5
68:4 89:4 94:4,24
126:6 127:5,5
218:4,8
**news (4)**
49:18,20 50:3,8
**newspaper (2)**
50:14,20
**next-to-last (1)**
30:7
**nice (4)**
47:4 201:24,25
205:18
**nine (2)**
57:2 176:10
**nineteen (2)**
45:5,6
**ninety (2)**
45:5 184:8
**nodding (1)**
27:2
**non-lawyer (1)**
80:5
**non-lawyers (1)**
80:4

**non-party (10)**
1:18 2:20 6:16 7:22
10:21 11:16 18:2
18:13 24:17 151:21
**normal (6)**
27:6 40:12 179:7
180:4 182:21,24
**normally (10)**
178:2 181:5,7,8,9,17
181:21,22 182:19
187:2
**notary (11)**
1:24 4:10 111:10,10
111:12,17,19
112:20 113:13
215:19 218:7
**note (6)**
27:21 77:17 89:24
132:5,15 159:17
**notes (2)**
17:15 199:24
**notice (3)**
7:9 153:4 154:23
**noticed (9)**
7:11 10:20,22,25
11:18 13:10 17:23
18:2,4
**notices (4)**
12:8 13:15,17 20:8
**noting (1)**
7:19
**number (40)**
13:21,23 14:2 16:25
53:2 56:13 67:5
68:10,12,15,18,19
73:3 74:14 75:9
76:3 79:15 84:23
88:9,14 92:5
105:24 107:18
117:17 121:13
122:13 124:5,10
125:22 133:7,8
135:4 146:12
166:16 184:12
192:8,11 197:10,18
216:6
**numbered (1)**

77:15
**numbers (5)**
55:20 74:24 75:2
76:21 129:14

---

**O**

**O (2)**
3:2 4:8
**oath (4)**
3:11 100:12 134:9
141:7
**object (13)**
11:2,20,25 20:11,19
24:20 82:23 83:23
91:21 98:20 145:14
174:6 212:15
**objected (2)**
20:11 22:22
**objecting (5)**
20:22 21:19 22:2
23:8,10
**objection (192)**
7:12 21:6 22:6,13,14
25:2 26:8,8,14
27:21 28:7,11 31:9
73:21 74:10,17
75:13 76:2,5,14
77:17,18 78:8,10,17
78:25 79:8,24
80:14,17,18 88:3,4
89:22,23,24 90:18
90:19 91:7,8,12,13
91:19 92:2,3,19
93:20 94:13,21
97:3,4,21 98:8,15
99:10,20 100:8,23
100:24 101:7,10,25
103:9,24 104:8,16
104:23 106:25
109:25 110:5,22
111:3,23 113:3,24
115:21 116:7,16,22
117:5,21 118:5,14
119:9,15,22 120:3
120:17,18 121:2,3
122:10,11 123:14
123:15 124:21,24

125:5,12 127:8,15
127:21 128:10,13
128:23 129:20
130:2,11,15,20
131:5,8 132:5,15,16
133:13 135:24
136:6,18,22 137:7
138:10 141:22
142:24 144:13
145:12,23 147:6
148:5,10 150:12
157:16,25 158:8,10
161:14,19 162:2,8
163:4 165:7 166:12
167:11 168:11,18
170:11,19 171:24
172:10,24 173:12
174:8 175:4 176:17
180:6 182:13 183:2
184:24 185:4,13,19
185:20,21 186:20
187:23 188:5,20
189:7,17 190:8,19
190:23 191:20
194:14,19 195:10
195:23 197:12,24
198:12 199:6,7,8,17
206:16 207:23
209:15,21 210:2,8
210:12 212:10
**objections (4)**
3:20 12:15 18:19,22
**obtain (2)**
31:6 32:20
**obtained (4)**
120:13 122:7 126:9
131:25
**offensive (1)**
45:7
**office (4)**
1:22 2:4 46:6 52:4
**officer (3)**
148:8,11 151:10
**off-the-record (10)**
25:19 26:18 30:16
61:21 105:12
134:14 145:5

199:10,21 206:9
**oh (15)**
8:9 14:10,21 15:4
31:19 52:14 57:16
71:20 95:22 126:24
160:10 167:18
194:18 202:19
204:18
**Ohio (1)**
41:24
**okay (280)**
5:14 11:14 12:21
13:7,20,25 14:15,18
14:23 15:20,24
17:14,14,19 19:13
21:7,15 23:24
24:24 25:6 27:6,13
28:2,9 30:2,23
31:19,21 32:4,11,19
32:23 33:15,19
34:5,21 35:6,8,15
37:24 38:7 40:11
40:21,24 41:12
43:8,12,15 44:18
45:11,19 46:21
47:2,15 49:7,17
50:6,9 51:19 53:17
54:21 55:14,25
57:6 58:11,17
59:18 60:5,8,22,25
61:6 62:24 64:14
64:17 65:3 67:6,24
69:14,18 72:7,12,16
73:10 74:6 76:11
77:21,23 80:10,23
83:8 84:2,21 85:20
85:25 86:11,17,24
87:2,6 89:8,11,13
93:4,23 94:2,7,22
95:6,9,11,14,17,20
96:2,6,19 97:16,23
98:4,11,17 99:5,15
99:15 100:17
102:11,18 103:2,2
103:16 104:3,10
106:7 107:19,24
108:11,19,20,22

109:14,21 111:4,6
111:16,17,18
112:11,15,18 113:2
113:19 114:4,13,15
115:13,24 116:12
120:7 123:12,18
125:24 126:16,21
128:20 129:2,15
130:13 131:10
134:24 135:14,21
136:15 138:14
139:18 140:21
142:2,6 143:4
144:17 146:11,19
147:10,13,20 149:8
149:16,19 150:8
151:2,8,25 152:11
152:18,22 153:2,15
153:25 154:11
155:4,11,18 156:23
157:2,10,18 158:18
159:24,25 160:7
161:3 162:5 163:5
163:11,20 165:2,9
165:17 166:7,18
168:7 169:13 170:7
170:9 171:2,16
172:2 173:2,14
175:10,22 176:2,6
176:11,16 177:9
179:4,7,24 180:3,7
182:10 183:11
184:14 186:22
187:5 189:13,25
192:18 193:5,19,24
195:12 196:4
197:16 198:21
199:3 200:4,23
201:4,9,14 202:19
202:25 204:23
205:17 206:16
207:3,14,21 208:20
209:17 212:13
213:2,9,12,19
214:14,20 215:5
**old (3)**
44:25 45:3,8

**Oleg (2)**
164:21,22
**once (2)**
163:8 174:20
**ones (3)**
76:8,8,12
**one-way (1)**
44:4
**onward (1)**
72:13
**open (1)**
205:4
**opinion (6)**
9:16,18 84:16 87:11
   132:6 216:12
**opportunity (2)**
20:10 41:9
**oppose (1)**
162:20
**opposed (4)**
27:2 142:14 154:3
   213:5
**opposing (1)**
206:6
**optical (1)**
50:22
**order (5)**
11:6 18:23 19:5 23:4
   171:14
**ordered (3)**
23:4,5 59:5
**orders (4)**
85:15,17,19 162:25
**original (12)**
3:8,16 106:18 108:18
   166:17 168:14
   169:16,18,25 187:6
   205:21,25
**outcome (1)**
218:17
**Outlook (1)**
34:21
**outstanding (1)**
166:17
**owners (2)**
148:3,22
**O'HARE (1)**

2:15
_____
**P**
**P (4)**
2:2,2,13 3:2
**packet (3)**
192:20,21,22
**page (25)**
30:7 87:4,5,6,23,24
   88:10 89:17,19
   92:13,15 94:10
   99:6,8 119:25
   146:3,14,16,17,23
   165:19 176:10
   216:6,16 217:4
**pages (10)**
86:2,6,10 89:9,21
   93:14,16 186:22
   196:22 216:21
**paper (3)**
54:20 156:16 162:4
**paragraph (6)**
115:16 135:2,7
   144:16 152:20,23
**paragraphs (2)**
88:2 135:15
**paralegal (1)**
194:24
**parallel (3)**
10:23 15:6 18:5
**Pardon (1)**
14:7
**Park (1)**
2:21
**PARNAGIAN (1)**
2:15
**part (11)**
49:22 67:15,17 71:8
   83:24 114:8 116:14
   157:4 190:14 198:9
   203:13
**participate (1)**
211:11
**particular (10)**
34:13 42:24 55:7
   64:5 81:12 137:8
   188:25 205:2

212:23 214:10
**particularly (3)**
26:8 40:12 42:12
**particulars (1)**
210:18
**parties (3)**
1:20 3:6 218:15
**party (1)**
47:12
**pass (1)**
206:5
**passed (2)**
203:22 204:3
**password (3)**
39:13,14,17
**patient (1)**
180:23
**pause (1)**
206:13
**pay (1)**
34:20
**paying (2)**
110:14 202:2
**payment (1)**
61:14
**PC's (4)**
44:2 59:3,3 67:18
**Peace (1)**
205:16
**penalty (2)**
77:5,6
**people (7)**
79:13,20 80:2 140:19
   157:7 164:17 212:6
**percent (30)**
35:12 58:20,25 59:2
   65:13 66:5 67:7,20
   67:21,23 68:8,21
   69:2,5 70:18,21
   71:24,25 117:19,24
   118:7 169:7,7,8
   183:14,15 184:8,12
   185:9,10
**percentage (8)**
57:13 58:18 65:7,22
   169:6,6 172:2
   185:11

**percent-plus (2)**
184:3,20
**period (6)**
42:20 66:21 81:8
   82:7,9 168:2
**perjure (1)**
77:2
**perjury (4)**
37:13 77:2,5,6
**person (13)**
59:10 60:23 74:15
   75:11,22 78:6 79:3
   96:23 144:22
   164:19 165:10
   208:9 212:11
**personal (8)**
33:6 38:13 39:5
   83:19 123:21
   126:13 212:18,20
**personally (7)**
39:6 83:18 90:3
   123:18,20 126:13
   202:9
**perusing (36)**
5:11 30:3,13 32:8
   72:25 73:8 83:15
   84:20 86:18 88:8
   89:12 93:5 105:7
   105:22 106:6
   123:16 124:2
   135:13,18 146:7,10
   152:15 159:10,22
   159:23 160:16
   165:18,20 168:12
   170:12 176:18
   180:14 193:18
   197:2,15 207:2
**phone (20)**
6:13 7:18 11:10
   17:17 25:9 35:7,17
   36:2,2,19,21,25
   37:5 38:10,22
   170:4,5 192:6,11
   214:12
**photos (2)**
213:10,18
**phrase (3)**

70:24 118:2,10
**physically (1)**
50:20
**picked (1)**
43:10
**piece (2)**
54:20 156:16
**Pin (1)**
150:3
**Pinpoint (21)**
56:9,10 60:6 62:4,15
62:17 63:9 147:11
147:14,17,20 148:4
149:6,10,19 150:4
150:11,18,23 151:3
151:13
**placed (1)**
10:12
**plain (2)**
63:20,20
**plaintiff (50)**
1:4,11 2:5 16:14 17:5
17:6,24,25 74:12
75:7,8,9,25 76:13
78:4,15,23 96:24
97:18 98:2,7,13
99:18 100:25 101:8
101:23 103:8,22
104:7,14,22 106:17
106:20 107:16
108:11,16 116:6,14
116:21 118:4,12
125:20 126:5 127:4
137:2 150:5 187:8
207:18 208:3 216:4
**plaintiff's (16)**
4:5 13:11 30:10 31:7
72:22 73:3 84:17
84:22 105:19,24
126:10 131:25
146:4 159:7,12
196:23
**plea (1)**
15:15
**please (25)**
4:3,14 14:6 17:13
27:10,14 30:15

49:10 73:7 75:6
84:14 101:18
102:13,17 105:15
106:4 107:12 135:4
135:10,11,14
145:25 173:6
174:12 183:24
**plug (1)**
59:7
**point (12)**
10:5 18:21 21:25
23:2 26:24 39:9
41:3 81:6 87:24
107:22 152:8
162:20
**Political (1)**
42:4
**Pomegranate (3)**
34:3 205:9,12
**poor (1)**
205:18
**portfolio (3)**
170:14,17 191:3
**portion (2)**
61:22 199:11
**pose (1)**
145:12
**position (3)**
21:22,24 52:20
**possible (2)**
122:24 183:3
**possibly (2)**
48:4 162:9
**post (2)**
153:10,13
**post-judgment (9)**
154:2,19 155:15
158:17,19 162:15
162:17,24 213:6
**Potentially (2)**
179:21,23
**practice (1)**
176:20
**prefer (5)**
35:24,25 37:10 38:5
115:7
**preference (1)**

36:4
**prepare (1)**
204:12
**preparing (2)**
167:12 168:5
**present (2)**
33:16 179:15
**presented (1)**
124:12
**pretty (5)**
47:8 51:16 63:19,20
109:19
**previous (1)**
185:14
**pre-judgment (3)**
154:19 155:5,6
**pre-litigation (1)**
212:25
**printed (3)**
55:3 112:11 177:19
**prior (5)**
7:12 96:18 155:12,13
156:3
**probably (5)**
43:4 52:9 67:23
69:17 164:16
**problem (6)**
8:21,23 9:4 15:22
22:17 26:23
**Procedural (4)**
87:25 88:10 89:19
92:15
**Procedure (1)**
1:21
**proceedings (7)**
9:22 16:6 25:17
83:20 123:22
126:14 145:9
**process (24)**
156:20,22 157:11,20
158:16 161:10
163:21 177:4,6,12
179:8 180:4 182:21
182:24 211:13,21
211:24 212:2 213:4
213:21,24 214:4,5,9
**produce (1)**

102:3
**produced (3)**
196:21 197:5 216:20
**program (14)**
48:23 56:10 61:18
153:15 154:18,25
155:3 158:15
162:15,23,24 163:6
163:10 192:19
**programmed (1)**
48:22
**programmer (5)**
46:3 110:12 121:12
133:21 154:12
**programmers (1)**
154:10
**programming (22)**
42:13 43:5,7,9,13,16
45:18,20 46:8
48:12 49:3,8,11,13
49:16 57:15 58:20
66:13 153:7 154:2
158:9 164:10
**programs (8)**
56:2,5,8 59:15 62:25
110:13 153:3
167:14
**project (1)**
205:12
**pronouncing (1)**
29:23
**proper (1)**
115:9
**properly (1)**
7:11
**prospective (1)**
22:21
**protective (1)**
23:3
**provide (1)**
77:10
**provides (1)**
166:15
**providing (2)**
91:18 99:22
**Public (4)**
1:24 4:10 215:19

218:7
**pull (2)**
49:20 88:20
**pulls (1)**
64:15
**Pune (2)**
46:20,22
**purchase (1)**
168:2
**purchased (1)**
170:15
**purpose (2)**
7:15 92:4
**purposes (2)**
38:15,15
**pursuant (5)**
1:20 5:20 20:13 21:5
23:16
**pushy (1)**
15:10
**put (14)**
12:7,13 38:25 55:10
57:20 67:5 102:14
139:5 143:15 147:9
166:4 171:14,14
178:20
**puts (1)**
64:2
**putting (3)**
59:4,4 82:19
**P-I-N-P-O-I-N-T (1)**
56:9
**p.m (2)**
1:16 215:9

———————————
**Q**

**queries (1)**
64:14
**query (2)**
64:17,18
**question (82)**
8:8 15:8 23:13 26:11
26:25 27:8,11,17,20
28:3,6 30:20 40:8
40:20,23 42:24
45:8 61:25 62:16
65:21 66:15 71:19

73:22 76:19 77:22
78:11,18 80:16,21
85:14 87:20 88:18
88:21 89:16 92:9
93:10 97:25 99:2
102:12 103:3,10
104:17 106:8 107:6
107:9 114:14
117:22 121:25
122:14 128:14,17
132:25 134:16,22
136:14 137:3
138:17 139:4,18
140:14 141:10,25
142:3 155:24
158:12 159:25
161:2,6,8 173:5,23
174:16 177:2
183:20,23 197:16
204:17 206:15
209:16,24 210:10
210:21
**questioning (3)**
36:11 82:25 158:24
**questions (12)**
19:9,18 21:3 22:10
23:10 27:14 58:3
86:2 200:7 206:8
206:13 213:16
**quick (3)**
84:4,6,7
**quickly (1)**
214:23
**quite (3)**
13:2 59:8 84:23
**quote (7)**
99:16 120:8,15
123:20,24 124:5,10
**quoted (6)**
83:24 90:8,11 121:22
124:3 165:24
**quotes (2)**
166:3,5

———————————
**R**

**R (4)**
2:2 3:2 4:8 218:2

**raised (2)**
12:17,18
**ran (1)**
178:14
**range (4)**
70:19 153:3 181:20
187:3
**read (71)**
5:8 30:14,22 32:6
53:21,24 54:2,7,15
54:16,18,19,20,21
54:25 55:2,8 56:17
60:21 61:7,10,23
63:19 64:22 73:6
82:22 85:3,11,16,19
85:23,24 86:3,7,12
86:13 87:3,5 88:5
89:8 93:8 95:19,21
95:25 106:3 119:16
120:7 126:17
130:21 135:17
144:23 152:12
160:12,13,15,21
166:13 167:21
176:7,16,24 178:4,5
180:7,13,14,15,22
180:25 199:12
201:2
**reader (2)**
50:5,22
**reading (5)**
41:13 61:4 64:24
120:23 179:19
**reads (13)**
62:6,6,17 63:13,15
63:16,21,25 64:4,6
64:7,12 178:17
**ready (3)**
7:25 89:14 134:18
**real (2)**
63:4 84:4
**really (10)**
6:8 12:19 22:24 63:2
70:12 86:9 90:9
145:23 214:19,23
**reason (6)**
19:20 34:13 158:13

158:20 162:14
205:2
**reasonable (4)**
27:19 28:5 66:14,15
**recall (16)**
39:25 40:4,8 41:16
104:2,9,10,11,19
128:3 181:18,23
182:4 187:18
208:23 214:19
**receive (2)**
168:14 169:15
**received (4)**
12:8 13:15,16 167:22
**receives (1)**
170:13
**recess (4)**
84:10 145:7 192:16
200:2
**recognize (1)**
207:4
**record (42)**
4:15 7:20 8:18,20,20
10:2,5 12:7 16:15
16:17 17:8,9 18:16
25:21 27:9 60:10
60:12,13 61:12
84:13 100:22
103:22 125:8,11
126:5 131:4,11
138:13 140:8
145:15,18 166:2
176:8 192:15,18
199:24 200:4
208:15 213:23
214:3 215:8 218:12
**recording (1)**
145:13
**records (102)**
99:18 100:7 101:6,14
101:23 103:7 104:7
104:14,21 116:6,14
116:21 118:4,11
120:9,12 121:18
122:4,7 123:10
125:3,13,20 126:7,9
127:4,7,10,12 128:5

128:12,19,20 129:3
129:8,10,17,19,21
130:6 131:15,22,24
132:11,21 133:5,11
135:22,23,25 136:2
136:8,10,12,17,19
136:20,23,25 137:4
137:5,13,16,20,25
138:7,11,14,18
139:6,6,9,13,14,17
139:20 140:5,10,15
141:2,2,4,12,18
142:13,17,22
143:17,21,25,25
144:6,8,19 148:20
149:12 205:25
207:18,22 208:2,6
208:21
**refer (1)**
208:7
**reference (6)**
120:20,22 121:12
137:8 189:22
191:17
**referenced (2)**
191:2 205:21
**references (9)**
87:11 190:12,22,24
191:3,7,10,21,22
**referencing (1)**
137:10
**referring (3)**
28:11 108:15 131:20
**refers (2)**
23:15 107:16
**reflected (8)**
132:3 136:3,21
138:15,20 140:22
144:2,11
**refresh (2)**
146:25 147:3
**refused (1)**
179:16
**regard (4)**
12:10,11 91:15
211:13
**regarding (6)**

33:22 34:2 74:13
153:12 157:19
170:17
**regardless (3)**
75:9 76:3 78:5
**regular (6)**
120:11 121:20 122:6
126:8,11 131:23
**related (4)**
36:9 83:20 123:22
218:14
**relates (1)**
188:17
**relating (1)**
126:15
**relationship (2)**
147:13 214:25
**relativity (1)**
121:5
**relevant (1)**
166:16
**relief (5)**
11:5,12,13 18:23
19:4
**remember (41)**
28:24 41:2,17 44:7
44:24 48:5 52:10
52:25 53:4,8,12
70:12,13 72:14
74:23,23,25 75:20
76:7 79:21 80:3,9,9
90:10 116:2,12
117:16 118:13
127:25 128:2 147:8
148:24 164:18
187:25 190:25
191:12 208:8
212:21,22 213:9
214:15
**repeat (9)**
27:22 73:22 78:18
80:21 97:10 118:6
128:14 158:11
209:16
**rephrase (7)**
27:15,18 28:4 88:21
104:17 173:17

174:10
**report (1)**
214:13
**reporter (8)**
4:7 27:9 72:24 84:19
105:21 146:6 159:9
196:25
**reporter's (1)**
26:21
**represent (5)**
87:10,13 202:3,13
206:21
**representation (2)**
192:2,3
**represented (1)**
201:10
**representing (5)**
12:5 13:4 20:2 21:11
211:8
**request (4)**
11:5,11 18:23 19:3
**requested (1)**
11:13
**required (2)**
26:10,14
**reserve (4)**
18:18 21:25 22:5
24:19
**reserved (1)**
3:21
**reserving (2)**
22:7 145:20
**reside (1)**
4:18
**resolve (1)**
10:3
**resolved (2)**
19:15 22:8
**resolves (1)**
25:5
**respectfully (1)**
20:24
**respective (2)**
1:20 3:5
**response (2)**
4:24 94:8
**responsibilities (7)**

53:13,18 58:6 66:18
66:19 71:8 72:4
**responsibility (1)**
53:20
**responsive (3)**
31:23 32:15,20
**rest (2)**
111:21 112:18
**restate (1)**
173:5
**restraining (2)**
153:4 154:23
**restraint (1)**
163:6
**retail (10)**
112:13,21 114:6
144:17 178:5
180:12,13 188:3,10
188:23
**retain (1)**
36:25
**retained (2)**
34:6 216:23
**retrieves (1)**
14:7
**returns (1)**
149:25
**review (3)**
41:6 86:22 145:21
**reviewing (2)**
93:14 176:20
**Richard (3)**
1:24 218:7,23
**right (115)**
6:12 7:17 13:23 14:9
15:20 16:7 18:18
19:15,24 21:25
22:5,7 23:18 24:19
25:4 26:17 28:10
29:5,17,19 32:17
34:19 35:17 38:14
45:4 47:9 48:9,11
50:16 51:13 52:23
53:6 56:23 57:9
59:9,16,19 63:11
64:10 67:9 70:22
74:9 77:12 78:18

82:21 85:10 87:18
94:12 95:24 96:17
100:7 109:2,16
111:12 112:7 117:6
122:21,23 133:4
137:24 138:16
140:17 141:21
145:4,16,20,22
146:22 147:10
150:3,14,16 151:2
151:17 154:17
156:17 161:7
162:16 163:15
165:13 169:11
170:7 171:7 174:15
179:4 181:5 182:5
182:9,11,17 184:22
185:3 186:5,6,16
187:9,21 188:3
190:6,18 191:18
192:12 194:9
196:11,17 199:16
202:2,12,16 204:14
205:11 206:4,5,17
207:25
**RNIS (1)**
154:20
**rnis.exe (1)**
155:2
**role (1)**
208:21
**room (2)**
31:12 200:25
**rough (3)**
66:7 68:16 70:18
**roughly (14)**
44:22 48:7 56:24
65:3,7 66:3 68:7,25
69:6,11,15 70:2,6
70:16
**rule (1)**
17:12
**rules (2)**
1:21 87:9
**ruling (6)**
10:16 15:6,25 16:20
25:16,24

**run (1)**
204:10
**running (2)**
34:16 149:16

--------

**S**

**S (7)**
1:7,14 2:2,18 3:2,2
216:2
**sale (4)**
170:14 172:22
173:24 197:8
**sales (1)**
173:24
**salons (1)**
47:24
**sample (1)**
170:15
**Samserv (16)**
2:16 20:3 156:20
157:7,19 158:6
159:13 160:2
161:12 163:19
211:9,12,20 212:7
213:22 215:2
**Samserv's (2)**
155:21 165:4
**saw (1)**
41:4
**saying (24)**
24:22 37:19 60:16
81:20 88:9 101:19
107:13 108:22
112:22 124:7 132:9
132:17,18 137:12
137:15 139:2 142:8
144:22 153:10
160:11 172:18
176:14 177:18
213:3
**says (27)**
26:13 87:8,22,25
89:18,19 96:18
97:17 102:8 105:2
112:21 125:24
131:21,24 136:25
136:25 144:17

146:23 153:3
156:21 160:10,11
166:10 176:12
190:17,20 191:14
**scan (2)**
50:10 162:12
**Scanlon (3)**
9:21,25 16:5
**Scanlon's (1)**
25:22
**scanned (3)**
50:21 162:6,13
**scanners (1)**
68:4
**Scher (75)**
2:22 6:15,18 7:19 8:7
8:10,21 27:21 28:7
29:8 30:19 31:11
36:7 37:7 57:20
71:18 74:18 77:4
78:8 79:8,24 81:6
83:22 88:4 89:24
90:22,24 91:3,12
95:5,7 97:4 98:22
99:20 100:24 107:8
119:23 120:18
121:3,8,10 122:11
123:15 124:7
129:20 132:5,15
134:18,21 142:8,12
145:17 147:6 148:5
148:10 151:12,15
151:18,21 160:13
160:23,25 161:5
167:17 171:8,12
174:25 183:20,23
185:21 197:19
199:8 202:3,13
215:6
**school (1)**
42:9
**Science (1)**
42:4
**scowling (1)**
26:22
**screen (5)**
49:24 174:23 177:22

182:20 184:6
**SDNY (2)**
11:18 14:4
**sealing (1)**
3:6
**search (10)**
30:23 31:22,22 32:9
32:15 36:18 49:19
50:23 51:11 178:15
**searchable (1)**
51:9
**searched (7)**
36:8,14,15 40:4,5,10
51:11
**Sears (2)**
205:22 206:2
**seats (1)**
206:11
**second (6)**
90:19 102:25 165:23
171:15 192:15
206:14
**SECRETARY (18)**
10:6,13 11:14 12:21
12:25 13:7,20,25
14:15,18,23,25 15:3
15:13,22,24 16:10
16:21
**security (3)**
38:15 39:5 69:25
**see (42)**
10:9 20:5,23 31:13
35:21,23 36:12
37:5 48:2 60:25,25
77:7 87:7 90:21
93:16 115:25
116:10 121:6,7,11
122:18,20,21
123:25 124:3
128:25 129:22
132:19 135:4,6,9
144:14 146:11
160:10 163:21
165:13,14 175:20
179:18 182:18
183:19 202:18
**seek (2)**

6:5 40:6
**seen (1)**
118:23
**seller (1)**
170:16
**sellers (1)**
167:25
**send (1)**
84:3
**sense (4)**
46:5 63:7 69:23
    174:17
**sent (1)**
174:4
**sentence (39)**
88:24 93:24,24 94:10
    94:19 95:12 96:18
    98:18 99:8,13
    119:25 120:2,16,23
    120:24 122:15
    123:12,13 125:22
    131:13,13,18,19
    153:2 166:10,11
    167:9,10 168:9,10
    169:9 170:9,10
    172:8,9 174:14
    176:14,16,24
**seriously (1)**
134:12
**serve (2)**
157:12 208:15
**served (9)**
5:6,21,24 7:8 18:22
    20:7,9 24:23
    156:21
**server (9)**
68:2,3 69:9,20
    156:20 157:20
    161:10 214:4,9
**servers (3)**
68:7 163:21 213:21
**serves (6)**
95:16,16,22 96:4,7
    97:11
**service (27)**
3:15 51:18 102:6
    156:2 157:6,12,13

157:20,21 159:5,13
160:4,6,18 161:9,9
162:7,22 163:18,19
211:13,20,23,24,25
213:4 216:18
**serving (6)**
95:25 96:2 163:19,21
    213:24 214:4
**set (6)**
13:10 19:9 55:14
    162:16 218:11,18
**sets (3)**
19:18 22:9 30:11
**seven (12)**
86:2,6 87:7,23 88:10
    89:17 92:14 93:14
    94:11 164:17
    165:19 206:7
**shaking (1)**
27:3
**shareholder (1)**
147:19
**short (3)**
84:10 192:16 200:2
**shorthand (1)**
109:11
**show (3)**
36:2 49:18 162:25
**showed (1)**
49:23
**showing (5)**
73:2 84:21 105:23
    159:11 197:3
**sic (26)**
52:11 72:13 89:3
    94:23,25 95:15,17
    120:10 123:22,24
    125:18 126:5,9,15
    126:18 146:25
    153:23 167:12,13
    167:15 168:5,14
    170:14 176:21,22
    191:14
**sign (18)**
74:15 78:3,21 98:5,9
    100:15 116:3
    174:18,20,23 178:7

179:8,9,16,18
182:22 186:19
188:18
**signature (1)**
106:12
**signed (53)**
3:9,11,14 77:25
    79:11,13 81:11
    83:17 96:23 97:14
    97:16,20 98:2,12
    100:4,5,11,18,19
    101:3,9,11,20 103:4
    104:5 105:25
    106:11 113:11
    115:16,19 116:15
    116:19 117:11,25
    118:8,17 121:16
    122:2,16,19 123:11
    125:16 130:4,25
    131:9 141:7 179:4
    179:24 184:4 185:2
    185:6 189:23
    194:17
**significant (6)**
58:9,16 66:20,24,25
    67:4
**significantly (2)**
58:15 69:10
**signing (5)**
79:18 104:11,19
    177:5,6
**signings (3)**
78:7 79:4,5
**Similar (1)**
55:11
**simplification (2)**
193:22,25
**simultaneous (1)**
23:9
**simultaneously (2)**
20:21 21:20
**single (3)**
18:12 22:2 144:20
**singular (1)**
143:6
**sir (14)**
4:23 8:17 26:2,4

45:16 130:24
    133:19 139:19
    143:16 146:9 176:5
    178:20 180:20,24
**sit (2)**
46:6 86:25
**sitting (1)**
118:25
**situation (2)**
56:20 181:4
**situational (1)**
82:11
**size (1)**
34:15
**slightly (2)**
12:6 77:21
**slow (1)**
27:24
**small (1)**
147:18
**SMITH (1)**
2:10
**software (14)**
42:16,18,22 47:18,22
    47:24 50:12 59:21
    59:25 65:5 66:2
    150:25 167:14
    195:16
**softwares (1)**
155:9
**sold (5)**
44:2 187:6 190:20
    191:15,16
**solid (3)**
68:10,12,14
**soon (1)**
11:9
**sorry (19)**
12:25 21:10 40:10
    43:17 51:6 71:20
    73:22 77:10 86:16
    95:18 97:9 103:16
    131:19 140:8,9
    167:18,19 191:9
    207:9
**sort (8)**
15:16 50:22 55:15

106:13 158:5
167:14 194:3,4
**source (4)**
194:10,13,15 195:18
**Southern (3)**
1:2 10:23 14:16
**spa (1)**
48:12
**space (1)**
34:16
**spas (2)**
47:12,25
**speak (6)**
21:22 202:22 208:20
209:4,7 212:6
**speaking (24)**
48:7 56:24 57:11
58:12 59:20,24
65:3,7,23 66:3
67:16 68:5,7,25
69:6,12,15 70:3,6
81:24 82:4 119:18
150:19 202:21
**specific (34)**
12:12 74:3 75:5 92:9
99:21 104:3 106:16
106:23 107:15,17
107:17 109:6,7,8
128:17,18 132:25
134:16 136:9,11,13
136:14 138:3,5
139:24 156:8
173:23 188:16,17
189:14 190:5
191:18 211:17
214:11
**specifically (11)**
40:23 51:8 102:19
128:3 138:7,11
140:16,19 189:4,15
189:21
**speculate (3)**
35:16 144:24 149:21
**speculating (5)**
119:10 139:2 153:10
172:14 176:3
**speculation (8)**

65:17 148:18 149:3
185:22,25 198:8,14
209:22
**speculative (1)**
168:22
**spell (1)**
48:25
**spelled (1)**
167:23
**spend (7)**
57:14 58:18,19 65:24
69:15 70:4 182:12
**spent (4)**
67:15 69:12 72:2,8
**spit (1)**
54:5
**spoke (2)**
197:6 212:11
**spread (2)**
181:7,14
**spreadsheet (4)**
191:25 192:5,9 197:9
**SS (1)**
218:4
**stack (1)**
174:19
**stand (1)**
6:25
**standard (1)**
176:20
**stands (2)**
141:2 154:21
**start (10)**
6:20 26:3 43:9 87:6
91:3 113:17 145:11
151:12,12 206:13
**started (10)**
32:12 43:5,7,10,13
45:18,19 46:5
50:18 53:15
**starting (1)**
53:21
**starts (1)**
176:13
**state (9)**
1:25 4:10,14 122:3
126:6 127:5 153:4

218:4,8
**stated (7)**
88:2 89:17,20 92:13
100:20 121:5
122:15
**statement (8)**
166:18 167:3 168:3
168:17 170:18
187:20 195:9
207:16
**statements (8)**
91:16 120:24 152:19
170:24,25 171:7,18
183:5
**states (4)**
1:2,9 120:6,8
**stating (1)**
145:18
**step (4)**
31:24 32:23 35:23
51:21
**steps (4)**
80:10 200:9,15 201:6
**stipulate (5)**
13:8 18:17 20:16
21:18 23:14
**STIPULATED (2)**
3:4,19
**stipulating (1)**
87:16
**stipulation (6)**
12:14 20:25 22:20
23:5 80:16 87:15
**stipulations (1)**
12:10
**stop (1)**
91:4
**stopped (1)**
53:15
**storage (1)**
200:19
**stored (1)**
214:7
**stores (3)**
62:10,11,20
**straightaway (1)**
177:8

**strategy (1)**
153:6
**Street (5)**
1:22 2:6,17 4:19 57:7
**stretch (1)**
62:3
**strike (11)**
80:24 92:11 109:4
124:14 129:4
141:24 150:4
163:16 171:3
192:23 199:19
**string (21)**
113:7,8,9,10 114:22
115:6,8,8,10,12,13
115:14,14,18,23
116:14,20 118:16
133:23 194:5,6
**strings (1)**
192:4
**stuck (2)**
178:22,24
**stuff (4)**
15:17 150:17,18
179:2
**submitted (3)**
89:2 94:3,23
**subpoena (17)**
7:9 12:16 23:16
30:11 31:24 32:5
32:12,14,14,21
153:5 154:24
200:11 201:14
202:23 216:7,8
**subpoenaed (4)**
12:9 24:17 38:17
200:17
**subpoenas (22)**
4:5,25 5:4,21,24 8:13
8:14 9:2,7,12 20:7
20:14 21:5 24:22
30:5 32:16 53:22
53:23 54:6 55:4,22
153:22
**subpoena's (1)**
8:5
**Subscribed (1)**

215:16
**succeed (1)**
141:15
**sue (3)**
171:5,5 173:9
**sued (1)**
172:23
**sues (3)**
171:21 173:4,25
**sufficient (1)**
37:16
**suit (1)**
101:24
**suite (3)**
2:17,21 145:10
**summarize (1)**
213:2
**summons (1)**
160:10
**supported (1)**
91:16
**sure (37)**
5:12 6:3 11:15 12:19
   15:22 20:18 22:24
   23:18 27:23 48:5
   52:15 57:12 69:23
   78:20 85:7 88:7
   90:10 105:6 112:2
   118:7,20 119:3
   140:15 145:19
   147:9 148:6,11
   155:25 158:13
   160:12 168:5
   177:20 179:23
   196:16 197:18
   200:6 209:17
**swear (3)**
77:11 100:12 134:9
**swearing (1)**
100:16
**swore (1)**
139:13
**sworn (4)**
3:9 4:9 215:16
   218:11
**Sykes (20)**
28:19 29:8,9 31:15

33:22 34:2 36:9
   40:2,6 41:7 84:16
   85:15 87:12 119:5
   171:9 178:25
   201:10 204:11,12
   216:12
**system (20)**
53:10 55:15 59:12
   60:9,11,13,14 61:12
   71:4,7 106:15,22
   128:7 155:19
   161:13 183:9
   192:19 193:20
   195:17 203:4
**systems (2)**
72:2 183:16
**S-Y-K-E-S (1)**
28:19

---

## T

**T (221)**
3:2,2 4:1,8 5:1 6:1
   7:1 8:1 9:1 10:1
   11:1 12:1 13:1 14:1
   15:1 16:1 17:1 18:1
   19:1 20:1 21:1 22:1
   23:1 24:1 25:1 26:1
   27:1 28:1 29:1 30:1
   31:1 32:1 33:1 34:1
   35:1 36:1 37:1 38:1
   39:1 40:1 41:1 42:1
   43:1 44:1 45:1 46:1
   47:1 48:1 49:1 50:1
   51:1 52:1 53:1 54:1
   55:1 56:1 57:1 58:1
   59:1 60:1 61:1 62:1
   63:1 64:1 65:1 66:1
   67:1 68:1 69:1 70:1
   71:1 72:1 73:1 74:1
   75:1 76:1 77:1 78:1
   79:1 80:1 81:1 82:1
   83:1 84:1 85:1 86:1
   87:1 88:1 89:1 90:1
   91:1 92:1 93:1 94:1
   95:1 96:1 97:1 98:1
   99:1 100:1 101:1
   102:1 103:1 104:1

105:1 106:1 107:1
   108:1 109:1 110:1
   111:1 112:1 113:1
   114:1 115:1 116:1
   117:1 118:1 119:1
   120:1 121:1 122:1
   123:1 124:1 125:1
   126:1 127:1 128:1
   129:1 130:1 131:1
   132:1 133:1 134:1
   135:1 136:1 137:1
   138:1 139:1 140:1
   141:1 142:1 143:1
   144:1 145:1 146:1
   147:1 148:1 149:1
   150:1 151:1 152:1
   153:1 154:1 155:1
   156:1 157:1 158:1
   159:1 160:1 161:1
   162:1 163:1 164:1
   165:1 166:1 167:1
   168:1 169:1 170:1
   171:1 172:1 173:1
   174:1 175:1 176:1
   177:1 178:1 179:1
   180:1 181:1 182:1
   183:1 184:1 185:1
   186:1 187:1 188:1
   189:1 190:1 191:1
   192:1 193:1 194:1
   195:1 196:1 197:1
   198:1 199:1 200:1
   201:1 202:1 203:1
   204:1 205:1 206:1
   207:1 208:1 209:1
   210:1 211:1 212:1
   213:1 214:1 215:1
   216:1,2 217:1
   218:1,2,2
**Taiwan (3)**
44:5,6,14
**take (39)**
5:9 15:9,15 17:8,15
   19:8 27:25 30:8,15
   32:7 34:17 35:22
   55:10 65:8,21
   80:11 84:5,7,24,25

86:7 93:3 106:4
   107:20 108:25
   109:5 112:8 126:25
   134:12 135:11,22
   146:8 159:14
   182:21,25 197:14
   200:15 201:6
   213:17
**taken (8)**
1:19 20:13,20 28:14
   84:11 145:7 192:17
   200:3
**talk (1)**
6:4
**talked (6)**
69:3,8 162:15 199:14
   200:8 206:25
**talking (16)**
60:22 91:3 99:21
   108:2,3 111:10
   133:19 144:18
   153:16 169:7 171:8
   171:10 189:21
   193:3,11,12
**task (2)**
55:7 58:24
**tasks (2)**
58:12 67:12
**taught (3)**
42:19 44:8 46:4
**tax (1)**
149:25
**taxes (1)**
110:14
**tech (7)**
59:9 164:15,20,24
   165:4 203:23,24
**technical (7)**
54:8,12,14 113:5,8
   114:24 115:4
**Technologies (11)**
146:24 147:11,14,17
   147:21 149:6,10,20
   150:4,19 151:3
**technology (3)**
95:15 96:4 152:5
**telephone (7)**

9:19 10:11 15:25
16:3 25:16 129:14
186:7
**tell (20)**
9:14 34:16 68:21
70:7 88:22 90:3
97:15 98:25 104:24
114:3 129:11 169:5
172:4 177:5,10
179:7,12 180:3
187:18 213:2
**telling (2)**
37:15 61:2
**template (22)**
81:3,10 82:8,10,18
82:24 83:2,5 90:4,5
90:6,7,9,11,12,15
90:16 92:10,13,17
93:13,22
**templates (1)**
81:17
**ten (6)**
68:11 70:13,14
181:24,24 187:24
**term (19)**
22:14 23:17 54:8,11
54:12,13,14 55:12
73:23 90:16 92:14
93:13 94:12,16
114:17 115:4
135:23,25 188:6
**terms (13)**
42:12 43:16 46:11
47:21 49:7 64:20
64:21 100:14
116:13 119:6,14
160:3 193:21
**testified (6)**
4:11 36:7 65:12
66:17 99:12 100:5
**testify (16)**
8:2 30:5 37:12,17
66:9 68:20 75:3
76:25 77:9,19
91:14 116:9 135:5
143:7,11,15
**testifying (3)**

4:24 73:5 141:8
**testimony (13)**
13:9 41:10 61:23
119:4,17,17 156:4
175:21,23,25 189:9
199:12 218:13
**text (14)**
50:5,11,14,23 51:3,9
51:12 82:18 106:15
113:4,6 115:13,14
133:6
**texts (1)**
107:16
**tfabacher@digital...**
33:10
**Tfabacher@gmail....**
33:3
**thank (14)**
4:21 15:21 25:13
26:4 29:25 39:24
41:18 67:11 80:20
152:2 196:11,17
201:22 214:20
**they'd (1)**
18:20
**thing (12)**
26:20 66:2 71:10
79:23 85:5,12 86:3
86:8 162:16 177:24
200:11 201:15
**things (6)**
67:25 90:4,25 145:18
192:11 212:21
**think (48)**
5:19 12:13 13:7 15:9
19:21 23:20,20
25:5 35:13 39:21
40:19,19 45:2
52:12 53:9 56:13
59:6 63:20 65:18
65:20 77:4 80:5
83:22 91:7 95:18
96:17 99:11 104:3
114:23 119:13,19
121:23 133:18
137:14 142:15
148:15 150:15

151:5,6 156:4
162:10 167:21
168:25 185:22
193:10 199:25
202:7 207:9
**third (1)**
144:16
**thought (4)**
14:10 18:11 66:17
102:14
**thousand (1)**
52:9
**three (8)**
29:3 30:11,24,25
126:24 137:22
187:4 193:4
**three-year (2)**
82:7,9
**ticket (1)**
44:4
**ticking (1)**
6:18
**tied (1)**
189:15
**time (83)**
1:16 3:21 4:22 5:9
6:14 7:5,21 18:4
19:11 22:11 25:11
26:4 27:25 30:8,15
32:7 42:20 50:13
51:21,25 57:14,17
57:18,20 58:15,18
58:19,21,23,24 65:8
65:21,23 66:21
67:6,8,15 68:6 69:6
69:11,19 70:3 72:2
72:8,14 81:6,8 82:6
84:24 86:7 88:22
93:3 106:4 107:20
108:25 109:6
119:12 122:25
123:10 127:2
135:11,22 154:13
154:16 160:6
163:22 175:18
178:8,11,14,22,24
179:13,14,17

183:17 188:24,25
189:10 197:14
200:24 213:21
214:4
**times (12)**
28:16,19 104:11
125:6 137:22,23,24
137:25 139:14,17
156:3 170:3
**timestamp (1)**
123:2
**title (27)**
53:6 71:5 88:14 96:7
125:15 128:18
170:23 172:18
173:18 174:2
180:16 186:16,17
186:23 187:5,22
188:2 189:20 190:2
190:3,5,12,15,17
191:13,17 197:23
**titles (1)**
183:6
**today (8)**
35:18 41:2 118:25
119:21 200:18
202:3,14 206:25
**Todd (11)**
1:19 2:21 4:16 10:21
18:3 29:21 95:14
96:2 146:3 215:13
216:16
**told (1)**
70:11
**tons (1)**
102:10
**top (1)**
67:20
**topics (1)**
212:7
**total (1)**
178:17
**totally (1)**
20:23
**tough (1)**
15:14
**training (1)**

42:11
**transcript (16)**
18:13,20,25 19:7
22:3 23:11,15 24:7
24:13 40:2 41:4,7
92:5 145:21 201:11
213:20
**transferred (9)**
128:8 141:20 150:10
173:9 197:22 203:8
203:14,17 204:19
**traveling (3)**
44:16,17,19
**trial (1)**
3:21
**tried (1)**
90:13
**trouble (2)**
143:11,16
**true (45)**
32:4 80:13 88:2,23
89:5,21 90:2 92:18
99:9 100:13,16,22
116:8 120:2,16,24
122:8 123:13
146:18 152:20
166:11,18 167:3,10
168:3,6,10,17
169:14 170:10,18
170:20 171:19,23
171:25 172:5,9
176:15 184:7,9
189:16 194:17,21
195:9 218:12
**truth (2)**
90:2,2
**truthful (1)**
41:15
**truthfulness (1)**
91:15
**try (7)**
27:10 31:6 141:13,16
141:17 162:18
206:13
**trying (33)**
19:5 31:17 36:5
39:18 40:18 45:2

62:2 64:5 90:13
97:23 105:9 107:2
114:25 128:15
134:4 136:11
137:18,18 139:12
141:3 142:18,19
143:12 144:15,25
155:25 157:3
160:14 169:21
176:4,5 182:18
199:13
**turn (6)**
30:6 50:11 60:23
62:2 205:14 206:23
**turned (1)**
29:18
**twice (4)**
19:9 28:17 69:14
137:20
**two (32)**
4:25 13:15,17 19:18
20:14 21:5 22:9,17
23:6 24:22 29:7,10
29:11,12,14,18
33:17 52:9 62:14
62:24 113:14,16
116:11 117:6 124:5
135:15 139:21,24
142:25 155:8
207:11 212:21
**type (10)**
46:8 55:21 66:2
108:13 195:5 196:3
197:10,20 213:22
214:2
**typed (4)**
112:7 156:5 157:7
196:9
**types (2)**
81:25 82:14
**typical (2)**
181:4 183:17
**typically (13)**
168:13,21,25 169:5,8
169:11,23 180:18
180:20,23 182:12
186:18,21

**T-O-D-D (1)**
4:16

_____

**U**

**U (1)**
3:2
**Uh-huh (1)**
146:15
**ultimately (1)**
187:7
**Umm (1)**
14:25
**unable (1)**
32:19
**underlying (1)**
166:15
**underneath (1)**
115:17
**understand (28)**
9:5 11:15,15 24:6
26:11,13 27:13
28:12 31:5 54:19
62:16 65:2 93:9
94:17 102:22 107:3
109:8 115:3 137:3
138:17 148:13
156:25 160:15,18
160:24 169:10
183:8 207:21
**understanding (14)**
18:15 22:4 36:24
37:3 58:5 123:8
127:17 130:3
156:19 163:14
189:9,12 191:2
214:6
**understood (3)**
8:3 27:20 28:6
**uniform (7)**
89:5,6 94:5,6,12,15
94:16
**UNITED (2)**
1:2,9
**universal (1)**
189:11
**University (1)**
41:23

**unnecessary (6)**
12:14 13:8 20:5,24
22:23 23:21
**unsigned (1)**
3:13
**untrue (1)**
172:15
**USAID (1)**
205:12
**use (56)**
6:5,22 7:14 11:3,7,21
11:24 12:2,11,12
18:12,24 19:6
20:16 21:18 22:2
22:21 23:17 24:5,7
24:9,13 33:5,8,13
34:14,21 42:12
63:2,21,24 70:24
73:23 74:3 82:23
83:2 90:5 92:12,16
93:12 94:11 104:13
113:5 114:21,21
115:7 136:16 137:4
137:19,20,21
139:12,20 140:15
144:8 151:5
**user (4)**
39:12,14,16 63:4
**uses (5)**
63:14 74:12 151:3
167:13 168:6
**usually (1)**
181:13
**utilities (2)**
56:13,15
**U.S (1)**
9:21

_____

**V**

**vacate (2)**
162:19 163:2
**valid (1)**
24:24
**validate (1)**
180:11
**value (1)**
137:14

varied (4)
71:16,16 72:9,11
varies (3)
65:9,11 181:19
varieties (1)
167:2
various (3)
102:9 167:13,25
vary (1)
180:17
vast (2)
171:19 184:19
Vera (2)
9:20 16:4
verbatim (1)
166:9
verify (2)
71:12 112:10
version (1)
56:18
versus (8)
10:19,24 16:14,24
17:7 18:10 106:10
207:8
video (1)
145:13
VIDEOTAPED (1)
1:18
voiced (1)
24:25
VOLUCK (1)
2:20
volunteer (2)
205:13,14
vs (8)
72:21 84:16 105:18
159:6 216:11,12,15
216:18

―――――――――
W
―――――――――
wait (3)
27:10 183:20,23
waived (1)
3:8
Wall (1)
2:17
want (48)

5:12 6:3,6,8,25 7:6
11:21,25 18:18
19:19,22 21:24
22:5 34:20 37:17
37:17,25 39:2 43:4
57:20 64:5 68:19
77:2,16,19 84:5,24
86:3 90:22 91:11
92:20,21 102:3
107:7,10 111:24
117:2 120:21
129:13 133:19,20
143:6 156:10,15
160:19,21 203:3
206:23
wanted (7)
47:13,23 118:15
145:19 163:17,20
205:4
wants (1)
47:12
warranties (5)
170:16 172:21 173:7
173:10 174:2
warranty (4)
173:2,3,20,21
wasn't (12)
49:22 50:24 51:4
114:19 157:24
158:2 176:5 178:25
212:23,25 214:18
215:4
waste (5)
6:13 7:4 19:10,17
22:11
water (1)
62:4
way (43)
13:11 38:23 39:2
41:3 49:19 53:14
58:9,14 61:5 63:23
66:20 67:2,4 87:22
87:23 111:6 112:24
141:13 150:21
157:7,23 161:25
163:23 166:20
168:20 170:21

172:16 175:6 186:3
186:10 187:11
188:22 189:3 190:2
190:10 191:12
194:21 195:25
196:12 200:8
204:15,21 218:16
website (2)
38:3,4
Webster (1)
139:10
week (6)
175:21 179:5 181:6,8
181:15 182:8
went (4)
43:24,25 46:19 66:12
West (1)
4:19
we'll (4)
6:4 109:15 111:16
113:5
we're (13)
8:19,20 9:25 14:24
16:15 19:16 21:4
24:12 86:19 110:18
145:17 149:15
199:25
we've (2)
133:4,8
WHEREOF (1)
218:18
whichever (1)
100:25
wife (1)
45:13
William (2)
2:16 211:9
willing (3)
7:25 38:16 39:6
wiring (1)
68:3
withdraw (2)
25:23 176:25
witness (46)
1:19 2:20 3:9,15,17
4:9 6:16 7:22 8:4,9
8:22 10:21 11:17

12:9 14:9 18:3,14
20:8,9 21:4 24:23
29:9 71:20 84:3,7
91:5,10 95:6,9,20
105:9 121:9,11
124:9 134:20,23
145:14,20 161:3
183:21 206:17
215:3,10 218:10,13
218:18
wondering (2)
162:23 188:9
Woodbury (1)
2:22
word (45)
22:14 24:5 50:8
66:23 74:13 75:8
75:10 82:24 90:4,5
90:6,9,10 92:10,12
92:16 93:21 97:18
97:24 98:3 110:9
112:23,24 113:5,9
114:19,22 115:3,8,9
135:3 136:10,16
137:4,25 139:6,13
139:16,16,20 143:3
144:8 169:10,21
171:17
words (14)
50:23 76:12 78:4,24
82:7 96:25 98:6,14
104:12 115:16
133:5 137:19 138:6
139:5
work (26)
43:12,24 45:25 51:14
52:24 65:25 66:2
67:8,14 69:2 70:25
124:13,15,20,22,23
127:13 147:17
152:12,24 164:8,9
164:15,24 189:3
205:20
worked (21)
43:14 44:20 45:24
46:3 51:25 52:4
53:18 66:21 67:7

69:19 71:9 77:24
79:7 81:9 119:12
147:4 175:2 202:7
209:5,8,18
**working (9)**
45:19 53:15 59:2,3
65:5,6 72:5 118:9
213:8
**world (3)**
47:13,14 205:13
**wouldn't (5)**
35:12 37:8 83:5
122:24 198:6
**wrapping (1)**
151:13
**write (15)**
42:16,17,21 47:24
50:4 61:9,10,15
62:9 95:3 150:24
156:10,13,15
178:17
**writing (1)**
153:22
**wrong (3)**
8:5 9:14 88:15
**wrote (3)**
50:4,11 51:11

**X**

**X (6)**
1:3,8,10,15 216:2
217:2

**Y**

**yeah (57)**
5:10 8:22 15:13
26:12 29:9 31:10
44:12,17 47:6,17
48:10 51:7 52:15
57:8,22 58:4,22
59:5,18 67:22
69:23 70:20 75:6
81:7 84:9 91:5
102:23 107:21
114:18,18,18
146:21 147:7,7,9
148:16 149:14,24

151:22 152:6,9
154:15,20 156:14
158:22 164:21
166:14 174:12
179:23 186:15
195:7,14 198:16
201:21 204:25
205:16 208:12
**year (14)**
34:7,17 35:11 44:20
44:21,23 46:16
49:5 51:15 65:4,6
65:14,24 154:13
**years (12)**
53:2 66:12 68:11
70:13,14 118:24
119:5,12 164:16
181:24 187:24
203:12
**year's (1)**
66:11
**York (25)**
1:2,9,23,25 2:6,12,12
2:17,17,22 4:10,20
4:20 40:12 48:19
48:21 49:4 89:4
94:4,24 126:6
127:5,5 218:4,8
**Young (4)**
80:7 148:16,25 149:9

**Z**

**zero (2)**
58:25 65:13
**ZIP (1)**
133:19

**1**

**1 (19)**
1:5 2:11 3:16 4:6,25
5:6 30:4,10,25 31:8
74:8,13 124:15
125:3 127:14,16,17
127:18 216:7
**1:16-cv-03499-GB...**
1:6
**1:16-cv-04737-WF...**

1:13
**10 (2)**
68:21 128:2
**10005 (1)**
2:17
**10011 (1)**
4:20
**10017 (1)**
2:12
**105 (1)**
216:14
**11 (1)**
87:24
**11241 (2)**
1:23 2:6
**11797 (1)**
2:22
**12 (2)**
169:7,7
**12:02 (1)**
1:16
**13 (22)**
2:11 21:12 105:17
106:10 108:3 128:9
128:22 129:3,8
142:23 143:18
206:21 207:7
208:16,24 209:5,11
209:12,18 210:5,17
216:14
**135 (1)**
2:21
**14 (2)**
169:7 191:15
**14th (1)**
2:12
**146 (1)**
216:16
**15 (1)**
127:25
**159 (1)**
216:17
**16 (2)**
1:22 2:6
**16-CV-3499 (2)**
14:17 16:25
**16-CV-4737 (1)**

14:13
**18 (26)**
2:11 12:22 13:4
72:20 74:14 125:9
125:11 127:22
128:9,21 129:8
142:23 143:18
159:5 191:16
206:22 207:10
208:17 209:2,8,25
210:11,22,24
216:10,18
**18th (2)**
4:19 218:19
**196 (1)**
216:20
**1989 (1)**
43:21
**1992 (1)**
45:4
**1995 (6)**
43:7,15,18 45:5,6,17
**1996 (2)**
47:7 48:4

**2**

**2 (7)**
1:12 2:11 4:6,25 5:6
30:4 216:8
**20 (13)**
66:4 67:7,20,20,22
68:8,25 69:5 71:24
125:6 183:12,14
215:17
**2000 (5)**
48:8,16 49:4 50:19
51:15
**2001 (3)**
52:6 146:11 147:2
**2001-2012 (1)**
147:5
**2002 (6)**
52:7,13,14 53:19,21
72:13
**201 (1)**
2:21
**2011 (2)**

33:16 146:25
**2012 (14)**
35:9,22 36:13 37:6
  37:14,20 38:10
  39:22 41:2 52:11
  53:3 119:21 146:25
  147:3
**2017 (2)**
1:16 218:19
**206 (1)**
217:6
**211 (1)**
217:7
**23 (5)**
74:9 124:16 125:4
  127:14,16
**26th (2)**
1:23 2:6

—————— **3** ——————
**3 (55)**
72:22 73:3 80:12
  81:2,9,19 97:17
  106:16,22 109:24
  110:20 122:13
  124:10 125:17
  126:17 127:2
  128:22 129:4,7,18
  130:7,8 131:14,16
  132:4,12 133:7,17
  135:3,7 136:5,16,21
  137:6 138:2,7,20
  141:18 143:24
  144:2,6,9,12 193:5
  193:14,14,18 194:7
  194:10,10,16
  195:21 206:24
  207:8 216:10
**3/1/11 (1)**
87:8
**30 (5)**
3:15 70:17,20 71:24
  183:15
**300 (1)**
2:17
**347-308-4859 (1)**
13:24

**350 (5)**
175:21 176:7 179:5
  181:6 182:6

—————— **4** ——————
**4 (10)**
84:18,23 87:3 125:18
  126:18 165:14
  216:7,8,12 217:5
**4:37 (1)**
215:9
**447 (1)**
4:19
**45 (2)**
196:22 216:21
**450 (1)**
2:12

—————— **5** ——————
**5 (46)**
57:2 105:19,24 106:9
  106:16,23 109:24
  110:20 126:22,24
  127:2 128:22 129:7
  129:18 130:7,8
  131:14,17 132:4,13
  133:8,17 135:3,4,8
  136:5 138:3,8,21
  141:19 143:24
  144:3,6,9,12 167:7
  167:8 193:15,18
  194:7,10,17 195:21
  206:24 207:9
  216:14
**50 (20)**
45:10,12 58:24
  117:19,24 118:7
  174:21 175:12,15
  175:17,18 178:8,11
  178:13 179:9,13,16
  179:25 181:13
  182:3

—————— **6** ——————
**6 (8)**
1:16 146:4,8,12,18
  158:14 191:15

216:16
**62 (1)**
169:8

—————— **7** ——————
**7 (8)**
159:3,7,12 161:9,18
  161:24 193:14
  216:17
**7E (1)**
4:20
**70 (9)**
70:17,21 71:25 182:6
  182:7,18 183:10,15
  183:18
**72 (1)**
216:10

—————— **8** ——————
**8 (12)**
74:14 196:19,23
  197:4,10,19,20
  198:2,4 199:4,5
  216:20
**80 (1)**
65:13
**82 (1)**
2:17
**84 (1)**
216:12

—————— **9** ——————
**9/11 (1)**
52:8
**90 (2)**
184:3,12
**95 (1)**
48:5
**96 (2)**
48:8,16
**98 (2)**
184:19 185:9
**98.1 (1)**
185:10